# Exhibit A

# SHOPPING CENTER LEASE

### Between
### USRP I, LLC
(Landlord)

### And

### MARYLAND PIZZA, INC.
### D/B/A Little Caesar's Pizza
(Tenant)

### At

### Watkins Park Plaza

Dated_____MARCH 27, 2013_____

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

INITIAL
HERE 

REGENCY
CENTERS

Case 17-03469-TOM7    Doc 95-1    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit A    Page 2 of 46

THIS **SHOPPING CENTER LEASE** (this "Lease"), made as of the ___27___ day of ___MARCH___, 2013 ("Effective Date"), is by and between USRP I, LLC, a Delaware limited liability company (herein called "Landlord"), and MARYLAND PIZZA, INC, a Maryland corporation (herein called "Tenant").

In consideration of the obligations of Tenant to pay rent and other charges as herein provided and in consideration of the other terms, covenants and conditions hereof, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises described herein for the Term described herein and subject to the terms and conditions set forth herein.

## ARTICLE 1.  INTRODUCTORY PROVISIONS

### 1.1  FUNDAMENTAL LEASE PROVISIONS.

Certain fundamental provisions and terms are presented and/or defined in this Section in summary form to facilitate convenient reference by the parties hereto:

(a) Tenant's Trade Name

Little Caesar's Pizza
(Section 7.1)

(b) Term

Sixty (60) full calendar months (plus any options to extend set forth in this Lease, provided any such options to extend are properly exercised in accordance with the terms and conditions applicable thereto set forth in this Lease). (Section 3.1)

(c) Premises

8
(Exhibit "B" - Part 2)

(d) GLA in Premises

1,680 square feet
(Section 1.5)

(e) GLA in the Landlord's Building

113,443 square feet
(Section 1.5)

(f) Tenant's Proportionate Share

Tenant's Proportionate Share shall be defined as the percentage that the gross leasable area ("GLA") of the Premises bears to the entire gross leasable area of the Landlord's Building except as hereinafter provided.  In determining Tenant's Proportionate Share of Common Area Costs and contribution for Taxes and Insurance, Landlord may exclude from the GLA of the Landlord's Building any premises containing 7,500 or more square feet of GLA if the lease for such premises does not require the applicable tenant to pay a prorata share of Common Area Costs, Taxes or Insurance, but in that event, Landlord shall deduct from the Common Area Costs, Taxes or Insurance any amounts payable by any such tenants specifically for items included in the Common Area Costs, Taxes or Insurance.

(g) Minimum Annual Rent (also sometimes referred to as "Minimum Rent")

| Lease Year | Minimum Rent (Monthly) | Minimum Rent (Per Sq. ft. of GLA) | Minimum Rent (Annual) |
|---|---|---|---|
| 1 and 2 | $2,800.00 | $20.00 | $33,600.00 |
| 3 | $2,884.00 | $20.60 | $34,608.00 |
| 4 | $2,970.80 | $21.22 | $35,649.60 |
| 5 | $3,060.40 | $21.86 | $36,724.80 |

plus applicable sales tax, if any.  If the Commencement Date is not the first day of a month, then Minimum Rent from the Commencement Date until the first day of the following month shall be prorated on a daily basis (based upon the monthly Minimum Rent for Month 1 of the Term).  (Section 4.2)

(h) Percentage Rent

None

(i) Commencement Date

The Commencement Date shall be one hundred twenty (120) days after the date the Permits are issued (as defined). The "date the Permits are issued" shall mean the earlier of the date (i) the Permits are available for Tenant to pick up (or obtain in electronic form) from the applicable governmental agency, or (ii) the governmental agency sends the Permits to Tenant via mail or other delivery service. (Section 3.1)

Tenant shall begin paying Minimum Annual Rent and Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance on the Commencement Date

(j) Use

The operation of a Little Caesar's Pizza restaurant primarily for the retail sale of pizza, chicken wings, and sandwiches (sandwich sales not to exceed 20% of Tenant's annual Gross Sales) for carry-out and delivery, and for the incidental retail sale of the following: non-alcoholic beverages, pasta, bread products (including, but not limited to, "Crazy Bread" and Italian cheese bread), sauces, salads, dessert items, promotional items, and other food items sold

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

INITIAL HERE 

REGENCY
CENTERS

in all other Little Caesar's Pizza restaurants in the Washington, D.C. metropolitan area for carry-out or delivery. Tenant acknowledges there will be no seating at the Premises for Tenant's customers. For purposes of this paragraph "incidental" shall mean no more than ten percent (10%) of Tenant's annual Gross Sales, collectively. (See Article 7) The Use is expressly subject to the existing exclusive uses and restrictive covenants encumbering the Shopping Center set forth in Exhibit "J".

| | | |
|---|---|---|
| (k) | Guarantor(s) (if none, so state) | RICHARD RUGGIERO and IQBAL KAISANI (Exhibit "D") |
| (l) | Default Rate | The lesser of twelve percent (12%) per annum or the maximum lawful rate of interest permitted by applicable law. |
| (m) | Security Deposit | None |
| (n) | Brokers | Regency Centers, L.P. representing Landlord and Renaud Consulting representing Tenant (Section 25.5) |
| (o) | Estimated Common Area Costs for 2012 | $3.72 per square foot of GLA of the Premises per annum (Article 8) (Subject to annual adjustment) |
| (p) | Estimated Taxes for 2012 | $2.80 per square foot of GLA of the Premises per annum (Article 5) (Subject to annual adjustment) |
| (q) | Estimated Insurance for 2012 | $0.35 per square foot of GLA of the Premises per annum (Article 11) (Subject to annual adjustment) |
| (r) | Advertising and Promotion Fund (if none, so state) | None |

(s)     Estimated Monthly Payment at Commencement Date

Minimum Annual Rent                                     $2,800.00

Additional Rent:

| | | |
|---|---|---|
| Common Area Costs | $520.80 | |
| Taxes | $392.00 | |
| Insurance | $49.00 | |

| | |
|---|---|
| Advertising and Promotion Fund (if none, so state) | None |
| Pylon Signage Fee (if none, so state) | None |
| Satellite Fee (if none, so state) | None |
| Total Monthly Additional Rent | $961.80 |
| State and County Sales Tax | None |
| Total Monthly Payment at Commencement Date | $3,761.80 |

(t) Address for Notice

To Landlord:

c/o Regency Centers Corporation
One Independent Drive
Suite 114
Jacksonville, Florida 32202-5019
Attention: Lease Administration

With a copy to:
c/o Regency Centers Corporation
One Independent Drive
Suite 114
Jacksonville, Florida 32202-5019
Attention: Legal Department

With a copy to:
c/o Regency Centers Corporation
1919 Gallows Road, Suite 1000
Vienna, Virginia 22182
Attention: Property Management

To Tenant:

226 Crowne Woods Drive
Birmingham, Alabama 35244

(u)     Tenant Allowance

$20.00 per square foot of the Premises; subject, however, to the terms and conditions of the Tenant Allowance provision of this Lease.

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL HERE

<u>**LEASE PROVISIONS**</u>

### 1.2 REFERENCES AND CONFLICTS.

Article and Section references appearing in Section 1.1 are to designate some of the other places in this Lease where additional provisions applicable to the particular Fundamental Lease Provisions appear. Each reference in this Lease to any of the Fundamental Lease Provisions contained in Section 1.1 shall be construed to incorporate all of the terms provided for under such provisions, and such provisions shall be read in conjunction with all other provisions of this Lease applicable thereto. If there is any conflict between any of the Fundamental Lease Provisions set forth in Section 1.1 and any other provision of this Lease, the latter shall control.

### 1.3 EXHIBITS.

The following are attached hereto as exhibits and hereby made a part of this Lease:

| | | |
|---|---|---|
| (a) | Exhibit "A" | Legal Description of the Shopping Center |
| (b) | Exhibit "B" | Site Plan of the Shopping Center |
| (c) | Exhibit "C" | Description of Tenant's Work and Work to be Performed by Landlord, if any, in the Premises; and Exhibit "C-1" Sign Criteria; and Exhibit "C-2" Tenant's Approved Exterior Storefront Sign Plans |
| (d) | Exhibit "D" | Absolute Unconditional Guaranty Agreement (sometimes referred to herein as the "Guaranty") |
| (e) | Exhibit "E" | Requirements and Restrictions |
| (f) | Exhibit "F" | Existing Exclusive Uses and Restrictive Covenants |

### 1.4 THE SHOPPING CENTER; THE LANDLORD'S BUILDING.

The "Shopping Center" means the land described in Exhibit "A" and improvements thereon constituting an integrated retail shopping center, as the same may be modified from time to time throughout the Term of this Lease. The structure or structures shown on Exhibit "B" the "Landlord's Building," as the same may be altered, reduced or expanded from time to time throughout the Term of this Lease, is hereinafter called the "Landlord's Building." Landlord may at any time and from time to time change the shape, size, location, number, height and extent of the improvements in the Shopping Center (and the street address and/or name of the Shopping Center) and eliminate or add any improvements to any portion of the Shopping Center and add land thereto or eliminate land therefrom. Notwithstanding the foregoing, Landlord shall not, in exercising its rights under this Section 1.4 make changes that would materially adversely affect access to and from the Premises to parking areas, or the regular conduct of Tenant's business in the Premises for the Permitted Use. The foregoing provisions of this paragraph shall not apply in instances where access or parking is temporarily affected as a result of repairs, remodeling, renovation or other construction to the Shopping Center or to changes required by Laws, provided that, to the extent it is within Landlord's control or ability to do so, reasonable alternate access and parking is temporarily established, and the parties agree that the foregoing sentence shall not apply to the types of uses Landlord permits in the Shopping Center . The restrictions in this paragraph shall be deemed to be null and void and of no force and effect if Tenant is in breach of its obligation to operate under Article 6 of this Lease.

### 1.5 GROSS LEASABLE AREA.

At the Commencement Date, GLA is estimated to be, with respect to the Premises, the number of square feet set forth in Section 1.1(d) and, with respect to the Landlord's Building, the number of square feet set forth in Section 1.1(e). GLA will change with additions or deletions to the Landlord's Building and/or the Premises. The GLA is measured from the exterior face of exterior walls, the exterior face of service corridor walls and the centerline of interior demising walls. No deduction shall be made for columns, stairs, elevators or any internal construction or equipment. Unless another provision of this Lease expressly grants to Tenant a right to certify and/or remeasure the GLA of the Premises, Tenant shall have no such right to certify and/or remeasure or otherwise dispute the GLA of the Premises set forth in Section 1.1(d) above. Within thirty (30) days after the Commencement Date, Tenant may cause its architect or engineer to re-measure the Premises and provide such information to the Landlord ("Tenant's Measurement Notice"). Landlord may contest such determination by giving Tenant written notice after receipt of such Measurement Notice. If Landlord and Tenant cannot mutually agree within thirty (30) days after Landlord's receipt of Tenant's Measurement Notice, the dispute shall be resolved by an independent architect or engineer to be mutually agreeable to Landlord and Tenant, the cost of whose service shall be shared equally by Landlord and Tenant. The GLA of the Premises, as determined by Tenant's or the parties' mutual architect or engineer (as the case may be), shall be deemed to be the GLA of the Premises for all purposes of this Lease and shall be binding on the parties. If Tenant fails to notify Landlord of any objections to the measurement of the Premises within thirty (30) days after the Commencement Date, the Premises shall be conclusively deemed to be the size set forth in Section 1.1(d) of this Lease. If the GLA of the Premises differs by five percent (5%) or more than that set forth in Section 1.1(d), then Minimum Rent and all other charges (including but not limited to Common Area

3

Case 17-03469-TOM7   Doc 95-1   Filed 09/05/17   Entered 09/05/17 15:32:05   Desc
Exhibit Exhibit A   Page 5 of 46

Costs, Taxes, Insurance and the Allowance) based on the size of the Premises shall adjust, provided, however, in no event shall Tenant be obligated to pay Rent (or receive any Allowance) on more than one thousand seven hundred sixty-four (1,764) square feet. Within ten (10) business days after such determination is made, Landlord and Tenant shall execute an appropriate amendment to this Lease, changing the size of the Premises and adjusting the Rent as aforesaid.

## ARTICLE 2. PREMISES

**2.1     LEASE OF PREMISES.**
Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises for the Term, at the rent, and upon the terms, covenants and conditions herein set forth.

**2.2     PREMISES DEFINED.**
The term "Premises" means the space situated in the Landlord's Building in the location marked on Exhibit "B" and shall consist of the space thereat within the walls, structural floor and the bottom of the roof of the Landlord's Building. The Premises shall include only the appurtenances specifically granted in this Lease, Landlord specifically excepting and reserving for itself the roof, the air space above the roof, the space below the floor, the exterior portions of the Premises (other than the storefront), and the right to install pipes, ducts, conduits, wires, solar panels and other mechanical equipment serving other portions, tenants and occupants of the Shopping Center under or above the Premises, without the same constituting an actual or constructive eviction of Tenant. Notwithstanding the foregoing, Landlord shall locate all pipes, conduits, wires, solar panels and other mechanical equipment which serve other portions, tenants and occupants of the Shopping Center and pass through the Premises above the dropped ceiling of the Premises, in the walls next to columns, under the floors, or in other locations hidden from view.

**2.3     DELIVERY OF PREMISES.**
Landlord agrees to deliver to Tenant, and Tenant agrees to accept from Landlord, possession of the Premises within fifteen (15) days after the Effective Date. Landlord's notice thereof shall constitute delivery of the Premises without further act by either party. Landlord will deliver possession of the Premises to Tenant in its current "as-is" condition. Except as expressly set forth herein to the contrary, if Landlord encounters delays in delivering possession of the Premises to Tenant, this Lease will not be void or voidable, nor will Landlord be liable to Tenant for any loss or damage resulting from such delay. If the delay in possession is caused by Tenant (including delays caused by Tenant's failure to supply the information referred to in the following sentence), then the date of Landlord's delivery of the Premises to Tenant shall be deemed to be the date such delivery would have occurred but for Tenant's delay. Notwithstanding the foregoing, Landlord will not be obligated to deliver possession of the Premises to Tenant until Landlord has received from Tenant all of the following: (i) a copy of this Lease fully executed by Tenant, and the Guaranty, if any, executed by Guarantor(s); and (ii) copies of policies or certificates of insurance as required under Article 11 of this Lease. If Tenant occupies the Premises prior to the Commencement Date, such early occupancy shall be subject to all of the terms and conditions of this Lease (except Minimum Annual Rent and Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance shall commence when provided in Section 1.1(i) of this Lease), and Tenant will not interfere with Landlord in the completion of Landlord's Work (if any). Landlord will give Tenant access for locks to be changed upon: (i) Tenant's acceptance of the Premises, (ii) Landlord's receipt of two (2) sets of drawings and specifications as set forth in Exhibit "C", and (iii) Landlord's receipt of a copy of the contractor's insurance certificate. Tenant will pay all expenses associated with changing the locks. Notwithstanding anything to the contrary contained herein, if the Premises are not available for Tenant's occupancy within sixty (60) days after the Effective Date, subject to delays associated with Unavoidable Delays (as defined herein), Landlord or Tenant may terminate this Lease any time thereafter by giving the other party written notice thereof; provided, however, if Tenant elects to terminate and Landlord delivers the Premises to Tenant prior to the expiration of ten (10) days from receipt of Tenant's notice to terminate, this Lease shall continue in full force and effect as if Tenant's termination notice had never been given.

**2.4     OPENING OF PREMISES.**
On or before ten (10) days after the date which is the later of: (i) delivery of possession of the Premises to Tenant in the condition required by this Lease, (ii) Landlord's approval of Tenant's Plans (as defined herein) in accordance with the terms of this Lease, (iii) Tenant's receipt of a fully executed Lease; and (iv) Tenant obtaining Tenant's Permits, Tenant shall commence Tenant's Work specified in Exhibit "C", diligently and continually proceed to completion, and, subject to delays associated with Unavoidable Delays, open for business fully fixtured, stocked and staffed on or before the date which is sixty (60) days after the Commencement Date specified in Section 1.1(i) subject to delays associated with Unavoidable Delays. In relation to Tenant's Work, Tenant shall execute the Notice of Commencement (or similar document required by the applicable jurisdiction) as "Owner" identifying Landlord only as the fee simple titleholder for purposes of permitting. By opening for business, Tenant shall be deemed to have acknowledged that Landlord's Work (if any) and any and all other obligations to be performed by Landlord on or before the opening of the Premises have been fully performed, and that the Premises is such time complete and in good, sanitary and satisfactory condition and repair without any obligation on Landlord's part to make any alterations, upgrades or improvements thereto. If Tenant fails to open as and when required by this Section then, for so long as neither this Lease nor Tenant's right to possession of the Premises under this Lease is terminated by Landlord, Tenant shall pay to Landlord on demand, in addition to the payment of all Rent (including, without limitation, Minimum Annual Rent) and other charges then due under this Lease and as Additional Rent hereunder, an additional amount equal to one (1) day

4

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

Case 17-03469-TOM7     Doc 95-1     Filed 09/05/17     Entered 09/05/17 15:32:05     Desc
Exhibit Exhibit A     Page 6 of 46

of Minimum Annual Rent at the then applicable rate as stated in Section 1.1(g) hereof until such time as Tenant opens the Premises for business fully fixtured, stocked and staffed. Notwithstanding the foregoing, Tenant's payment of such amount shall not deprive Landlord of any other rights and remedies available to it hereunder, at law or in equity as a result of Tenant's failure to open described herein.

### 2.5 TENANT'S WORK.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, LANDLORD HEREBY DISCLAIMS, AND TENANT WAIVES THE BENEFIT OF, ANY AND ALL IMPLIED WARRANTIES, INCLUDING IMPLIED WARRANTIES OF HABITABILITY AND FITNESS OR SUITABILITY FOR A PARTICULAR PURPOSE; PROVIDED HOWEVER, THE FOREGOING SHALL NOT AFFECT ANY EXPRESS WARRANTIES MADE BY LANDLORD IN THIS LEASE. Without limiting the foregoing and in addition to Tenant's obligations set forth in Exhibit "C", it shall be Tenant's responsibility and obligation to obtain all building, occupancy, use and other governmental permits and/or approvals required in connection with the construction of Tenant's Work, a certificate of occupancy for the Premises upon completion thereof and Tenant's use thereof, including, without limitation, the payment of all utility connection/hookup/meter fees and charges and any development impact fees, transportation uniform mitigation fees and/or school mitigation fees assessed with respect to the Premises and/or Tenant's use and/or Tenant's Work as opposed to the Shopping Center. In the event Landlord pays any such fees on Tenant's behalf, Tenant shall reimburse Landlord for such fees as Additional Rent within ten (10) days of Tenant's receipt of an invoice therefor from Landlord. Notwithstanding anything to the contrary contained herein, Tenant shall not be responsible for any assessments for special improvements imposed in connection with the development or re-development of the Shopping Center, including, without limitation, assessments for the widening of any exterior roads and the installation and/or hook up or maintenance of sewer and sewer lines and sanitary and storm drainage systems.

### 2.6 PERMITS.

Within ten (10) business days after the later of (i) delivery of possession of the Premises to Tenant in the condition required by this Lease, (ii) Landlord's approval of Tenant's Plans in accordance with the terms of this Lease, and (iii) Tenant's receipt of a fully executed Lease (such later date referred to herein as the "Permit Filing Date"), Tenant shall, at Tenant's own expense, apply for any and all governmental permits, licenses and approvals required to permit Tenant to perform Tenant's Work (collectively, "Permits"), and thereafter Tenant shall diligently pursue obtaining the Permits. Tenant shall give Landlord written notice of (x) the actual Permit filing date, together with a dated stamped copy of the first page of Tenant's application from the applicable governmental agencies showing the actual Permit filing date, (y) the date Permits are issued, and (z) the actual date Tenant obtains its Permits, which notice shall be accompanied by a copy of such Permit. Upon Tenant's written request, Landlord agrees to reasonably cooperate with Tenant, at no cost or expense to Landlord, as may be necessary for Tenant to obtain such Permits, provided Landlord shall not be required to make any changes to the Shopping Center or any entitlements thereto in connection with the issuance of the Permits. If Tenant fails to timely submit Tenant's Plans for Landlord's approval, or to resubmit the same within ten (10) days after receiving any comments from Landlord, or if Tenant fails to submit its application for Permits on or before the Permit Filing Date, or if Tenant otherwise fails to diligently pursue its Permits, the Commencement Date shall be one hundred twenty (120) days after Landlord's delivery of the Premises to Tenant without regard to Permits. Permits shall not apply to Tenant's signage.

### ARTICLE 3.  TERM

### 3.1 TERM OF THIS LEASE.

The Term of this Lease shall commence on the Commencement Date specified in Section 1.1(i) and shall continue for the number of months set forth in Section 1.1(b); provided, however, if the Commencement Date is not the first day of a month, then the Term shall commence on the Commencement Date and shall continue for the balance of the month in which the Commencement Date occurs and thereafter for the number of months set forth in Section 1.1(b). Upon Landlord's written request, Tenant shall promptly execute and deliver to Landlord documentation confirming the date of Landlord's delivery of the Premises to Tenant, the Commencement Date and expiration date of the Term of this Lease; provided, however, execution and delivery of such documentation shall in no event delay any such dates.

### ARTICLE 4.  RENT

### 4.1 TENANT'S AGREEMENT TO PAY RENT.

Tenant hereby agrees to pay Minimum Annual Rent and Additional Rent. The term "Rent" includes the Minimum Annual Rent and Additional Rent.

### 4.2 MINIMUM ANNUAL RENT; FIRST FULL MONTHLY PAYMENT OF RENT.

The minimum amount of rent Tenant shall pay Landlord for each Lease Year (as defined below) is the amount set forth in Section 1.1(g) (the "Minimum Annual Rent").

The Minimum Annual Rent for each Lease Year shall be payable in twelve (12) equal monthly installments, in advance, on the first day of each calendar month. The first full monthly payment of Rent shall be due on the first day of the first full month of the Term and shall include a prorated amount of the Minimum Annual Rent and Additional Rent applicable to the period from the Commencement Date to the last day of the month in which the Commencement Date occurred.

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

Case 17-03469-TOM7    Doc 95-1    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit A    Page 7 of 46

**4.3    LEASE YEAR DEFINED.**
The "First Lease Year" means the period beginning on the Commencement Date and ending on the last day of the twelfth full calendar month thereafter; provided, however, if the Commencement Date is not the first day of a month, then the First Lease Year shall commence on the Commencement Date and shall continue for the balance of the month in which the Commencement Date occurs and for a period of twelve (12) full calendar months thereafter.  "Lease Year" means each successive twelve (12) month period after the First Lease Year occurring during the Term.  Notwithstanding the foregoing, if the expiration of the last Lease Year of the Term occurs during the period commencing September 1 and ending January 5 in such applicable Lease Year, then the last Lease Year shall extend to the immediately following January 31st.

**4.4    GROSS SALES.**
"Gross Sales" means the actual prices of all goods, wares, internet/electronic based sales and merchandise sold and the actual charges for all services performed by Tenant or by any subtenant, licensee, concessionaire or other person in, at, from, or arising out of the use of the Premises, whether wholesale or retail, whether for cash or credit, or otherwise, and includes the value of all consideration received or promised for any of the foregoing, without reserve or deduction for inability or failure to collect, including, but not limited to, sales and services:  (i) where the orders therefor originate in, at, from or arising out of the use of the Premises, whether delivery or performance is made from the Premises or from some other place and regardless of the place of bookkeeping for, payment of, or collection of any account; or (ii) made or performed by mail, telephone, or telecopy orders received or filled in, at or from the Premises; or (iii) made or performed by means of mechanical and other vending devices in the Premises; or (iv) which Tenant, or any subtenant, licensee, concessionaire or other person, in the normal and customary course of its business, would credit or attribute to its operation at the Premises or any part thereof.  Any deposit not refunded shall be included in Gross Sales in the month in which such deposit is received.  Notwithstanding the inclusion of this Section 4.4 in this Lease, Tenant under no circumstances shall be required to submit or provide any financial information to Landlord or any third party upon Landlord's behalf or direction, including, but not limited to, financial statements or sales reports.

**4.5    ADDITIONAL RENT.**
Tenant shall pay, as additional rent (herein sometimes collectively called "Additional Rent"), all sums of money or charges of whatsoever nature (except Minimum Annual Rent) required to be paid by Tenant to Landlord pursuant to this Lease, whether or not the same is designated as "Additional Rent."

**4.6    WHERE RENT PAYABLE AND TO WHOM; NO DEDUCTION; LATE CHARGE.**
Rent payable by Tenant under this Lease shall be paid to Landlord on or before the first day of each month without prior notice or demand therefor (except where such prior demand is expressly provided for in this Lease), without any deductions, offsets or counterclaims whatsoever (except as otherwise expressly set forth in this Lease to the contrary), at the place to which notices are to be sent to Landlord or to such payee and at such place as may be designated by Landlord to Tenant in writing at least ten (10) days prior to the next ensuing Minimum Annual Rent installment payment date.  Without limiting the foregoing, electronic payment is available at Tenant's election in accordance with Landlord's electronic payment procedures.  Landlord shall have the discretion to direct how Tenant's payments under this Lease are applied to any then due amounts on Tenant's account for the Premises.  Tenant acknowledges that, in addition to interest costs, the late payments by Tenant to Landlord of any Rent due under this Lease will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impractical to fix.  Such other costs include, without limitation, processing, administrative and accounting charges and late charges that may be imposed on Landlord by the terms of any mortgage, deed of trust, related loan documents or other documents encumbering or otherwise affecting the Premises, the Landlord's Building or the Shopping Center.  Accordingly, if any payment of Rent or other charges due hereunder is not received by Landlord in good funds on its due date, Tenant will pay to Landlord a late charge equal to Two Hundred Fifty and 00/100 Dollars ($250.00).  The parties agree that such late charge (as well as any other late charges or interest under this Lease) represents a fair and reasonable estimate of the costs that Landlord will incur by reason of any late payment as hereinabove referred to by Tenant, and the payment of late charges and interest are distinct and separate in that the payment of interest is to compensate Landlord for the use of Landlord's money by Tenant, while the payment of late charges is to compensate Landlord for Landlord's processing, administrative and other costs incurred by Landlord as a result of Tenant's delinquent payments.  Acceptance of a late charge or interest shall not constitute a waiver of Tenant's default with respect to the overdue amount nor prevent Landlord from exercising any of the other rights and remedies available to Landlord under this Lease, at law or in equity.

## ARTICLE 5.  TAXES AND ASSESSMENTS

**5.1    TENANT'S PROPORTIONATE SHARE OF TAXES AND PAYMENT.**
Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of Taxes (as defined below).  In the event any assessments may be paid in annual installments, only the amount of such annual installment and statutory interest shall be included within the computation of the annual Taxes for the Lease Year in question. Tenant shall pay its Proportionate Share of Taxes at the times and in the manner provided in Section 8.6.  As used in this Lease, "Taxes" means and includes without limitation, ad valorem taxes; sewer taxes; front-foot benefit charges (public or private) (if applicable in the jurisdiction in which the Shopping Center is located); school taxes; real estate taxes; assessments, including, without limitation, special and general assessments (public or private) of any kind; impact fees; water and sewer

6

INITIAL
HERE 

rents and charges; governmental license and permit fees; charges for public or private easements benefiting the Shopping Center or any portion thereof; taxes on other areas made available for the common use or benefit of tenants; and all other governmental impositions and charges (extraordinary as well as ordinary, foreseen and unforeseen) which during the Term are either a lien on the Shopping Center or any portion thereof or which are charged, levied or assessed on, or imposed in connection with, the use, occupancy or possession of the Shopping Center or any portion thereof, and/or which appear as a charge on a tax bill given to Landlord by any official taxing authority (provided that Taxes shall not be deemed to include any taxes on any property that is adjacent to the Shipping Center and which is owned or controlled by Landlord or any of its affiliates); any other taxes, assessments or charges in the manner of taxes, which Landlord shall be obligated to pay arising out of the use, occupancy, ownership, leasing, management, repair or replacement of the Shopping Center or any portion thereof (e.g., taxes, license fees or other charges measured by the rents receivable by Landlord from the Shopping Center or any portion thereof; occupancy taxes; Landlord's business, professional and occupational tax, or similar taxes; interest on Tax installment payments paid over a period of more than one (1) year); and, if Landlord contests Taxes or seeks a reduction of the same, any and all reasonable costs, expenses and fees (including reasonable attorneys' and other experts' fees) incurred by Landlord in reviewing, initiating, appealing, contesting and/or negotiating Taxes with the public authorities (regardless of the outcome), provided, however, in the event that the contest results in any reduction or refund of Taxes, the Tenant shall receive a credit for its Proportionate Share of such refund applicable during to a period during the Term after taking deducting all costs associated with such successful contest. Taxes shall also include impositions payable by Landlord, including payments in lieu of Taxes, under any arrangement with governmental authority. If any governmental authority or unit under any present or future law effective at any time during the Term hereof shall in any manner levy a tax on rents payable under this Lease or rents accruing from use of the Shopping Center or any portion thereof, or a tax in any form against Landlord because of, or measured by, income derived from the leasing or rental of the Shopping Center or any portion thereof, such tax shall be paid by Tenant, either directly or through Landlord. Tenant shall not be required to pay (i) any municipal, county, state or federal income tax, (ii) any inheritance, estate, succession, transfer, franchise, corporation, net income or profit tax or capital levy imposed upon Landlord, (iii) special assessments related to the initial development or redevelopment of the Shopping Center. A copy of an official tax bill with respect to a governmental tax or assessment shall be conclusive evidence of the amount of a Tax. Tenant shall not be responsible for any sums due for interest or penalties which result from Landlord's failure to pay taxes when due, provided that Tenant has paid Tenant's Proportionate Share of all Taxes in a timely manner.

### 5.2 PERSONAL PROPERTY TAXES.

Tenant shall be liable for, and shall pay before delinquency, all taxes and assessments (real and personal) levied against (a) any personal property or trade fixtures placed by Tenant in or about the Premises (including any increase in the assessed value of the Premises based upon the value of any such personal property or trade fixtures), and (b) any Tenant improvements or alterations in the Premises (whether installed and/or paid for by Landlord or Tenant). If any such taxes or assessments are levied against Landlord or Landlord's property, Landlord may, after written notice to Tenant (and under proper protest if requested by Tenant), pay such taxes and assessments, and Tenant shall reimburse Landlord therefor within ten (10) days after demand by Landlord; provided, however, Tenant, at its sole cost and expense, shall have the right, with Landlord's cooperation, to bring suit in any court of competent jurisdiction to recover the amount of any such taxes and assessments so paid under protest.

### <u>ARTICLE 6. TENANT'S CONDUCT OF BUSINESS</u>

### 6.1 CONTINUOUS OPERATIONS; HOURS.

Tenant hereby acknowledges that Tenant's use of the Premises and ability to generate patronage to the Premises and the Shopping Center were all relied upon by Landlord and served as significant and material inducements contributing to Landlord's decision to enter into this Lease with Tenant. As such, Tenant agrees that, from and after the date Tenant opens for business in the Premises, Tenant will continuously and uninterruptedly keep open and operate its business in the entire Premises fully fixtured, stocked and staffed for the purpose specified in Section 1.1(j) and under the trade name specified in Section 1.1(a) with the public daily during at least seventy-five (75) hours over six (6) days per week. Tenant's failure to operate as required by this Section shall be deemed an automatic Event of Default, pursuant to Article 18 of this Lease, under this Lease. If such an Event of Default occurs, then, for so long as neither this Lease nor Tenant's right to possession of the Premises under this Lease is terminated by Landlord, Tenant shall pay to Landlord on demand, in addition to the payment of all Rent (including, without limitation, Minimum Annual Rent) and other charges then due under this Lease and as Additional Rent hereunder, an additional amount equal to one (1) day of Minimum Annual Rent at the then applicable rate as stated in Section 1.1(g) hereof until such time as Tenant resumes operations in the Premises as required by this Section. Notwithstanding the foregoing, Tenant's payment of such amount shall not deprive Landlord of any other rights and remedies available to it hereunder, at law or in equity as a result of Tenant's Event of Default described herein. In addition, Landlord recognizes that the Premises may be closed during certain times on a very infrequent and incidental basis for (i) Unavoidable Delays, (ii) inventory control (not to exceed a total of three (3) days in any Lease Year), (iii) necessary repairs to the Premises (not to exceed a total of ten (10) days in any Lease Year, but this limitation shall not apply to closing to the extent caused by casualty or condemnation damage), and (iv) renovations (not to exceed a total of sixty (60) days every five (5) Lease Years) (the foregoing, "Permitted Closures"). If Tenant is closed for one of the aforementioned reasons and such closing is reasonable in nature and does not exceed the permitted period of closure as set forth above and Tenant has notified Landlord in advance of

7

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

Case 17-03469-TOM7   Doc 95-1   Filed 09/05/17   Entered 09/05/17 15:32:05   Desc
Exhibit Exhibit A   Page 9 of 46

such closing whenever reasonably possible under the circumstances, then the same shall not be considered an Event of Default under this Lease.

## ARTICLE 7.  USE OF PREMISES

### 7.1    SOLE USE AND TRADE NAME.

Tenant shall use the Premises for the purpose specified in Section 1.1(j) and for no other purpose whatsoever and shall conduct its business in the Premises solely under the trade name specified in Section 1.1(a).  Notwithstanding the foregoing, Tenant may, with Landlord's consent, change the Tenant's Trade Name, such consent not to be unreasonably withheld or delayed so long as (i) concurrently therewith the trade name of substantially all other similar stores operated under the "Little Caesars" franchise shall likewise be changed to the same trade name at the direction of Tenant's franchisor, (ii) such trade name is not confusingly similar to the trade name of any other tenant in the Shopping Center, and (iii) Tenant pays the cost of all necessary signage changes throughout the Shopping Center.  Except as otherwise specifically set forth in the Article of this Lease entitled "Exclusive", nothing in this Lease shall be construed to grant Tenant an exclusive right to the purpose specified in Section 1.1(j) or any other purpose or use.  In addition, Tenant agrees that no representations have been made to Tenant that any other tenants or occupants have leased or occupy or will continue to lease or occupy space within the Shopping Center.  Tenant shall procure, at Tenant's sole expense, any permits or licenses required for the transaction of business in the Premises.  Tenant acknowledges that it is Landlord's intention that the Shopping Center be operated in a manner which is consistent with the highest standards of cleanliness, decency and morals in the community in which it serves.  Toward that end, Tenant shall not sell, distribute, display or offer for sale any item or service, or otherwise conduct its business in a manner, which is inconsistent with the quality of operation of the Shopping Center.  Notwithstanding anything contained in this Lease, Tenant agrees that it will not violate other existing tenant exclusives or other restrictive covenants as set forth in Exhibit "F" to this Lease, and the Use will not include the right to any use prohibited by such exclusives or restrictive covenants.

### 7.2    REQUIREMENTS AND RESTRICTIONS.

Tenant agrees to comply with the Requirements and Restrictions set forth on Exhibit "E" attached hereto (Landlord hereby reserving the right from time to time to modify, amend or supplement same) (collectively, the "Requirements and Restrictions").  Landlord agrees that it will not unreasonably discriminate in the application of Rules and Regulations.  Notwithstanding the foregoing, in the case of a conflict between the Requirements and Restrictions and an express provision of this Lease, the express provision of this Lease shall prevail.

## ARTICLE 8.  COMMON AREAS

### 8.1    MAINTENANCE.

Landlord agrees to maintain, as part of Common Area Costs, the Common Areas in good condition; provided, however, that the manner in which the Common Areas shall be maintained shall be solely determined by Landlord.  If any owner or tenant of any portion of the Shopping Center maintains Common Areas located upon its parcel or premises (Landlord shall have the right, in its sole discretion, to allow any purchaser or tenant to so maintain Common Areas located upon its parcel or premises and to be excluded from participation in the payment of Common Area Costs), Landlord shall not have any responsibility for the maintenance of that portion of the Common Areas and Tenant shall have no claims against Landlord arising out of any failure of such owner or tenant to so maintain its portion of the Common Areas.

### 8.2    COMMON AREAS DEFINED.

"Common Areas" means all areas, facilities, and improvements provided in the Shopping Center for the convenience and use of patrons of the Shopping Center, and shall include, but not be limited to, all parking areas and facilities, sidewalks, stairways, service corridors, truckways, ramps, loading docks, delivery areas, landscaped areas, access and interior roads, lighting facilities and similar areas and facilities situated within the Shopping Center which are not reserved for the exclusive use of any Shopping Center occupants.

### 8.3    LANDLORD'S CONTROL.

The use and occupancy by Tenant of the Premises shall include a non-exclusive license to use, in common with others entitled thereto, the Common Areas, as may be designated from time to time by Landlord; subject, however, to the terms and conditions of this Lease including without limitation the Requirements and Restrictions.  Landlord shall at all times have the sole and exclusive control, management and direction of the Common Areas and the right to make reasonable changes to the Common Areas, and may at any time exclude and restrain any person from use or occupancy thereof. As provided above, the rights of Tenant in and to the Common Areas are subject to the rights of others to use the same in common with Tenant.  Landlord may at any time and from time to time close all or any portion of the Common Areas to make repairs, improvements, alterations or changes and, to the extent necessary in the opinion of Landlord, to prevent a dedication thereof or the accrual of any rights to any person or to the public therein.

8

INITIAL
HERE

**8.4 EMPLOYEE PARKING.**

Landlord may from time to time designate a particular parking area or areas to be used by its tenants and their employees provided such parking area or areas is/are well lit and within reasonable proximity to the Premises.

**8.5 COMMON AREA COSTS.**

"Common Area Costs" means costs related to Landlord's maintenance, replacement and repair obligations set forth in this Lease (including, without limitation, Article 13 hereof) and all other costs incurred in a manner deemed by Landlord to be reasonable and appropriate and for the best interests of the Shopping Center in connection with the management, operation, maintenance, replacement and repair of the Common Areas including, but not limited to, security, landscaping, utilities, painting, cleaning, striping, lighting, management fee of four percent (4%) of gross revenues (e.g., minimum rents, additional rents and other costs and charges) derived by Landlord from the Shopping Center ("Management Fee"), and pest control among other items. Notwithstanding the foregoing, the following items shall be specifically excluded from Common Area Costs: (i) the cost of any repair or replacement item which, by standard accounting practice, is required to be capitalized (provided, however, that the cost of any such capitalized repair or replacement items shall be amortized over the life of the repair, replacement or improvement in accordance with generally accepted accounting principles, but in no event over more than five (5) years, and the annual amortization cost shall be included in the Common Area Costs) and (ii) any administrative fees other than the Management Fee referenced above.

**8.6 TENANT'S PROPORTIONATE SHARE OF COMMON AREA COSTS, TAXES AND INSURANCE.**

Tenant agrees to pay to Landlord, as Additional Rent, Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance (as hereinafter defined) in the following manner:

(a)     Tenant shall pay Landlord, commencing on the date specified in Section 1.1(i) of this Lease and on the first day of each calendar month of the Term thereafter, an amount estimated by Landlord to be Tenant's monthly Proportionate Share of the Common Area Costs, Taxes and Insurance. Landlord may, no more than once per calendar year, adjust said amount at the end of any calendar month on the basis of Landlord's experience and reasonably anticipated costs. Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance shall be prorated on a daily basis for any partial calendar month.

(b)     Within ninety (90) days following the end of each calendar year, or as soon as reasonably possible thereafter, Landlord shall furnish to Tenant a statement covering such year just ended, showing the Common Area Costs, Taxes and Insurance and the amount of Tenant's Proportionate Share of such costs for such year and the payments made by Tenant with respect to such year. If Tenant's Proportionate Share of such costs is less than Tenant's payments so made, Tenant shall be entitled, subject to Landlord's right to offset any amounts then due Landlord pursuant to this Lease, to a credit of the difference against the next regular monthly payment of Rent or portion thereof until such credit is exhausted (or payment if such credit is not exhausted prior to the natural expiration of the Term of this Lease) or, if such share is greater than Tenant's said payments, Tenant shall pay Landlord the difference within thirty (30) days after receipt of such statement. Landlord and Tenant's obligations under this subsection shall survive the expiration or earlier termination of this Lease.

(c)     Any failure or delay by Landlord in delivering any estimated or final statement pursuant to this Section 8.6 shall not constitute a waiver of Landlord's right to receive Tenant's payment of Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance.

## ARTICLE 9. HAZARDOUS MATERIALS

The term "Hazardous Substances" as used in this Lease shall mean pollutants, contaminants, toxic wastes, or any other substances, the removal of which is required or the use of which is restricted, regulated, prohibited or penalized by any "Environmental Law." The term "Environmental Law" or "Environmental Laws" shall mean any federal, state or local law or ordinance relating to pollution or protection of the environment. Tenant shall not cause or permit any Hazardous Substances to be brought upon, kept or used in or about the Premises or the Shopping Center by Tenant or any of Tenant's agents, employees, subtenants, assignees, licensees, contractors or invitees (collectively, "Tenant Parties") except as may be required in the ordinary and customary course (including ordinary and customary quantities) of Tenant's business set forth in Section 1.1(j) of this Lease and provided that Tenant shall in all circumstances keep and maintain the Premises in compliance with, and shall not cause or permit the Premises to be in violation of, any Environmental Law. If Tenant (or any Tenant Parties) breaches the obligations stated in the preceding sentence, then, in addition to any other remedies available under this Lease, at law or in equity, Landlord shall be entitled to terminate this Lease immediately (notwithstanding any other provision in this Lease to the contrary). If the presence of Hazardous Substances on the Premises or the Shopping Center caused or permitted by Tenant or any Tenant Parties results in contamination of the Premises or the Shopping Center, or if contamination of the Premises or the Shopping Center by Hazardous Substances otherwise occurs which is caused or permitted by Tenant or any Tenant Parties, then Tenant shall indemnify, defend and hold Landlord and Landlord's officers, trustees, directors, partners, beneficiaries, joint venturers, members, stockholders, or other principals or representatives, disclosed or undisclosed (and their respective successors and assigns) (collectively, "Landlord Parties") harmless from any and all claims, judgments, damages, penalties, fines, costs,

9

INITIAL
HERE 

liabilities or losses which arise during or after the Term as a result of such contamination (including, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any federal, state or local governmental agency or political subdivision because of Hazardous Substances present in the soil or ground water on or under the Premises or the Shopping Center, diminution in value of the Premises and the Shopping Center, damages for the loss or restriction on use of rentable or usable space or of any amenity of the Premises and the Shopping Center, and other property damages arising from any adverse impact upon the marketability of the Premises or the Shopping Center, as well as sums paid in settlement of claims, reasonable attorneys' fees, consultant fees and expert fees). Without limiting the foregoing, if the presence of any Hazardous Substances on the Premises or the Shopping Center caused or permitted by Tenant or any Tenant Parties results in any contamination of the Premises or the Shopping Center, then Tenant shall at its sole expense remove all such Hazardous Substances from the Premises and other impacted property and shall promptly take all actions at its sole expense as are necessary to return the Premises and the Shopping Center to the condition existing prior to the introduction of any such Hazardous Substances to the Premises and the Shopping Center; provided, however, that Landlord's approval of such actions shall first be obtained. The obligations contained in this Article shall survive the expiration or earlier termination of this Lease.

Landlord represents to its actual knowledge as of the date of this Lease, without independent inquiry, that it does not know of any Hazardous Substances in or on the Premises in violation of any Environmental Law. If at any time during the Term, Hazardous Substances are found to be present in or on the Premises in violation of any Environmental Law (other than Hazardous Substances introduced by Tenant or any Tenant Parties) as a result of any use of the Premises prior to the date Tenant takes possession of the Premises, Landlord shall, upon written notice of same from Tenant, remediate the same (or if Landlord is not the responsible party, use commercially reasonable efforts to cause the responsible party to remediate), as and to the extent required by Environmental Law; provided, Landlord shall only be required to take action if and to the extent required of Landlord pursuant to a written directive by applicable regulatory agenc(ies).

## ARTICLE 10. ALTERATIONS TO PREMISES

### 10.1 ALTERATIONS; DAMAGES.

Except as provided on Exhibit C (which shall govern Tenant's initial construction of the Premises), Tenant shall make no alterations, additions or changes in or to the Premises without Landlord's prior written consent. Without limiting the foregoing, in no event shall Tenant make or cause to be made any penetration through any roof, floor, or exterior or corridor wall without the prior written consent of Landlord. Should Landlord consent to Tenant's penetration through the roof, Tenant shall use Landlord's roofing contractor to repair or re-flash Tenant's roofing penetrations. Tenant shall deliver to Landlord a certification letter from such roofing contractor stating that all roof repairs and penetrations have been made in compliance with the roof warranty. This certification is required as a condition to any obligation of Landlord to release any Tenant Allowance monies. Tenant shall be responsible for any and all damages resulting from any alteration, addition or change Tenant makes, whether or not Landlord's consent was obtained. Any and all alterations, additions and changes made to the Premises shall be made under the supervision of a licensed architect or licensed structural engineer (if structural in nature) and in accordance with plans and specifications approved in writing by Landlord before the commencement of the work and all necessary governmental approvals and permits, which approvals and permits Tenant shall obtain at its sole expense. All contractors and subcontractors utilized by Tenant shall be subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed. Prior to proceeding with any alteration, Tenant shall provide Landlord with at least fifteen (15) days prior written notice. Landlord shall have the right to record and/or post a notice of non-responsibility with respect to any such work pursuant to the laws of the state in which the Premises is located. However, Landlord's failure to, or election not to, record and/or post any such notice shall in no way relieve Tenant of all obligations with respect to the payment in full for all such work. Tenant shall deliver to the Shopping Center management office a reproducible copy of the "as built" drawings of the alterations. All work with respect to any alterations, additions and changes must be done in a good and workmanlike manner and diligently prosecuted to completion to the end that the Premises shall at all times be a complete unit except during the period of the work. Subject to the terms hereof, any work done by Tenant without Landlord's consent (except where Landlord's consent is not required) shall be returned to its original condition at Tenant's expense upon request by Landlord. In addition to the other provisions of this Lease governing Tenant's Work including without limitation Exhibit "C" hereto, the terms and conditions of this Article 10 shall apply to any alterations, additions or changes in or to the Premises in connection with Tenant's Work. If Tenant commences Tenant's Work or any other alterations, additions or changes in or to the Premises requiring Landlord's consent and/or approval hereunder without first obtaining such consent and/or approval, then the same shall constitute an immediate Event of Default which cannot be cured. In addition to such costs, Tenant shall pay to Landlord, within ten (10) business days after completion of any alterations, the actual, reasonable costs incurred by Landlord for services rendered by Landlord's management personnel and engineers to coordinate and/or supervise any of the alterations to the extent such services are provided in excess of or after the normal on-site hours of such engineers and management personnel.

Notwithstanding anything to the contrary contained in this Lease and after Tenant has completed Tenant's Work (as defined in Exhibit C) and opened for business in the Premises, Tenant shall have the right to make non-structural interior alterations, repairs or replacements in and to the Premises without

10

INITIAL HERE 



first obtaining Landlord's prior written consent or approval, but upon at least forty-eight (48) hours' prior notice to Landlord, provided (i) such interior alterations, repairs or replacements neither require any structural or roof alteration nor impose any greater load on any structural portion of the Premises or on the utility or mechanical system serving the Premises, (ii) such interior repairs or replacements are in accordance with Tenant's originally approved plans and are in conformance with Landlord's then current design criteria, (iii) the cost of such interior alteration, repair or replacement shall not exceed Twenty Thousand and 00/100 Dollars ($20,000.00) in any Lease Year, (iv) such changes do not affect parking requirements or entitlements for the Premises or the Shopping Center, and (v) Tenant agrees to indemnify and hold harmless Landlord from and against all claims, actions, liability and damage sustained by Landlord as a result of any such work by Tenant, its agents, employees or contractors. Tenant shall comply with all Laws in making any alterations, repairs or replacements. If Tenant is required to file plans with any governmental agency as a condition to doing such work, Tenant shall provide Landlord with a copy of the plans for informational purposes.

### 10.2    COMPLIANCE WITH LAWS.

Subject to the paragraph immediately below, any permitted changes, alterations and additions made by Tenant shall be performed strictly in accordance with applicable laws, rules, regulations and building codes relating thereto including, without limitation, the provisions of Title III of the Americans with Disabilities Act of 1990, as amended from time to time (referred to in this Section as the "ADA"). Tenant shall have the work performed (i) in such a manner so as not to obstruct the access to the Premises or to the premises of any other tenant or obstruct the Common Areas, (ii) so as not to unreasonably or adversely interfere with the occupancy of any other tenant of the Shopping Center, and (iii) at such times, in such manner and subject to such rules and regulations as Landlord may from time to time reasonably designate.    Throughout the performance of Tenant's alterations, Tenant shall obtain, or cause its contractors to obtain, builder's risk insurance, workers' compensation insurance in compliance with applicable federal and state laws and with no less than statutory limits (providing a waiver of subrogation in favor of Landlord) and employer's liability insurance meeting the requirements set forth in Article 11 of this Lease, and commercial general liability insurance and auto liability insurance in form and substance meeting the requirements set forth in Article 11 of this Lease.

If Landlord receives notice from any governmental authority that the Common Areas of the Shopping Center were in violation of the ADA as of the date of this Lease, then it is Landlord's responsibility to bring any such violations into compliance at Landlord's sole cost and expense.  If the ADA is amended after the date of this Lease, it is Landlord's responsibility, as part of Common Area Costs, to make the Common Areas of the Shopping Center compliant with the amended ADA to the extent required by the amended ADA and subject to grandfathering, special exceptions or variances to the extent applicable. Notwithstanding the foregoing, Tenant shall, at Tenant's sole cost and expense, be responsible for compliance with the ADA and/or the amended ADA if required as a direct result of Tenant's Work, Tenant's specific use of the Premises, or any alterations made to the Premises by Tenant (i.e., the Common Areas of the Shopping Center would have otherwise been in compliance but for Tenant's Work, Tenant's specific use of the Premises, or any alterations made to the Premises by Tenant).   As an example, if, as part of Tenant's Work or any subsequent alteration to the Premises made by Tenant, Tenant relocates the entrance door to the Premises and if, as a result of such entrance door relocation, the ADA and/or the amended ADA requires relocation or reconfiguration of any handicapped parking spaces, then Tenant shall be responsible for same at Tenant's sole cost and expense (however, Landlord may elect to perform any work in the Common Areas and bill the cost of same to Tenant).

### 10.3    INSURANCE AND RECONSTRUCTION.

In the event Tenant shall make any alterations, additions or changes to the Premises, none of such alterations, additions or changes need be insured by Landlord under such insurance as Landlord may carry on the Landlord's Building, nor shall Landlord be required under any provisions of this Lease to reconstruct or reinstall any such alterations, additions or changes in the event of casualty loss, it being understood and agreed that all such alterations, additions or changes shall be insured by Tenant pursuant to Article 11 and reconstructed by Tenant (at Tenant's sole expense) in the event of a casualty loss pursuant to Article 12.

### ARTICLE 11.  LIABILITY, INDEMNITY AND INSURANCE

### 11.1    LANDLORD'S LIABILITY.

Landlord shall not be liable for any damage or liability of any kind or for any injury to or death of any persons or damage to any property on or about the Premises from any cause whatsoever, except to the extent any such matter is not covered by insurance required to be maintained by Tenant under this Lease and is attributable to Landlord's or its agents', contractors' or employees' gross negligence or willful misconduct.

### 11.2    INDEMNIFICATION.

(a)     Tenant hereby agrees to indemnify, defend and save Landlord and any Landlord Parties harmless from all claims, actions, judgments, suits, losses, fines, penalties, demands, costs and expenses and liability whatsoever, including reasonable attorneys' fees, expert fees and court costs ("Indemnified Claims") on account of (i) any damage or liability occasioned in whole or in part by any use or occupancy of the Premises or by any act or omission of Tenant or any Tenant Parties, (ii) the use of the Premises and Common Areas by Tenant or any Tenant Parties and conduct of Tenant's business by

11

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

Tenant or any Tenant Parties, or any other activity, work or thing done, permitted or suffered by Tenant or any Tenant Parties, in or about the Premises, the Landlord's Building or elsewhere on the Shopping Center; and/or (iii) any default by Tenant of any obligations on Tenant's part to be performed under the terms of this Lease. In case any action or proceeding is brought against Landlord or any Landlord Parties by reason of any such Indemnified Claims, Tenant, upon written notice from Landlord, shall defend the same at Tenant's expense by counsel approved in writing by Landlord and Landlord's insurance carrier, which approval shall not be unreasonably withheld. Tenant shall not be liable for damage or injury occasioned by the gross negligence or willful acts of Landlord or its agents, contractors, or employees unless such damage or injury arises from perils against which Tenant is required by this Lease to insure and then only to the extent of such insurance. Tenant's indemnification obligation under this Section 11.2 shall survive the expiration or earlier termination of this Lease. Tenant's covenants, agreements and indemnification in Sections 11.1, 11.2 and 11.7, are not intended to and shall not relieve any insurance carrier of its obligations under policies required to be carried by Tenant pursuant to the provisions of this Lease.

(b)    Landlord shall indemnify, defend and hold the Tenant Parties harmless from and against all third party liabilities, obligations, damages, judgments, penalties, claims, costs, charges and expenses, including, without limitation, reasonable architects' and attorneys' fees, which may be imposed upon, incurred by, or asserted against any of the Tenant Parties by third parties arising, directly or indirectly, out of or in connection with (i) the negligence or willful misconduct of the Landlord Parties, and (ii) Landlord's breach of its obligations under this Lease. If any action or proceeding is brought against any of the Tenant Parties by reason of any of the foregoing, Landlord's insurance company shall defend the Tenant Parties by counsel chosen by Landlord's insurance company. If Landlord's insurance company declines to defend the Tenant Parties, Landlord shall reimburse to the Tenant Parties the reasonable cost of defending such action or proceeding. Any such cost, damage, claim, liability or expense incurred by Tenant Parties for which Landlord is obligated to reimburse Tenant Parties hereunder shall be due and payable within twenty (20) days after notice to Landlord that payment is due.

**11.3    INSURED'S WAIVER.**
In the event of loss or damage to the property of Landlord or Tenant, each party will look first to its own insurance before making any claim against the other. To the extent possible, each party shall obtain, for all policies of property insurance required by this Lease, provisions permitting waiver of subrogation against the other party, and each party, for itself and its insurers, hereby waives the right to make any claim against the other (or its agents, employees or insurers) for loss or damage covered by the property insurance requirements of this Lease.

**11.4    TENANT'S INSURANCE.**

(a)    Tenant agrees that, from and after the date of delivery of the Premises to Tenant, Tenant will carry at its sole cost and expense the following types of insurance, in the amounts specified and in the form hereinafter provided for:

1.    Commercial General Liability and Property Damage Insurance covering the Premises and Tenant's use thereof against claims for personal injury or death and property damage occurring upon, in or about the Premises, such insurance to afford protection to the limit of not less than $1,000,000.00 with respect to injury or death of any number of persons and property damage arising out of any one occurrence and $2,000,000.00 in the aggregate, such insurance against property damage to the Premises to afford protection to the limit of not less than $500,000.00 with respect to any one occurrence; and Auto Liability Insurance, such insurance to afford protection to the limit of not less than $1,000,000.00 in respect of injury or death of any number of persons arising out of any one occurrence. The insurance coverage required under this Section 11.4(a)1 shall, in addition, extend to any liability of Tenant arising out of the indemnities provided for in Section 11.2; and

2.    Tenant Improvements and Property Insurance covering all of the items included in Tenant's Work, Tenant's leasehold improvements including those constructed as part of Tenant's Work and Landlord's Work (if any), heating, ventilating and air conditioning equipment, plate glass, trade fixtures, signage and personal property from time to time in, on or upon the Premises and alterations, additions or changes made by Tenant pursuant to Article 10, in an amount not less than the full replacement cost, providing protection against perils included within a special form property insurance policy, including earthquake and/or flood coverage where applicable. Any policy proceeds from such insurance shall be held in trust by Tenant for the repair, reconstruction, restoration or replacement of the property damaged or destroyed, unless this Lease shall cease and terminate under the provisions of Article 12.

(b)    All policies of insurance provided for in Section 11.4(a) shall be issued by sound and reputable insurance companies with a general policyholder rating of not less than A- and a financial rating of Class VII as rated in the most currently available "Best's Insurance Reports" and qualified to do business in the state in which the Premises is located. Each such policy shall be issued in the name of Tenant and name Landlord and any other parties in interest from time to time designated in writing by notice by Landlord to Tenant as additional insured(s) and/or loss payee(s), as applicable. Said policies shall be for the mutual and joint benefit and protection of Landlord and Tenant and a certificate of insurance shall be delivered to Landlord upon or prior to delivery of possession of the Premises to Tenant and thereafter within thirty (30) days prior to the expiration of each such policy, policies shall be made

12

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL HERE

Case 17-03469-TOM7    Doc 95-1    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit A    Page 14 of 46

available to Landlord for review within ten (10) days of Landlord's written request. As often as any such policy shall expire or terminate, renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent. Tenant will give Landlord at least thirty (30) days notice in writing in advance of any cancellation or lapse, or the effective date of any reduction in the amounts, of insurance. All such liability, property damage and other casualty policies shall be written as primary policies which do not contribute to any policies which may be carried by Landlord. All such liability and property damage policies shall contain a provision that Landlord, although named as an additional insured and/or loss payee, shall nevertheless be entitled to recover under said policies for any loss occasioned to it, its agents, contractors and employees by reason of the negligence of Tenant. Any insurance provided for in Section 11.4(a) may be effected by a policy of blanket insurance covering additional items or locations or insureds; provided, however, that (i) Landlord shall be named as an additional insured and/or loss payee thereunder as its interest may appear; (ii) the coverage afforded Landlord will not be reduced or diminished by reason of the use of such blanket policy of insurance; (iii) any such policy or policies (except any covering the risks referred to in Section 11.4(a)(1)) shall specify therein (or Tenant shall furnish Landlord a written statement from the insurers under such policy specifying) the amount of the total insurance allocated to "Tenant Improvements and Property" more specifically detailed in Section 11.4(a)(2); and (iv) the requirements set forth herein are otherwise satisfied. Tenant agrees to permit Landlord at all reasonable times to inspect the policies of insurance of Tenant covering risks upon the Premises for which policies or copies thereof are not delivered to Landlord.

(c)    In addition to the types of insurance set forth in subsection (a) above, Tenant shall carry workers' compensation insurance in compliance with applicable federal and state laws and with no less than statutory limits (providing a waiver of subrogation in favor of Landlord) and employer's liability insurance with limits of not less than $500,000.00 per person or $1,000,000.00 per accident or disease in the relevant jurisdiction.

### 11.5    LANDLORD'S INSURANCE.

(a)    Landlord shall at all times during the Term maintain in effect a policy or policies of insurance covering the Landlord's Building and the Common Areas (excluding Tenant improvements and property required to be insured by Tenant pursuant to Section 11.4(a)) in an amount not less than the full replacement cost (exclusive of the cost of excavations, foundations and footings), providing protection against perils included within a special form property insurance policy including earthquake and/or flood where applicable, together with insurance against sprinkler damage, vandalism, and malicious mischief, and such other risks as Landlord may from time to time determine and with any such deductibles as Landlord may from time to time determine and commercial general liability insurance in such amounts as Landlord deems to be reasonable. Any insurance provided for in Sections 11.5(a) or (b) may be effected by a policy or policies of blanket insurance covering additional items or locations or insureds (and, if so, Landlord shall determine the cost of Insurance attributable to the Shopping Center hereunder on an equitable basis determined by Landlord), provided that the requirements of Section 11.5(a) are otherwise satisfied. In addition, at Landlord's option, Landlord may elect to self-insure all or any part of such required insurance coverage. Landlord may, but shall not be obligated to, carry any other form or forms of insurance as Landlord or the mortgagees or ground lessors of Landlord may reasonably determine is advisable.

(b)    Landlord may carry rent insurance with respect to the Premises in an aggregate amount equal to twelve (12) or more times the sum of (i) the monthly requirement of Minimum Annual Rent, plus (ii) the sum of the amounts estimated by Landlord to be payable by Tenant for Additional Rent for the month immediately prior to the month in which the policy is purchased or renewed.

(c)    All insurance described in this Section 11.5 is referred to herein as "Insurance". Tenant agrees to pay Tenant's Proportionate Share of premiums for Insurance pursuant to Section 8.6 of this Lease. Tenant shall have no rights in any Insurance maintained by Landlord nor shall Tenant be entitled to be a named insured thereunder. If, at anytime time during the Term of this Lease, any type of insurance policy required by this Lease is no longer available, discontinued or generally considered outdated within the insurance industry (such as how, as of the date of this Lease, the outdated term "public liability insurance" is now referred to as "commercial general liability insurance") (collectively referred to herein as an "Outdated Policy"), then in lieu of such Outdated Policy, Landlord and Tenant shall maintain the new type of policy replacing and most comparable to the Outdated Policy.

### 11.6    COMPLIANCE WITH INSURANCE AND GOVERNMENTAL REQUIREMENTS.

Tenant agrees, at its sole cost and expense, to comply with all reasonable recommendations and requirements with respect to the Premises, or its use or occupancy, of the insurance underwriters and any similar public or private body, and any governmental authority having jurisdiction over insurance rates with respect to the use or occupancy of the Shopping Center. Tenant shall not do or suffer to be done anything upon or in the Premises which will contravene Landlord's policies of insurance or cause an increase in Landlord's insurance rates. If and for so long as Tenant is conducting business specifically and only for the Use, Landlord agrees that Tenant's business operations in the Premises shall not, in and of themselves, be grounds for requiring Tenant to pay its share of any increase in Landlord's insurance rates referred to above (except to the extent such increased costs are included in the Insurance pool for which Tenant pays its Proportionate Share together with other tenants), provided such business activities are not hazardous, do not result in an undue accumulation of waste or trash within the Premises, and do not otherwise violate the terms of this Lease.

13

INITIAL
HERE 

REGENCY
CENTERS

**11.7    LIMIT OF LANDLORD'S RESPONSIBILITY.**

Except to the extent such matter is not covered by the insurance required to be maintained by Tenant under this Lease and is attributable to the gross negligence or willful misconduct of Landlord or Landlord's agents, employees or contractors, Landlord shall not, without limiting the generality of Section 11.1 hereof, be responsible or liable to Tenant or the Tenant Parties for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying space in any other part of the Shopping Center, or for any loss or damage resulting to Tenant or Tenant's property from bursting, stoppage or leaking of water, gas, sewer or steam pipes or for any damage caused by water leakage from any part of the Premises or from the pipes, appliances or plumbing works or from the roof, street or subsurface or from any other places or by dampness or by any other cause of whatsoever nature, or loss of property within the Premises from any cause whatsoever or any damage caused by other tenants or persons in the Premises, occupants of adjacent property of the Shopping Center, or the public, or caused by construction of any private, public or quasi-public work.

## ARTICLE 12.  DESTRUCTION

**12.1    DESTRUCTION.**

Subject to the provisions of Sections 12.2, 12.3 and 12.4 below, if the Premises shall be damaged or destroyed by any casualty, Landlord shall promptly restore same to its condition immediately prior to the occurrence of the damage to the extent of Landlord's insurance obligation set forth in Article 11 and to the extent of insurance proceeds received (or would have received had Landlord maintained the insurance required of it under this Lease), and the Minimum Rent and Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance shall be abated proportionately as to that part of the Premises rendered untenantable.

**12.2    LANDLORD'S ELECTION.**

If the Premises (i) are rendered wholly untenantable; (ii) are substantially damaged (i.e., the cost to repair or replace exceeds fifty percent (50%) of its value) as a result of a risk which is not required by Article 11 to be covered by Landlord's insurance; (iii) are substantially damaged during the last year of the Term or of any renewal term hereof regardless of insurance coverage; (iv) or the building of which the Premises is a part (whether the Premises is damaged or not), or all of the buildings which then comprise the Shopping Center, are damaged to the extent of fifty percent (50%) or more of the value thereof, so that the Shopping Center cannot in the reasonable judgment of Landlord be operated as an integral unit; or (v) are damaged and the holder of any mortgage, deed of trust or other lien requires the use of all or any part of Landlord's insurance proceeds in satisfaction of all or a part of the indebtedness secured by any such mortgage, deed of trust or other lien, then in any of such events, Landlord may either elect to repair the damage to the extent of Landlord's insurance obligation set forth in Article 11 and to the extent of insurance proceeds received (or would have received had Landlord maintained the insurance required of it under this Lease) or may cancel this Lease by notice of cancellation within ninety (90) days after such event (whereupon this Lease shall terminate and Tenant shall vacate and surrender the Premises to Landlord). Tenant's liability for Rent, subject to the provisions regarding abatement of Minimum Rent and Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance contained above, shall continue until the date of termination of this Lease.

**12.3    TENANT'S RIGHT TO TERMINATE.**

This Lease sets forth the terms and conditions upon which this Lease may be terminated in the event of any damage or destruction. Accordingly, except for Tenant's termination rights specifically set forth in this Article, Tenant hereby waives any right to terminate this Lease by reason of damage or casualty loss pursuant to any present or future laws or case decisions to the same effect.   If Landlord fails to commence its required restoration of the Premises within one hundred eighty (180) days after the casualty and such delay is not caused by Tenant (or any Tenant Parties) or any Unavoidable Delays described in Section 25.6, then Tenant shall have the right to terminate this Lease by notice to Landlord given prior to Landlord's commencement of construction.   In addition, Tenant shall have the right to terminate this Lease by giving written notice to Landlord of exercise thereof within thirty (30) days after the date the Premises is damaged or destroyed if:

(a)        no part of the Premises remains tenantable after damage or destruction thereof from any cause and Landlord's restoration obligation is reasonably estimated by Landlord to take longer than three hundred sixty-five (365) days to complete; or

(b)        the damage or destruction occurs within the last three hundred sixty-five (365) days of the Term.

**12.4    REPAIR, ETC.**

In the event Landlord elects to repair the damage as provided herein and Tenant does not exercise its right to termination hereunder, any abatement of Minimum Rent and Tenant's Proportionate Share of Common Area Costs, Taxes and Insurance shall end the earlier of (i) sixty (60) days after notice by Landlord to Tenant that Landlord has completed its required restoration, or (ii) the date Tenant reopens the damaged Premises for business. Unless this Lease is terminated by Landlord or Tenant as provided above and following the completion of Landlord's required restoration, Tenant shall promptly restore the Premises to a condition equal to that existing prior to its destruction or casualty to the extent of Tenant's insurance obligation set forth in Article 11 (including, without limitation, restoration of all leasehold

14

REGENCY
CENTERS

INITIAL
HERE

improvements including those constructed as part of Tenant's Work and Landlord's Work (if any), heating, ventilating and air conditioning equipment, plate glass, trade fixtures, signage and personal property from time to time in, on or upon the Premises and alterations, additions or changes made by Tenant pursuant to Article 10).

## ARTICLE 13. MAINTENANCE

### 13.1 LANDLORD'S DUTY TO MAINTAIN.

Landlord will, as part of the Common Area Costs, maintain (and repair and replace as required) the roof, exterior walls, structural columns and structural floor or floors of the Landlord's Building in good condition (but specifically excluding outer floor and floor coverings in the Premises; non-structural, demising walls in the Premises installed by or at the request of Tenant; the doors, windows and glass at the Premises; and any alterations, additions or changes performed by or on behalf of Tenant (whether structural or non-structural), all of which shall be Tenant's responsibility as set forth in Section 13.2 below). Notwithstanding the foregoing provisions of this Section, Landlord shall not in any way be liable to Tenant on account of its failure to make repairs unless Tenant has complied with the notice and cure procedures set forth in Article 19 of this Lease and provided that any damage arising therefrom shall not have been caused by the negligence or willful act or omission of Tenant or Tenant Parties (in which event Tenant shall be responsible therefor) or have been caused to any of the items Tenant is required to insure pursuant to Article 11. Without limiting the foregoing, but except as allowed pursuant to Section 19.1, Tenant waives the right to make repairs at Landlord's expense and/or any related termination right under any law, statute or ordinance now or hereafter in effect.

### 13.2 TENANT'S DUTY TO MAINTAIN.

Tenant will, at its own cost and expense, maintain the Premises (except that part Landlord has agreed to maintain as set forth in Section 13.1 above) in good and tenantable condition consistent with a first class shopping center and otherwise in compliance with all applicable federal, state and local laws, rules, regulations, orders and guidelines now or hereafter in force, and make all repairs to the Premises and every part thereof as needed. Tenant's obligations under this Section shall include, but not be limited to, modifying, repairing, replacing, installing and maintaining, as applicable, the following: items as are required by any governmental agency having jurisdiction thereof (whether the same is ordinary or extraordinary, foreseen or unforeseen); interior walls and glass; the interior portions of exterior walls; ceilings; utility meters (including those outside the Premises if they exclusively serve the Premises); pipes and conduits within the Premises; all pipes and conduits outside the Premises exclusively serving the Premises between the Premises and the service meter; all fixtures; HVAC equipment (whether such HVAC equipment is located inside or outside the Premises but subject to Landlord's obligations pursuant to Article 34 of this Lease); sprinkler equipment and other equipment within the Premises; the storefront and all exterior glass; all of Tenant's signs (both interior and exterior); locks and closing devices; all window sashes, casements or frames, doors and door frames; and any alterations, additions or changes performed by or on behalf of Tenant (whether structural or non-structural); provided that Tenant shall make no adjustment, alteration or repair of any part of any sprinkler or sprinkler alarm system in or serving the Premises without Landlord's prior approval. Tenant shall contract with a service company licensed to business in the state wherein the Premises is located and reasonably approved by Landlord for the preventive maintenance of the HVAC and a copy of the service contract (which contract shall be subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed) shall be furnished by Tenant to Landlord within ten (10) days after Tenant's opening for business, and a copy of any subsequent contract shall be furnished by Tenant to Landlord within ten (10) days after the same becomes effective. Such service contract must provide for at least four (4) visits, inspections and services each year and the regular changing of filters. All broken glass, both exterior and interior, shall be promptly replaced by Tenant with glass of the same kind, size and quality. At Tenant's expense, Tenant shall be responsible for providing all janitorial, cleaning and pest control services within the Premises. All such services shall be provided in accordance with standards customarily maintained for similar first class shopping centers. Tenant shall permit no waste, damage or injury to the Premises and Tenant shall initiate and carry out a program of regular maintenance and repair of the Premises, including the painting or refinishing of all areas of the interior and the storefront, so as to impede, to the extent possible, deterioration by ordinary wear and tear and to keep the same in attractive condition. Tenant will not overload the electrical wiring serving the Premises and will install, at its expense, with Landlord's written approval, any additional electrical wiring required in connection with Tenant's apparatus. Landlord shall be under no obligation to make any repairs, replacements, reconstruction, alterations, or improvements to or upon the Premises or the mechanical equipment exclusively serving the Premises except as expressly provided for herein.

### 13.3 LANDLORD'S RIGHT OF ENTRY AND USE.

Upon at least forty-eight (48) hours prior verbal or written notice to Tenant (except in an emergency in which event no notice shall be required), Landlord and/or its agents, representatives, and contractors shall have the right to enter into or upon any part of the Premises at any reasonable time (except in an emergency in which event entry may be at any time) to inspect the condition, occupancy or use thereof, to comply with any regulatory or governmental order, and to maintain, make repairs and/or perform other work or improvements to the Premises and/or the Shopping Center or any part or component thereof including without limitation any spaces adjacent to or adjoining the Premises. Upon at least forty-eight (48) hours prior verbal or written notice to Tenant, Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to purchasers, mortgagees or insurers of all or a portion of the Shopping Center or, during the last year of the Term of this Lease, to

15

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE



prospective tenants of the Premises. During any period of time during which Tenant occupies the Premises on a holdover basis or has vacated the Premises, Landlord may erect a suitable sign on the Premises stating the Premises is available for lease. In connection with any such entry described above, Landlord shall endeavor to minimize disruption to Tenant's use of the Premises.

**13.4 CONFLICTS.**
If there is a conflict between the provisions of this Article 13 and Article 12, the provisions of Article 12 shall govern.

## ARTICLE 14. UTILITIES AND GARBAGE DISPOSAL

Tenant, at Tenant's own expense, shall arrange with the appropriate utility companies for the provision of utilities to the Premises (including without limitation water, electricity, gas, and telephone and data service). In addition to Tenant's obligations under Section 2.5 of this Lease, Tenant shall (A) pay the appropriate utility companies for all charges related to such utilities and sanitary sewer services used within the Premises (commencing on the date of Landlord's delivery of the Premises to Tenant and continuing throughout the Term) as and when such charges become due and payable, and (B) make such deposits or pay such permits required by the utility or sanitary sewer service company providing the same, including, but not limited to, those related to application for and installation of temporary and permanent meters for the Premises. Notwithstanding the foregoing, if any such utilities are not already separately metered, then, at Landlord's election and upon Landlord's written request, (1) Tenant shall arrange for such separate metering at Tenant's own expense, or (2) Tenant shall pay to Landlord its allocable share of such utilities as reasonably determined by Landlord (in addition, Tenant shall pay to Landlord the cost of any excess utility usage in the Premises as reasonably determined by Landlord). Landlord shall not be liable for any interruption or failure whatsoever in utility services, nor shall any such failure or interruption constitute an actual or constructive eviction of Tenant from the Premises or result in or give rise to any abatement in any Rent reserved hereunder. Upon written request from Landlord, Tenant will, at Tenant's expense, contract with the service company designated by Landlord for the disposal of all trash and garbage from the Premises provided that the charges of such service company are competitive with other such companies performing similar services in the general geographical area as the Shopping Center. Tenant will furnish to Landlord a copy of such contract prior to opening for business, and a copy of each renewal of such contract shall be furnished to Landlord at least seven (7) days prior to the expiration of the existing contract. Landlord shall have the right to designate vendors to provide utility services and garbage collection services to the Premises, provided that the cost of such service is generally competitive in the vicinity of the Shopping Center. Subject to the preceding sentence, if Landlord now or in the future has a master contract for waste removal and garbage collection services, then at Landlord's election: (i) Tenant shall be billed directly by the service provider, and (ii) Tenant shall pay directly to the service provider all charges attributable to the Premises pursuant to such contract. In addition, if at any time Landlord determines that Tenant's use of the existing trash removal system (including the use of dumpsters) is excessive, then Tenant shall (a) pay to Landlord all costs incurred with respect to such excessive use, and (b) at Landlord's request, provide an appropriate number of dumpsters to satisfy Tenant's trash removal needs and pay all costs incurred with respect to such trash removal. Should Landlord provide utilities to the Shopping Center, Tenant shall pay its allocable share of such utilities as reasonably determined by Landlord (in addition, Tenant shall pay to Landlord the cost of any excess utility usage in the Premises as reasonably determined by Landlord).

## ARTICLE 15. LIENS

Landlord's property shall not be subject to liens for work done or materials used on the Premises made at the request of, or on order of or to discharge an obligation of, Tenant. This Article shall be construed so as to prohibit, in accordance with the provisions of the laws of the state in which the Premises is located, the interest of Landlord in the Premises or any part thereof from being subject to any lien for any improvements made by Tenant or any third party on Tenant's behalf (except Landlord) to the Premises. If any lien or notice of lien on account of an alleged debt of Tenant or any notice of lien by a party engaged by Tenant or Tenant's contractor or materialmen to work on the Premises shall be filed against the Shopping Center or any part thereof, Tenant, within ten (10) days after notice of the filing thereof, will cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction or otherwise. If Tenant shall fail to cause such lien or notice of lien to be discharged and released of record within the period aforesaid, then, in addition to any other right or remedy, Landlord may discharge the same either by paying the amounts claimed to be due or by procuring the discharge of such lien by deposit or by bonding procedures. Any amount so paid by Landlord and all costs and expenses, including reasonable attorneys' fees and court costs, incurred by Landlord in connection therewith, including interest at the Default Rate, shall constitute Additional Rent and shall be paid by Tenant to Landlord on demand, or be deducted from Tenant Allowance monies owed to Tenant by Landlord, if any.

## ARTICLE 16. SIGNAGE

Tenant shall at its own expense erect a sign on the exterior sign band of the Premises, which sign shall: (i) conform to the general material, size and appearance of other tenants' signs at the Shopping Center, (ii) be in strict conformity with any guidelines or sign criteria adopted by Landlord with respect to the

16

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

Case 17-03469-TOM7    Doc 95-1    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit A    Page 18 of 46

Shopping Center, including, without limitation, the sign criteria set forth in Exhibit "C-1" attached hereto and made a part hereof, (iii) be in accordance with all applicable laws, and (iv) be otherwise subject to Landlord's prior written approval, not to be unreasonably withheld, conditioned or delayed. Tenant shall install its permanent signage on the exterior of the Premises on or before the Commencement Date. Landlord will not be liable to Tenant or any Tenant's contractor for city requirements pertaining to signage.

Notwithstanding anything in Article 16 to the contrary, (i) Tenant shall have the right to install the exterior storefront sign depicted, and pursuant to the Sign Plans shown on Exhibit C-2 attached hereto, provided Tenant adheres to Landlord's criteria for installation and mounting and those portions of Exhibit C-1 which do not directly conflict with Tenant's approved Sign Plans; (ii) after the Commencement Date, Tenant shall be permitted, subject to all applicable codes, laws, regulations and other governmental requirements, and further subject to Landlord's prior written approval with respect to the design, location, content, and method of installation, to furnish and install, at Tenant's sole cost and expense, one (1) professionally made temporary banner, announcing Tenant's "Grand Opening" and/or that Tenant is "Coming Soon", on the storefront of the Premises, provided that the period during which Tenant's temporary banner is installed on the storefront of the Premises shall not exceed the lesser of (x) the maximum period permitted by applicable codes, laws and regulations, or (y) sixty (60) days; and (iii) the named Tenant herein (but not its successor or assigns, other than successors or assigns for which Tenant need not, pursuant to the express terms of this Lease, obtain Landlord's consent) may install professionally made promotional signs which Tenant uses in a majority of its stores in the Washington DC metropolitan area or is part of Franchisor's standard signage program in the interior portion of the storefront window(s), without Landlord's prior written approval, provided that the total window signage does not occupy more than twenty percent (20%) of the glass (collectively and/or per each window), and further provided that such signs are permitted by Laws.

Furthermore, Landlord acknowledges that Tenant intends to shakerboard on the property adjacent to the Shopping Center but not owned by Landlord (but not on any areas which are part of the Shopping Center Common Areas) for promotional purposes, such shakerboarding to be at Tenant's sole risk.

## ARTICLE 17.  ASSIGNMENT AND SUBLETTING

**17.1    RESTRICTIONS ON TRANSFER.**

Tenant will not assign this Lease, sublet all or any part of the Premises or enter into any license or concession agreements (collectively or individually, a "Transfer") without the prior written consent of Landlord, which consent Landlord will not unreasonably withhold.  In no event may Tenant encumber or hypothecate this Lease or its leasehold interest hereunder, and any attempt to do so shall be void and confer no rights upon any third person and shall be a violation of this Section.  The consent by Landlord to any Transfer shall not constitute a waiver of the necessity for such consent to any subsequent Transfer.  Any attempted Transfer without Landlord's prior written consent shall be void and confer no rights upon any third person and shall be a violation of this Section.  Any Transfer of this Lease from Tenant by liquidation or otherwise by operation of law, including, but not limited to, an assignment for the benefit of creditors, shall be a violation of this Section.  In the event that Tenant proposes any Transfer, Tenant shall notify Landlord in writing by certified mail, return receipt requested, at least sixty (60) days before the date on which the Transfer is to be effective, and, included with such notice, furnish Landlord with:  (a) the name of the entity receiving such Transfer (the "Transferee"); (b) a detailed description of the business of the Transferee; (c) audited financial statements of the Transferee if available, otherwise a financial statement certified by the Transferee's chief financial officer or chief operating officer; (d) all written agreements governing the Transfer (provided that in the event that the Transfer is a result of the sale of Tenant's business, Tenant may redact information regarding the purchase price); (e) if the Transferee is an individual, a true and correct copy of the Transferee's driver's license; (f) any information reasonably requested by Landlord with respect to the Transfer or the Transferee; and (g) a fee of Two Thousand Five Hundred and No/100 Dollars ($2,500.00) to compensate Landlord for legal fees, costs of administration, and other expenses to be incurred in connection with the review and processing of such documentation (whether or not such Transfer is consummated).  Landlord shall respond to Tenant's request for Landlord's approval or disapproval of the Transfer within thirty (30) days after Landlord receives the request and documents and information required above.  Without limiting Landlord's right to withhold its consent on any reasonable grounds, it is agreed that Landlord will not be acting unreasonably in refusing to consent to a Transfer if, in Landlord's opinion, (i) the business operation of the proposed Transferee is not equal to, or greater than, the class, quality or standard of operation (including, without limitation, number of locations) of Tenant's business; (ii) such Transferee may adversely affect (A) the business of the other tenants or occupants (such as, without limitation, any duplication of uses including without limitation those contained in letters of intent or lease contracts which Landlord is actively negotiating with prospective tenants and of which Landlord can provide reasonably documentary evidence), (B) the tenant mix in the Shopping Center (including without limitation those contained in letters of intent or lease contracts which Landlord is actively negotiating with prospective tenants and of which Landlord can provide reasonably documentary evidence), or (C) Intentionally Omitted; (iii) the net worth and financial capabilities of such Transferee is less than that of Tenant and any Guarantor(s) as of the date of this Lease or at the time of the Transfer, whichever is greater, in constant dollars; (iv) the proposed Transfer involves a change of use of the Premises from that specified herein or would otherwise breach any covenant of Landlord respecting radius, location, use or exclusivity in any other lease in the Shopping Center or any Shopping Center agreements; or (v) the proposed Transfer involves an increased risk of the presence, use, release or discharge of Hazardous Substances.  In addition,

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

Landlord's consent will not be deemed unreasonably withheld should Landlord deny consent to a Transfer within the period commencing on the Commencement Date and ending the last day of the eighteenth full calendar month thereafter or if consenting to a Transfer would result in more than two (2) occupants in the Premises. Notwithstanding any contrary provision of this Lease, if Tenant or any proposed Transferee claims that Landlord has unreasonably withheld or delayed its consent to a proposed Transfer or otherwise has breached its obligations under this Section 17.1, Tenant's and such Transferee's only remedy shall be to seek a declaratory judgment and/or injunctive relief, and Tenant, on behalf of itself and, to the extent permitted by law, such proposed Transferee, waives all other remedies against Landlord, including, without limitation, the right to seek monetary damages or to terminate this Lease. Within thirty (30) days of Landlord's receipt of any Transfer request and any additional information requested by Landlord concerning the proposed Transferee's financial responsibility, Landlord will notify Tenant of its election to do one of the following: (1) consent to the proposed Transfer subject to such reasonable conditions as Landlord may impose in providing such consent; or (2) refuse such consent. The voluntary or other surrender of this Lease by Tenant or a mutual cancellation hereof shall not work as a merger but shall, at the option of Landlord, either terminate all or any existing subleases or subtenancies or operate as an assignment to Landlord of such subleases or subtenancies. Any Transferee approved by Landlord shall expressly assume in writing the obligations of Tenant hereunder. As used herein, the term "constant dollars" shall mean the present value of the dollars to which such phrase refers. An adjustment shall occur on January 1 of each year following the date of this Lease. Constant dollars shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the Current Index Number and the denominator of which is the Base Index Number. The "Base Index Number" shall be the level of the Index for the month during which this Lease is dated; the "Current Index Number" shall be the level of the Index for the month of September of the year preceding the adjustment year; the "Index" shall be the Consumer Price Index for All Urban Consumers, U.S. City Average published by the United States Department of Commerce (base year 1982-84=100), or any successor index thereto as hereinafter provided. If publication of the Index is discontinued, or if the basis of calculating the Index is materially changed, then Landlord shall substitute for the Index comparable statistics as computed by an agency of the United States Government or, if none, by a substantial and responsible periodical or publication of recognized authority most closely approximating the result which would have been achieved by the Index.

Further, notwithstanding anything to the contrary contained hereinabove, Tenant may assign this Lease or sublet the entire Premises to a bona fide franchisee approved by _____ ("Franchisee"), without Landlord's prior written consent, if:

(a)     Franchisee covenants to only use the Tenant's Advertised Name and Use as provided or required by this Lease, and to operate such franchise in the same manner as the franchise is being operated by a majority of Franchisor's other franchisees;

(b)     the transfer consists of all of Tenant's leasehold interest or of the entire Premises, as the case may be;

(c)     the Franchisee shall (xx) assume, by written recordable instrument, in form and content reasonably satisfactory to Landlord, the due performance of all of Tenant's obligations under this Lease, including any accrued obligations as of the time of the assignment or subletting, and (yy) agree to perform and observe all of Tenant's representations, warranties, and obligations under this Lease;

(d)     such Transfer shall be upon and subject to all the provisions, terms, covenants and conditions of this Lease;

(e)     if the Franchisee is a corporation, partnership or limited liability company, the principal(s) of such entity (and the spouse(s) of such principal(s)) shall provide a personal guaranty(ies) meeting the requirements described below;

(f)     the Franchisee shall not be subject to any bankruptcy or insolvency proceedings;

(g)     the tangible net worth (exclusive of goodwill) of any proposed Franchisee and new guarantor(s), immediately prior to and following such transfer, shall not be less than $1,000,000.00;

(h)     such proposed Franchisee shall have owned at least two (2) other quick service restaurants during the two (2) years immediately preceding such Transfer and shall continue to own such quick service restaurants as of the date of such Transfer; and

(i)     Landlord shall have received advance written notice of such Transfer at least thirty (30) days prior to the effective date of such Transfer.

**17.2    RELEASE.**
Except as expressly set forth below, no Transfer will release Tenant and/or Guarantor, if any, of Tenant's obligations under this Lease or alter the primary liability of Tenant to pay the Rent and to perform all other obligations to be performed by Tenant hereunder. In the event of default by any Transferee of Tenant or any successor Tenant in the performance of any of the terms hereof, Landlord may proceed directly against Tenant and/or Guarantor, if any, without the necessity of exhausting remedies against such Transferee or successor.

18

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

Case 17-03469-TOM7    Doc 95-1    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit A    Page 20 of 46

Notwithstanding the above to the contrary, in the event of an assignment of this Lease by Tenant to a bona fide Franchisee who meets the qualifications set forth in subsections (a) ___ (i) of Section 17.1 of this Lease, provided the notice to Landlord of such proposed assignment contains a statement, in bold and conspicuous lettering, advising that such proposed re-assignment shall relieve Tenant or Franchisor of liability and provided Landlord approves such transfer (it being agreed that notwithstanding the provisions in the paragraph above, any transfer wherein a release of liability will be relevant would require Landlord's consent), then Tenant, shall be relieved of all liability accruing under the Lease after the effective date of such assignment of this Lease ("Assignment Effective Date") or Tenant, it being expressly understood that (a) any claims for personal injury or property damage arising on or prior to the Assignment Effective Date for which and against which Tenant is obligated under the terms of the Lease to indemnify and hold harmless Landlord and (b) any liabilities, actions, demands, claims, penalties, losses, costs, expenses (including reasonable attorneys' fees, consultants' fees and remedial costs), suits, and costs of any settlement or judgment, which may be paid, incurred or suffered by, or asserted against, Landlord, Landlord's managing agent, Landlord's mortgagee and/or their respective successors and assigns, arising out of any violation by Tenant or its agents, employees or contractors of any applicable environmental laws or regulations prior to the Assignment Effective Date shall be deemed to have accrued prior to the Assignment Effective Date.

Furthermore, in connection with a re-assignment of this Lease by Tenant to a bona fide Franchisee pursuant to this Lease, if (i) Tenant provides new guarantor(s) with a tangible net worth (exclusive of good will) not less than One Million and 00/100 Dollars ($1,000,000.00), and (iii) on the one year anniversary of the later of the execution of the assignment and the execution of the new guaranty, the conditions in subparagraphs (aa) through (cc) below are met to the sole satisfaction of Landlord, then Landlord shall release Guarantors from any further obligations thereafter accruing under the Guaranty: (aa) this Lease is in full force and effect and has continuously been in full force and effect, without any Event of Default, throughout the prior 365 days; (bb) the assignee has made all payments of Rent in a timely fashion throughout the prior 365 days and all such payments are current; and (cc) the assignee has provided Landlord with updated, audited financial statements, acceptable to Landlord, that show, in Landlord's reasonable judgment, that the assignee continues to meet the financial requirements set forth above in subsection (i) for the original Guarantors to be released from liability under the Guaranty.

### 17.3    CHANGE OF OWNERSHIP.

Subject to Section 17.4 below, if Tenant or any Guarantor is a corporation, limited liability company, partnership or other business entity, then (i) a transfer, assignment or hypothecation of any stock or interest in such corporation, limited liability company, partnership or business entity by any stockholder, partner or member so as to result in a change in the control thereof by the person, persons or entities owning a majority interest therein as of the date of this Lease, or (ii) a change in the person who directly or indirectly possesses the power to direct or cause the direction of the management or policies of Tenant or any Guarantor, whether through the ownership of voting securities or interests, by contract or otherwise, shall be deemed to be a Transfer of this Lease. Subsection (i) of this provision shall not be applicable to Tenant or to any Guarantor if it is a corporation whose voting stock is listed on a national securities exchange (as defined in the Securities Exchange Act of 1934, as amended) or is traded in any recognized over-the-counter market.

### 17.4    EXCESS CONSIDERATION.

In the event that Landlord consents to a sublease and the rental due and payable by the sublessee (or a combination of the rent payable under such sublease plus any bonus or other consideration therefore or incident thereto) exceeds the Rent payable under this Lease, then Tenant shall be bound and obligated to pay Landlord fifty percent (50%) of all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant from such sublessee. Finally, in the event of any subletting, it is understood and agreed that all rentals equal to Tenant's free Rent obligation under this Lease plus any excess consideration to which Landlord is entitled shall be received by Tenant in trust for Landlord, to be forwarded immediately to Landlord (to be applied as a credit and offset to Tenant's Rent obligations with the exception of any excess consideration described above which Landlord may retain). This Section 17.4 shall not apply to an assignment or in the case of Tenant's sale of its business.

## ARTICLE 18.  DEFAULTS BY TENANT

### 18.1    EVENTS OF DEFAULT.

The following shall each be deemed to be an event of default (each of which is sometimes referred to as an "Event of Default") in this Lease:

(a)        any part of the Rent required to be paid by Tenant under this Lease shall at any time be unpaid and such failure continues for five (5) days after Landlord notifies Tenant that such Rent is due; provided, however, if Landlord provides Tenant with written notice on two (2) occasions during any twelve (12) month period, then during the twelve (12) month period following such second (2nd) notice, Landlord shall not be required to give Tenant notice and Tenant's failure to pay any installment of Rent on or before the due date shall constitute an Event of Default under this Lease.

(b)        Except for events enumerated in the other subsections below of this Section 18.1, Tenant fails in the observance or performance of any of its other covenants, agreements or conditions

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

provided for in this Lease, and said failure shall continue for a period of twenty (20) days after written notice thereof from Landlord to Tenant (unless such failure cannot reasonably be cured within twenty (20) days and Tenant shall have commenced to cure said failure within said twenty (20) days and continues diligently to pursue the curing of the same, which cure shall occur no later than ninety (90) days from the date of such notice from Landlord).

(c)       Tenant fails, after the date on which it is required by this Lease to open the Premises for business with the public, to be open for business as required by this Lease, or vacates or abandons the Premises.

(d)       the estate created in Tenant or any Guarantor hereof is taken in execution or by other process of law, or all or a substantial part of the assets of Tenant or any Guarantor hereof is placed in the hands of a liquidator, receiver or trustee (and such receivership or trusteeship or liquidation continues for a period of thirty (30) days), or Tenant or any such Guarantor makes an assignment for the benefit of creditors, or admits in writing that it cannot meet its obligations as such obligations become due, or is adjudicated a bankrupt, or Tenant or any such Guarantor institutes any proceedings under any federal or state insolvency or bankruptcy law, or under any other act relating to the subject of bankruptcy wherein Tenant or any such Guarantor seeks to be adjudicated as bankrupt, or to be discharged of its debts, or to effect a plan of liquidation, composition or reorganization, or should any involuntary proceedings be filed against Tenant or any such Guarantor under any such insolvency or bankruptcy law and such proceeding not be removed within ninety (90) days thereafter. If any insolvency proceedings, such as those referred to in this Section 18.1(d), are instituted against Tenant, the Premises shall not become an asset in any such proceedings.

### 18.2    LANDLORD'S REMEDIES.
If any Event of Default occurs, Landlord may treat the occurrence of such event as a breach of this Lease and, in addition to any and all other rights or remedies of Landlord in this Lease or by law or in equity provided, Landlord shall have the option and right without further notice or demand to Tenant or any other person to:

(a)       declare the Term ended and to enter the Premises and take possession thereof and remove all persons therefrom, and Tenant shall have no further claim thereon or thereunder.

(b)       bring suit for the collection of Rent as it accrues pursuant to the terms of this Lease and damages including consequential damages without canceling this Lease, and with or without entering into possession of the Premises.

(c)       retake possession of the Premises from Tenant by summary proceedings or otherwise, either with or without terminating this Lease, and to sue Tenant for an amount equal to the remaining Rent to become due during the Term (or any extension period then in effect) discounted to its present value at a discount rate equal to the U.S. Treasury Bill or Note rate with the closest maturity to the remaining term of this Lease as selected by Landlord. Landlord's damages shall include the actual or estimated costs of reletting and alteration, leasing commissions and other costs of Landlord in connection therewith. Alternatively, Landlord may, after such retaking of possession, relet the Premises or any portion thereof. Tenant shall pay to Landlord all monthly deficits in Rent after any such re-entry in monthly installments as the amounts of such deficits from time to time are ascertained. Such deficiency shall be calculated and paid monthly; Tenant shall have no right to any excess. Tenant shall also pay to Landlord any costs and expenses, including, but not limited to, brokerage commissions and reasonable attorneys' fees, incurred by Landlord in such reletting or in making such alterations and repairs not covered by the rental received from such reletting. Should Landlord enter or take possession of the Premises as aforesaid, Landlord shall have the right, but not the obligation, to remove all or any part of the personal property located therein and may place the same in storage at a public warehouse at the expense and risk of the owner or owners thereof. In the case where Landlord elects to accelerate the remaining Rent pursuant to this subsection 18.2(c), Landlord's total damages shall not exceed twelve (12) months' Rent at a time.

### 18.3    ATTORNEYS' FEES AND COSTS.
In the event that any action, suit or other proceeding is initiated concerning or arising out of this Lease, the prevailing party shall recover all of such party's costs and reasonable attorneys' fees incurred in each and every action, suit or other proceeding (including any alternative dispute resolution proceedings), including any and all appeals or petitions therefrom from the non-prevailing party. As used herein, "reasonable attorneys' fees" shall mean the full and actual costs of any legal services actually rendered in connection with the matters involved, calculated on the basis of the usual fee charged by the attorney performing such services.

### 18.4    TENANT'S PROPERTY TO REMAIN.
If there is an Event of Default, all of Tenant's fixtures, furniture, equipment, improvements, additions, alterations, and other personal property shall, at the election of Landlord, remain on the Premises and, in that event and continuing during the length of said default, Landlord shall have the right to take exclusive possession of same and to use same, without cost, until all defaults are cured or, at its option, at any time during the Term to require Tenant to forthwith remove same.

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

**18.5   TENANT'S WAIVER.**

Tenant hereby expressly waives, for itself and all persons claiming by, through, or under it, any right of redemption or for the restoration of the operation of this Lease under any present or future law, including without limitation any such right which Tenant would otherwise have in case Tenant shall be dispossessed for any cause, or in case Landlord shall obtain possession of the Premises as herein provided. If an Event of Default occurs, Tenant hereby waives its rights to receive any notice of default, as well as any period of and right to cure said default, as may be required by state or local law, and Tenant's rights in that regard shall be solely as provided in this Lease.

**18.6   COSTS UPON DEFAULT AND LITIGATION.**

In the event of any default by Tenant under this Lease or the exercise of any remedy by reason of any default by Tenant under this Lease, Tenant shall reimburse Landlord, as Additional Rent, all reasonable costs and reasonable attorneys' fees incurred by Landlord enforcing the terms of this Lease (whether or not the matter is settled before a judgment or order is entered and including any and all appeals) together with all consequential fees and costs including, without limitation, all costs and expenses incurred by Landlord obtaining possession of the Premises, removing any of Tenant's personal property from the Premises and any reasonable attorneys' fees and brokers' fees incurred in the course of re-letting the Premises.  In addition to the foregoing, Tenant shall pay all expenses incurred by Landlord (including, without limitation, reasonable attorneys' fees) in connection with: (i) any petition for relief under the Bankruptcy Code filed by or against Tenant and any related proceeding, and/or (ii) any assignment of this Lease to any assignee of Tenant pursuant to the Bankruptcy Code.  If Landlord or its mortgagees shall be made a party to any litigation commenced against Tenant or any litigation pertaining to this Lease or the Premises, at the option of Landlord and/or its mortgagees, Tenant, at its expense, shall provide Landlord and/or its mortgagees with counsel approved by Landlord and/or its mortgagees and shall pay all costs incurred or paid by Landlord and/or its mortgagees in connection with such litigation.

<u>**ARTICLE 19.  LIMITATION OF LANDLORD'S LIABILITY**</u>

**19.1   LANDLORD'S DEFAULT.**

Except as otherwise provided in this Lease, Landlord shall be in default under this Lease if Landlord fails to perform any of its obligations hereunder and said failure continues for a period of thirty (30) days after written notice thereof from Tenant to Landlord (unless such failure cannot reasonably be cured within thirty (30) days and Landlord shall have commenced to cure said failure within said thirty (30) days and continues diligently to pursue the curing of the same which cure shall occur no later than ninety (90) days from the date of said notice from Tenant unless the nature of the failure would reasonable take longer than 90 days to cure).  If Landlord defaults under this Lease and if, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied against the right, title and interest of Landlord in the Shopping Center including, but not limited to, the rents, proceeds and profits derived therefrom as the same may then be constituted and encumbered, and Landlord shall not be liable for any deficiency.  In no event shall Tenant have the right to levy execution against any property of Landlord other than its right, title and interest in the Shopping Center including, but not limited to, the rents, proceeds and profits derived therefrom.  Upon any such uncured default by Landlord, Tenant may exercise any of its rights provided at law or in equity; provided, however: (a) Tenant shall have no right to offset or abate rent in the event of any default by Landlord under this Lease, except to the extent offset rights are specifically provided to Tenant in this Lease; (b) Tenant shall have no right to terminate this Lease; and (c) Tenant's rights and remedies hereunder shall be limited to the extent (i) Tenant has expressly waived in this Lease any of such rights or remedies and/or (ii) this Lease otherwise expressly limits Tenant's rights or remedies.  Notwithstanding anything contained in this Lease to the contrary, the obligations of Landlord under this Lease (including any actual or alleged breach or default by Landlord) do not constitute personal obligations of the individual partners, directors, officers, members or shareholders of Landlord or Landlord's partners, and Tenant shall not seek recourse against the individual partners, directors, officers, members or shareholders of Landlord or against Landlord's partners or any other persons or entities having any interest in Landlord, or any of their personal assets for satisfaction of any liability with respect to this Lease.  Notwithstanding anything contained in this Lease to the contrary, in no event shall Landlord or any Landlord Parties ever be liable pursuant to this Lease for lost profits or consequential, speculative or punitive damages.

If Landlord shall breach, or fail to perform or observe, any agreement or condition in this Lease contained on Landlord's part to be performed or observed, and if Landlord shall not cure such breach or failure within thirty (30) days after Landlord's receipt of written notice from Tenant specifying such breach or failure (or, if such breach or failure shall reasonably take more than thirty (30) days to cure, and Landlord shall not have commenced to cure within the thirty (30) days and has not diligently prosecuted the cure to completion), Tenant may, at Tenant's option, cure such breach or failure for the account of Landlord and any reasonable amount paid or incurred by Tenant in so doing shall be deemed paid or incurred for the account of Landlord and Landlord agrees to reimburse Tenant therefor.  Landlord agrees to pay Tenant the reasonable amount paid or incurred by Tenant in curing such breach or failure within thirty (30) days after the date Landlord receives copies of invoices from Tenant detailing such work performed by Tenant.  Tenant shall have no right to deduct or withhold from its Rent any amount owed by Landlord.  Notwithstanding anything to the contrary in the foregoing, Tenant's right to cure Landlord's breaches or failures shall be limited to the performance of Landlord's maintenance and repair obligations under this Lease which directly relate to the interior portions of the Premises.  In no event shall Tenant have the right to exercise its right to cure in regard to the Common Area, or other tenant premises in the Shopping Center.

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

Case 17-03469-TOM7    Doc 95-1    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit A    Page 23 of 46

**19.2    TRANSFER OF LANDLORD'S INTEREST.**
In the event of the sale or other transfer of Landlord's interest in the Premises (except in the case of a sale-leaseback financing transaction in which Landlord is the lessee), Landlord shall transfer and assign to such purchaser or transferee the obligations of Landlord under this Lease  whereupon Landlord shall be deemed released from all liability and obligations hereunder arising out of any act, occurrence or omission relating to the Premises or this Lease occurring after the consummation of such sale or transfer. Provided such purchaser or transferee assumes (or is deemed to have assumed) the obligations of Landlord under this Lease as described above, Tenant agrees to attorn to any such purchaser or transferee without further act by Landlord or such purchaser or transferee.

<u>**ARTICLE 20.  SUBORDINATION AND ATTORNMENT**</u>

**20.1    SUBORDINATION OF LEASE AND TENANT'S ATTORNMENT.**
This Lease is subordinate to the lien of all mortgages, deeds of trust, security instruments, ground leases, easement agreements and any covenants, conditions and restrictions (collectively, "Superior Interests") now or hereafter covering all or any part of the Shopping Center, and to all amendments, modifications, consolidations, renewals, replacements and extensions thereof.    Tenant also agrees that, if any mortgagee elects to have this Lease prior to the lien of its mortgage and signifies such election in the instrument creating its lien, or by separate recorded instrument, this Lease shall be prior in dignity to such mortgage.  In the event of any proceedings brought for the enforcement of any instrument of any Superior Interest holder (including but not limited to a mortgage or lease), Tenant shall, upon demand by the Superior Interest holder, attorn to and recognize such Superior Interest holder as Landlord under this Lease.  Tenant hereby waives its rights under any current or future law which gives or purports to give Tenant any right to terminate or otherwise adversely affect this Lease and the obligations of Tenant hereunder in the event of any such foreclosure proceeding or sale.

**20.2    INSTRUMENTS TO CARRY OUT INTENT.**
Tenant agrees that, in order to confirm the provisions of this Article, but in no way limiting the self-operative effect of said provisions, Tenant shall execute and deliver whatever instruments may be required for such purposes within fifteen (15) business days following Landlord's written request.  Should Tenant fail to sign and return any such instruments within said fifteen (15) business day period, Tenant shall be in default hereunder without the benefit of any additional notice or cure periods specified in this Lease.

<u>**ARTICLE 21.  ESTOPPEL CERTIFICATES**</u>

**21.1    TENANT'S AGREEMENT TO DELIVER.**
Within ten (10) business days after request therefor from Landlord, Tenant agrees to execute and deliver to Landlord, or to such other addressee or addressees as Landlord may designate (and any such addressee may rely thereon), a statement in writing certifying (if true) that this Lease is in full force and effect and unmodified or describing any modifications; that Tenant has accepted the Premises; that Landlord has performed all of its obligations under this Lease arising prior to the date of the certificate; that there are no defenses or offsets against the enforcement of this Lease or stating with particularity those claimed by Tenant; stating the date to which Rent has been paid; and making such other true representations as may be reasonably requested by Landlord.

<u>**ARTICLE 22.  QUIET ENJOYMENT**</u>

**22.1    FAITHFUL PERFORMANCE.**
Upon payment of the Rent herein provided for and the observance and performance of all of the agreements, covenants, terms and conditions to be observed and performed by Tenant and subject to the terms and conditions of this Lease, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term without hindrance or interruption by Landlord.  In addition, Landlord warrants and represents the following to Tenant to the best of Landlord's knowledge: (a) Landlord is the fee owner of the property upon which the Shopping Center is located and has the right to enter into this Lease with Tenant; (b) there is no action, suit or proceeding pending against or involving the Shopping Center that would adversely affect Tenant's rights and/or increase Tenant's obligations under this Lease; or (c) Landlord has no knowledge of any current fact, action or proceeding which could result in the termination of the free and adequate access from the Premises, building or Shopping Center to the adjacent public highways and roads.

<u>**ARTICLE 23.  SURRENDER AND HOLDING OVER**</u>

**23.1    DELIVERY AFTER TERM.**
Upon the expiration or earlier termination of the Term, Tenant shall (i) deliver up and surrender to Landlord possession of the Premises broom clean, free of debris, in good order, condition and state of repair (except as may be Landlord's obligation under this Lease and ordinary wear and tear), (ii) subject to any Landlord lien rights under this Lease, remove all of Tenant's movable furniture, trade fixtures or

22

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

INITIAL
HERE

REGENCY
CENTERS

Case 17-03469-TOM7    Doc 95-1    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit A    Page 24 of 46

other personal property including interior and exterior signage, and repair any damage caused by such removal, and (iii) deliver the keys (and any combinations, as applicable) to the Premises to the office of Landlord in the Shopping Center or to Landlord at the address to which notices to Landlord are to be sent. For purposes of this Section, the term "trade fixtures" shall not include any permanently affixed items or equipment (such as without limitation plumbing fixtures, HVAC equipment, kitchen hoods and walk-in coolers), carpeting, floor coverings, attached shelving/cabinetry, lighting fixtures (other than freestanding lamps), wall coverings, or similar Tenant improvements which shall remain on the Premises at the expiration or earlier termination of this Lease unless otherwise requested by Landlord in writing. If not sooner terminated as herein provided, this Lease shall terminate at the end of the Term as provided for in Article 3 without the necessity of notice from either Landlord or Tenant to terminate same, Tenant hereby waiving notice to vacate the Premises and agreeing that Landlord shall be entitled to the benefit of all provisions of law respecting the summary recovery of possession of the Premises from a tenant holding over.

### 23.2    EFFECT OF HOLDING OVER; RENT.

If Tenant or any party claiming under Tenant remains in possession of the Premises, or any part thereof, after any termination or expiration of this Lease, no tenancy or interest in the Premises shall result therefrom, but such holding over shall be an unlawful detainer and all such parties shall be subject to immediate eviction and removal, and Tenant shall upon demand pay to Landlord, as liquidated damages, a sum equal to all Additional Rent provided for in this Lease during any period which Tenant shall hold the Premises after the Term has expired, plus an amount computed at the rate of one hundred fifty percent (150%) of the Minimum Annual Rent payable for the month immediately preceding expiration of the Term. In addition, Tenant shall indemnify, protect, defend (by counsel approved in writing by Landlord and, as applicable, Landlord's insurance carrier) and hold Landlord harmless from and against any and all claims, judgments, suits, causes of action, damages, losses, liabilities and expenses (including reasonable attorneys' fees and court costs) resulting from such failure to surrender, including, without limitation, any claim made by any succeeding tenant based thereon. The foregoing indemnity shall survive the expiration or earlier termination of this Lease. The foregoing provisions of this Section 23.2 are in addition to, and do not affect, Landlord's right of re-entry or any other rights of Landlord hereunder or otherwise provided by law or equity.

## ARTICLE 24. CONDEMNATION

### 24.1    ALL OF PREMISES TAKEN.

If the whole of the Premises shall be taken either permanently or temporarily by any right of eminent domain or conveyance in lieu thereof (each being hereinafter referred to as "condemnation"), this Lease shall terminate as of the day possession shall be taken by the condemning authority.

### 24.2    LESS THAN ALL OF PREMISES TAKEN.

If twenty percent (20%) or more of the GLA in the Premises is taken by condemnation or if (regardless of the percentage of the GLA in the Premises which is taken) the remainder of the Premises is divided in two (2) or more units, then in either event Landlord or Tenant shall have the right to terminate this Lease upon written notice to the other delivered no later than the day possession shall be taken by such condemning authority whereupon this Lease shall terminate as of the day possession shall be taken by such condemning authority. Tenant shall pay Rent and perform all of its other obligations under this Lease up to that date. If this Lease is not so terminated, the GLA of the Premises shall be accordingly adjusted as of the date of the taking, Rent shall be accordingly adjusted and any pre-paid Rent shall be proportionately credited or debited to Tenant. Thereafter, the Rent shall be based on the square footage of GLA in the Premises. Landlord agrees, at Landlord's cost and expense, as soon as reasonably possible, to restore the Premises on the land remaining to a complete unit of like quality and character as existed prior to such appropriation or taking, provided that Landlord shall not be required to expend more on such restoration than the condemnation award received by Landlord (less all expenses, costs, legal fees and court costs incurred by Landlord in connection with such award).

### 24.3    SHOPPING CENTER TAKEN.

(a)    If any part of the Shopping Center (including any easement appurtenant to Landlord's interest therein) is taken by condemnation so as to render, in Landlord's judgment, the remainder unsuitable for use as a retail shopping center, Landlord shall have the right to terminate this Lease upon notice in writing to Tenant. If Landlord so terminates this Lease, such termination shall be effective as of the day possession is taken by the condemning authority, and Tenant shall pay Rent and perform all of its obligations under this Lease up to that date with a proportionate refund by Landlord of any Rent as may have been paid in advance for a period subsequent to such possession.

(b)    If title to (i) twenty percent (20%) or more of the GLA of the Landlord's Building or (ii) twenty percent (20%) or more of the parking required to be maintained in the Shopping Center is so taken, and if Landlord within one (1) year after such taking has not substituted an equivalent number of parking spaces in a location reasonably accessible to the Shopping Center, then either party may terminate this Lease by written notice to the other given within thirty (30) days after the taking or after the expiration of such one (1) year period, as the case may be.

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE 

### 24.4 OWNERSHIP OF AWARD.

All damages for any condemnation of all or any part of the Shopping Center, including, but not limited to, all damages as compensation for diminution in value of the leasehold, reversion and fee, shall belong to Landlord without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby assigns to Landlord all its right, title and interest to any such award. Although all damages in the event of any condemnation are to belong to Landlord, Tenant may have the right to claim and recover from the condemning authority, but not from Landlord, such compensation as may be separately awarded or recoverable by Tenant in Tenant's own right on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss which Tenant might incur in removing Tenant's merchandise, furniture, fixtures, leasehold improvements and equipment provided the same does not reduce Landlord's award.

### 24.5 CONFLICTS.

If there is a conflict between the provisions of this Article 24 and Article 13, the provisions of Article 24 shall govern.

### 24.6 WAIVER OF TERMINATION RIGHT.

This Lease sets forth the terms and conditions upon which this Lease may be terminated in the event of any taking. Accordingly, except for Tenant's termination rights specifically set forth in this Article, Tenant hereby waives any right to terminate this Lease by reason of any taking pursuant to any present or future laws or case decisions to the same effect.

## ARTICLE 25. MISCELLANEOUS

### 25.1 INTERPRETATION.

(a)    The captions appearing in this Lease are inserted only as a matter of convenience and in no way amplify, define, limit, construe or describe the scope or intent of such sections of this Lease. The neuter, feminine or masculine pronoun when used herein shall each include each of the other genders and the use of the singular shall include the plural. The deletion of any printed, typed or other portion of this Lease shall not evidence an intention to contradict such deleted portion. Such deleted portion shall be deemed not to have been inserted in this Lease.

(b)    The printed provisions of this Lease were drawn together by Tenant and Landlord so that this Lease shall not be construed for or against Landlord or Tenant, but this Lease shall be interpreted in accordance with the general tenor of the language in an effort to reach the intended result.

(c)    Notwithstanding any other provision of this Lease, if the state in which the Premises is located recognizes a distinction between an estate for years and a "usufruct," it is the intention of the parties for this instrument to create a usufruct and not an estate for years.

(d)    The provisions of this Lease with respect to any obligation of Tenant to pay any sum owing in order to perform any act or satisfy its monetary obligations hereunder after the expiration of other termination of this Lease shall survive the expiration or other termination of this Lease.

### 25.2 RELATIONSHIP OF PARTIES.

Nothing herein contained shall be construed as creating any relationship between the parties other than the relationship of Landlord and Tenant, or cause either party to be responsible in any way for the acts, debts or obligations of the other.

### 25.3 NOTICES.

(a)    Any notice, demand, request, approval, consent or other instrument which may be or is required to be given under this Lease shall be in writing and shall be sent by either United States certified mail, return receipt requested, postage prepaid, or overnight delivery courier (unless otherwise specifically set forth in this Lease) and shall be addressed to the party to be notified at the address of such party set forth in Section 1.1(t), or to such other address as such party may from time to time designate by notice to the other in accordance with this Section. Notices shall be effective upon delivery unless delivery is refused or cannot be made, in which event notice shall be effective at the time of refusal.

(b)    No notice required to be given to Landlord shall be effective for any purpose unless and until a true copy thereof is given to each mortgagee of Landlord's estate, provided Tenant has previously been given written notice of the name and address of such mortgagee.

(c)    Notices required hereunder may be given by an attorney acting on behalf of Landlord or Tenant.

### 25.4 SUCCESSORS.

This Lease shall inure to the benefit of and be binding upon Landlord, its successors and assigns, and shall be binding upon Tenant, its successors and assigns, and shall inure to the benefit of Tenant and only such assigns of Tenant to whom the assignment by Tenant has been made in accordance with the provisions of this Lease.

24

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE



Case 17-03469-TOM7    Doc 95-1    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit A    Page 26 of 46

**25.5    BROKER'S COMMISSION.**
Landlord has entered into an agreement with the real estate broker specified in Section 1.1(n) of this Lease as representing Landlord ("Landlord's Broker"), and Landlord shall pay any commissions or fees that are payable to Landlord's Broker with respect to this Lease in accordance with the provisions of a separate commission contract.  Landlord shall have no further or separate obligation for payment of commissions or fees to any other real estate broker, finder or intermediary. Tenant represents that it has not had any dealings with any real estate broker, finder or intermediary with respect to this Lease, other than Landlord's Broker and the broker specified in Section 1.1(n) of this Lease as representing Tenant ("Tenant's Broker").  Any commissions or fees payable to Tenant's Broker with respect to this Lease shall be paid exclusively by Landlord's Broker.  Each party represents and warrants to the other, that, to its knowledge, no other broker, agent or finder (a) negotiated or was instrumental in negotiating or consummating this Lease on its behalf, or/and (b) is or might be entitled to a commission or compensation in connection with this Lease.  Any broker, agent or finder of Tenant whom Tenant has failed to disclose herein shall be paid by Tenant.

**25.6    UNAVOIDABLE DELAYS.**
In the event that either party shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure labor or materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, fire or other casualty or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed in performing work or doing acts required under the terms of this Lease (collectively, "Unavoidable Delays" and each an "Unavoidable Delay"), then performance of such act shall be excused for the period of an Unavoidable Delay and the period for the performance of any such act shall be extended for a period equivalent to the period of an Unavoidable Delay.  The party rendered unable to fulfill any obligation by reason of an Unavoidable Delay shall take all commercially reasonable action necessary to remove such inability with all due speed and diligence.  The nonperforming party will be prompt and diligent in attempting to remove the cause of its failure to perform, and nothing herein shall be construed as permitting that party to continue to fail to perform after said cause has been removed.  The provisions of this Section shall not operate to excuse Tenant from prompt payment of Rent or any other payments required by the terms of this Lease and shall not extend the Term.  Delays or failures to perform resulting from lack of funds shall not be deemed delays beyond the reasonable control of a party.

**25.7    ENTIRE AGREEMENT; PARTIAL INVALIDITY.**
There are no oral agreements between the parties hereto affecting this Lease, and this Lease supersedes and cancels any and all previous negotiations, arrangements, letters of intent, lease proposals, brochures, agreements, representations, promises, warranties and understandings between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof.  This Lease, including the Exhibits and any addenda attached hereto, sets forth all the covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Premises and the Shopping Center.  No alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced in writing, signed and mutually delivered by both Landlord and Tenant.  If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and enforced to the fullest extent permitted by law.

**25.8    APPLICABLE LAW; VENUE.**
The laws of the state in which the Premises is located shall govern the validity, performance and enforcement of this Lease.  Each of Landlord and Tenant hereby irrevocably and unconditionally:  (i) consents to submit to the exclusive jurisdiction of the state and federal courts of the state in which the Premises is located for any proceeding arising in connection with this Lease and each such party agrees not to commence any such proceeding except in such courts, and (ii) waives any objection to the laying of venue of any such proceeding in the state and federal courts of the state in which the Premises is located.

**25.9    WAIVER.**
Failure of either party to insist upon the strict performance of any provision of this Lease or to exercise any option or enforce any rules and regulations shall not be construed as a waiver in the future of any such provision, rule or option.

**25.10    ACCORD AND SATISFACTION.**
No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any such check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy provided for in this Lease or available at law or in equity.

**25.11    LANDLORD'S SELF-HELP.**
In addition to Landlord's rights of self-help set forth elsewhere in this Lease or available at law or in equity, if Tenant at any time fails to perform any of its obligations under this Lease in a manner

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

INITIAL
HERE

REGENCY
CENTERS



reasonably satisfactory to Landlord, Landlord shall have the right, but not the obligation, upon giving Tenant at least ten (10) days' prior written notice of its election to do so (except in the event of an emergency when no prior notice shall be required), to perform such obligations on behalf of and for the account of Tenant and to take all such action necessary to perform such obligations without liability to Tenant for any loss or damage which may result to Tenant's stock or business by reason of such repairs. In such event, Landlord's costs and expenses incurred therein shall be paid for by Tenant as Additional Rent, forthwith upon demand therefor, with interest thereon from the date Landlord performs such work at the Default Rate. The performance by Landlord of any such obligation shall not constitute a release or waiver of Tenant therefrom.

### 25.12   RECORDING.

Tenant agrees that it will not record this Lease, or a short memorandum hereof. Should the parties agree to a Memorandum of Lease, the party desiring to record such a document shall pay all transfer taxes associated with the execution of this Lease.

### 25.13   JOINT AND SEVERAL LIABILITY.

If two or more individuals, corporations, partnerships or other business entities (or any combination of two or more thereof) shall sign this Lease as Tenant, the liability of each of them shall be joint and several. In like manner, if Tenant named in this Lease shall be a partnership or other business entity, the members of which are, by virtue of statute or general law, subject to personal liability, the liability of each such member shall be joint and several.

### 25.14   EXECUTION OF LEASE.

The submission of this Lease for examination does not constitute a reservation of or option for the Premises or any other space within the Shopping Center and shall vest no right in either party. This Lease shall become effective as a binding lease only upon execution and legal delivery thereof by the parties, together with the execution and delivery to Landlord of the Guaranty in the form attached hereto by Guarantor(s), if any, named in Section 1.1(k) and the delivery by Tenant to Landlord of any documents and monies (if any) required to be delivered by Tenant to Landlord upon Tenant's execution and delivery of this Lease to Landlord. This Lease may be executed in more than one counterpart, and each such counterpart shall be deemed to be an original document.

### 25.15   WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS LEASE, OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS LEASE, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

### 25.16   TIME OF THE ESSENCE.

Time is of the essence of each and every obligation under this Lease.

### 25.17   TENANT'S AUTHORITY.

If Tenant executes this Lease as a corporation, limited liability company, partnership or other business entity, then Tenant and the persons and/or entities executing this Lease on behalf of Tenant covenant, represent and warrant that as of the date of this Lease and continuing throughout the Term of this Lease: (a) Tenant is duly organized, authorized, validly existing and qualified to do business in the state in which the Premises is located; (b) such persons and/or entities executing this Lease are duly authorized to execute and deliver this Lease on Tenant's behalf in accordance with Tenant's duly adopted organizational documents; and (c) this Lease is binding upon Tenant in accordance with its terms. Concurrently with Tenant's execution and delivery of this Lease to Landlord and/or at any time during the Term within ten (10) days of Landlord's request, Tenant shall provide to Landlord a copy of any documents reasonably requested by Landlord evidencing such qualification, organization, existence and authorization.

### 25.18   ANTI-TERRORISM AND MONEY LAUNDERING REPRESENTATION AND INDEMNIFICATION.

Tenant certifies that: (i) neither it nor its officers, directors or controlling owners are acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order, the United States Department of Justice, or the United States Treasury Department as a terrorist, "Specially Designated National or Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control ("SDN"); (ii) neither it nor its officers, directors or controlling owners are engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation; and (iii) neither it nor its officers, directors or controlling owners are in violation of Presidential Executive Order 13224, the USA Patriot Act, the Bank Secrecy Act, the Money Laundering Control Act or any regulations promulgated pursuant thereto. Tenant

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

INITIAL HERE

REGENCY
CENTERS

Case 17-03469-TOM7   Doc 95-1   Filed 09/05/17   Entered 09/05/17 15:32:05   Desc
Exhibit Exhibit A   Page 28 of 46

hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing certification. Should Tenant, during the term of this Lease, be designated an SDN, Landlord may, at its sole option, terminate this Lease.

## ARTICLE 26. EXCLUSIVE

Landlord will not lease in the future to any tenant in the Shopping Center whose primary business is as follows:

The retail sale of pizza for delivery or carryout ("Exclusive")

It is understood that this exclusive shall not apply to any tenant (including any assignee, sublessee or other transferee thereof) pursuant to a lease existing as of the date of this Lease. It is further understood that other tenants (including any assignees, sublessees or other transferees thereof) in the Landlord's Building or Shopping Center may sell one or more of the exclusive item(s) as an incidental part of its business (for purposes hereof, "incidental part" means ten percent (10%) or less of such tenant's total annual gross sales, said limitation to be computed on the aggregate sales of the Exclusive items computed on a rolling twelve (12) month basis), and permission heretofore or hereafter granted by Landlord to conduct such incidental sales shall not be deemed to violate this covenant. This exclusive shall automatically terminate and be of no further force or effect (i) should this Lease be assigned, and as a result of such assignment, the use of the Premises is changed from the primary use set forth in Section 1.1(j) of this Lease, or (ii) if the use of the Premises is otherwise changed (or if operations cease in violation of this Lease) from the primary use set forth in Section 1.1(j) of this Lease. Should Tenant become in default beyond any applicable notice and cure period under any provision of this Lease, then this exclusive shall automatically terminate and be of no further force or effect, except that if Tenant subsequently cures such default, then this exclusive shall continue from and after the date of such cure and otherwise in accordance with the terms of this Article 26.

Notwithstanding anything to the contrary set forth above, Landlord reserves the right to lease (or consent to the use of) any space in the Landlord's Building without imposing any restriction on the use of such space to any tenant whose principal business at the time the lease is made (or consent is given) is that of a department store, junior department store, variety store, grocery store, drug store, or to any tenant initially occupying more than 10,000 square feet of GLA, it being understood that Landlord shall not be obligated to restrict the use of any of such space in any manner whatsoever.

Notwithstanding anything to the contrary in this Article, (i) if Tenant's exclusive shall be violated by another tenant because said tenant is operating in its premises in violation of its permitted use as set forth in such tenant's lease ("Rogue Tenant"), then Landlord shall not be deemed to have violated Tenant's exclusive and Tenant shall not have the right to any remedy against Landlord, so long as Landlord is diligently and continually taking reasonable steps to stop the offending activity by such Rogue Tenant, including, but not limited to, the commencement of any appropriate legal proceedings; and (ii) Landlord shall not be obligated to maintain or enforce Tenant's exclusive use rights under this Article to the extent the same would cause a violation of any applicable anti-trust law as determined by a court of competent jurisdiction.

In the event of a breach of Landlord's agreement set forth in this Article 26, provided Tenant (i) continuously operates in the Premises, except in the event of any closures expressly permitted in this Lease, (ii) is not in an Event of Default under this Lease, and (iii) provides Landlord with written notice of such breach within ninety (90) days after the date Tenant has notice that a tenant in the Shopping Center commences the Exclusive use ("Notice of Breach"), then as Tenant's sole remedy, Tenant may pay a reduced Minimum Rent ("Reduced Rent") in the amount of fifty percent (50%) of the Minimum Rent otherwise due under this Lease during the period of such breach. With respect to a violation of the provisions above, Landlord shall be deemed to have cured such violation if the alleged violating tenant's annual gross sales of the items constituting the breach for the most recent twelve (12) month period are incidental as defined hereinabove. If Tenant has paid or been entitled to pay Reduced Rent pursuant to this Article 26 for a period of twelve (12) months ("12 Month Period"), Tenant shall either terminate this Lease by giving notice to Landlord of such election prior to the expiration of the 12 Month Period, or Tenant shall commence paying full Minimum Rent on the day following the 12 Month Period as otherwise provided in this Lease. If Tenant elects to terminate, this Lease shall terminate effective as of the date that is thirty (30) days after the date on which Tenant gives notice of its election to terminate. Tenant's failure to terminate this Lease in accordance with the terms herein shall be a waiver of Tenant's right to terminate.

## ARTICLE 27. LIMIT ON COMMON AREA COSTS

During the first (1st) full calendar year of the initial Term (and any portion of a calendar year of such initial Term prior to the commencement of such first (1st) full calendar year), as applicable, Tenant's responsibility for Common Area Costs shall be for Tenant's Proportionate Share of the actual Common Area Costs. Notwithstanding the provisions of Article 8 of this Lease, commencing with the second (2nd) full calendar year of the Term and continuing thereafter for each year in the Term and any Renewal Terms of this Lease, Landlord agrees that Tenant's Proportionate Share of Controllable Common Area Costs shall not be increased by more than five percent (5%) for any one (1) calendar year in excess of

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE 

Case 17-03469-TOM7    Doc 95-1    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit A    Page 29 of 46

the amount payable by Tenant for Controllable Common Area Costs in the immediately preceding calendar year, on a non-cumulative basis.

"Controllable Common Area Costs" are all of those Common Area Costs described in Section 8.5 except for the costs of utilities furnished to the Common Areas, security, snow and ice removal costs, and the costs of any services provided by governmental authorities or agencies. The cap on Controllable Common Area Costs set forth above shall in no event be construed to cap Taxes or Insurance.

## ARTICLE 28. ADDITIONAL MAINTENANCE REQUIREMENTS

Tenant shall, at its sole cost and expense, clean all plumbing and sewer lines up to the main sewer line on a regular basis, no less often than quarterly and provide Landlord with written evidence thereof. Tenant shall also be responsible and shall pay for any repairs to the roof and other components of the Shopping Center caused by grease vented from the Premises. In addition, Tenant shall at its sole cost and expense, install a venting or exhaust system approved by Landlord in writing in order to remove any noxious fumes or odors caused by Tenant's use of the Premises.

## ARTICLE 29. ADDITIONAL REQUIREMENTS FOR RESTAURANT USE IN PREMISES

### 29.1 REQUIREMENTS FOR WASHDOWN AREAS.
Landlord requires that the following materials be furnished and installed for all Tenant kitchen/food preparation areas where a wash down procedure takes place:

1.  All areas must contain a minimum of one (1) floor drain.

2.  All floor surfaces must be covered with a waterproof/cleanable surface that extends a minimum of six (6) inches up the wall.

3.  The next two (2) vertical feet of wall surface treatment above the base material should be waterproof, i.e. a marlite fiberglass reinforced panel.

These requirements are in-place to prevent water from entering the drywall partitions contained within the Premises or any adjacent space.

### 29.2 GREASE TRAP.
In the event Tenant uses all or any portion of the Premises for food preparation, Tenant must comply with all regulations and requirements of applicable health and safety authorities, including, if required by such authorities, the installation of an adequate grease trap (or verifying that the existing grease trap, if there is one, is adequate) and grease recycler. Landlord acknowledges that such grease trap and any connections from the grease trap to the Premises and such grease recycler may be located underground, so long as the plans and specifications for such grease trap and grease recycler, including the specific locations of such grease trap and grease trap connections and such grease recycler, have been approved by Landlord in writing. Such grease trap and grease recycler shall remain subject to all other terms and conditions in this Lease as if the grease trap and grease recycler were a part of the Premises; provided, however, that the square footage of any area underground in which the grease trap and grease recycler are installed shall not be included in the GLA of the Premises. Tenant must arrange for regular and frequent cleaning of any such grease trap and grease recycler (which cleaning shall be as often as necessary but no less frequently than that required by applicable code) so as to fully and completely prevent any overflow of the grease trap and grease recycler. Tenant shall additionally power wash around the grease trap and grease recycler at least monthly to maintain the area in which such equipment is located in a clean and sanitary condition. Additionally, Tenant shall provide Landlord a detailed description of the systems which Tenant intends to utilize for the handling, transportation, storage and disposal of grease, and such systems remain subject to Landlord's prior written approval. Tenant shall additionally install a grease guard at the exhaust system on the roof of the Premises to prevent grease from collecting on the roof or in the exhaust system and/or causing damage or deterioration to the roof surface or membrane. Such grease guard shall be installed in compliance with all municipal, state and federal codes and regulations, including, without limitation, NFPA 96 Standard for Ventilation Control and Fire Protection of Common Cooking Operations 1998 (4-8.2.1), as amended from time to time. Tenant shall provide plans and specifications for its proposed grease guard for Landlord's review and approval prior to installation. Tenant shall maintain such exhaust system in good condition, order and repair. Without limiting the foregoing, Tenant shall enter into a contract for the inspection and maintenance of the exhaust system in the Premises with a licensed contractor, which contract shall provide for a thorough inspection, cleaning, and maintenance of such exhaust system on such basis as may be required by applicable code (provided that either Landlord or Tenant may require at any time that such work be conducted more frequently if necessary to prevent clogging or to minimize odors emanating from the Premises). Tenant shall promptly provide to Landlord a copy of such contract and copies of all inspection and maintenance reports. Tenant shall promptly undertake any remedial action reasonably recommended by its contractor. In the event that Tenant does not enter into such a contract or does not undertake any remedial action recommended by its contractor, Landlord may, upon notice to Tenant, enter into such a contract on behalf of Tenant or perform the work and in either case, charge Tenant the cost thereof along with a reasonable amount for Landlord's overhead.

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE 

**30.1    DEFINITION OF TENANT ALLOWANCE.**
Landlord agrees to reimburse Tenant an amount not to exceed the amount stated in Section 1.1(u) of this Lease as a tenant finish allowance for "Permanent Improvements to the Premises" as hereinafter defined (the "Tenant Allowance").

**30.2    CONDITIONS TO RELEASE OF TENANT ALLOWANCE.**
Landlord shall pay the Tenant Allowance to Tenant within thirty (30) days after all of the following conditions have been met:

(a)        If Tenant has engaged a general contractor in connection with Tenant's Work, then Tenant has furnished to Landlord a copy of the final construction contract (including a reasonably detailed final scope of services and a reasonably detailed final cost breakdown but redacted to hide financial terms) for Tenant's Work and Landlord has inspected the Premises to confirm that the work set forth in such final construction contract has indeed been completed, <u>or</u> if Tenant has not engaged a general contractor in connection with Tenant's Work, then Tenant has furnished to Landlord a reasonably detailed final cost breakdown for Tenant's Work and Landlord has inspected the Premises to confirm that the work set forth in such final cost breakdown has indeed been completed.  Landlord's inspection right set forth herein is intended solely for Landlord to confirm that Tenant's Work has been completed and Landlord provides no representations or warranties to Tenant, express or implied, with respect to Tenant's Work. Landlord shall perform its inspection after the completion of Tenant's Work and within ten (10) days of the date Tenant provides to Landlord both (i) a written request for inspection including a copy of the final construction contract (including final scope of services and final cost breakdown) or the final cost breakdown, as applicable, as set forth above, and (ii) a certificate of occupancy from the governmental authority having jurisdiction (or an equivalent if the governmental authority having jurisdiction does not issue certificates of occupancy), as set forth in item (c) below.

(b)        Tenant has furnished to Landlord original, final affidavits and original, final lien releases from Tenant's general contractor, if any, all subcontractors and all material suppliers for all labor and materials performed or supplied as part of Tenant's Work (whether or not the Tenant Allowance is applicable thereto).  Such affidavits and lien releases shall (i) be on Landlord's form if so requested by Landlord, (ii) specify on their face the work performed by and the total amount paid to the party providing such affidavit and/or lien release, (iii) be satisfactory to Landlord in establishing payment in full for all labor and materials which may form a predicate for a claim of lien against the Premises or any other portion of the Shopping Center, and (iv) otherwise be in form and substance acceptable to Landlord.

(c)        A certificate of occupancy from the governmental authority having jurisdiction (or an equivalent if the governmental authority having jurisdiction does not issue certificates of occupancy) has been delivered to Landlord.

(d)        Tenant is open for business to the public in the entire Premises and has paid to Landlord Rent for the first month and second month of the Term.

(e)        Landlord has received and approved a copy of the HVAC preventative maintenance agreement as required by Section 13.2 of this Lease.

(f)        Landlord has received a certificate of insurance as required by Section 11.4 of this Lease.

(g)        Landlord has received evidence that Tenant has paid its utility deposits and local government impact fees.

(h)        Landlord has received a copy of Tenant's "as built" drawings confirming compliance with the Americans with Disabilities Act.

(i)        Landlord has received a Form W-9, Request for Taxpayer Identification Number and Certification, executed by Tenant.

(j)        Tenant is not in default under this Lease beyond any applicable notice and cure periods.

(k)        Tenant has installed its permanent signage on the exterior of the Premises.

(l)        Tenant has provided to Landlord a written request for payment of the Tenant Allowance, which written request shall specifically address Tenant's satisfaction of the other conditions set forth above and include any documentation required by the other conditions set forth above (the "Tenant Allowance Request").

**30.3    DEFINITION OF PERMANENT IMPROVEMENTS TO THE PREMISES.**

(a)        "Permanent Improvements to the Premises" specifically <u>include</u> without limitation labor and materials for the following areas of Tenant's Work (to the extent the same are included in the

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

scope of Tenant's Work): demolition or removal of any existing items or improvements from the Premises; cleaning and/or trash removal; temporary utilities to the Premises during construction; portable restrooms; asbestos inspection; permit fees; plumbing (including fixtures and restrooms); electrical; lighting; floor slab; floor coverings (including without limitation custom flooring); walls; wall coverings (including without limitation paint); ceilings (including without limitation ceiling tile replacement); doors; utility meters; permanently affixed cabinetry and permanently affixed restaurant equipment such as kitchen hoods and walk-in coolers; HVAC installation or replacement; fire system (i.e., sprinkler system) installation or replacement; fire system upgrades; firewalls; locks/glasswork; plans and specifications for Tenant's Work; grease traps and affixed vents/ventilation equipment (such as without limitation venting on the roof); ADA ramps; and any specific repairs to existing permanent improvements (such as repairs to the floor slab or any existing plumbing, electrical, HVAC or fire systems including any inspection fees associated with such repairs). Any Permanent Improvements to the Premises shall remain in the Premises upon the expiration or earlier termination of this Lease unless otherwise requested by Landlord in writing.

(b)    "Permanent Improvements to the Premises" specifically <u>exclude</u> without limitation labor and materials for the following areas of Tenant's Work (to the extent the same are included in the scope of Tenant's Work): removable furniture, fixtures and equipment (e.g., removable shelving, computer equipment such as point of sale equipment and other computer equipment such as monitors, and removable restaurant equipment such as ovens and stoves); inventory; moving or relocation; any type of utility deposits; gift certificates; televisions or television equipment; telecommunications lines; telephones or telephone equipment; satellite dishes or satellite dish equipment; office supplies; mileage; food and/or entertainment; uniforms; security system; and signage.

(c)    If a particular area of Tenant's Work is not specifically included or excluded from Permanent Improvements to the Premises as set forth above, then Landlord shall determine whether the same should be included or excluded from Permanent Improvements to the Premises.

(d)    As provided above, Tenant acknowledges and agrees that the Tenant Allowance is intended to reimburse Tenant for Permanent Improvements to the Premises as defined above and that in no event will the amount of the Tenant Allowance exceed Tenant's actual cost of Permanent Improvements to the Premises as evidenced by the lien releases required above and as determined in accordance with this Article.

**30.4    OUTSIDE DATE FOR TENANT ALLOWANCE REQUEST.**  If Tenant does not provide the Tenant Allowance Request to Landlord within three hundred sixty five (365) days of the Commencement Date of this Lease, then Tenant shall be deemed to have waived, without the requirement of any notice, any right to the Tenant Allowance and Landlord's reimbursement obligation under this Article shall be deemed null and void and of no further force or effect.

<u>**ARTICLE 31.  LANDLORD'S LIEN**</u>

TO SECURE THE PAYMENT OF ALL RENTAL AND OTHER SUMS OF MONEY DUE OR TO BECOME DUE HEREUNDER AND THE FAITHFUL PERFORMANCE OF THIS LEASE BY TENANT, TENANT HEREBY GRANTS TO LANDLORD AN EXPRESS FIRST AND PRIOR CONTRACTUAL LIEN AND SECURITY INTEREST ON ALL PROPERTY (INCLUDING, BUT NOT LIMITED TO, FURNITURE, FIXTURES, EQUIPMENT, INVENTORY, CHATTELS AND MERCHANDISE AND ALL ACCESSORIES THERETO AND ALL PROCEEDS THEREOF) WHICH MAY BE PLACED ON THE PREMISES, AND ALSO UPON ALL PROCEEDS OF ANY INSURANCE WHICH MAY ACCRUE TO TENANT BY REASON OF DESTRUCTION OF OR DAMAGE TO ANY SUCH PROPERTY.  SUCH PROPERTY SHALL NOT BE REMOVED FROM THE PREMISES WITHOUT THE WRITTEN CONSENT OF LANDLORD UNTIL ALL ARREARAGES IN RENTAL AND OTHER SUMS OF MONEY THEN DUE TO LANDLORD HEREUNDER SHALL FIRST HAVE BEEN PAID.  ALL EXEMPTION LAWS ARE HEREBY WAIVED IN FAVOR OF SAID LIEN AND SECURITY INTEREST.  THIS LIEN AND SECURITY INTEREST IS GIVEN IN ADDITION TO LANDLORD'S STATUTORY LIEN AND SHALL BE CUMULATIVE THERETO.  UPON THE OCCURRENCE OF ANY EVENT OF DEFAULT, THIS LIEN MAY BE FORECLOSED WITH OR WITHOUT COURT PROCEEDINGS, BY PUBLIC OR PRIVATE SALE, PROVIDED LANDLORD GIVES TENANT AT LEAST TEN (10) DAYS NOTICE OF THE TIME AND PLACE OF SAID SALE, AND LANDLORD SHALL HAVE THE RIGHT TO BECOME THE PURCHASER UPON BEING THE HIGHEST BIDDER AT SUCH SALE.

<u>**ARTICLE 32.  OPTION TO EXTEND THE TERM**</u>

Tenant shall have the option, exercisable by written notice to Landlord, by certified mail, return receipt requested, given not later than one hundred eighty (180) days prior to the expiration of the then current Term and not earlier than two hundred seventy (270) days prior to the expiration of the then current Term, to extend the Term of this Lease for two (2) further terms of sixty (60) months each on the same terms and conditions as provided in this Lease, except that:

(a)    Landlord shall have no obligation to make any improvements to the Premises; and

(b)    Minimum Annual Rent for the extended Term shall be as set forth below:

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

|  | Lease Year | $ Per Square Foot Per Annum |
|---|---|---|
| Option 1 | 6 | $22.52 |
|  | 7 | $23.20 |
|  | 8 | $23.90 |
|  | 9 | $24.62 |
|  | 10 | $25.36 |
| Option 2 | 11 | $26.12 |
|  | 12 | $26.91 |
|  | 13 | $27.71 |
|  | 14 | $28.54 |
|  | 15 | $29.40 |

and

    (c)        There shall be no option to further extend the Term.

Notwithstanding the foregoing, any option to extend the Term of this Lease shall be deemed null and void, at Landlord's sole discretion, if one or more of the following has occurred:

    1.        Tenant has been late in the payment of Rent on three (3) or more occasions within any Lease Year. For this purpose, a payment shall be deemed to be late if it is received by Landlord after the second day of the month in which such Rent is due.

    2.        Tenant is in default in the performance of any of its obligations under this Lease beyond any applicable notice and cure period at the time Tenant exercises the option to extend or at the commencement of the extended Term.

    3.        Tenant has failed to give written notice by certified mail, return receipt requested, to Landlord one hundred eighty (180) days prior to the expiration of the then current Term or has given notice earlier than two hundred seventy (270) days prior to the expiration of the then current Term.

    4.        This Lease has ever been assigned by Tenant in violation of this Lease.

### ARTICLE 33.  INTENTIONALLY OMITTED

### ARTICLE 34.  HVAC

Provided that Tenant has obtained and maintained, at Tenant's sole cost, service contracts with reputable, licensed mechanical contractors to carry out a program of regular maintenance and repair of the heating, ventilating and air-conditioning system serving the Premises, Landlord shall, for a period of one (1) year from the date Landlord delivers possession of the Premises to Tenant, be responsible for the repair or replacement of such HVAC system to the extent not covered by the aforesaid service contract; excluding, however, any repairs or replacements to the HVAC system due to the acts or negligence of Tenant, its agents, servants, contractors, employees, sublessees, assigns, concessionaires, licensees, or invitees; in which event such repairs and replacement shall be the responsibility of Tenant. After the existing HVAC system or any portion thereof is repaired or replaced, Landlord shall no longer be responsible for any excess costs associated with any further repair or replacement of such HVAC system or portion thereof.

[SIGNATURES ON NEXT PAGE]

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL HERE 

Case 17-03469-TOM7   Doc 95-1   Filed 09/05/17   Entered 09/05/17 15:32:05   Desc
Exhibit Exhibit A   Page 33 of 46

**IN WITNESS WHEREOF**, Landlord and Tenant have duly executed this Lease under seal as of the day and year first above written.

LANDLORD:

USRP I, LLC,
a Delaware limited liability company
By: USRP I Holding, LLC, a Delaware limited
liability company, its sole member
By: GRI-Regency, LLC, a Delaware limited
liability company, its sole member
By: Regency Centers, L.P., a Delaware limited
partnership, its managing member
By: Regency Centers Corporation, a Florida
corporation, its general partner

By: _____
Print Name: _____
Its: _____

TENANT:

MARYLAND PIZZA, INC.,
a Maryland corporation

By: _Richard Ruggiero_
Print Name: _Richard Ruggiero_
Its: _VP_ (SEAL)

Attest: _Wayne Karwan_
Its: _Wayne Karwan V.P._

Tax I.D.#: _45 2846929_

Print Name: _____ _Mark Watkins_
Witness

Print Name: _____
Witness

Print Name: _Scott S. Katz_
Witness

Print Name: _____
Witness

**Execution:**
**Corporate:** This Lease must be executed for Tenant, if a corporation, by the president or vice president and attested by the secretary or assistant secretary, unless the bylaws or a resolution of the Board of Directors shall otherwise provide, in which event, a certified copy of the bylaws or resolution, as the case may be, must be furnished. Also, the corporate seal of Tenant, if Tenant has such a seal, must be affixed.

EMILY STELLFOX
NOTARY PUBLIC
BALTIMORE COUNTY
MARYLAND

2/20/13
Emily Stellfox

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

# EXHIBIT A

## LEGAL DESCRIPTION OF THE LAND COMPRISING THE SHOPPING CENTER

All that certain property located in Prince George's County, Maryland, being more particularly described as follows:

Being part of Parcel "A" as shown on plat of subdivision entitled "Parcel 'A', Watkins Park Plaza" recorded among the Land Records of Prince George's County, Maryland in Plat Book NLP 125 at Plat No. 19 and Part of Parcel "B" Block 63, as shown on a plat of subdivision entitled "Plat of Correction, Plat No. 41-A, Kettering" recorded among the aforesaid Land Records in Plat Book NLP 100 at Plat No. 51, and being more particularly described as one Parcel as follows:

Beginning for the same at a point on the northeasterly right-of-way line of Watkins Park Drive, 120.00 feet wide, said point also being at the southwesterly end of the South 16° 54' 47" West, 1238.63 foot line of Parcel "A" as shown on the first mentioned plat, and running, thence with said right-of-way line with the outline of said Parcel "A"

1. North 37° 19' 40" West, 430.61 feet to a point of curvature;

2. 295.91 feet along the arc of a curve, deflecting to the left, having, a radius of 5669.58 feet and a chord bearing North 35° 49' 58" West, 295.87 feet to a point, thence crossing the aforesaid Parcels "A" and "B";

3. North 56° 29' 22" East, 0.80 feet to a point;

4. 262.52 feet along the arc of a curve, deflecting to the right, having, a radius of 2,804.77 feet and a chord bearing of North 30° 49' 49" West, 262.42 feet to a point of compound curvature; and

5. 153.54 feet along the arc of a curve deflecting to the right having a radius of 113.00 feet and a chord bearing of North 10° 46' 52" East, 142.00 feet to a point on the southerly right of way line of Central Avenue (Maryland Route #214) variable width; thence with said right-of-way;

6. North 71° 23' 51" East, 229.69 feet to a point of curvature;

7. 529.42 feet along the arc of a curve deflecting to the right, having a radius of 2208.83 feet and a chord bearing of North 78°15' 53" East, 528.15 feet to a point;

8. South 04° 52' 07" East, 22.00 feet to a point; and

9. 143.81 feet along the arc of a curve, deflecting to the right, having a radius of 2,186.83 feet and a chord bearing of North 87° 00' 55" East, 143.79 feet to a point on the South 16° 54' 47" West, 65.66 foot line of the aforesaid Parcel "B", distant 20.55 feet southerly

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars 2012\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

of the northerly end thereof, thence with part of said line and with the outline of the aforesaid Parcel "A".

10. South 16° 54' 47" West, 1164.17 feet to the place of beginning containing 557,221 square feet or 12.7921 acres of land.

Said property is also shown on plat of survey prepared by Ben Dyer Associates, Inc. (bearing the certification of David S. Oertly, Maryland Registration No. 10809), dated November 26, 1985, last revised and recertified February 24, 2000, which plat of survey is incorporated herein by this reference and made a part of this description.

Tax I.D. Nos. 07-0777086 and 07-0777078

The street address of the property is:

2-68 Watkins Park Drive
Upper Marlboro, MD 20774

A-2

REGENCY
CENTERS

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars 2012\Little Caesars Watkins Lease FINAL 2013.doc

INITIAL
HERE

**EXHIBIT B**

**SITE PLAN OF THE SHOPPING CENTER**

[The site plan is presented solely for the purpose of identifying the approximate location and size of the improvements in the Shopping Center. Subject to the terms and conditions of this Lease, building sizes, dimensions, access and parking area, existing tenant locations and identities are subject to change without notice and at Landlord's discretion. Unit numbers as indicated are not necessarily the actual suite numbers and are intended for use as a reference only.]

Mitchellville, MD 20774

# Watkins Park Plaza

50 Watkins Park Drive

 Premises



MD Route 214 - Central Avenue

MD Route 193 - Watkins Park Drive



Rev. 05/17/12

**Regency Centers.**



FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

B-1

INITIAL
HERE

# EXHIBIT C

## DESCRIPTION OF TENANT'S WORK AND WORK TO BE PERFORMED BY LANDLORD

A.   Procedure for the Preparation and Approval of Working Drawings and Specifications.

Tenant shall, within ten (10) days after the later of the date of execution of this Lease or Tenant's receipt of possession of the Premises in the condition required by this Lease, deliver to Landlord for its review and approval two (2) sets of drawings and specifications for Tenant's proposed improvements to the Premises ("Tenant's Plans"). One set will be returned to Tenant and one set will be retained by Landlord. Landlord may at its election require electronic drawings and specifications (both .PDF format or similar, and .DWG format or similar). Such drawings shall consist of at least a site plan (if sitework changes to the utilities, paving, landscaping, mechanical, electrical, or plumbing systems etc. are proposed), a floor plan, and exterior building elevations (if any modifications are proposed to the storefront or exterior walls) done at a reasonable scale, which will convey detail and intent, as well as an indication of color selection and graphics. Storefront elevations shall include specification of materials and color scheme.   The following conditions, as applicable, are to be clearly detailed on the drawings:

New roof penetrations, including plumbing penetrations for vent stacks, or any modifications to the roof system
New equipment (satellite dishes, HVAC, etc.) installed on the roof
Underground utility changes and pavement demolition/replacement
Modifications to exterior walls to include new doors, windows, finishes, etc.
Anything to be mounted on the exterior walls
Changes to electrical, water, or gas service
Changes to the concrete floor slab
Grease trap location

Landlord shall approve or disapprove Tenant's Plans within ten (10) business days after receipt of Tenant's Plans and Tenant shall have ten (10) business days after receiving Landlord's approval or disapproval to respond.   This procedure shall continue until Landlord approves Tenant's Plans.   If Landlord fails to approve or disapprove Tenant's Plans within the aforementioned 10-day period, then Tenant's Plans shall be deemed approved.

Time is of the essence of this agreement.

Tenant shall have access to change locks upon Landlord's receipt of two (2) sets of plans, contractor's insurance and Tenant's acceptance of space.   Tenant will pay costs of lock change and must make appointment with Landlord.

B.   Landlord's Work.

LANDLORD HAS NO OBLIGATION TO PERFORM ANY WORK WITHIN THE PREMISES OR THE SHOPPING CENTER AND TENANT AGREES TO ACCEPT THE PREMISES IN ITS CONDITION "AS IS" AND SHALL BE OBLIGATED TO PERFORM SUCH WORK AS IS NECESSARY TO RENDER THE PREMISES USEFUL FOR THE PURPOSES LEASED, EXCEPT FOR LANDLORD'S OBLIGATIONS TO MAKE REPAIRS PURSUANT TO SECTION 13.1 AND LANDLORD'S OBLIGATIONS REGARDING THE HVAC AS SET FORTH IN ARTICLE 34.

C.   Tenant's Work.

"Tenant's Work" shall mean all work necessary to furnish and install all improvements, equipment, and fixtures to the Premises necessary for Tenant to prepare the Premises for the opening and initial operation of Tenant's business.   The following work shall be at the sole expense of the Tenant and shall be subject to the approval of the Landlord, unless otherwise expressly provided herein:

1.       Furniture and Fixtures - all furniture, furnishings, trade fixtures and related parts, all of which shall be new unless otherwise approved by Landlord.

2.       Fixture and Equipment Connections - electrical and mechanical connection of all merchandising, lighting, floor and wall fixtures or equipment and related parts, including kitchen and food service equipment and other equipment peculiar to Tenant's occupancy.

3.       Approved Fire Protection Devices – sprinkler system, approved fire extinguishers or fire protection devices in size, type and quantity throughout the Premises as required by code and standards of governing insurance rating boards.

4.       All Signs and Graphics - the design, installation and location of all signs, exit signs and emergency lighting.   Except as set forth in Article 16 of the Lease, Landlord must approve all signs prior to any installation.   Tenant shall install its permanent signage on the exterior of the Premises on or before the Commencement Date.   Signage will be solely Tenant's responsibility.   Landlord will not be responsible for compliance with city ordinances or liable for Tenant's contractor actions.

C-1


INITIAL HERE

REGENCY
CENTERS

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars 2012\Little Caesars Pizza\Lease Caesars Watkins Lease FINAL 2013.doc

5. Ceilings - all ceilings, including lighting coves and other special effects. Ceiling to include insulation no less than R 19 installed no lower than the storefront glass. Requests for sheetrock ceilings must be approved by Landlord. Sheetrock ceilings will be allowed when installing a thirty inch (30") opening access panel within Tenant space.

6. Show Window Backgrounds - all show window backgrounds, show windows, show window floors, show window ceilings and show window lighting installations.

7. Walls and Wall Finishes - all interior partition walls within the Premises and all finishes on walls, including placing the finishes and installing the insulation on and within the partitions erected by Landlord.

8. Doors - all doors and hardware within the Premises. Service doors to exterior are provided by Landlord.

9. Floor Coverings - all floor coverings and floor finishes.

10. Interior Final Finishes - all interior painting, papering, paneling and decoration.

11. Plumbing - all plumbing, including connections to utility systems.

12. Electrical and Telephone Systems and Equipment - furnishing and installation of all interior distribution panels, lighting panels, power panels, conduits, outlet boxes, switches, outlets, wiring, lighting fixtures and lamping; furnishing and installation of conduit and outlets as required for Tenant's telephone service.

13. Tenant will be responsible for costs of installing a rear door unless a rear door already exists or is required by Code.

14. Exterior conduits for utility lines and boxes must be painted to match fascia of building.

D. General.

1. Landlord, Tenant or utility company shall have the right, subject to Landlord's approval, to run utility lines, pipes, roof drainage pipes, conduit, wire or duct work, where necessary, through attic space, column space or other parts of the Premises, and to maintain same in a manner which does not interfere unnecessarily with Tenant's use thereof.

2. Tenant shall prepare all its plans and perform all its work to comply with all governing statutes, ordinances, regulations, codes and insurance rating boards; take out all necessary permits and obtain certificates of occupancy for the work performed by Tenant - all subject to Landlord's approval. Tenant shall further pay all utility deposits and government impact fees.

3. Intentionally omitted

4. All work done on the Premises by Tenant must be performed by licensed contractors reasonably approved by Landlord. Tenant's contractors shall be required to waive all lien rights against Landlord's interest in the Shopping Center.

5. Meters - All meters required for utility services and utility deposits shall be furnished and installed at Tenant's expense.

C-2

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars 2012\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL HERE

# EXHIBIT C-1

## SIGN CRITERIA

I. **GENERAL NOTES AND SPECIFICATIONS**

A. All signs and fixtures installed by Tenant shall be new.

B. Tenant is limited in design to individual channel type letters with illuminated Plexiglas face. No exposed neon or other type of lighted sign is acceptable. All letter transformers must be hidden within and above the canopy ceiling area.

C. Signs shall be erected in such a manner that fasteners are concealed and any damage to canopy structure and exterior walls shall be at the responsibility of the Tenant. The Tenant shall be responsible for restoring to its original condition the storefront where the sign has been erected.

D. Design of the sign method of construction and installation means shall be approved in writing by the Owner prior to installation. Two (2) copies of the proposed plans shall be forwarded to the Landlord. The Landlord may remove any unapproved sign at the Tenant's expense.

E. All signs shall be kept in good working order and any sign found to be unsafe or unkept shall be removed or repaired at the Tenant's expense.

F. Tenant shall also be responsible for the installation and maintenance of the illuminated sign(s) under the canopy area of the premises. All such sign(s) shall be pre-approved by the Landlord.

G. The sign shall be centered vertically on the sign band and centered horizontally from lease line to lease line. The total sign width shall not exceed 75% of the storefront width.

H. Channel letters are to be directly mounted to sign band raceway and shall have 60 milliamp transformers.

I. Letter faces are to be 3/16" Plexiglas-color to be subject to Landlord's approval.

J. Letters are to be trimmed with on (1) inch dark bronze trim cap.

K. Illumination within letters is to be 650K neon tubing-color to be white.

INITIAL HERE 

EXHIBIT C-2

TENANT'S APPROVED EXTERIOR STOREFRONT SIGN PLANS

## Channel Letters

700 sq. ft. of building frontage
41.26 sq. ft. of signage utilized

### Face-lit Channel Letters

**Tiltman Logo**
- 5" deep aluminum channel returns, matte black, white interior
- white acrylic face with opaque black and translucent orange (3M 3630-44 orange) vinyl applied to first surface
- black trimcap
- internally illuminated with white LEDs

**"Little Caesars" Letters**
- 5" deep aluminum channel returns, matte black, white interior
- orange Plexiglas acrylic face (2119) with opaque black vinyl outline applied to first surface
- black trimcap
- internally illuminated with orange LEDs
- LC symbol is applied black vinyl on white pre-finished aluminum, attached to letter return

Letters and Tiltman are mounted to standard 6" raceway (painted to match building color) and mounted to building facade



⟨—— 43'-9" ——⟩

3'-4"

16'-0"

① Wall Elevation - Front
  Scale: 1/8" = 1'-0"



207 5/8"

35"      164 5/8"

35"

28"

② Layout Detail
  Scale: 1/2" = 1'-0"

| | | | |
|---|---|---|---|
| Designer: Matt | Client: Little Caesars | Drawing # | Drawings Dates |
| Salesperson: Doug | Location: Oxen Hills, MD | 12-0431-01 | Initial: 9/6/12 |
| Scale: As Noted | Filepath: \\Fs1\grfx\LL\Little Caesars Locations\Oxen Hill Md | Revision: A | Revisons: |
| | \LC_Ox HI MD_front elev Chnl Ltr_120431_01_A | | |

A: 3300 Palm Ave.
Fort Myers, FL 33901
P: 239.278.4245
F: 239.278.3912

THIS SIGN, INCLUDING BUT NOT LIMITED TO ALL PLASTIC OR SIMILAR COMPONENTS THEREFORE, HAS BEEN DESIGNED IN COMPLIANCE WITH THE 2010 EDITION OF THE FLORIDA BUILDING CODE INCLUDING SEC. 1609 WIND LOADS AND SEC. 3107 STRUCTURAL REQUIREMENTS

THIS DESIGN IS THE EXCLUSIVE PROPERTY OF LEE DESIGNS LLC AND IS NOT TO BE USED IN WHOLE OR PART BY ANY OTHER PARTIES WITHOUT WRITTEN PERMISSION BY LEE DESIGNS LLC DIMENSIONS AND COLORS MAY VARY SLIGHTLY DUE TO LIMITATIONS IN THE FABRICATION MATERIALS

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars 2012\Little Caesars Watkins Lease Plaza\Lease FINAL 2013.doc

C-4

REGENCY
CENTERS

INITIAL
HERE

**EXHIBIT D**

## ABSOLUTE UNCONDITIONAL GUARANTY AGREEMENT

KNOW ALL MEN BY THESE PRESENCE: That,

THIS Absolute Unconditional Guaranty Agreement (the "Guaranty") is executed and delivered this 27 day of March, 2013 by RICHARD RUGGIERO and IQBAL KAISANI, individuals, jointly and severally (herein collectively, "Guarantor") in favor of USRP I, LLC, a Delaware limited liability company ("Landlord").

R E C I T A L S :

MARYLAND PIZZA, INC., a corporation organized and existing under the laws of the State of Maryland ("Tenant"), and Landlord are party to that certain Shopping Center Lease dated March 27, 2013 (the "Agreement").

In order to induce Landlord to enter into the Agreement, Guarantor agreed to execute and deliver to Landlord this Guaranty.

Guarantor acknowledges that Landlord would not have entered into the Agreement without the execution and delivery of Guarantor of this Guaranty.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Guarantor, Guarantor hereby agrees in favor of Landlord (and Landlord's successors and assigns) as follows:

Guarantor absolutely, unconditionally and irrevocably guarantees the prompt and complete payment and performance when due, whether by acceleration or otherwise, of all obligations, liabilities and covenants, whether now in existence or hereafter arising, of Tenant to Landlord, and arising under the Agreement, including without limitation all amounts due to Landlord as rent or otherwise under the Agreement (the "Obligations"). Guarantor hereby agrees to pay and/or perform punctually, upon written demand by Landlord, each such Obligation which is not paid or performed as and when due and payable by Tenant, in like manner as such sum amount is due from Tenant. For purposes hereof, the Obligations shall be performed and/or due and payable when due and payable under the terms of the Agreement notwithstanding the fact that the collection or enforcement thereof as against Tenant may be stayed or enjoined under Title 11 of the United States Code or similar applicable law. This Guaranty is one of payment and not of collection.

Guarantor's obligations under this Guaranty are absolute and unconditional and shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or the Agreement, or by any other circumstance relating to the Obligations or the Agreement which might otherwise constitute a legal or equitable discharge of or defense of a guarantor or surety. Guarantor hereby irrevocably waives any and all suretyship defenses, defenses that could be asserted by Tenant (except payment) and all other defenses that would otherwise be available to Guarantor. All payments by Guarantor pursuant to this Guaranty shall be made without setoff. Landlord shall not be obligated to file any claim relating to the Obligations in the event that Tenant becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of Landlord so to file shall not affect Guarantor's obligations under this Guaranty. Guarantor irrevocably waives any right to require Landlord to pursue any other remedy in Landlord's power whatsoever, whether against Tenant or any other obligor principally or secondarily obligated with respect to the Obligations. Guarantor irrevocably waives any defense arising by reason of any disability, bankruptcy, reorganization or similar proceeding involving Tenant. In the event that any payment in respect of any Obligations is rescinded or must otherwise be returned for any reason whatsoever, Guarantor shall remain liable under this Guaranty in respect of such Obligations as if such payment had not been made.

Guarantor agrees that Landlord may at any time and from time to time, either before or after the maturity thereof, without notice to or further consent of Guarantor, extend the time of payment of, or performance of, or renew, any of the Obligations, and may also make any agreement with Tenant or with any other party to or person liable on any of the Obligations, or interested therein, for the extension, renewal, payment, compromise, waiver, discharge or release thereof, in whole or in part, or for any amendment or modification of the terms thereof or of the Agreement or any other agreement between Landlord and Tenant or any such other party or person, without in any way impairing, releasing or affecting the liabilities of Guarantor under this Guaranty.

Guarantor will not exercise any rights which it may acquire by way of subrogation until all of the Obligations to Landlord shall have been indefeasibly paid in full or performed in its entirety. Any amount paid to Guarantor in violation of the preceding sentence shall be held in trust for the benefit of Landlord and shall forthwith be paid to Landlord to be credited and applied to the Obligations, whether matured or unmatured. Guarantor hereby subordinates any and all liabilities and indebtedness to Guarantor to the prior indefeasible payment in full of the Obligations.

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

INITIAL HERE



REGENCY CENTERS

This Guaranty shall remain in full force and effect and be binding upon Guarantor, its successors and assigns until all of the Obligations have been satisfied in full and the Agreement shall have been terminated or fully performed. This Guaranty may not be modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Landlord and Guarantor. This is a continuing Guaranty relating to all Obligations, including any arising during any holdover term or arising under transactions renewing or extending the term of the Agreement, changing the terms of any Obligations, or creating new or additional Obligations after prior Obligations have in whole or in part been satisfied, regardless of any lapse of time. If any of the present or future Obligations are guaranteed by persons, partnerships, corporations or other entities in addition to Guarantor, the death, release or discharge, in whole or in part, or the bankruptcy, liquidation or dissolution of one or more of them shall not discharge or affect the liabilities of Guarantor under this Guaranty. The obligations of Guarantor hereunder shall be additional to, and not in substitution for, any security or other guarantee or indemnity at any time existing in respect of Tenant's obligations, liabilities and covenants under the Agreement.

No failure on the part of Landlord to exercise, and no delay in exercising, any right, remedy or power under this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise by Landlord of any right, remedy or power under this Guaranty preclude any other or future exercise of any right, remedy or power under this Guaranty. Each and every right, remedy and power granted to Landlord under this Guaranty or allowed it by law or by the Agreement or any other agreement shall be cumulative and not exclusive of any other, and may be exercised by Landlord from time to time.

Guarantor hereby waives notice of acceptance of this Guaranty and notice of any obligation or liability to which it may apply, and waives presentment, demand for payment, protest, notice of dishonor or non-payment of any such obligation or liability, suit or the taking of other action by Landlord against, and all other notices whatsoever to, Tenant, Guarantor or others.

Landlord may at any time and from time to time without notice to or consent of Guarantor and without impairing or releasing the obligations of Guarantor hereunder: (a) take or fail to take any action of any kind in respect of any security for any obligation, covenant or liability of Tenant to Landlord, (b) exercise or refrain from exercising any rights against Tenant or others, (c) compromise or subordinate any obligation or liability of Tenant to Landlord including any security therefor, (d) consent to the assignment by Tenant of its interest in the Agreement, or (e) consent to any other matter or thing under or relating to the Agreement. Guarantor agrees to reimburse Landlord for the costs and reasonable attorneys' fees incurred by reason of Landlord having to enforce this Guaranty.

Guarantor represents and warrants to Landlord that (a) the Agreement has been duly authorized, executed and delivered by Tenant and is a legal, valid and binding instrument enforceable against Tenant in accordance with its terms, and (b) this Guaranty has been duly authorized, executed and delivered by Guarantor and is a legal, valid and binding instrument enforceable against Guarantor in accordance with its terms.

Guarantor may not assign its rights nor delegate its obligations under this Guaranty, in whole or in part, without prior written consent of Landlord, and any purported assignment or delegation absent such consent is void. This Guaranty shall remain in full force and effect notwithstanding (a) any assignment or transfer by Tenant of its interest in the Agreement (in which case this Guaranty shall apply, from and after such assignment or transfer, to all of the obligations, liabilities and covenants of the assignee or transferee under the Agreement), or (b) any assignment or transfer by Landlord of its interest in the Agreement (in which case Guarantor's obligations under this Guaranty shall inure to the benefit of Landlord's assignee or transferee), in each case irrespective of whether Guarantor has notice of or consents to any such assignment or transfer.

GUARANTOR HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THE AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. GUARANTOR FURTHER WARRANTS AND REPRESENTS THAT GUARANTOR HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT GUARANTOR KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF MARYLAND WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW. GUARANTOR AND LANDLORD JOINTLY AND SEVERALLY AGREE TO THE EXCLUSIVE JURISDICTION OF COURTS LOCATED IN THE STATE OF MARYLAND, UNITED STATES OF AMERICA, OVER ANY DISPUTES ARISING OUT OF OR RELATING TO THIS GUARANTY.

Notwithstanding anything to the contrary contained herein, provided Tenant has not been in default under the Lease beyond any applicable notice and cure period during the first five (5) Lease Years, then effective as of the first day of the sixth (6th) Lease Year, Guarantor's liability for Rent hereunder shall not exceed an amount equal to the sum of (i) all Rent due and payable, or which has accrued but as yet has

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

D-2

REGENCY
CENTERS

INITIAL
HERE▸

not been billed, under the Lease through the date upon which Tenant has vacated or Landlord has obtained possession of the Premises, and (ii) an amount equal to twelve (12) full calendar months of Rent due and payable or which accrues under the Lease from and after the date upon which Tenant has vacated or Landlord has obtained possession of the Premises, and (iii) all reasonable costs of enforcement of this Guaranty.

IN WITNESS WHEREOF, this Guaranty has been executed under seal and delivered as of the date and year first above written.

Signed, sealed and delivered
in the presence of:

_____
RICHARD RUGGIERO

Address: 1809 Harewood Lane, Crofton,
Maryland 21114

_____
IQBAL KAISANI

Address: 1809 Harewood Lane, Crofton,
Maryland 21114

_____
Witness

_____
Witness

_____
Witness

_____
Witness

Guarantor acknowledges its address and will notify Landlord of any changes thereto.

D-3

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

# EXHIBIT E

## REQUIREMENTS AND RESTRICTIONS

Tenant:

1. will not, without Landlord's consent, conduct or permit to be conducted any auction, fire, bankruptcy or going-out-of-business sales, or similar type sale, in connection with the Premises; provided, however, that this provision shall not restrict the absolute freedom of Tenant to determine its own selling prices nor shall it preclude the conduct of periodic seasonal, promotional or clearance sales;

2. will not use or permit the use of any apparatus for sound reproduction or transmission or of any musical instrument in such manner that the sounds so reproduced, transmitted or produced shall be audible beyond the interior of the Premises; will not utilize an advertising medium within the Shopping Center which can be seen, heard or experienced outside the Premises, including, but not limited to, flashing lights, searchlights, loudspeakers, phonographs, radio or television; will not display, paint or cause to be displayed, painted or placed, any handbills, bumper stickers or other advertising devises on any vehicle parked in the parking area of the Shopping Center; will not distribute, or cause to be distributed, in the Shopping Center any handbills or other advertising devices; and will not conduct or permit any activities that might constitute a nuisance or an annoyance to the public, other occupants of the Shopping Center or to Landlord, or that will injure the reputation of the Shopping Center;

3. will keep all mechanical apparatus free of vibration and noise which may be transmitted beyond the confines of the Premises; will not cause or permit strong, unusual, offensive or objectionable noise, odors, fumes, dust or vapors to emanate or be dispelled from the Premises; will not burn trash or store or permit accumulations of any trash, garbage, rubbish or other refuse outside of the Premises except in compactors or other receptacles approved by Landlord;

4. will not load or permit the loading or unloading of merchandise, supplies or other property, nor ship, nor receive, outside the area and entrance designated therefor by Landlord from time to time; will not permit the parking or standing, outside of said area, of trucks, trailers or other vehicles or equipment engaged in such loading or unloading in a manner to interfere with the use of any Common Areas or any pedestrian or vehicular use and good shopping center practice; will use its best efforts to complete or cause to be completed all deliveries, loading, unloading and services to the Premises prior to 10:00 a.m. each day;

5. will not paint or decorate any part of the exterior of the Premises, or change the architectural treatment thereof, or install any visible protective devices such as burglar bars or security shutters or window tinting, without first obtaining Landlord's written approval; and will remove promptly upon order of Landlord any paint, decoration or protective device which has been applied to or installed upon the exterior of the Premises without Landlord's prior approval, or take such other action with reference thereto as Landlord may direct;

6. will keep the inside and outside of all glass in the doors and windows of the Premises clean; will not place or maintain any merchandise, vending machines or other articles in the vestibule or entry of the Premises, on the footwalks adjacent thereto or elsewhere on the exterior thereof; will maintain the Premises at its own expense in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests; and will keep refuse in proper containers on the interior of the Premises until removed from the Premises;

7. will comply (at its sole cost and expense) with all federal, state and local laws, rules, regulations, orders and guidelines now or hereafter in force relating to or affecting the use, occupancy, alteration or improvement of the Premises, including parking requirements and will not use or permit the use of any portion of the Premises for any unlawful purpose or in violation of any recorded covenants, conditions and restrictions affecting the Shopping Center including without limitation those set forth on Exhibit "J" to this Lease;

8. except as otherwise specifically set forth in this Lease, will not place, permit or maintain on the exterior walls or roof of the Premises any sign, advertising matter, decoration, lettering, insignia, emblems, trademark or descriptive material (herein called "Signs") and will not permit any Signs to remain or be placed on any window or door of the Premises unless the same have been approved in writing by Landlord; and will maintain any and all Signs as may be approved in good condition and repair at all times, Landlord reserving the right to do so at Tenant's expense if Tenant fails to do so after five (5) days' notice from Landlord;

9. will keep the display windows in the Premises electrically lighted and any and all electric signs lighted during all other periods that a majority of tenants are open for business in the Shopping Center (or if Tenant is open longer hours than the majority of tenants in the Shopping Center, during all hours Tenant is open and operating); and

10. will not use the sidewalks adjacent to the Premises, or any other space outside of the Premises, for the sale or display of any merchandise or for other business, occupation or undertaking.

FG 02/22/13
S:\Regency\Watkins Park Plaza\Little Caesars Pizza\Little Caesars Pizza\Lease 2012\Little Caesars Watkins Lease FINAL 2013.doc

REGENCY
CENTERS

INITIAL
HERE

## EXHIBIT F

### EXISTING EXCLUSIVE USES AND RESTRICTIVE COVENANTS

THE FOLLOWING PROHIBITIONS AND RESTRICTIONS SHALL NOT BE DEEMED TO APPLY TO LANDLORD, BUT ONLY TO TENANT UNDER THIS LEASE. Landlord shall have the right, in Landlord's sole and absolute discretion, to waive all or any of the prohibitions set forth herein upon such matters, terms and conditions as Landlord, in its sole discretion, may determine.

Tenant shall not use the Premises for any of the following businesses, uses or activities:

(1) Filling medicine prescriptions (except for prescriptions customarily filled by an ophthalmologist) or for the operation of a drug store. For purposes hereof, a drugstore shall be deemed to mean, and shall be limited to, a store either trading with "drug" in its tradename, holding out to the public that a drugstore is being operated, or devoting a substantial part of its storeroom premises (i) to the sale of drugs and/or (ii) to the sale of all of the following items: cosmetics; health and beauty aids such as shampoos, hair dyes, shaving accessories and toothpaste; and nonprescription and patent medicines. The term "drugstore" is not intended to, and shall not, encompass any store selling one or more, but not all, of the items set forth in clause (ii) above such as, but not limited to, those of the type being operated, as of 1984, under such tradenames as "Merle Norman", "I Natural", "General Nutrition Center" and "Nature Foods".

(2) Operate a full-service hair salon providing women's hair styling, as its primary use. The foregoing restriction shall not apply to (i) a barber shop primarily providing men's and children's haircuts, or (ii) a family discount hair salon (e.g., Hair Cuttery or Great Clips).

(3) Fast food restaurant business with gross sales from hamburgers of 25% or more of total gross sales.

(4) Operation of a business whose total sales are more than 20% in submarine sandwiches.

(5) Operation of a convenience food store or a dairy type food store selling food or dairy items for the consumption off-premise, except a grocery store occupying more than 5,000 square feet of floor space.

(6) Entertainment or recreational activities such as, but not limited to, bowling alleys, theaters, carnivals or other places of public or private amusement.

(7) Sale of pornographic materials, the operation of "head shops" and/or other uses devoted to the legal sale of articles or merchandise normally used or associated with illegal or unlawful activities, such as but not limited to the sale of paraphernalia used in the use of controlled drugs.

(8) Operate a child day care facility.

(9) The operation of an urgent care facility

(10) The operation of a banking facility

(11) The sale of beauty supplies as its primary use

(12) Operation of a business whose sales are 40% or greater in the sale of cooked chicken.

(13) Retail dry cleaning pick-up store, laundry, alterations, shoe repair, ancillary uses and the resale of items ancillary to the dry cleaning industry

(14) Prescription eyewear sales and eye examination services

(15) Shipping services and packaging services

(16) The operation of a liquor store

(17) A Chinese restaurant for carry-out, delivery, and dinning

(18) The operation of a first-class retail day spa operation specializing in services involving natural hair, dental aesthetics, and wellness-oriented services focused on Complementary and Alternative Medicine practices, including non-invasive and, potentially, minimally invasive hair care, skin care or body care procedures

FG 02/22/13
S:\Regency\Watkins Park Plaza\Watkins Park Plaza\Little Caesars Pizza\Little Caesars Pizza\Lease 2012\Little Caesars Pizza\Lease Caesars Watkins Lease FINAL 2013.doc

INITIAL HERE

REGENCY CENTERS

F-1