# Exhibit C

# LEASE

**THIS LEASE**, entered into at Beachwood, Ohio, as of this 28 day of January , ~~2014~~ 2015 ("Effective Date") by and between DDRM Largo Town Center LLC, a Delaware limited liability company ("Landlord"), and Maryland LC Ventures LLC, a Maryland limited liability company ("Tenant").

### WITNESSETH:

**IN CONSIDERATION** of the mutual covenants hereinafter contained, and each act performed hereunder by either of the parties, Landlord and Tenant agree as follows:

I.    **BASIC LEASE PROVISIONS**

    A.   This Article I is an integral part of this Lease and all of the terms hereof are incorporated into this Lease in all respects. In addition to the other provisions which are elsewhere defined in this Lease, the following, whenever used in this Lease shall have the meanings set forth in this Article I:

       1.  Shopping Center: Largo Town Center, situated in the City of Upper Marlboro, State of Maryland (Article II).

       2.  Premises: Unit No. 2 containing approximately 1,700 square feet of gross floor area (Article II).

       3.  Tenant's Trade Name: Little Caesar's Pizza.

       4.  Permitted Use: The Premises shall be used for the operation of a carry-out (and delivery at Tenant's option and if allowed by Tenant's Franchisor as defined hereinbelow) pizza restaurant selling pizza, non-alcoholic cold beverages, pasta, bread products (including, but not limited to, "Crazy Bread" and Italian cheese bread), salads, and chicken wings. As an incidental part of Tenant's business, Tenant may offer sandwiches, dessert items, promotional items and other items typically sold in a majority of Little Caesar's restaurants in the Washington D.C. metropolitan area and authorized for sale by Little Caesar Enterprises, Inc. ("Tenant's Franchisor"). The Premises shall be used for no other use or purpose whatsoever. For purposes of this Article I(A), Section 4 only, "incidental" shall be defined as an amount not to exceed fifteen percent (15%) of Tenant's gross sales on an item by item basis during any twelve (12) month rolling period. Tenant acknowledges and agrees that any food or soft drinks that are sold for off-Premises consumption must be properly packaged in accordance with the requirements of Tenant's Franchisor and applicable laws. Notwithstanding the foregoing, in no event will Tenant violate the exclusive or prohibited uses set forth on Exhibit E attached hereto and made a part hereof. (Article IX).

       5.  Lease Term: Five (5) lease years (Article III).

       6.  Rent Commencement Date: The earlier of (i) the Outside Opening Date, or (ii) the date Tenant initially opens for business to the public in the Premises. (Article III).

       7.  Expiration Date: Five (5) lease years following the Rent Commencement Date (Article III).

       8.  Minimum Rent during Lease Term: See Rent Schedule A (Article IV).

       9.  Annual Percentage Rent during Lease Term: None.

     10.  Estimated Delivery of Possession Date: Within sixty (60) days following the later of (i) mutual execution of this Lease by Landlord and Tenant, or (ii) Landlord's receipt of its building permit (if any) (Article VI).

     11.  Outside Opening Date: one hundred twenty (120) days following the later of (i) Landlord's delivery of the Premises to Tenant, (ii) Landlord's approval of Tenant's Plans (defined below) and (iii) receipt of the Permits (defined below) (provided the Permits are obtained pursuant to the schedule set forth in Article VI, Section C) (Article VI).

     12.  Common Area Maintenance (CAM) Charge: (Article VII).

        Initial Estimate:   $2.28 per square foot, $323.00 per month, $3,876.00 per year

        Reserve Account:   $0.10 per square foot, $14.70 per month, $170.00 per year

     13.  Insurance: (Article XII).

        Initial Estimate:   $0.27 per square foot, $38.25 per month, $459.00 per year

     14.  Real Estate Tax Charge: (Article V).

Case 17-03469-TOM7    Doc 95-3    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit C    Pt. 1    Page 2 of 38

Initial Estimate: $2.16 per square foot, $306.00 per month, $3,672.00 per year

15. [Intentionally omitted.]

16. Security Deposit: Eight Thousand Four Hundred Forty-Six and 17/100 Dollars ($8,446.17) (Article XVIII).

17. Options to Renew: See Rent Schedule A (Article XXIII).

   Two (2) consecutive periods each containing five (5) lease years ("Renewal Term"); three hundred sixty-five (365) days prior notice to exercise required.

18. Landlord: DDRM Largo Town Center LLC
   3300 Enterprise Parkway
   Beachwood, Ohio 44122
   Attention: Executive Vice President-Leasing
   Federal I.D. 20-8906579

   With Copies

   To: DDR Corp.
   3300 Enterprise Parkway
   Beachwood, Ohio 44122
   Attention: General Counsel

19. Tenant: Maryland LC Ventures LLC
   226 Crowne Woods Drive
   Birmingham, Alabama 35224
   Attention: Mark Williams

20. Guarantor(s): Richard Ruggiero
   1809 Harewood Lane
   Crofton, Maryland 21114

   Wazir Kaisani and Zaib Kaisani, husband and wife
   1526 Astona Drive
   Allen, Texas 75013

21. Tenant's Franchisor: Little Caesar Enterprises, Inc.

## II. PREMISES:

A. Landlord leases to Tenant, and Tenant leases from Landlord, the premises described in Article I, Section A(2) ("Premises"), as measured from the exterior face of any exterior walls and to the centerline of common walls and outlined in red on Exhibit "A" attached hereto and made a part hereof. The shopping center described in Article I, Section A(1) ("Shopping Center") is depicted on Exhibit "A" attached hereto, but shall not include those areas crosshatched on said Exhibit "A". Landlord shall have the right from time to time, in its sole discretion, to increase, reduce and/or otherwise alter (i) the Shopping Center, including, without limitation, the sale and/or acquisition of land, whether or not currently subdivided, and/or (ii) the buildings comprising the Shopping Center. Additionally, notwithstanding anything contained herein to the contrary, for the limited purposes of calculating Common Area Charges (hereinafter defined), Taxes (hereinafter defined), and Insurance Charge (hereinafter defined), Landlord shall have the right, from time to time, in its sole discretion, to include or exclude parcels adjacent to or within the Shopping Center, which may be owned by Landlord or an entity other than Landlord, including, without limitation, Landlord's affiliates, subsidiaries, joint venture partners or parent entity; provided that the calculation of Tenant's proportionate share of Common Area Charges, Taxes, and Insurance Charge shall be adjusted accordingly to include or exclude, as the case may be, the gross leasable area of the buildings located within such parcels; however, in all circumstances excluding the square footage of any building located in any such parcel in which the owner, tenant or occupant thereof maintains its Common Areas at its sole expense or pays its own real estate taxes and assessments attributable to such parcel directly to the taxing authority, or maintains some or all of the insurance policies that otherwise would be maintained by Landlord for its building and/or parcel.

B. Landlord reserves the right to maintain, repair, and replace utility lines under, over, upon or through the Premises as may be reasonably necessary or advisable for the servicing of the Premises or other portions of the Shopping Center. Landlord further reserves the right to use (or grant to other parties the right to use) and Tenant will have no right title or interest in (i) the roof of the buildings within the Shopping Center, including the Premises, (ii) exterior non-storefront portions of the Premises (including, without limitation, neutral piers, demising walls, and outer walls of buildings in

11802147.12

Case 17-03469-TOM7    Doc 95-3    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit C    Pt. 1    Page 3 of 38

which the Premises are located (subject to Tenant's signage rights below), and (iii) air rights above the Shopping Center, including the Premises, and (iv) the right to land and improvements below the floor level of the Premises. Landlord shall have the exclusive right to lease any rooftop within the Shopping Center, including the rooftop of the Premises.

## III. TERM:

A. The terms and provisions of this Lease (excluding specifically, payment of Minimum Rent, Common Area Charges, Taxes and Insurance Charge) shall become effective on the Effective Date. The Lease Term shall commence upon the Rent Commencement Date and shall expire on the last day of the last consecutive full lease year set forth in Article I, Section A(7), following the Rent Commencement Date established pursuant to Article I, Section A(6), unless sooner terminated. The term "lease year" shall mean a period of twelve (12) consecutive full calendar months. If the Rent Commencement Date does not occur on the first day of a calendar month, the first lease year shall include any partial calendar month. Notwithstanding the foregoing, if the initial Term is scheduled to naturally expire between September 1st and January 5th, then the expiration date of the initial Lease Term shall be extended to the January 31st immediately following the naturally scheduled expiration date.

## IV. RENT:

A. **Minimum Rent.** Tenant agrees to pay to Landlord, at its office or other place as Landlord may from time to time designate, as "Minimum Rent" for the Premises during the Lease Term, without any deduction or setoff (except as otherwise set forth in this Lease), the amount(s) set forth in Schedule A, in advance, on the first day of each calendar month. Minimum Rent and Additional Rent (as hereinafter defined) shall be prorated on a per diem basis (based upon a thirty (30) day calendar month) for any partial month included in the first lease year.

Notwithstanding Tenant's obligation to pay Minimum Rent and/or Additional Rent as of the first day of each month during the Lease Term, in the event that an insolvency, bankruptcy or similar proceeding is filed by or against Tenant, Tenant shall be obligated to pay all such Minimum Rent and/or Additional Rent on a ratable basis from the date of the commencement of any such proceeding through the end of the month in which such proceeding is commenced.

B. **Percentage Rent.** Intentionally deleted.

C. **Co-Tenancy.** Provided Tenant shall not be in default of any term or condition of this Lease and Tenant is open and operating its business in the Premises, as required under this Lease, if at any time during the term of this Lease two (2) or more of the following tenants: Shoppers Food Warehouse, Regency Furniture, or Marshalls or their successors, assigns or replacements (individually an "Anchor Tenant" and collectively the "Anchor Tenants") cease to operate in and vacate the Shopping Center (individually and collectively, the "Anchor Tenant Premises"), and Landlord fails to replace such Anchor Tenants with a tenant or tenants who are operating and open for business to the public and who shall occupy not less than seventy-five percent (75%) of the applicable vacated Anchor Tenant Premises ("Co-Tenancy Requirement") within twelve (12) months after the date any two (2) of the Anchor Tenants cease operation in the Shopping Center (the "Vacation Period"), Tenant shall continue to occupy the Premises and operate its business therein subject to an adjustment in the computation of Minimum Rent following the Vacation Period as hereinafter provided. Notwithstanding anything to the contrary contained herein, Tenant shall continue to pay Minimum Rent and Additional Rent (i.e., Real Estate Taxes, Common Area Charges, Insurance and any other amounts payable by Tenant under the terms of this Lease) through and until the expiration of the Vacation Period. At the written request of either party, Landlord and Tenant shall execute a written acknowledgment setting forth the commencement and expiration dates of the Vacation Period.

In the event Landlord fails to satisfy the Co-Tenancy Requirement on or before the expiration of the Vacation Period, Tenant shall pay as "Co-Tenancy Substitute Rent", in lieu of Minimum Rent required to be paid hereunder, an amount equal fifty percent (50%) of the Minimum Rent then in effect until the earlier to occur of (i) the first day of the next renewal period, if any, or (ii) twelve (12) consecutive calendar months following the expiration of the Vacation Period, or (iii) such time as Co-Tenancy Requirement is satisfied (the "Substitute Rent Period"). Upon the expiration of the Co-Tenancy Substitute Rent Period, Tenant's obligation to pay Minimum Rent set forth in this Article IV hereof shall be fully reinstated without any obligation of prior notice thereof by Landlord to Tenant. Nothing contained herein shall be construed to relieve Tenant of its obligation to pay Additional Rent during any period when Substitute Rent is payable.

If Landlord has not satisfied the Co-Tenancy Requirement on or before the expiration of the Co-Tenancy Substitute Rent Period, Tenant shall have the right to either (i) terminate this Lease, or (ii) continue to occupy the Premises and operate its business therein and Tenant's obligation to pay the Minimum Rent set forth herein shall be fully reinstated without obligation of prior notice thereof by Landlord to Tenant.

4

11802147.12

In the event Tenant elects to terminate this Lease, Tenant shall give Landlord written notice of its election to terminate the Lease within twenty (20) days after the expiration of the Co-Tenancy Substitute Rent Period. Termination of the Lease shall be effective thirty (30) days after the date Landlord receives Tenant's notice of termination (the "Termination Date"), provided that Tenant pays to Landlord all sums and charges due and owing by Tenant to Landlord through and including the Termination Date. Any sum which cannot be exactly determined by Landlord as of the Termination Date shall be paid by Tenant to Landlord within thirty (30) days after receipt by Tenant of Landlord's statement for said sums. The obligation of Tenant to pay any such sums shall survive the termination of this Lease.

If Tenant does not notify Landlord of its election to terminate this Lease within the twenty (20) day period set forth in the preceding paragraph, Tenant shall be deemed to have waived its right to terminate this Lease pursuant to this Section.

Notwithstanding the foregoing, if the Co-Tenancy Requirement is not satisfied as a result of Force Majeure, casualty, condemnation or the making of repairs or restorations following any casualty or condemnation event, then Tenant shall not be entitled to exercise any of the remedies set forth in this Section.

Notwithstanding anything to the contrary contained in this Lease, in the event Tenant has an Option to Renew pursuant to Article XXIII, Section M, of this Lease and, at the time Tenant elects to exercise Tenant's Option to Renew, Tenant is paying Co-Tenancy Substitute Rent due to the failure of a Co-Tenancy Requirement pursuant to this Section, then, commencing on the first day of the renewal period, Tenant shall be deemed to have waived its right to pay Co-Tenancy Substitute Rent and Tenant shall pay to Landlord the scheduled annual Minimum Rent set forth on Schedule A attached hereto and all Additional Rent required to be paid pursuant to the terms of this Lease.

D.  **Gross Sales.** Intentionally Deleted.

V.  **TAXES**:

A.  **Real Estate Taxes and Assessments.** Tenant agrees to pay Tenant's proportionate share of all real estate taxes and assessments, both general and special, levied and assessed against the land, buildings, and all other improvements which may be added thereto, or constructed within the tax parcel(s) comprising the Shopping Center ("Taxes"). The term Taxes shall be further defined as the amount set forth on any invoice or statement issued by the taxing authority for the Shopping Center tax parcel(s) which is due and payable by Landlord in the calendar month prior to the accrual of any penalties and/or interest. Tenant's proportionate share of Taxes shall be the total amount of the Taxes multiplied by a fraction, the numerator of which shall be the number of square feet of gross leasable area within the Premises, and the denominator of which shall be the gross leasable area of the completely constructed buildings within the Shopping Center tax parcel containing the Premises at the time the Taxes were levied or assessed, but excluding the gross leasable area of (i) any buildings within the Shopping Center tax parcels which are separately assessed for tax purposes and billed to an entity other than Landlord or paid directly by an entity other than Landlord, even though billed to Landlord, and (ii) that portion of any Shopping Center building(s) which cannot be reasonably leased and has been decommissioned by Landlord for reasons such as, but not limited to, lack of access, reasonable visibility from the public right of way, and/or violations or lack of compliance with applicable building codes, provided, however, that for purposes of such denominator, Landlord shall not decommission more than ten (10%) of the gross leasable area of the Shopping Center building(s).

Tenant shall pay to Landlord, monthly in advance on or before the first day of each calendar month, an amount equal to one-twelfth (1/12th) of Tenant's proportionate share of Landlord's estimate of Taxes for the current tax year together with all expenses incurred by Landlord in negotiating, reviewing, administering, appealing or contesting such taxes and assessments, including, but not limited to fees and/or expenses paid to independent third parties engaged by Landlord to contest Taxes, whose fees may be based on an hourly basis or a percentage of the tax savings or other reasonable fee structures. If Tenant's proportionate share of Taxes with respect to any tax year is less than the total amount paid by Tenant for such tax year, the excess shall be credited against the payments with respect to Taxes next becoming due. If such excess shall occur at the expiration of this Lease, such excess shall be refunded to Tenant. If Tenant's proportionate share of Taxes for any tax year exceeds the total amount paid by Tenant for such tax year, Tenant shall pay the difference to Landlord upon demand.

B.  **Rental Taxes.** If any governmental taxing authority shall levy, assess, or impose any tax, excise or assessment (other than income or franchise tax) upon or against the rents payable by Tenant to Landlord ("Rent Tax"), either by way of substitution for or in addition to any existing tax on land, buildings or otherwise, Tenant shall directly pay, or reimburse Landlord for, the Rent Tax, as the case may be.

C.  **Impact Fees.** Tenant shall pay all impact fees, including, without limitation, any commercial impact fees for water and sewer, attributable to Tenant's usage of such utilities at the Premises and/or based on the number of square feet within

11802147.12

Case 17-03469-TOM7    Doc 95-3    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit C    Pt. 1    Page 5 of 38

the Premises. Tenant shall reimburse Landlord for any such fees previously paid by Landlord and attributable to the Premises.

**VI.**    <u>**CONSTRUCTION:**</u>

    A.    **Landlord's Work.** Landlord agrees to perform or cause to be performed such work in the construction of the Premises as may be set forth as Landlord's work in Exhibit "B" attached hereto and made a part hereof, such work to be substantially in accordance with the specifications set forth in said Exhibit "B".

    B.    **Delivery of Premises.** Landlord shall use reasonable efforts to deliver the Premises to Tenant, with Landlord's work substantially complete, on or before the Estimated Delivery of Possession Date set forth in Article I, Section A(10), herein, subject to delays caused by acts of God, government or public enemy, labor disputes, inability to obtain material or labor on reasonable terms, failure of Tenant to perform Tenant's obligations pursuant to Section C of this Article VI, including, but not limited to, Tenant's failure to provide Landlord, promptly upon Tenant's receipt of Landlord's request, information needed for Landlord to complete Landlord's Work, or other cause beyond the control of Landlord. Under no circumstances shall Landlord be liable for any delay or failure to commence or complete its construction or deliver possession of the Premises to Tenant; and Landlord may, at its option, declare this Lease null and void should construction not be commenced or completed, and thereafter all parties shall be released from all liability whatsoever. Upon substantial completion of its construction, Landlord shall deliver the Premises to Tenant, and Tenant agrees to accept delivery thereof, for the commencement of Tenant's Work (hereinafter defined). For purposes of this Section, the term "substantial completion" shall mean completion of Landlord's Work such that Tenant can commence Tenant's Work without material interference by Landlord while Landlord is completing Landlord's Work. Tenant's acceptance of possession of the Premises as substantially completed, shall not relieve Landlord of its obligation to diligently carry forward its construction of the Premises to final completion as required by Article VI, Section A. In the event that a dispute shall arise as to whether or not Landlord's construction of the Premises is substantially completed, a certification of Landlord's architect that such construction is substantially completed in accordance with plans and specifications therefor shall be conclusive and binding upon the parties hereto.

If notwithstanding Landlord's reasonable efforts, Landlord fails to deliver the Premises to Tenant within six (6) months after the Estimated Delivery of Possession Date, as set forth in Article I, Section A(10), subject to delays caused by Tenant and/or Force Majeure, (the "Delivery Failure") then Landlord and Tenant shall each have the right to terminate this Lease, upon delivery of written notice to the other party within fifteen (15) days of such Delivery Failure ("Delivery Termination"), in which event neither party shall have any further rights or obligations under this Lease, except for matters that expressly survive the termination hereof. If neither party exercises its right to terminate this Lease within the fifteen (15) day period set forth above, the mutual termination right as set forth herein shall be null and void and this Lease shall continue full force and effect. In the event Tenant elects to terminate this Lease due to a Delivery Failure as set forth herein, Landlord shall reimburse Tenant for its actual out-of-pocket expenses not to exceed Twenty Thousand and 00/100 Dollars ($20,000.00), in the aggregate, in connection with the negotiation of this Lease and the preparation of plans and specifications.

Notwithstanding the foregoing, in the event Tenant elects to terminate this Lease, and Landlord is capable of delivering the Premises within ten (10) days after the Delivery Termination, Landlord shall have the option to suspend Tenant's termination notice by delivering notice to Tenant ("Landlord's Suspension Notice") within five (5) days after the date Landlord receives Tenant's termination notice, in which event, Tenant's termination shall be suspended for such ten (10) day period (the "Delivery Extension Period"). If Landlord delivers the Premises within the Delivery Extension Period, the mutual termination right as set forth herein shall be null and void and this Lease shall continue full force and effect. If Landlord fails to deliver the Premises within the Delivery Extension Period, then this Lease shall terminate as set forth in the preceding paragraph.

    C.    **Tenant's Construction.** Within sixty (60) days from the date of this Lease, Tenant shall prepare and deliver to Landlord detailed plans and specifications ("Tenant's Plans") of the improvements to the Premises to be constructed by Tenant in compliance with Exhibit "B" attached hereto and made a part hereof. Within ten (10) days following Landlord's receipt of Tenant's Plans Landlord shall notify Tenant in writing whether Tenant's Plans are acceptable to Landlord and state the specific reasons therefor. If Tenant's Plans are not acceptable to Landlord, Landlord will advise Tenant of the required modifications to Tenant's Plans. Tenant shall modify and deliver to Landlord the revised Tenant's Plans within ten (10) days from receipt of Landlord's required modifications. Landlord and Tenant will continue this process until Landlord has approved Tenant's Plans ("Tenant's Work"). Within ten (10) days from receipt of Landlord's approval of Tenant's Plans, Tenant will apply for any and all permits and other governmental approvals necessary to perform Tenant's Work and Tenant will diligently pursue such application until approved. Tenant shall not modify Tenant's Plans approved by Landlord without Landlord's prior written consent. Upon Landlord's delivery of the Premises, and provided Landlord has approved Tenant's Plans and Tenant has received its Permits. Tenant will commence construction of Tenant's improvements to the Premises in accordance with the Tenant's Plans approved by

6

Case 17-03469-TOM7   Doc 95-3   Filed 09/05/17   Entered 09/05/17 15:32:05   Desc
Exhibit Exhibit C   Pt. 1   Page 6 of 38

Landlord. The approval of Tenant's Plans by Landlord shall not be considered a representation, warranty or covenant (either express or implied) on behalf of Landlord that any applicable governmental approval has been or will be granted with respect to the Tenant's Work. If any portion of the Tenant's Work, as set forth on Tenant's Plans is not approved by such a governmental or quasi-governmental entity, Landlord and Tenant shall reasonably cooperate with one another (at no out of pocket expense to Landlord) to obtain additional approvals from such governmental or quasi-governmental entity and/or to modify the Tenant's Plans in a manner that such governmental or quasi-governmental entity would approve and that is reasonably acceptable to Landlord and Tenant. Tenant shall not commence any work in the Premises until Tenant delivers to Landlord a policy of public liability and property damage insurance in accordance with the requirements of Article XII of this Lease. In the event Tenant has not complied with each of the foregoing conditions, Landlord may, in its sole and absolute discretion, reasonably control Tenant's access to the Premises to the extent Landlord deems necessary without such actions resulting in any postponement or delay of the Rent Commencement Date set forth in Article I of this Lease. Tenant will complete construction of Tenant's improvements, fixture and stock the Premises and initially open for business to the public on or before the Outside Opening Date provided in Article I, Section A(11).

Tenant shall submit to Landlord for Landlord's approval Tenant's Plans for Tenant's exterior signage in accordance with Exhibit "C" attached hereto and made a part hereof. Tenant must receive Landlord's consent to its exterior signage plans and specifications prior to installation of Tenant's exterior signage upon the Premises. Landlord requires Tenant to install its approved exterior signage, at Tenant's sole cost and expense, prior to the date Tenant opens for business to the public from the Premises. Tenant may place professionally prepared signage on the interior window of the Premises and professionally prepared interior signs and banners within the store front windows, provided that such signage does not exceed thirty-three percent (33%) of the total storefront window of the Premises, without Landlord's prior written consent, provided that such signage is consistent with a majority of Franchisor's stores in the United States.

D.  **Coming Soon Sign.** Sixty (60) days prior to the date Tenant initially opens for business to the public in the Premises, Landlord shall install a "Coming Soon" sign ("Coming Soon Sign") as identified on Exhibit "C-1" attached hereto, on the interior window surface within the Premises. The location and dimension of the Coming Soon Sign shall be determined by Landlord in Landlord's sole discretion. Tenant agrees to pay to Landlord upon execution of this Lease the sum of Fifty and 00/100 Dollars ($50.00) to reimburse Landlord for the cost incurred by Landlord to fabricate and install the Coming Soon Sign within the Premises. Landlord agrees to use commercially reasonable efforts to incorporate Tenant's trademarks or logos on the Coming Soon Sign, if applicable, provided such information is presented to Landlord with Tenant's plans and specifications depicting Tenant's proposed improvements to the Premises. Upon Tenant's opening in the Premises for business to the public, Tenant shall remove the Coming Soon Sign.

E.  **Miscellaneous.** Tenant shall be required to control and retain noise, dust or other materials within the Premises, subject to directives from Landlord. Tenant shall be required to clean all HVAC filters clogged with dust, or other materials resulting from its construction activities.

F.  **Construction Allowance for Tenant's Work.** Provided Tenant is not in default under any of the terms and conditions contained herein, Landlord shall reimburse Tenant for a portion of the cost of Tenant's Work (excluding trade fixtures, equipment and inventory) within the Premises, in the amount and manner hereinafter provided. The amount of such reimbursement shall hereinafter be referred to as "Tenant's Allowance." It is understood and agreed that Tenant's Allowance shall be a reimbursement for a portion of the actual cost incurred by Tenant to complete Tenant's Work within the Premises as detailed in the plans and specifications therefor to be approved by Landlord. Tenant's Allowance shall be equal to the lesser of (i) Forty Thousand and 00/100 Dollars ($40,000.00), or (ii) the actual cost incurred by Tenant to complete Tenant's Work. Landlord shall pay Tenant's Allowance to Tenant in two (2) installments as follows:

The first installment of Tenant's Allowance shall be in the amount of Twenty Thousand and 00/100 ($20,000.00) and shall be paid to Tenant within thirty (30) days after Tenant has furnished to Landlord each of the following:

    (a)  Copies of paid invoices documenting the actual cost incurred by Tenant to complete at least fifty percent (50%) of Tenant's Work (excluding trade fixtures, equipment and inventory) within the Premises;

    (b)  An original notarized affidavit of Tenant's architect and/or general contractor in a form acceptable to Landlord, in its sole discretion, stating that (i) not less than fifty percent (50%) of Tenant's Work has been completed, all in accordance with the plans and specifications approved by Landlord, subject, however, to Landlord's verification thereof and (ii) all subcontractors, laborers and material suppliers have been paid in full for the work completed; and

    (c)  An original notarized partial waiver of lien in a form acceptable to Landlord, in its sole discretion, with respect to the Premises, executed by every subcontractor, laborer and material supplier engaged in or

11802147.12

supplying labor or materials, to the extent such subcontractor, laborer and material supplier has been paid for its labor and/or materials.

The second installment shall be an amount equal to the remainder of the Tenant's Allowance, subject to the limitations set forth above, and shall be paid within thirty (30) days after the latest to occur of the following conditions: (i) Tenant has opened for business in the Premises, (ii) Tenant has paid the Minimum Rent and Additional Rent for the first month of the Term of this Lease, and (iii) Tenant has furnished to Landlord the following:

    (a)    Copies of paid invoices documenting the actual cost incurred by Tenant to complete Tenant's Work (excluding trade fixtures, equipment and inventory) within the Premises;

    (b)    The original notarized affidavit of the general contractor in the form of Exhibit D-1 attached hereto and made a part hereof, stating that (i) Tenant's Work has been fully completed in accordance with the plans and specifications approved by Landlord, subject, however, to Landlord's verification thereof and (ii) all subcontractors, laborers and material suppliers have been paid in full;

    (c)    An original notarized waiver of lien in the form of Exhibit D-2 attached hereto and made a part hereof, with respect to the Premises, executed by every subcontractor, laborer and material supplier engaged in or supplying labor or materials; and

    (d)    A certificate of use and occupancy for the Premises issued by the appropriate governmental authority.

Notwithstanding anything to the contrary contained herein, Landlord reserves the right to offset against Tenant's Allowance any delinquent amounts due to Landlord by Tenant accrued hereunder. In addition, Landlord reserves the right to offset against Tenant's Allowance all costs and/or expenses incurred by Landlord to repair any damage to the Shopping Center caused by Tenant or Tenant's contractor during the performance of Tenant's Work. In the event this Lease shall be terminated for any reason prior to the natural expiration of the initial Term of the Lease, Tenant shall pay to Landlord the unamortized portion of Tenant's Allowance, said amortization to be computed based upon a five (5) year term commencing on the Rent Commencement Date, and an annual interest rate of twelve percent (12%).

Tenant agrees that Tenant's Work within the Premises and all other work undertaken by Tenant in the Premises shall be performed in a first-class and workmanlike manner and all equipment, fixtures and installation shall be new and in usable condition on the Rent Commencement Date.

G.    **Grease Traps.** Tenant shall, at Tenant's sole cost and expense, maintain or, if necessary, install, (i) a hood system to prevent grease from exhaust systems serving the Premises from dripping onto the roof of the Shopping Center, as well as (ii) its own individual grease interceptor system, including all requisite plumbing associated therewith, to prevent fats, oils and grease generated from Tenant's business operations at the Premises from entering and clogging the sanitary sewer system of the Shopping Center (the foregoing in (i) and (ii) collectively defined hereinafter as the "Grease Traps"). Tenant's installation of the Grease Traps shall be in strict accordance with criteria dictated by Landlord in its sole reasonable judgment and all applicable laws, codes, regulations and ordinances of governmental authorities, and shall be subject to all provisions of the Lease relating to construction of, and alterations to, the Premises, including but not limited to the requirement to obtain Landlord's approval of plans and specifications before proceeding with installation.

Such Grease Traps shall be properly maintained, operated, and cleaned, repaired and replaced periodically by Tenant at its sole cost and expense, in accordance with criteria dictated by Landlord in its sole judgment and all applicable laws, building codes, regulations and ordinances of governmental authorities and any replacement of the Grease Traps shall be in accordance with the requirements herein for the installation thereof. Tenant shall dispose of all cooking grease, oils, fats and filters generated from its business operations at the Premises, which shall be disposed of in strict compliance with the maintenance and disposal standards and procedures established from time to time by Landlord in its sole judgment and all applicable Federal, State and local laws, building codes, regulations and ordinances in their sole judgment.

In the event Tenant fails to install, maintain, clean, repair or replace either or both of the Grease Traps (as the case may be) as required herein, Landlord shall have the right, but not the obligation, to install, maintain, clean, repair or replace such Grease Trap(s), as applicable in or upon the Premises and Tenant shall, immediately upon demand, reimburse Landlord all costs and expenses incurred by Landlord in connection with the installation, maintenance, cleaning, repair or replacement of such items, plus an additional fifteen percent (15%) of such costs and expenses to reimburse Landlord its administrative overhead and an additional sum equal to ten percent (10%) of said amount for profit.

In addition to the foregoing, Tenant shall at its expense properly ventilate the Premises so that adjoining tenants shall not be disturbed or disrupted by odors emanating from the Premises. In the event Tenant fails to properly ventilate the Premises as required herein, Landlord shall have the right, but not the obligation, to cause the Premises to be properly

11802147.12

Case 17-03469-TOM7    Doc 95-3    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit C    Pt. 1    Page 8 of 38

ventilated and Tenant shall immediately upon demand reimburse Landlord all costs and expenses incurred by Landlord to ventilate the Premises, plus an additional sum equal to fifteen percent (15%) of such costs to reimburse Landlord its administrative overhead.

## VII.  COMMON AREAS:

A.  **Common Areas**.  Landlord grants to Tenant and Tenant's customers and invitees the non-exclusive right to use the areas designated by Landlord from time to time as Common Areas.  The term "Common Areas" shall mean the parking areas, roadways, pedestrian sidewalks, loading docks, delivery areas, exterior surfaces of Shopping Center buildings, landscaped areas, service courts, open and enclosed courts and malls, fire corridors, meeting areas and public restrooms, and all other areas or improvements which may be provided by Landlord for the common use of the tenants of the Shopping Center.  Landlord does not represent or warrant that the Common Areas will be free from interruption of service or use for reasons beyond Landlord's reasonable control.  In no event shall Landlord be liable for compensatory, incidental or consequential damages by reason of such interruption.  Landlord hereby reserves the following rights with respect to the Common Areas:

1.  To establish reasonable rules and regulations for the use thereof;

2.  To use or permit the use by others to whom Landlord may have granted such rights for promotional activities;

3.  To close all or any portion thereof as may be deemed necessary by Landlord to prevent a dedication thereof or the accrual of any rights to any person or the public herein;

4.  To change the layout of such Common Areas, including the right to reasonably add to or subtract from their shape and size, whether by the addition of building improvements or otherwise, and shall have the right to retain revenue from income producing events whether or not conducted for promotional purposes;

5.  To erect and install signs, kiosks, landscaping (including planters), fountains, sculptures, free standing buildings and other structures, additional stories to existing buildings or otherwise; and

6.  To operate, manage, equip, light, repair and maintain said Common Areas for their intended purposes in such manner as Landlord shall in its sole discretion from time to time determine In the event that Tenant remains open for business beyond standard shopping center hours (subject to Article IX) Tenant agrees to reimburse Landlord for any additional operating or Common Area lighting costs incurred in connection with such after-hours operation.

B.  **Common Area Charges**.  For each full or partial calendar year in the Lease Term, Tenant shall pay to Landlord a proportionate share of all costs and expenses of every kind and nature paid or incurred by Landlord in operating, maintaining, repairing and managing the Common Areas, including but not limited to, cleaning, lighting, repairing, painting, maintaining, and replacing all Common Area improvements including the roofs of all buildings within the Shopping Center; snow removal, landscaping and security; fire safety and protection systems, monitoring, testing and operating charges; restriping and overlay of the parking lot; painting of exterior surfaces of Shopping Center buildings; total compensation and benefits (including premiums for Workers' Compensation and other insurance) paid to or on behalf of employees; personal property taxes; supplies; fire protection; utility charges; licenses and permit fees; reasonable depreciation of equipment used in operating and maintaining the Common Areas and rent paid for leasing such equipment, any fees paid or assessed by Landlord for management of the Shopping Center; and administrative costs equal to fifteen percent (15%) of the total cost of all the foregoing items (hereafter referred to as "Common Area Charges").  Tenant's proportionate share of Common Area Charges shall be determined by multiplying the total cost incurred by Landlord by a fraction, the numerator of such fraction being the square feet within the Premises and the denominator of which is the gross leasable area of all completely constructed and initially occupied buildings in the Shopping Center depicted on Exhibit A attached hereto, excluding from the denominator the square footage of (i) any tenant in the Shopping Center which provides such item at its own expense for the portion of the Common Areas within such tenant's demised premises, and (ii) that portion of any Shopping Center building(s) which cannot be reasonably leased and has been decommissioned by Landlord for reasons such as, but not limited to, lack of access, reasonable visibility from the public right of way, and/or violations or lack of compliance with applicable building codes, provided, however, that for purposes of such denominator, Landlord shall not decommission more than ten (10%) of the gross leasable area of the Shopping Center building(s).

1.  Tenant's Common Area Charges shall be paid in monthly installments on the first day of each month in an amount to be estimated by Landlord.  Subsequent to the expiration of the period used by Landlord in estimating Landlord's cost, Landlord shall furnish to Tenant a statement of the actual amount of Tenant's proportionate share of such Common Area Charges for such period.  If Tenant's proportionate share of

9

11802147.12

Common Area Charges with respect to any calendar year is less than the total amount paid by Tenant for such calendar year, the excess shall be credited against the payments with respect to Common Area Charges next becoming due. If such excess shall occur at the expiration of this Lease, such excess shall be refunded to Tenant. If Tenant's proportionate share of Common Area Charges for any calendar year exceeds the total amount paid by Tenant for such calendar year, Tenant shall pay the difference to Landlord upon demand.

Notwithstanding the foregoing, Tenant's Common Area Charge for either of calendar year 2014 and 2015 shall not exceed $2.39 per square foot per year. Following the expiration of the 2015 calendar year of this Lease, Tenant's annual Common Area Charge in each subsequent calendar year of the initial Term of the Lease shall not increase by more than five percent (5%) of the maximum amount otherwise payable in the immediately preceding calendar year (on a cumulative basis) during the Lease Term (including renewal terms); provided, however, the foregoing limitation shall not apply to Landlord's cost of Common Area snow and ice removal, utilities and security. [*Site Specific*]

C. **Reserve Account.** In addition to Tenant's contribution for Common Area maintenance as provided in Article VII, Section B, above, Tenant shall also be required to pay to Landlord an amount equal to the amount per square foot of gross leasable area of the Premises per year set forth in Article I, Section A(12), above, representing Tenant's contribution for "major repairs" to or replacement of Common Area improvements performed by Landlord subsequent to the Rent Commencement Date. Tenant's contribution to the Reserve Account shall be paid in equal monthly installments during the Term of this Lease or any renewals thereof, in advance, on or before the first day of each calendar month. The term "major repairs" shall include, but shall not be limited to repairs to or replacement of parking lot surfaces, sidewalks and utility lines. Funds contributed by Tenant to the Reserve Account shall not be applied to the items recited in Article VII, Section B, above, but shall be retained by Landlord until such time as Landlord shall perform a major repair, regardless of the date(s) such amount was contributed by Tenant. In no event shall Tenant be entitled to a refund of the amounts so contributed by Tenant to the Reserve Account.

VIII. **UTILITIES AND RUBBISH DISPOSAL**:

A. **Utility Charges.** Commencing on the date Landlord delivers the Premises to Tenant, Tenant shall pay for all utilities provided to or for the benefit of the Premises, including but not limited to water/sewer, demand or reservation fees, connection fees, tap fees, gas, electricity, fuel, light, heat, power, telephone, cable, and trash and garbage removal, together with all taxes levied or other charges on such utilities and governmental charges based on utility consumption. Tenant shall, at its sole cost and expense, pay for the cost of installation of meters for the Premises and any and all related costs and expenses if such meters do not exist at the Premises on the date possession of the Premises is made available to Tenant.

If any utilities are not separately metered or are only partly separately metered and are used in common with other tenants of the Shopping Center, Tenant shall pay to Landlord its share of such utility costs computed by Landlord, in Landlord's sole discretion, to reasonably reflect Tenant's consumption of such utility from the Premises. Such payments shall be made pursuant to Article VIII, Section C.

Notwithstanding the foregoing, Landlord shall have the right, but not the obligation, to supply Tenant with any or all utility services provided to or for the benefit of the Premises and Tenant shall pay to Landlord or Landlord's agent the cost of such utilities provided to Tenant at the Premises pursuant to Article VIII, Section C. Landlord shall, in Landlord's sole discretion, compute Tenant's cost of such utilities to reasonably reflect Tenant's consumption of such utilities from the Premises. In no event, however, shall the cost of such utility service(s) supplied by Landlord exceed a rate which Tenant would otherwise pay for such utility service(s) if Tenant obtained such utility service(s) directly from the applicable utility supplier. Landlord and Tenant further agree that Landlord shall have the right to discontinue supplying such utility service(s) upon ten (10) days prior written notice to Tenant, provided Landlord shall not discontinue such utility service(s) until Tenant has obtained the discontinued utility service(s) from the applicable utility supplier and Tenant has provided Landlord with written notice thereof.

Landlord and Tenant hereby acknowledge that electrical service to the Premises may be furnished by one or more companies providing electrical generation, transmission and/or distribution services. Landlord hereby reserves the right to charge Tenant for the cost of electrical service to the Premises as a single charge or divided into and billed in a variety of categories such as distribution charges, transmission charges, generation charges, public good charges or other similar categories. Landlord further reserves the right, at its sole discretion, to select the company(ies) providing electrical service(s) to the Shopping Center, including the Premises, to aggregate the electrical service for the Premises and other premises within the Shopping Center, to purchase electricity for the Shopping Center, including the Premises, through a broker and/or buyers group and to change the providers and/or manner of purchasing electricity from time to time. Landlord shall be entitled to receive a reasonable fee (if permitted by law) for the services provided by Landlord in connection with the selection of utility companies and the negotiation and administration of contracts for the generation of electricity to the Shopping Center. In addition, if Landlord bills Tenant directly for the cost of electricity service to the Premises, the cost of electricity service may include (if permitted by law) an administrative fee to reimburse Landlord for the cost of reading meters, preparing invoices and related costs; provided, however, in no event

10

Case 17-03469-TOM7    Doc 95-3    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit C    Pt. 1    Page 10 of 38

will the cost of such utilities, inclusive of any such administrative fees or charges, exceed the cost which Tenant would otherwise pay for such utility service if Tenant obtained the same directly from the applicable public utility provider.

B. **Rubbish Disposal.** Intentionally omitted.

C. **Payment.** If and to the extent Landlord shall bill Tenant for utilities and/or rubbish disposal pursuant to this Article VIII, such charges shall be paid by Tenant in monthly installments on the first day of each month based upon the annual amount to be reasonably estimated by Landlord from time to time. Subsequent to the expiration of the period used by Landlord in estimating Tenant's share of such cost, Landlord shall furnish to Tenant a statement of the actual amount of Tenant's proportionate share of utilities and/or rubbish disposal for such period and within fifteen (15) days, Tenant shall pay to Landlord or Landlord shall remit to Tenant, as the case may be, the difference between the estimated amounts previously paid by Tenant and the actual amount of Tenant's utilities and/or rubbish disposal charges for such period as shown by Landlord's statement.

D. In no event shall Landlord be liable for the quality, quantity, failure, or interruption of the foregoing utility and rubbish disposal services to the Premises, except to the extent due to the gross negligence or wrongful willful act to Landlord, its agents, employees and/or contractors.

## IX.   UNDERLINE USE OF PREMISES BY TENANT:

A. **Tenant's Use of Premises.** Tenant shall use the Premises only for the uses set forth in Article I, Section A(4), of this Lease and for no other purpose.

B. **Operation of Business.** Tenant agrees to open its store for business on or before the Outside Opening Date, fully fixtured, stocked and staffed and to continuously conduct in one hundred percent (100%) of the Premises on all business days during the Term of this Lease and any renewal or extension thereof, the business described in Article I, Section A(4), above, except for closure due to Permitted Closures (as defined below). In addition, Tenant agrees to keep the Premises open for business to the public during such extended hours as Landlord may establish for the Shopping Center during recognized holiday seasons and any special promotional events, provided that a majority of the other existing non-anchor tenants are open during such extended hours. Tenant recognizes it is a material consideration to Landlord that Tenant produce the maximum Gross Sales possible from the Premises during the Lease Term. In no event, however, will Tenant first open for business on any day before 9:00 A.M. or remain open for business after 12:00 P.M. without Landlord's prior written consent, subject to Article VII, Section A(6).

As used herein, the term Permitted Closure shall mean, (a) damage and destruction, (b) eminent domain, (c) permitted repairs/alterations (not to exceed 30 days unless preapproved by Landlord, or in the case of a Franchisor Remodeling Period, not to exceed 90 days), (d) New Year's Day, Easter, Thanksgiving Day and Christmas Day, and (e) events described in Article XXIII, Section Q.

Recognizing the difficulty or impossibility of determining Landlord's damages for loss of percentage rent anticipated from occupants of the Shopping Center or for loss of values of the Shopping Center because of diminished salability, mortgagability, adverse publicity or appearance which may result if Tenant shall (i) fail to open for business fully fixtured, stocked and staffed on the Outside Opening Date and/or (ii) fail to operate its business within the Premises in accordance with this Article IX, Section B, and/or (iii) vacate or abandon the Premises and/or (iv) fail to operate in the Premises as otherwise required by Landlord, then and in any such event the Landlord shall, in addition to any other remedy available to Landlord under this Lease, have the right to collect from Tenant in addition to and together with Minimum Rent due under this Lease, and as liquidated damages for such breach, an amount equal to Seventy-Five and 00/100 Dollars ($75.00) per day for each day during such time as any one or more of the aforementioned events shall continue. The parties hereby acknowledge and agree that such additional amount represents a reasonable estimate of Landlord's damages sustained by reason of Tenant's breach. For purposes of this Article IX, the terms "vacate" and "abandon" shall not be abrogated because Tenant may have left all or any part of its trade fixtures, furniture, furnishings or stock-in-trade within the Premises.

C. **Exclusive Use.** Provided that Tenant is in possession of the Premises and operating its business therein without default and Tenant has not defaulted under any of the terms and conditions contained in this Lease more than twice during any lease year, Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center by a tenant, subtenant, assignee, licensee or concessionaire (collectively "Occupant") whose Principal Business (as hereinafter defined) is the operation of a pizza and Crazy Bread restaurant (the "Exclusive Use"). As used herein, the term "Principal Business" shall mean any business devoting more than thirty percent (30%) of its menu items to pizza and Crazy Bread via carry-out or delivery service. Notwithstanding anything to the contrary contained herein, the foregoing Exclusive Use shall not be applicable to the units occupied by tenants whose gross leasable area is three thousand five hundred (3,500) square feet or more, the occupant of any outparcel within and adjacent to the Shopping Center, any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors or assigns under

11

said current lease. In the event Tenant ceases to operate its business in the Premises, or defaults under the terms and conditions contained in this Lease more than twice during the Term of this Lease, the Exclusive Use shall terminate as of the date Tenant ceases to operate its business in the Premises or the date of the third default, whichever shall be the case, and thereafter the Exclusive Use shall be null, void and of no further effect.

Landlord and Tenant acknowledge that the Exclusive Use has been included herein at the sole request of Tenant, and in the event the Exclusive Use shall be construed to be or shall be declared to be invalid or unenforceable by the decision of any court or any governmental agency having jurisdiction over such matters or by the enactment of any law, ordinance or regulation, or in the event the Exclusive Use shall be construed to be or shall be declared to be in violation of any law, rule or regulation, including but not limited to any anti-trust laws, rules or regulations, Tenant agrees to indemnify, defend and hold Landlord harmless from and against any claim, demand, damage, cost or liability, including reasonable attorney fees and court costs, arising from Landlord's grant of the Exclusive Use. Tenant hereby further agrees to indemnify, defend and hold Landlord harmless against any claim, demand, damage, cost or liability, including reasonable attorney fees and court costs, arising from any claim, demand, action or proceedings brought by a third party against Landlord based upon the grant by Landlord of the Exclusive Use.

In the event of a violation of the foregoing covenant by Landlord, Tenant shall not be entitled to monetary damages nor shall Tenant be entitled to injunctive relief. Tenant's sole remedy shall be to remain in possession of the Premises and continue to operate its business therein subject to an adjustment in the Minimum Rent and Additional Rent then payable. In the event Tenant's Exclusive Use shall be violated by another Occupant of the Shopping Center, Tenant shall pay to Landlord fifty percent (50%) of Minimum Rent and Additional Rent ("Exclusive Use Substitute Rent"), then due and payable under the terms of this Lease, until the earlier to occur of (a) twelve (12) consecutive calendar months immediately following the date Tenant commenced payment of Substitute Rent, (b) the date the Occupant ceases violating the Exclusive Use, (c) the date Tenant ceases to operate a pizza and Crazy Bread restaurant as its Principal Business in the Premises, or (d) the first day of the next renewal period, if any, (the "Substitute Rent Period"). Exclusive Use Substitute Rent shall be due and payable in accordance with the Minimum Rent and Additional Rent provisions set forth in this Lease. At the expiration of the Exclusive Use Substitute Rent Period Tenant's obligation to pay Minimum Rent shall be fully reinstated without any obligation of prior notice thereof by Landlord to Tenant.

Notwithstanding anything to the contrary contained herein, in the event the Exclusive Use shall be violated by an Occupant operating in its premises in default of the permitted use provision set forth in such Occupant's lease (a "Rogue Tenant"), Landlord shall not be deemed to have violated Tenant's Exclusive Use, and Tenant shall have no right to terminate the Lease or pay Exclusive Use Substitute Rent as provided herein so long as Landlord is using commercially reasonable efforts to cure any such default. Notwithstanding the foregoing, if despite Landlord's commercially reasonable efforts to stop the violation, if a Rogue Tenant continues to violate Tenant's Exclusive Use for more than twelve (12) consecutive months ("Rogue Tenant Termination Period"), then Tenant shall have the right to terminate this Lease.

In the event Tenant elects to terminate this Lease, Tenant shall give Landlord written notice of its election to terminate the Lease within thirty (30) days after the expiration of the Rogue Tenant Termination Period. Termination of Lease shall be effective thirty (30) days after the date Landlord receives Tenant's notice of termination (the "Termination Date"), provided that Tenant pays to Landlord all sums and charges due and owing by Tenant to Landlord through and including the Termination Date. Any sum which cannot be exactly determined by Landlord as of the Termination Date shall be paid by Tenant to Landlord within thirty (30) days after receipt by Tenant of Landlord's statement for said sums. The obligation of Tenant to pay any such sums shall survive the termination of this Lease.

If Tenant does not notify Landlord of its election to terminate this Lease within the thirty (30) day period set forth in the preceding paragraph, Tenant shall be deemed to have waived its right to terminate this lease pursuant to this Section.

In the event Tenant ceases to operate its business in the Premises for a period of ninety (90) consecutive days for reasons other than repair or remodel, or, in the case of a remodel required by Tenant's Franchisor ("Franchisor Remodeling Period"), such period of time as is reasonable to complete the same not to exceed ninety (90) days, this Article IX, Section C, the same shall constitute a default under this Lease pursuant to which Tenant's rights hereunder shall become null and void and of no further force and effect. This section shall not apply in the case of a casualty, which will be governed by Article XII provided Tenant operates following restoration work in event of casualty.

## X.  TENANT'S COVENANTS WITH RESPECT TO OCCUPANCY:

    A.  **Tenant agrees:**

11802147.12

Case 17-03469-TOM7    Doc 95-3    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit C    Pt. 1    Page 12 of 38

1. To occupy the Premises in a safe and careful manner and in compliance with all laws, ordinances, rules, regulations and orders of any governmental bodies having jurisdiction over the Premises, and without committing or permitting waste;

2. To neither do nor suffer anything to be done or kept in or about the Premises which contravenes Landlord's insurance policies or increases the premiums therefor;

3. To keep its show or display windows, canopy and electric signs lighted until at least 9:30 P.M. local time of each day or until thirty (30) minutes after the close of each business day, whichever is the later;

4. To permit no reproduction of sound which is audible outside the Premises or permit odors to be unreasonably dispelled from the Premises;

5. To place no sign on the exterior of the Premises or on the interior surface of any windows of the Premises without Landlord's prior written consent and in accordance with the requirements of Exhibit "C" attached hereto. Tenant shall maintain all signs placed upon the Premises by Tenant in good condition and repair. Except as provided in Article VI, Section D above, Tenant agrees not to display any banners, pennants, search lights, window signs, balloons, or similar advertising media on or about the Premises. Upon vacating the Premises, Tenant agrees to remove all signs installed by Tenant and repair all damage caused by such removal in accordance with Article XI, Section D, of this Lease;

6. To place no merchandise, sign or other thing of any kind in the vestibule or entry of the Premises or on the sidewalks or other Common Areas adjacent thereto;

7. To park Tenant's vehicles and to require all employees to park only in such places as may be designated from time to time by Landlord for the use of Tenant and its employees, and specifically not to permit parking of any Tenant or employee vehicles in any service court area. Landlord reserves the right to impose fines against Tenant for any violation of these parking restrictions by Tenant and/or Tenant's employees and to have towed, at Tenant's cost and expense, any automobile parked in violation of this Section;

8. To keep any rubbish, garbage and waste generated by Tenant from the Premises in proper dumpsters provided by Tenant adjacent to the Premises or such other area designated by Landlord from time to time until such rubbish, garbage and waste is removed from the Shopping Center and to permit no refuse to accumulate around the exterior of the Premises;

9. To neither load nor unload or permit the loading or unloading of merchandise, equipment or other property from any doors of the Premises that open onto the front sidewalk areas, nor from any other doors except from the rear of the Premises and to use its best efforts to prevent the parking or standing of vehicles and equipment upon Shopping Center land except when actually engaged in loading or unloading. In the event Tenant violates this covenant, Tenant shall have twenty-four (24) hours following receipt of notice from Landlord (which notice may be given by personal delivery to the Premises including, but not limited to, oral notice by Landlord's representative at the Shopping Center) to cease such activity or be deemed to be in default under this Lease, notwithstanding any cure periods set forth in Article XVI, and Landlord shall have the immediate right to invoke any legal or equitable remedies to enjoin Tenant from such activity;

10. To conduct no auction, fire, bankruptcy, liquidation, going-out-of-business, moving, relocating or any other similar sale without the prior written consent of Landlord;

11. To permit Landlord free access to the Premises upon reasonable prior written notice at all reasonable times (provided that no notice or time limitations shall apply in the case of an emergency) for the purpose of examining or making repairs to the Premises that Landlord may deem necessary or desirable for the safety or preservation thereof;

12. Not to permit to be attached or recorded against the Premises or any other portion of the Shopping Center any lien, encumbrance or charge arising out of any work performed or materials furnished by any contractor, mechanic, laborer, or materialman for or at the request of Tenant. Tenant will not enter into any mortgages, conditional sale, security agreement or like instrument nor suffer any other matter or thing whereby the estate, right and interest of Landlord in the Premises or any part thereof might be impaired or diminished. If any lien or notice of lien on account of an alleged debt of Tenant or any notice of contract by a party engaged by Tenant or Tenant's contractor to work on the Premises is filed against the Premises or any part of the Shopping Center, Tenant will, within ten (10) calendar days after notice of the filing thereof, cause the same to be discharged of record by payment, deposit, bond, order of a court of competent jurisdiction, letter of

11802147.12

credit or other adequate security. If Tenant fails to cause such lien or notice of lien to be discharged within such period, Landlord, its managing agent, or Landlord's lender, may, but shall not be obligated to, discharge the same either by paying the amounts claimed to be due or by procuring the discharge of such lien by deposit, bond or otherwise, and Tenant shall, immediately upon demand, reimburse Landlord, its managing agent, or Landlord's lender for any and all costs and expenses incurred by Landlord, its managing agent, or Landlord's lender, to discharge such lien including, without limitation, all attorneys' fees, court costs and similar expenses, plus an administrative fee equal to One Thousand and 00/100 Dollars ($1,000.00). Notwithstanding the foregoing, Tenant may grant its lending institution a security interest on its Trade Fixtures and Proprietary Items (as defined in Article XI, Section C) and other personal property. Landlord agrees to subordinate any security lien or other interest in Tenant's Trade Fixtures and Proprietary Items that it has by virtue or statute of common law, pursuant to subordination agreement attached as Exhibit "F" simultaneously with the execution of this Lease. In addition, Tenant shall indemnify and hold Landlord, its managing agent, and Landlord's lender, if any, harmless from and against all loss, cost, expense and liability whatsoever (including Landlord's or its managing agent's cost of defending against the foregoing, such cost to include attorneys' fees) resulting or occurring by reason of any claims or causes of actions that may arise as a result of any lien, notice of lien or, claim relating to work and/or materials furnished to the Premises at the request of Tenant, its employees, agents or contractors;

13. To solicit no business in the Common Areas, nor distribute handbills or other advertising matter to customers, nor place the same in or on automobiles in the Common Areas, nor conduct any promotional activity whatsoever in the Common Areas;

14. To comply with all reasonable rules and regulations which Landlord may from time to time establish for the use and care of the Premises and the Common Areas;

15. To advertise with a display-type advertisement a minimum of six (6) times during each lease year with a total of at least 120 column inches per lease year in the printed media approved by Landlord;

16. To shut off all exhaust fans, if any, servicing the Premises at all times when the Premises are closed; to keep the Premises adequately heated and cooled to comfortable room temperature year round and, if applicable, to at least the same minimum temperature (in the case of heat) or at the same maximum temperature (in the case of air-conditioning) as Landlord shall attempt to maintain in the enclosed Common Areas, if any;

17. To prohibit the operation on the Premises or in any part of the Shopping Center of any coin or token-operated vending machines, video games or similar devices;

18. To permit Landlord or its agents, during the ninety (90) day period preceding the expiration of the Term of this Lease, to show the Premises to potential tenants, provided that no "For Rent" or similar notices may be placed on the same until after Tenant has vacated the Premises, provided that Landlord may place a "generic" "For Rent" or similar notice by the driveways, right of ways and Common Areas indicating a certain number of square feet for lease and a name and contact number, so long as the same does not identify Tenant or the Premises (example "endcap");

19. That it shall make no installations upon or any penetrations through the roof or the exterior walls of the Premises without the prior written consent of Landlord. Any unauthorized roof installations or penetrations by Tenant shall be subject to immediate removal and repair, at Tenant's sole cost and expense, upon notice from Landlord. Repairs shall be made with materials of equal or better quality and by contractors approved by Landlord;

20. In the event Landlord elects to make any additions or changes to the Premises and/or Shopping Center, Tenant shall, at its sole cost and expense, upon Landlord's request: (i) temporarily relocate Tenant's signage and/or remove Tenant's signage; and/or (ii) modify Tenant's signage to conform to Landlord's signage criteria, then in effect, that applies to the Shopping Center, provided such requirements are uniformly applied and enforced; and

21. Tenant shall, at its sole cost and expense, contract for termite and pest extermination services covering the Premises to be rendered as required by Landlord; provided, however, Landlord reserves the right to implement a program for termite and pest extermination for portions of the Shopping Center and Tenant shall participate in such program at Tenant's sole cost and expense upon notice from Landlord.

## XI. REPAIRS AND ALTERATIONS:

14

11802147.12

A. **Repairs by Landlord.** Landlord shall keep the foundations, roof (including, but not limited to, gutters, downspouts and roof membrane), and structural portions of the outer walls, interior structural walls and the maintenance of building-wide mechanical, electrical, plumbing and other such systems to the extent they service an area greater than the Premises in good repair, except for repairs required thereto by reason of the acts of Tenant, Tenant's employees, agents, invitees, licensees, or contractors. Notwithstanding anything herein to the contrary, some or all of these repairs will be subject to inclusion in Tenant's Common Area Charges, including, but not limited to, the cost of painting of the outer walls of the Shopping Center buildings including the Premises. Tenant shall give Landlord written notice of the necessity for repairs coming to the attention of Tenant following which Landlord shall have a reasonable time to undertake and complete such repairs. The provisions of this Article XI, Section A, shall not apply in the case of damage or destruction by fire or other casualty or by eminent domain, in which events the obligations of Landlord shall be controlled by either Article XIII or Article XV hereof.

It is expressly understood that Landlord shall not be responsible for any portions of the Premises constructed by Tenant or any prior occupant of the Premises.

B. **Repairs by Tenant.** Except as provided in Article XI, Section A, Tenant shall keep the Premises and any fixtures, facilities, signs or equipment contained therein, in good condition and repair, including, but not limited to, exterior and interior portions of all doors, door checks and operations, windows, plate glass, and showcases surrounding the Premises, the heating, air conditioning, electrical, plumbing and sewer systems (to the extent that the same exclusively serve the Premises and/or an area of the Shopping Center in addition to the Premises), the exterior doors, window frames, and all portions of the store front area, and shall make any replacements of the foregoing and of all broken and/or cracked plate and window glass which may become necessary during the Term of this Lease, and any renewals thereof. In connection with Tenant's obligation to maintain the HVAC system serving the Premises, Tenant shall, during the Term of this Lease, and any renewals thereof, at its sole cost and expense, maintain a service contract for the routine performance of standard HVAC system maintenance, including but not limited to, periodic replacement of filters, oiling of mechanical components and inspection for wear and tear. Landlord reserves the right to designate an HVAC contractor with whom Tenant shall contract for such routine HVAC system maintenance so long as the fee charged by Landlord's designated contractor shall be the same or less than the fee charged by Tenant's contractor for similar services. If Tenant fails to commence or complete repairs promptly and adequately, Landlord may make or complete said repairs and Tenant shall pay the cost thereof to Landlord upon demand, together with the sum of fifteen percent (15%) of said costs for overhead.

C. **Alterations or Improvements by Tenant.** Tenant shall not, without Landlord's prior written consent, make, or permit to be made, any alterations, additions or improvements to the Premises, which consent Landlord may withhold in its sole discretion. Any alterations which may be permitted by Landlord shall be based upon plans and specifications submitted by Tenant and approved by Landlord and upon the condition that Tenant shall promptly pay all costs, expenses, and charges thereof, shall make such alterations and improvements in accordance with applicable laws and building codes and ordinances and in a good and workmanlike manner, and shall fully and completely indemnify Landlord, its managing agent, and Landlord's lender against any mechanic's lien or other liens or claims in connection with the making of such alterations, additions, or improvements. Tenant shall promptly repair any damages to the Premises, or to the buildings of which the Premises are a part, caused by any alterations, additions or improvements to the Premises by Tenant.

Notwithstanding the foregoing, Tenant may make such interior, nonstructural alterations, improvements and additions to the Premises as Tenant deems necessary or desirable up to Fifty Thousand and 00/100 Dollars ($50,000.00) per lease year without obtaining Landlord's consent; provided, however, Tenant shall not make any alterations, improvements, additions or repairs in, on, or about the Premises that are structural in nature and/or affect the exterior storefront, the roof or the mechanical or utility systems of the Premises, other premises or the Shopping Center. Tenant agrees to provide to Landlord a duplicate set of plans for any work to the Premises requiring a building permit, upon approval of such plans, but Landlord's approval of such plans shall not be required except as otherwise expressly provided in this Article XI, Section C.

Tenant may make, at any time during the Lease Term (including renewal terms) non-structural alterations, additions or improvements to the Premises, including, but not limited to the installation and/or removal of its equipment, machinery, appliances, (including, but not limited to, Tenant's oven hood and cooler) furniture and other personalty (collectively "Trade Fixtures") or items that reflect the national trade dress, trademarks and/or copyrights of Tenant's Franchisor, examples of which are set forth on Exhibit "G" ("Proprietary Items").

D. **Removal of Improvements.** At the expiration or earlier termination of the Lease Term, all improvements included in Landlord's Work, if any, all heating and air conditioning equipment, and all alterations, additions and other improvements by Tenant shall become the property of Landlord and shall not be removed from the Premises. Notwithstanding the foregoing, all Trade Fixtures and Proprietary Items shall remain the property of Tenant and shall be removed upon the expiration of the Lease Term, provided that Tenant, at its option, may leave its oven, hood and/or

15

cooler; provided, however, that Landlord may, in its sole discretion, require that Tenant remove its oven, hood and/or cooler with seven (7) days' prior notice to expiration or earlier termination of the Lease Term. Tenant shall repair any damage caused to the Premises by the removal of any such items that are affixed to the Premises. If Tenant fails to remove such items from the Premises prior to the expiration or earlier termination of this Lease, or if Tenant has not fully performed all of the covenants and agreements to be performed by Tenant under the provisions of this Lease, all such trade fixtures, furniture, furnishings, and signs shall become the property of Landlord. In such event, Landlord shall have the right to remove and sell such trade fixtures, furniture, furnishings, and signs to pay for the cost of removal and/or repairs to the Premises. To the extent the revenue received by Landlord's sale of such trade fixtures, furnishings, and signs is insufficient to recover Landlord's cost of removing the same and/or repairs to the Premises, then Landlord shall have the right to proceed directly against Tenant to recover any balance. Notwithstanding anything contained to the contrary in this Lease, if Tenant removes such items from the Premises but fails to repair any damage caused by such removal, Landlord may make or complete said repairs without providing Tenant notice prior to the commencement of said repairs. To the extent Landlord exercises self help under this paragraph, Tenant shall reimburse Landlord the cost thereof upon demand, together with the sum of fifteen percent (15%) of said costs for overhead and an additional sum equal to ten percent (10%) of said amount for profit. Tenant's obligations under this Section D shall survive the termination of this Lease.

XII. **INDEMNITY AND INSURANCE**:

A. **Indemnification by Tenant.** Tenant will indemnify and hold Landlord, its managing agent, and Landlord's lender harmless from and against all loss, cost, expense, and liability whatsoever (including Landlord's cost of defending against the foregoing, such cost to include attorney's fees and including damage to other tenant's contents and improvements) resulting or occurring by reason of (i) the negligent or willful act or misconduct of Tenant, its employees, agents and contractors, occurring within the Shopping Center, and (ii) Tenant's construction, use or occupancy of the Premises.

B. **Tenant's Insurance.** Effective as of the date Tenant first enters the Premises and continuing throughout the Lease Term and any extensions or renewals thereof, including, without limitation, any holdover with or without Landlord's consent, Tenant shall procure, pay for and keep in full force and effect, the following types of insurance:

1. Commercial General Liability Insurance Policy insuring the Premises and Tenant's use thereof, together with contractual liability endorsements covering Tenant's obligations set forth in Article XII, Section A, above, in a form satisfactory to Landlord with companies having an A.M. Best Rating or its equivalent of A-VIII or better, and with a minimum limit of One Million and 00/100 Dollars ($1,000,000.00) on account of bodily injuries to or death or property damage for each occurrence and a minimum limit of Two Million and 00/100 Dollars ($2,000,000.00) annual general aggregate. The aggregate limit may be satisfied through a combination of primary and umbrella/excess liability insurance. Such insurance shall also provide that the general aggregate limits apply separately to each insured location, if applicable. The foregoing policy shall name Landlord and DDR Corp., and such other parties as Landlord may from time to time designate in writing to Tenant as additional insureds under Tenant's insurance policy and shall bear endorsements to the effect that the insurer agrees to notify all additional insureds not less than thirty (30) days in advance of any modification or cancellation thereof;

2. Special Form Cause of Loss Property Insurance Policy, including extended coverage endorsements insuring all leasehold and building improvements in the Premises, Tenant's stock-in-trade, trade fixtures, furniture, furnishings, special equipment, floor and wall coverings, and all other items of personal property of Tenant located on or within the Premises, such coverage to be in an amount equal to one hundred percent (100%) of the replacement cost thereof, and business interruption or loss of income insurance in an amount equal to the Minimum Rent, and any other Additional Rent (hereunder defined) payable under this Lease for a minimum period of twelve (12) months. The foregoing policy shall name Landlord and DDR Corp., and such other parties as Landlord may from time to time designate in writing to Tenant as loss payee under Tenant's insurance policy with regard to the permanent leasehold improvements within the Premises, including mechanical equipment and permanent fixtures and shall bear endorsements to the effect that the insurer agrees to notify all loss payees not less than thirty (30) days in advance of any modification or cancellation thereof;

3. Workers' compensation insurance (meeting the requirements of the workers' compensation laws of the State in which the Premises is located) and employer liability insurance covering all of Tenant's employees at the Premises. Tenant shall also use good faith efforts to ensure all contractors, sub-contractors, vendors, leased employees, and temporary employees are properly insured for workers' compensation;

4. Plate glass insurance covering all plate glass on the Premises at full replacement value;

5. Commercial automobile liability insurance for hired, owned/registered under Tenant's name and non-owned vehicles, including contractual liability with a single limit of liability not less than One Million and 00/100 Dollars ($1,000,000) per accident for bodily injury and property damage combined; and

6. Any insurance policies reasonably designated necessary by Landlord with regard to Tenant's, or Tenant's contractors' construction of Tenant's Work, as well as with regard to the construction of alterations including, but not limited to, contingent liability and "all risk" builders' risk insurance.

Tenant shall deposit with Landlord prior to the date of any use or occupancy of the Premises by Tenant certificates evidencing Tenant's compliance with each of the required coverages. To the extent that any of the foregoing policies shall change in name and/or coverage due to general changes in the insurance industry, Tenant shall obtain and maintain the equivalent policies and coverages as are then recognized in the insurance industry.

C. **Mutual Waiver of Subrogation**. All insurance policies required to be carried by either party pursuant to the terms set forth in this Article XII shall, to the extent permitted by law, expressly waive any right on the part of the insurer against the other party. The parties hereto agree that their policies will include such waiver clause or endorsement. The failure of any insurance policy to include such waiver clause or endorsement shall not affect the validity of this Lease. Tenant and Landlord further agree to waive all claims, causes of action and rights of recovery against the other, and their respective agents, officers, and employees, for any injury to or death of persons or any damage or destruction of persons, property or business which shall occur on or about the Premises originating from any cause whatsoever including the negligence of either party and their respective agents, officers, and employees to the extent such injury, death or property damage is required to be covered by a policy or policies maintained by either Landlord or Tenant pursuant to this Lease. Notwithstanding the above, Landlord and Tenant agree and acknowledge that the waiver of subrogation herein contained shall expressly extend to and include any uninsured loss paid by the insured in the form of a deductible or self-funded retention cost.

D. **Landlord's Liability.** Landlord shall not be liable (i) for any damage to Tenant's property located in the Premises, regardless of the cause of such damage, (ii) for any acts or omissions of other tenants of the Shopping Center, nor (iii) for any condition of the Premises whatsoever unless Landlord is responsible for the repair thereof, and has failed to make such repair after notice from Tenant of the need therefor, and expiration of a reasonable time for the making of such repair.

E. **Landlord's Insurance.** Landlord agrees to carry insurance under a Special Form Cause of Loss Policy (or an equivalent policy that becomes the insurance industry standard in the future) on the Shopping Center improvements constructed by Landlord in an amount equal to at least eighty percent (80%) of the insurable value of such improvements, together with endorsements insuring against such other risks as Landlord deems appropriate (including, but not limited to, earthquake, flood, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent) and in such amounts, with such terms and with such insurers, all as Landlord deems appropriate in Landlord's sole discretion. Such insurance shall specifically exclude Tenant's personal property and the interior leasehold improvements, mechanical equipment and permanent fixtures that Tenant is obligated to maintain pursuant to the terms of this Lease. Landlord shall also maintain in full force and effect throughout the Term commercial general liability insurance with regard to the Common Areas with minimum limits of One Million and 00/100 Dollars ($1,000,000) per occurrence, Two Million and 00/100 Dollars ($2,000,000.00) general aggregate, for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket" and/or "umbrella" policies covering the Shopping Center and other properties. Any insurance policies maintained by Landlord may include deductibles, self-insured retentions or the like in amounts determined by Landlord, in Landlord's sole discretion. Landlord shall have the right, but not the obligation, to maintain commercial insurance policies covering some or all of the deductibles, self-insured retentions or the like which are provided in any of Landlord's other insurance policies. The insurance policies maintained by Landlord pursuant to this Section are individually and collectively referred to herein as "Landlord's Insurance." Tenant agrees that Tenant's contribution to the foregoing insurance shall be as provided for in Article I, Section A(13) and Article XII, Section F of this Lease and Tenant shall pay its proportionate share of Landlord's Insurance per said Articles which may include the cost of insuring or providing additional coverage for any deductibles; provided, however, that Tenant shall have no rights in said policy or policies maintained by Landlord and shall not, by reason of such reimbursement, be entitled to be a named insured thereunder.

F. **Insurance Charge**. Tenant agrees to pay Landlord the following amounts which collectively constitute Tenant's "Insurance Charge": (A) Tenant's proportionate share of the cost and expense of Landlord's Insurance, plus (B) Tenant's proportionate share of any deductible or self-insured retention actually paid in connection with Landlord's Insurance. Tenant agrees to pay to Landlord, in monthly installments, in advance on the first day of each month, Tenant's estimated Insurance Charge for Landlord's Insurance, including, but not limited to any coverage maintained by Landlord for deductibles or self-insured retentions as determined by Landlord in Landlord's sole discretion. For

11802147.12

purposes of this paragraph, Tenant's proportionate share of Landlord's Insurance shall be determined by multiplying the total cost by a fraction, the numerator of such fraction being the square footage within the Premises and the denominator of such fraction being the gross leasable area of the Shopping Center depicted on Exhibit "A" attached hereto (or as may hereafter exist), excluding from the denominator the square footage of (i) any occupant in the Shopping Center who maintains property damage insurance on its building and/or commercial general liability insurance for the Common Areas within its parcel, (ii) any space which is not completely constructed and occupied by a tenant, and (iii) that portion of the Shopping Center building(s) which cannot be reasonably leased and has been decommissioned by Landlord for reasons such as, but not limited to, lack of access, lack of reasonable visibility from the public right of way, and/or violations or lack of compliance with applicable building codes, provided, however, that for purposes of such denominator, Landlord shall not decommission more than ten (10%) of the gross leasable area of the Shopping Center building(s). Subsequent to the expiration of the period used by Landlord in estimating Tenant's share of Landlord's Insurance, Landlord shall furnish to Tenant a statement of the actual amount of Tenant's proportionate share of Landlord's Insurance for such period and within fifteen (15) days from receipt of Landlord's statement, Tenant shall pay to Landlord or Landlord shall remit to Tenant, as the case may be, the difference between the estimated amounts paid by Tenant and the actual amount of Tenant's Insurance Charge for such period as shown by such statement. In the event Landlord maintains blanket and/or umbrella policies which insure premises or risks in addition to the Shopping Center or the rents therefrom, the statement of the insurer shall be conclusive as to the portion of the total premium attributable to the Shopping Center.

**XIII.**    **DAMAGE AND DESTRUCTION:**

In the event the Premises are damaged by any peril covered by the insurance policies that Landlord is required to maintain pursuant to Article XII of this Lease, the damage shall, except as hereinafter provided, promptly be repaired by Landlord, at Landlord's expense; provided, however that in no event shall Landlord be required to repair or replace any of the property or improvements described in Article XII, Sections (B)(2) and (B)(4) which shall be the obligation of Tenant to replace to at least equal condition immediately prior to such damage. In the event (a) the Premises are damaged to the extent of twenty-five percent (25%) or more of the cost of replacement of the Premises, (b) the buildings on the Shopping Center are damaged to the extent of fifty percent (50%) or more of the cost of replacement, notwithstanding the extent of damages to the Premises, or (c) the building containing the Premises is damaged to the extent of fifty percent (50%) or more of the cost of replacement, notwithstanding the extent of damage to the Premises, or (d) damage to the Premises to the extent of ten percent (10%) or more of the cost of replacement occurs during the last two (2) years of the Term of this Lease, Landlord may elect either to repair or rebuild the Premises or the buildings on the Shopping Center, as the case may be or to terminate this Lease upon giving notice of such election in writing to Tenant within ninety (90) days after the event causing the damage. If any damage to the Premises to the extent of twenty-five percent (25%) or more of the cost of replacement occurs during the last two (2) years of the Term of this Lease, then Tenant, shall have the right to terminate this Lease exercisable upon delivery of written notice to Landlord within ninety (90) days after the event causing the damage. If the casualty, repairing, or rebuilding shall render the Premises untenantable, in whole or in part, a proportionate abatement of the Minimum Rent and Additional Rent in proportion to the sales floor area of the Premises rendered untenantable shall be allowed until the date Landlord completes the repairs or rebuilding only so long as cause of damage was not due to acts or omissions of Tenant or its employees, agents and contractors.

**XIV.**    **ASSIGNING AND SUBLETTING:**

Tenant shall not assign this Lease nor sublet the Premises or any part thereof, without in each case the prior written consent of Landlord, which consent shall not be unreasonably withheld; provided, however, Tenant shall have the right to assign this Lease or sublet the Premises or any part thereof, without Landlord's consent, provided that each of the following conditions are satisfied: (i) Tenant shall not be in default under any of the terms and conditions of this Lease at the time of the proposed assignment or subletting; (ii) the assignee or sublessee shall occupy the Premises and conduct its business therein in accordance with the permitted use set forth in Article I(A), Section 4, of this Lease; (iii) the tangible aggregate net worth of the proposed assignee or sublessee as of the date of such assignment or sublease and any guarantor shall be equal to or greater than One Million Two Hundred Thousand and 00/100 Dollars ($1,200,000.00); (iv) Tenant and its assignee or sublessee, as the case may be, shall execute, acknowledge and deliver to Landlord a fully executed counterpart of the written assignment of lease or sublease within ten (10) days of the date thereof wherein assignee agrees to assume or sublessee agrees to comply with all of Tenant's obligations under this Lease; and (v) Intentionally deleted. See Paragraph 2 below. Tenant shall not permit any business to be operated in or from the Premises by any concessionaire or licensee without the prior written consent of Landlord, which consent Landlord may withhold in its sole discretion. In the event Tenant shall request Landlord's consent to an assignment of this Lease or subletting of the Premises, Tenant shall pay Landlord, as a condition to obtaining Landlord's consent, a consent fee of One Thousand Five Hundred and 00/100 Dollars ($1,500.00) per request, regardless of whether such assignment or sublease is consummated by Tenant or consented to by Landlord.

In the case of a sublease only, in the event a proposed sublease provides for, or Tenant otherwise receives rent or other consideration related to the Lease in excess of that provided for in this Lease, Landlord shall be entitled to the amount of such excess as it is received by or becomes due to Tenant. In all other cases, including, but not limited to, an assignment of

18

11802147.12

the Lease pursuant to this Article XIV, Tenant shall be entitled to all consideration received in connection with the transaction.

Any sale, assignment, bequest, inheritance, transfer or other disposition of the ownership of Tenant's entity which shall result in a change in the effective control of Tenant including, without limitation, the sale of (a) stock in a corporate tenant, (b) partnership interests in a partnership tenant, or (c) member interests in a limited liability company tenant shall be deemed an assignment of this Lease requiring Landlord's prior written consent; provided, however, that if Tenant is not in default of this Lease beyond any applicable cure periods, Tenant shall be permitted to assign this Lease without Landlord's prior consent to (a) a parent, subsidiary or Affiliate of Tenant or any subsidiary of any parent corporation of Tenant; (b) a corporation or other business entity which Tenant has sold all or substantially all of its assets; (c) a corporation or entity which has purchased all of Tenant's interest in all of Tenant's stores. For purposes of this Article XIV, the term "Affiliate" means any corporation or non-business entity that controls, is controlled by, or is under common control with a party to this Lease. A corporation or non-corporate business entity shall be regarded as in control of another corporation if it owns or directly or indirectly controls at least fifty percent (50%) of the voting stock of another corporation, or (a) in the absence of the ownership of at least fifty percent (50%) of the voting stock of a corporation, or (b) in the case of a non-corporate business entity, if it possesses, directly or indirectly, whether by virtue of an ownership interest of any kind, by contract or otherwise, the power to direct or cause the direction of the management and policies of the corporation or non-corporate business entity or to elect or cause the election of a majority of the board of directors or other governing body of such corporation or non-corporate business entity. Notwithstanding the foregoing, any sale, transfer or other disposition of the ownership of Tenant's entity to a parent or Affiliate of Tenant or the public offering or trading of the stock of Tenant or a parent or Affiliate of Tenant which shall result in a change in the effective control of Tenant shall not be deemed an assignment of this Lease and shall not require Landlord's prior written consent.

Notwithstanding anything contained in this Lease to the contrary, Tenant shall have the right, without Landlord's prior written consent, to assign this Lease or sublease the Premises to a duly authorized franchisee of Franchisor (the "Authorized Franchisee"), provided that (a) Tenant shall not be in default under any of the terms and conditions of this Lease at the time of the proposed assignment; (b) the Authorized Franchisee shall occupy the Premises and conduct its business therein in accordance with the Permitted Use set forth in Article I.A.4 of this Lease; (c) the aggregate tangible net worth of the a duly authorized franchisee of Franchisor, and any new guarantors, as of the date of such assignment or sublease shall be equal to or greater than One Million Two Hundred Thousand and 00/100 Dollars ($1,200,000.00); (d) Tenant and the Authorized Franchisee shall execute, acknowledge and deliver to Landlord a fully executed counterpart of the written assignment of lease or sublease, as the case may be; and (e) in the case of a sublease only, in the event the proposed sublease provides for, or Tenant otherwise receives rent or other consideration related to the Lease in excess of that provided for in this Lease, Tenant shall pay to Landlord the amount of such excess as it is received by or becomes due to Tenant. Any notice of assignment or sublease in accordance with this paragraph shall include the name and address of the assignee or sublessee, a certification signed by Tenant and the Authorized Franchisee as to the above items, and the effective date of the proposed assignment or sublease. Except as otherwise expressly provided for herein to the contrary, no such consent by Landlord to any assignment of this Lease by Tenant to the Authorized Franchisee shall relieve Tenant from joint and several liability for performance of Tenant's obligations under this Lease.

In no event shall Tenant be permitted to use a series of one or more permitted transfers, as provided for in the preceding paragraph, solely for the purpose of "spinning-off" this Lease to an independent third party that would not otherwise be a permitted transferee. As an example of the foregoing, Tenant shall not assign this Lease to an affiliated corporation whose assets consist solely of this Lease and the rights granted herein and thereafter sell the stock of such affiliate corporation to an independent third party, with the intended result being to defeat the purpose of this Section by the transfer of this Lease to an independent third party by means of what would otherwise be two (2) separate permitted transfers.

Except as set forth below, no assignment of this Lease or sublease of the Premises by Tenant, irrespective of whether Landlord's consent is required, shall operate to relieve Tenant and/or Tenant's Guarantors, if any, from joint and several liability for the performance of Tenant's obligations under this Lease.

In the event Tenant assigns its right, title and interest in and to this Lease to an Authorized Franchisee during the first three (3) lease years, then following two (2) years after such assignment, Tenant shall have the right to provide written notice to Landlord requesting that Landlord release Tenant and Tenant's Guarantors from joint and several liability for the performance of the obligations under this Lease as of the date of Tenant's written request. Landlord agrees that provided that (i) the assignee is in possession of the Premises and operating its business therein without default, and (ii) the assignee has not defaulted under any of the terms and conditions contained in this Lease beyond any applicable notice and cure periods, at any time during assignee's tenancy, then Tenant and Tenant's Guarantors shall be released from their obligations under this Lease as of the date of Tenant's written request.

In the event Tenant assigns its right, title and interest in and to this Lease to Authorized Franchisee after the expiration of the third (3rd) lease year, then following twelve (12) months after such assignment, Tenant shall have the right to provide written notice to Landlord requesting that Landlord release Tenant and Tenant's Guarantors from liability for the performance of the obligations under the Lease as of the date of Tenant's written request. Landlord agrees that provided that (i) the assignee is in possession of the Premises and operating its business therein without default, and (ii) the assignee

11802147.12

Case 17-03469-TOM7    Doc 95-3    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit C    Pt. 1    Page 19 of 38

has not defaulted under any of the terms and conditions contained in this Lease beyond any applicable notice and cure periods, at any time during assignee's tenancy, then Tenant and Tenant's Guarantors shall be released from their obligations under this Lease as of the date of Tenant's written request.

In the event Tenant and Tenant's Guarantors shall be released from liability under the Lease, as set forth above, Landlord shall provide written notice to Tenant and Tenant's Guarantors and the assignee documenting the date of Tenant's release.

## XV.   EMINENT DOMAIN:

In the event the Shopping Center or any part thereof shall be taken or condemned either permanently or temporarily for any public or quasi-public use or purpose by any authority in appropriate proceedings or by any right of eminent domain, the entire compensation award thereof, including, but not limited to, all damages as compensation for diminution in value of the leasehold, reversion and fee, shall belong to Landlord, without any deduction therefrom for any present or future estate of Tenant, and Tenant hereby assigns to Landlord all its right, title, and interest to any such award. Tenant shall have the right to recover from the condemning authority, but not from Landlord, such compensation as may be separately awarded to Tenant.

In the event of a taking under the power of eminent domain of (i) more than twenty-five percent (25%) of the Premises or (ii) a sufficient portion of the Shopping Center so that after such taking less than fifty percent (50%) of the leasable floor area within all buildings located on the Shopping Center (as constituted prior to such taking) are occupied by tenants, either Landlord or Tenant shall have the right to terminate this Lease by notice in writing given within ninety (90) days after the condemning authority takes possession, in which event all rents and other charges shall be prorated as of the date of such termination.

In the event of a taking of any portion of the Premises not resulting in a termination of this Lease, Landlord shall use so much of the proceeds of Landlord's award for the Premises as is required therefor to restore the Premises to a complete architectural unit and this Lease shall continue in effect with respect to the balance of the Premises, with a reduction of Minimum Rent in proportion to the portion of the Premises taken.

## XVI.   DEFAULT:

**A. Tenant Default.** If Tenant defaults in the payment of Minimum Rent or other charges and such payment is not made within five (5) days following Landlord's written notice that same is due, or if Tenant shall default in the performance of any other of Tenant's obligations hereunder and Tenant fails to remedy such default within thirty (30) days after written notice from Landlord (unless a shorter time period is specifically provided elsewhere in this Lease, in which event, the shorter time period will be applicable), provided that in no event shall Landlord be obligated to provide Tenant with written notice of any default, monetary or otherwise, more than once per calendar year, or if a receiver of any property of Tenant on the Premises is appointed, or Tenant's interest in the Premises is levied upon by legal process, or Tenant be adjudged bankrupt and Tenant fails within thirty (30) days to cause the vacation of such appointment, levy or adjudication, or if Tenant files a voluntary petition in bankruptcy, disposes of all or substantially all of its assets in bulk, or makes an assignment for the benefit of its creditors, then and in any such instance, without further notice to Tenant, Landlord shall have the right to exercise any and all rights or remedies available to Landlord at law, in equity or otherwise, arising from such default, including but not limited to the right to (i) terminate this Lease, or (ii) enter upon the Premises without terminating this Lease and relet the Premises in Landlord's name for the account of Tenant for the remainder of the Term upon terms and conditions reasonably acceptable to Landlord and immediately recover from Tenant any deficiency for the balance of the Term, plus expenses of reletting. In addition to the foregoing, any time after such default and the lapse of any applicable notice period, Landlord shall have the right to make such payments in default or perform such act in default for the account and at the expense of Tenant, and all unpaid Minimum Rent or other charges which are not paid when due and all sums paid by Landlord pursuant to this sentence, including reasonable attorneys' fees as specifically provided below, shall accrue interest at the annual rate of (i) fifteen percent (15%), or (ii) five percent (5%) above the prime lending rate most recently published by the Wall Street Journal, whichever is greater, which shall constitute Additional Rent under this Lease and shall be payable upon demand. Notwithstanding the foregoing, Landlord shall have no duty to mitigate the damages suffered by Landlord rising from the default by Tenant of any of its obligations under this Lease. If Tenant shall issue a check to Landlord which is dishonored by Tenant's depository bank and returned unpaid for any reason, including without limitation, due to insufficient funds in Tenant's checking account, Tenant shall (i) pay to Landlord as an administrative fee, the lesser of (a) the sum of Seventy-five and 00/100 Dollars ($75.00), or (b) the maximum amount permitted by State law, and (ii) at Landlord's option, make all subsequent rental payments by bank certified check. The foregoing remedies shall be in addition to any other rights or remedies available to Landlord at law.

Tenant's failure to pay Rent, Additional Rent, or any other Lease costs when due under this Lease may cause Landlord to incur unanticipated costs. The exact amount of such costs is impractical or extremely difficult to ascertain. Such costs may include, but are not limited to, processing and accounting charges and late charges that may be imposed on Landlord by any ground lease, mortgage, or deed of trust encumbering the Shopping Center. Therefore, if Landlord does not receive the Rent, Additional Rent, or any other Lease costs in full on or before the fifth (5th) day of the month it becomes due, Tenant shall pay Landlord a late charge, which shall constitute liquidated damages, equal to Fifty and 00/100 Dollars ($50.00) a day

20

11802147.12

for each day rent is late after the first of the month ("Late Charge"), which shall be paid to Landlord together with such Rent, Additional Rent, or other Lease costs then in arrears. The parties agree that such Late Charge represents a fair and reasonable estimate of the cost Landlord will incur by reason of such late payment. All Late Charges and any returned check charges shall then become Additional Rent and shall be due and payable immediately along with such other Rent, Additional Rent, or other Lease costs then in arrears. Money paid by Tenant to Landlord shall be applied to Tenant's account in the following order: (i) to any unpaid Additional Rent, including, without limitation, Late Charges, returned check charges, legal fees and/or court costs legally chargeable to Tenant, and Common Area Maintenance Charges, and then (ii) to unpaid Minimum Rent. Nothing herein contained shall be construed so as to compel Landlord to accept any payment of Rent, Additional Rent, or other Lease costs in arrears or Late Charge or returned check charge should Landlord elect to apply its rights and remedies available under this Lease or at law or equity in the event of default hereunder by Tenant. Landlord's acceptance of Rent, Additional Rent, or other Lease costs in arrears or Late Charge or returned check charge pursuant to this clause shall not constitute a waiver of Landlord's rights and remedies available under this Lease or at law or equity.

At any time after the termination of this Lease, Landlord shall be entitled to additional damages ("Liquidated Damages"), which, at the election of Landlord shall be either:

(a)   an amount equal to the Minimum Rent and Additional Rent (collectively "Rent"), which, but for the termination of this Lease, would have become due during the remainder of the Lease Term, less the amount of Rent, if any, which Landlord shall receive during such period from others to whom the Premises may be rented, in which case such Liquidated Damages shall be computed and payable in monthly installments, in advance, on the first day of each calendar month following termination of this Lease and continuing until the date on which the Lease Term would have expired but for such termination, and any suit or action brought to collect any such Liquidated Damages for any month shall not in any manner prejudice the right of Landlord to collect any Liquidated Damages for any subsequent month by a similar proceeding; or

(b)   an amount equal to the present worth (as of the date of such termination) of Rent which, but for the termination of this Lease, would have become due during the remainder of the Lease Term, less the fair rental value of the Premises in which case such Liquidated Damages shall be payable to Landlord in one lump sum on demand and shall bear interest of five percent (5%) until paid. For purposes of this clause (b), "present worth" shall be computed by discounting such amount to present worth at a discount rate equal to one percentage point above the discount rate then in effect at the Federal Reserve Bank nearest to the location of the Shopping Center.

Tenant agrees to pay to Landlord upon demand, as Additional Rent, a sum equal to all costs and expenses (including attorney fees, professional fees, costs of investigation and disbursements) incurred by Landlord in enforcing any or all of its rights hereunder, specifically including the cost of collecting sums due, whether or not an action or proceeding is commenced, or levying and collecting on any judgment or arbitration award in Landlord's favor, plus an additional sum equal to fifteen percent (15%) of all such costs and expenses representing the cost of Landlord's administrative expense to enforce its rights under this Lease.

All rights and remedies of Landlord herein enumerated shall be cumulative, and none shall exclude any other remedies allowed at law or in equity.

1.   **Legal Expenses**:

(a)   In the event that Landlord should retain counsel and/or institute any suit against Tenant for violation of or to enforce any of the covenants or conditions of this Lease, or should Tenant institute any action against Landlord for violation of any covenants or conditions of this Lease, or should either party institute a suit against the other for a declaration of rights hereunder, or should either party intervene in any suit in which the other is a party, to enforce or protect its interests or rights hereunder, the prevailing party in any such suit shall be entitled to all its costs, expenses and reasonable fees to its attorney(s) in connection therewith.

(b)   In the event that a bankruptcy proceeding is filed by or against Tenant under any chapter of the Bankruptcy Code, or Tenant makes an assignment for the benefit of creditors or commences or otherwise becomes the subject of any insolvency, receivership or similar proceeding, Landlord shall be entitled to recover from Tenant or any trustee, custodian, receiver, assignee or other representative acting on its behalf, its reasonable attorneys' fees and costs incurred in or in connection with any such proceeding including, but not limited to, those incurred in seeking relief from the automatic stay, in dealing with the assumption or rejection of this Lease, in any adversary proceeding, and in the preparation and filing of any proof of claim, all of which fees and expenses shall constitute, in addition to any other sums due and owing under this Lease (i) an obligation of Tenant hereunder, and (ii) a component of any cure claim assertable by Landlord under 11 U.S.C. § 365(b) or otherwise.

21

11802147.12

B. **Landlord Defaults.** Subject to more specific terms and conditions set forth in this Lease, including, but not limited to, Tenant's self-help right set forth in Article XI, Section A of this Lease, it shall be a default under and a breach of this Lease by Landlord if it shall fail to perform or observe any term, condition, covenant or obligation required to be performed or observed by it under this Lease for a period of thirty (30) days after notice thereof from Tenant; provided, however, that if the term, condition, covenant or obligation to be performed by Landlord is of such nature that the same cannot reasonably be performed within such thirty (30) day period, such occurrence shall not constitute a default if Landlord commences such performance within said thirty (30) day period and thereafter diligently undertakes to complete the same. Upon the occurrence of any such default, Tenant may pursue any rights or remedies available at law or in equity, except for matter which a remedy is specified by the terms of this Lease. Notwithstanding the foregoing, if such Landlord default adversely and materially affects Tenant's business operations within the Premises, then it shall be a default under and a breach of this Lease by Landlord if it shall fail to perform or observe any term, condition, covenant or obligation required to be performed or observed by it under this Lease for a period of ten (10) days after notice thereof from Tenant; provided, however, that if the term, condition, covenant or obligation to be performed by Landlord is of such nature that the same cannot reasonably be performed within such ten (10) day period, such occurrence shall not constitute a default if Landlord commences such performance within said ten (10) day period and thereafter diligently undertakes to complete the same.

XVII. **NOTICES:**

Any notice or consent required to be given by or on behalf of either party to the other shall be given in writing and mailed by certified mail or by overnight courier service which provides a receipt, at the addresses stated on Article I, Sections A(18), A(19) and A(20), if any, of this Lease, or at such other address as may be specified, from time to time, by notice in the manner herein set forth. Any notice may be given by an attorney for a party with the same force and effect as if given by the party. Notices shall be deemed given upon actual receipt or first rejection.

XVIII. **SECURITY DEPOSIT:**

Contemporaneously with Tenant's execution and delivery of this Lease to Landlord, Tenant shall deposit with Landlord the amount set forth in Article I(A), Section 16, herein (the "Security Deposit"). The Security Deposit shall be held by Landlord, without liability for interest, as security for the timely performance by Tenant of all the terms of this Lease which are to be observed and performed by Tenant. Landlord shall not be obligated to hold the Security Deposit as a separate fund and may commingle the Security Deposit with other funds. If any sum payable by Tenant to Landlord is unpaid, including, but not limited to, utility charges and calendar year adjustments for Taxes and Common Area Charges, or if Landlord makes payments on behalf of Tenant, or performs any of Tenant's obligations under this Lease, then Landlord may, at its option and without prejudice to any other remedy which Landlord may have on account thereof, apply the Security Deposit as may be necessary to compensate Landlord toward the payment of the sum payable by Tenant to Landlord for loss or damage sustained by Landlord due to such breach on the part of Tenant, and Tenant shall, upon demand, restore the Security Deposit to the original sum deposited. If Tenant complies with all of the terms of this Lease, the Security Deposit shall be returned to Tenant within sixty (60) days following the completion of year end net charge reconciliations for the Shopping Center for the calendar year in which this Lease expires or is terminated, less any sums payable by Tenant to Landlord, unless specifically prohibited by law. In the event of bankruptcy or other debtor/creditor proceedings against Tenant, the Security Deposit shall be deemed to be applied first to the payment of rent and other charges due Landlord for all periods prior to the filing of such proceedings. Landlord may deliver the Security Deposit to the purchaser of Landlord's interest in the Premises in the event that such interest be sold, and thereupon Landlord shall be discharged from any further liability with respect to the Security Deposit and this provision shall also apply to any subsequent transferees.

XIX. **MORTGAGE SUBORDINATION:**

This Lease, and Tenant's rights hereunder shall be subject and subordinate to the lien of any mortgages, ground leases or deeds of trust or other similar instrument that may now exist or may hereafter be placed upon the Shopping Center and all renewals, replacements, and extensions thereof without further notice or action on the part of Landlord or Tenant. Tenant agrees to attorn to any underlying ground lessor, mortgagee or trustee, their respective affiliates, successors and assigns and any purchaser of the Shopping Center that shall succeed to Landlord's interest in this Lease in a foreclosure proceeding, by power of sale, by a deed in lieu of foreclosure or other proceeding or by any other action for the enforcement of such mortgages, deeds of trust or other similar instruments. Tenant shall execute and deliver to Landlord within fifteen (15) days from receipt of Landlord's request such instruments (including but not limited to a Memorandum of Lease and/or a Subordination, Non-Disturbance and Attornment Agreement in recordable form) which may be required by Landlord's mortgagee or trustee to evidence such subordination and attornment.

XX. **ESTOPPEL CERTIFICATES:**

At any time and from time to time, Tenant agrees, upon request in writing from Landlord, to execute and deliver to Landlord, for the benefit of such persons as Landlord names in such request, a statement in writing and in substance satisfactory to Landlord certifying to such of the following information as Landlord shall request: (i) that this Lease

constitutes the entire agreement between Landlord and Tenant and is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications); (ii) the dates to which the Minimum Rent and other charges hereunder have been paid, and the amount of any security deposited with Landlord; (iii) that the Premises have been completed on or before the date of such letter and that all conditions precedent to this Lease taking effect have been carried out; (iv) that Tenant has accepted possession, that the Lease Term has commenced, that Tenant is occupying the Premises, that Tenant knows of no default under the Lease by Landlord and that there are no defaults or offsets which Tenant has against enforcement of this Lease by Landlord; (v) the Rent Commencement Date of this Lease and the expiration date of this Lease; and (vi) that Tenant's store is open for business, provided such facts are true and ascertainable. Tenant acknowledges and agrees that Tenant's failure to execute and deliver to Landlord any estoppel certificate(s) requested by Landlord within fifteen (15) days from Tenant's receipt of Landlord's request shall be deemed Tenant's acknowledgement that the terms and conditions contained in such estoppel certificate are true and correct and that such terms and conditions may also be relied upon by any third party or parties identified in such estoppel certificate.

XXI.  **QUIET ENJOYMENT**:

Landlord hereby covenants and agrees that if Tenant shall perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance hereof have the peaceable and quiet enjoyment and possession of the Premises without any hindrance from Landlord or any person or persons lawfully claiming the Premises.

In connection therewith, Landlord represents and warrants to Tenant the following:

(a)  Landlord is the sole fee simple owner of the property wherein the Shopping Center is located;

(b)  Landlord has full right and lawful authority to lease the Premises to Tenant and to execute this Lease; and

(c)  No existing restrictions, building, or zoning ordinances, or other laws or requirement of any governmental entity prevents the use of the Premises for the Permitted Use.

Landlord herby acknowledges that Tenant is relying upon all of the foregoing representations and warranties in executing this Lease and that matters so represented and warranted are material to Tenant.

XXII.  **LIABILITY OF LANDLORD**:

Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Landlord, that if Landlord shall fail to perform any covenant, term or condition of this Lease upon Landlord's part to be performed and, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title, and interest of Landlord in the Shopping Center, as the same may then be encumbered, and neither Landlord nor any of its officers or shareholders shall be liable for any deficiency. It is understood that in no event shall Tenant have any right to levy execution against any property of Landlord other than its interest in the Shopping Center as hereinbefore expressly provided. In the event of the sale or other transfer of Landlord's right, title and interest in the Premises or the Shopping Center, Landlord shall be released from all liability and obligations under this Lease.

XXIII.  **MISCELLANEOUS PROVISIONS**:

A.  **Accord and Satisfaction.** No payment by Tenant, or anyone occupying the Premises by, through or under Tenant, or receipt by Landlord of a lesser amount than the rents stated herein shall be deemed to be other than on behalf of Tenant and on account of the next due rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy provided for in this Lease or available at law or in equity.

B.  **Waiver.** No waiver of any condition or legal right or remedy shall be implied by the failure of Landlord or Tenant to declare a forfeiture, or for any other reason, and no waiver of any condition or covenant shall be valid unless it be in writing signed by Landlord or Tenant, as the case may be. No waiver by Landlord with respect to one or more tenants or occupants of the Shopping Center shall constitute a waiver in favor of any other tenant. No waiver of a breach of any condition be claimed or pleaded to excuse a future breach of the same condition or covenant. Tenant shall be deemed to have waived the right to dispute any matter relating to Tenant's obligation to pay or prior payment of Rent or Additional Rent including, without limitation, Minimum Rent, Taxes, Common Area Charges or Insurance Charge, unless Tenant provides notice to Landlord within twelve (12) months from earlier of (i) the date Tenant receives Landlord's billing statement setting forth the exact amount of such charge, or (ii) the date such payment is due pursuant to the terms of this Lease.

23

11802147.12

C.  **Broker's Commission.** Tenant warrants that, except for any amounts payable by Landlord to its agent and the amount payable by Landlord to Tenant's agent, New Genesis, LLC d/b/a Renaud Consulting (the "Commission"), there are no claims for broker's commissions or finder's fees in connection with its execution of this Lease, and Tenant agrees to indemnify and save Landlord harmless from any liability that may arise from such claims, including reasonable attorney's fees. In the event this Lease be terminated for any reason prior to the natural expiration of the initial Term of this Lease (except for default by Landlord or termination by casualty), Tenant shall pay to Landlord the unamortized portion of the Commission, said amortization to be computed based upon a five (5) year term commencing on the Rent Commencement Date.

D.  **No Partnership.** Landlord does not, in any way or for any purpose, become a partner of Tenant in the conduct of its business, or otherwise, or a joint venturer or a member of a joint enterprise with Tenant.

E.  **Lease Inures to the Benefit of Assignees.** This Lease and all of the covenants, provisions, and conditions herein contained shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns respectively, of the parties hereto, provided, however, that no assignment by, from, through, or under Tenant in violation of the provisions hereof shall vest in the assigns any right, title, or interest whatsoever.

F.  **Entire Agreement.** This Lease and the exhibits attached hereto set forth the entire agreement between Landlord and Tenant, and all prior promises and agreements, oral or written, between them are merged into this Lease. No amendment to this Lease shall be binding upon Landlord or Tenant unless in writing.

G.  **Abandonment, Surrender and Holding Over.** Tenant shall deliver up and surrender to Landlord possession of the Premises upon the expiration of the Lease Term, or earlier termination for any reason, in as good condition and repair as the same shall be at the commencement of said Term (damage by fire and other perils covered by standard fire and extended coverage insurance and ordinary wear and decay only excepted). At the time Tenant shall deliver and surrender possession of the Premises to Landlord, Tenant shall provide Landlord with a written statement from an HVAC contractor reasonably acceptable to Landlord who shall certify that the HVAC system serving the Premises has been properly maintained and is in good working order. In the event Tenant shall fail to provide such statement to Landlord, Landlord shall have the right, but not the obligation without prior notice to Tenant to retain an HVAC contractor of Landlord's choosing who shall inspect the HVAC system serving the Premises and report to Landlord as to the condition of said HVAC system. If such report discloses the need for repair or maintenance, Landlord shall have the right, but not the obligation, without prior notice to Tenant, to cause such repairs or maintenance. Tenant shall reimburse Landlord for all costs and expenses so incurred by Landlord in performing the inspection, maintenance and/or repairs plus an additional ten percent (10%) of such cost for and as Landlord's overhead. If Tenant remains in possession of the Premises after the expiration or earlier termination of this Lease, Tenant shall be bound by the terms and provisions of this Lease except that no tenancy or interest in the Premises shall result, but such holding over shall be an unlawful detainer and all such parties shall be subject to immediate eviction, and Tenant shall (with no additional notice required by Landlord) pay Landlord two hundred fifty percent (250%) of the Minimum Rent payable during the calendar month immediately preceding the expiration or earlier termination of this Lease for any period during which Tenant shall hold the Premises after the stipulated Term of this Lease shall expire or may have terminated. If Tenant vacates the Premises prior to the scheduled expiration of the Lease Term (except in the case of repair or remodel). Tenant shall be in default of this Lease, and if Tenant has not re-entered the Premises and resumed the operation of the business set forth in Article IX, Section B, of this Lease within the next thirty (30) consecutive days, Tenant shall be deemed to have abandoned the Premises, and Landlord shall have the right, but not the obligation, to take sole possession of the Premises on or after the tenth (10th) day following the expiration of said thirty (30) day period and Landlord may relet said Premises in accordance with the terms in Article XVI hereof.

H.  **No Option.** The submission of this Lease by Landlord for review by Tenant does not constitute a reservation of or option for the Premises, and shall vest no right in Tenant. This Lease becomes effective as a Lease only upon execution and delivery thereof by the parties hereto.

I.  **Additional Rent.** Any amounts to be paid by Tenant to Landlord pursuant to the provisions of this Lease, whether such payments are periodic or recurring, shall be deemed to be "Additional Rent" and otherwise subject to all provisions of this Lease and of law as to the default in the payment of rent.

J.  **Power of Attorney.** Intentionally deleted.

K.  **Financial Statements.** Guarantor shall, within ten (10) days after receipt of a written request from Landlord (but not more often than once per calendar year, unless requested by prospective purchaser, current or prospective lender, ground lessor, or joint venture partner), furnish to Landlord Guarantor's current financial statement and such other financial information as Landlord may request. Landlord covenants that the financial information provided by Guarantor shall be treated as confidential, except that Landlord may disclose such information to any prospective

11802147.12

purchaser, prospective or existing lender or prospective or existing ground or underlying lessor upon the condition that the prospective purchaser, prospective or existing lender or underlying lessor shall also covenant to treat such information as confidential.

L.  **Severability.**  In the event that any provision or section of this Lease is rendered invalid by the decision of any court or by the enactment of any law, ordinance or regulation, such provision of this Lease shall be deemed to have never been included therein, and the balance of this Lease shall continue in effect in accordance with its terms.

M.  **Option to Renew.**  Provided Tenant is not in default under any of the terms and provisions herein contained, Landlord hereby grants to Tenant the option to renew this Lease for the periods set forth in Article I(A), Section 17, commencing on the day following the expiration of the original Term.  Any such Renewal Term shall be upon all the terms and conditions as the original Lease Term except that the Minimum Rent shall be increased in accordance with Schedule A.

The foregoing option to renew shall be exercised by written notice to Landlord given not less than the number of days set forth in Article I, Section A(17), above prior to the expiration of the original Term of this Lease, or any renewal thereof.  Tenant's option to renew the Term of this Lease is personal to Tenant and may not be exercised by any other party other than Tenant, except pursuant to an assignment contemplated in accordance with the terms of Article XIV.

Notwithstanding anything to the contrary contained in this Lease, in the event Tenant is paying Substitute Rent due to the failure of a continuing Co-Tenancy requirement set forth in Article IV, Section C of this Lease (if any) (or because of a violation of Tenant's Exclusive Use as set forth in Article IX, Section C of this Lease) at the time Tenant exercises Tenant's option to renew, then commencing on the first day of the Renewal Term, Tenant shall pay to Landlord the Minimum Rent set forth in this Article XXIII, Section M and on Schedule A attached hereto, all Additional Rent including the Common Area Charges, Taxes and Insurance Charge set forth in this Lease, and Tenant shall be deemed to have waived its right to pay Substitute Rent pursuant to Article IV, Section C, and Article IX, Section C of this Lease.

N.  **Net Rent.**  It is the intention of Landlord and Tenant that the rent herein specified shall be net to Landlord in each year of the Lease Term hereof, and that no costs, expenses and obligations relating to the Premises (except as herein specifically provided) shall be paid by Landlord.

O.  **Counterparts.**  This Lease may be executed in multiple counterparts, each of which shall constitute an original and all of which taken together shall constitute one and same agreement binding upon the parties, notwithstanding that all the parties are not signatories to the same counterpart.  In order to facilitate the agreements contemplated by this Lease, signatures transmitted by facsimile machine or signatures transmitted via e-mail in a "PDF" format may be used in place of original signatures on this Lease.  Each party intends to be bound by such party's facsimile or "PDF" format signature on this Lease, is aware that the other parties are relying on such party's facsimile or "PDF" format signature, and hereby waives any defenses to the enforcement of this Lease based upon the form of signature.  Promptly following any facsimile transmittal or e-mail transmittal of "PDF" format signatures, the parties shall deliver to the other parties the original executed Lease by reputable overnight courier to the addresses shown in Article I(A), Sections 18 and 19.

P.  **Consents.**  With respect to any provision of this Lease which provides or infers, in effect, that Landlord shall not unreasonably withhold or unreasonably delay its consent or approval, Tenant, in no event, shall be entitled to make, nor shall Tenant make, any claim against Landlord for money damages, and Tenant hereby waives any claim or assertion by Tenant that Landlord has unreasonably withheld or unreasonably delayed any consent or approval, but Tenant's sole remedy shall be an action or proceeding to enforce any such provision of this Lease, or for specific performance, injunction or declaratory judgment.

Q.  **Force Majeure.**  In the event Landlord or Tenant is prevented or delayed in the performance of any improvement or repair or fulfilling any other obligation required under this Lease due to delays caused by fire, catastrophe, strikes or labor trouble, civil commotion, acts of God, governmental prohibitions or regulation, inability or difficulty to obtain materials or other causes beyond the performing party's reasonable control, the performing party shall, within ten (10) days of the event causing such delay, provide written notice to the other party of the event causing the delay and the anticipated period of delay, and the period of such delay shall be added to the time for performance thereof.  The performing party shall have no liability by reason of such permitted delays.  In the event the performing party fails to provide notice to the other party of the force majeure delay within such ten (10) day period, the performing party shall not be excused from the timely performance of such obligation regardless of the cause.  This provision shall not excuse Tenant from its obligation to pay Minimum Rent and Additional Rent, except when such payment is excused pursuant to other provisions of this Lease.

11802147.12

Case 17-03469-TOM7    Doc 95-3    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit C    Pt. 1    Page 25 of 38

R. **Joint and Several Liability.** In the event Tenant shall be comprised of more than one (1) individual or business entity, each such individual or business entity comprising Tenant shall be jointly and severally liable for each and every obligation of Tenant under the terms of this Lease.

S. **Right to Relocate.** As a material inducement for Landlord to enter into this Lease with Tenant, Landlord shall, throughout the Term of this Lease and any renewals thereof, shall have the one-time right at Landlord's expense to relocate Tenant to other premises ("New Premises") within the area identified as "Permissible Relocation Zone" on Exhibit "A-1" attached hereto and made a part hereof. In the event Landlord elects to exercise the right of relocation, Landlord shall deliver written notice to Tenant identifying the location of the proposed New Premises ("Landlord's Notice"). The New Premises shall be of substantially and materially the same size and configuration of the Premises Tenant shall not be obligated to close for more than seven (7) business days in its existing Premises prior to the Tenant opens for business in the New Premises. Landlord shall reimburse Tenant for its out-of-pocket expenses not to exceed Ten Thousand and 00/100 Dollars ($10,000.00), in the aggregate, incurred by Tenant in relocating to the New Space ("Tenant Relocation Expense"). The Tenant Relocation Expense may include, without limitation, all out of pocket planning, architect, engineering, construction, fixturing, moving, and administrative expenses incurred by Tenant as a result of such relocation and Tenant's facilitation thereof. In the event Tenant shall not agree to the New Premises proposed by Landlord, Tenant shall have the right to terminate this Lease within thirty (30) days after the date of Landlord's Notice by delivering written notice to Landlord of its election to terminate ("Tenant's Termination Notice"). In the event Tenant elects to terminate this Lease, Landlord shall have the option to rescind Tenant's Termination Notice by delivering notice to Tenant ("Landlord's Rescission Notice") within fifteen (15) days after the date Landlord receives Tenant's Termination Notice, in which event, Tenant's Termination Notice shall be null and void and this Lease shall continue full force and effect without relocation of Tenant. If Landlord does not provide Landlord's Rescission Notice to Tenant, this Lease and the obligations of the parties, excluding any obligations of the parties that expressly survive the termination or expiration of this Lease, or have otherwise accrued as of the Termination Date (hereinafter defined), shall terminate as of the date which is thirty (30) days after the date of Tenant's Termination Notice (the "Termination Date"), provided Tenant pays to Landlord all sums and charges due and owing by Tenant to Landlord through and including the Termination Date. Any sum which cannot be exactly determined by Landlord as of the Termination Date shall be paid by Tenant to Landlord within thirty (30) days after Tenant's receipt of a statement therefor. The foregoing obligation shall survive termination of this Lease. If Tenant shall not terminate this Lease within the thirty (30) day period set forth above, Tenant shall be deemed to have waived its right to terminate this Lease pursuant to this paragraph, and Tenant shall relocate to the New Premises. Landlord's rescission of Landlord's Notice shall not be deemed a waiver of Landlord's right to relocate Tenant to New Premises in the future.

T. **Payment Under Protest.** All rent and other amounts payable hereunder shall be payable without demand, offset or deduction. If at any time a dispute shall arise as to any amount or sum of money to be paid by Tenant to Landlord under the provisions hereof, Tenant shall make such payment "under protest" and under no circumstances shall Tenant be entitled to withhold any payment due hereunder. If Tenant makes a payment "under protest" and it is subsequently determined that Tenant was not obligated to pay all or a portion of an amount paid "under protest," Landlord shall refund to Tenant the portion of the payment made "under protest" which Tenant was not obligated to pay.

U. **Waiver of Trial By Jury.** To the extent permitted by applicable law Landlord and Tenant waive all right to trial by jury in any claims, action, proceeding or counterclaim by either Landlord or Tenant against each other or any matter arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant or Tenant's use or occupancy of the Premises. Tenant waives its right to assert any and all claims or counterclaims that may be asserted by Tenant in response to a summary eviction proceeding and such counterclaims shall only be made the subject of a separate action. In such separate action, it is agreed that trial by jury shall be waived by both parties

V. **Labor Disputes.** Tenant shall take no action which would violate Landlord's union contracts, if any, affecting the Shopping Center nor create any work stoppage, picketing, labor disruption or dispute or any interference with the business of the Landlord or any tenant or occupant in the Shopping Center or with the rights and privileges of any customer or other person lawfully in and upon said Shopping Center, nor cause the impairment or reduction of the goodwill of the Shopping Center.

W. **Hazardous Materials.** Landlord represents and warrants to Tenant that, to Landlord's actual knowledge, without further investigation or inquiry, Landlord has not generated, stored or disposed of Hazardous Materials on the Premises or the Shopping Center in violation of applicable laws, rules and regulations. In the event Tenant determines that the foregoing representation and warranty was not accurate in a material respect when made, Tenant shall have the right, as its sole and exclusive remedy, to terminate this Lease by providing written notice of termination to Landlord and thereafter neither Landlord nor Tenant shall have any further liability under this Lease. Subject to the limitations set forth below, Landlord agrees to indemnify, defend and hold Tenant harmless from and against any and all loss, cost, expense and/or damage that Tenant incurs as a result of Landlord's intentional misrepresentation of the condition of the Premises.

11802147.12

Tenant agrees that if any governmental authority having jurisdiction over the Premises requires that remedial action be taken with regard to any Hazardous Material discovered within the Premises or in the Shopping Center subsequent to the date of this Lease, Landlord shall have no obligation to undertake any remedial action. If Landlord elects to take any remedial action, it shall be at Landlord's sole discretion and expense. If Landlord does not elect to remediate such condition, Tenant's sole remedy shall be to terminate this Lease within thirty (30) days after the date Landlord elects not to remediate. Notwithstanding the foregoing the term "Hazardous Substance" shall not be deemed to include normal cleaning solvents utilized by Tenant in accordance with all applicable laws in the regular conduct of its business for the Permitted Use, provided they are used in compliance with the manufacturer's specifications.

In the event Tenant discovers any Hazardous Materials in the Premises, Tenant shall immediately cease any work which may disturb the Hazardous Materials and notify Landlord no later than twenty-four (24) hours after discovery of the presence of Hazardous Materials. Tenant will not be required to remove or otherwise abate any Hazardous Materials which may be in the Premises (including any Hazardous Materials which were in the Premises prior to Tenant's occupancy of the Premises) other than Hazardous Materials which exist as a result of the acts or omissions of Tenant, its employees, agents and/or contractors. If, as a result of the presence of Hazardous Materials in the Premises which are not the result of the acts of Tenant, its employees, agents and/or contractors, Tenant is required by applicable authority to cease its operation at the Premises or Tenant's construction in the Premises or Tenant's opening for business in the Premises is materially interrupted or delayed, then Tenant's Minimum Rent and other charges shall abate for the period of time beginning on the date Tenant is required, by applicable authority, to cease its operations at the Premises or the date Tenant is materially interrupted or delayed in its construction or opening for business to the public at the Premises. Such abatement shall continue until Tenant is authorized by applicable authority to recommence its operation at the Premises, to continue with its construction or to open for business in the Premises.
Landlord shall hold harmless and defend Tenant from and against any and all claims, actions, losses, and expenses (including attorneys' and other professional fees) arising from any conduct, activity, act, omission, or operation involving the use, handling, generation, treatment, storage, disposal, or release of any Hazardous Materials in, from, or to the Premises or the Shopping Center, to the extent arising from the actions of Landlord, its employees, and/or contractors.

Landlord's obligation to defend Tenant against any such claims relating to the existence of Hazardous Materials in, under or upon the Shopping Center shall include Landlord's obligation to retain counsel, consultants and experts of Landlord's choice, and Tenant shall not be entitled to reimbursement from Landlord in the event Tenant elects to retain counsel, consultants and experts independent of and in addition to those retained by Landlord. Tenant shall cooperate with Landlord in Landlord's defense or remedy of any such third party claims relating to Hazardous Materials found in, under or upon the Premises or the Shopping Center. In the event Landlord shall settle any or all third party claims in which Tenant shall be named as a defendant, Tenant shall have no right to object to such settlement unless the terms of such settlement shall adversely and materially affect Tenant and/or its business operations within the Premises.

X.   **Payment By Third Party.** In no event shall Landlord's acceptance of the payment of Minimum Rent or Additional Rent from any party other than Tenant constitute a release of Tenant's primary obligations under this Lease or Landlord's acceptance of any other party as an assignee or sublessee of Tenant, regardless of the number of payments accepted by Landlord or the length of time that said party made such payments.

Y.   **Recording.** This Lease shall not be recorded in any public records office or department by Landlord or Tenant.

Z.   **Interpretation.** This Lease, and any riders and exhibits hereto, have been mutually negotiated by Landlord and Tenant. Any ambiguities will not be interpreted in favor of either party. The captions contained herein are for convenience and reference only and will not be deemed as part of this Lease or construed in any manner limiting or amplifying the terms and provisions of this Lease to which they relate.

AA. **Certification.** Tenant represents and warrants to Landlord that (i) Tenant is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation, named by any Executive Order or the United States Treasury Department as a "terrorist", "Specially Designated National and Blocked Person", or other banned or blocked person, group, or nation (collectively, "Banned Persons") pursuant to any anti-terrorism law; (ii) Tenant is not engaged in this Lease transaction, or instigating or facilitating this Lease, directly or indirectly on behalf of any Banned Person; (iii) Tenant currently does not appear, and throughout the Lease Term, neither Tenant, nor any officer, director, shareholder, partner, member or other owner of Tenant shall appear, on any list of Banned Persons; (iv) no anti-terrorism law prohibits Landlord from doing business with Tenant; (v) Tenant, its officers, directors, or principal shareholders, partner, member, or other owner of Tenant, shall not, during the Lease Term, violate any anti-terrorism laws; and (vi) Tenant, its officers, directors, principal shareholders, partners or members shall not, during the Lease Term, do business with any party, individual, or entity that has violated or will violate any anti-terrorism laws. For purposes of this Lease, "anti-terrorism laws" shall mean Executive Order 13224 and related regulations promulgated and enforced by the

11802147.12

Office of Foreign Assets Control, the Money Laundering Control Act, the United States Patriot Act, or any similar law, order, rule or regulation enacted in the future. Tenant hereby agrees to defend, indemnify, protect, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, fines, penalties, expenses (including attorneys' fees) and costs arising from or related to a breach of the foregoing representations and warranties. The foregoing indemnity obligations of Tenant shall survive the termination or expiration of this Lease.

BB. **Payment.** All payments to be made to Landlord or Tenant pursuant to the terms of this Lease shall be made in lawful currency of the United States of America.

CC. The submission of this Lease to Tenant or its broker, or other agent, does not constitute an offer to Tenant to lease the Premises. This Lease shall have no force and effect until (a) it is executed and delivered by Tenant to Landlord, and (b) it is fully reviewed and executed by Landlord.

DD. **Landlord's Lien Subordination.** If required by Tenant's lender and upon written request from Tenant, Landlord will agree to subordinate any lien granted to Landlord, whether statutory or otherwise, in Tenant's personal property, including furnishings, moveable equipment, trade fixtures, inventory and stock-in-trade located in the Premises, for non-payment of Rent, default by Tenant or any other reason whatsoever to any lien granted to any of Tenant's current or future lenders that are granted an interest in such property and Landlord will execute a confirmation of such subordination reasonably acceptable to Landlord, Tenant and Tenant's lender and substantially in the form attached hereto as Exhibit "F".

EE. **Exhibits.** The following Exhibits are attached to this Lease and incorporated herein by reference:

| | | |
|---|---|---|
| Exhibit "A" | - | Site Plan of Shopping Center |
| Exhibit "A-1" | - | Depiction of Permissible Relocation Zone |
| Exhibit "B" | - | Construction |
| Exhibit "C" | - | Signage Criteria |
| Exhibit "C-1" | - | Coming Soon Sign |
| Exhibit "D-1" | - | General Contractor's Lien Waiver |
| Exhibit "D-2" | - | Subcontractor's Lien Waiver |
| Exhibit "E" | - | Exclusive and Prohibited Uses |
| Exhibit "F" | - | Form of Landlord Lien Subordination |
| Exhibit "G" | - | Tenant's Proprietary Items |

**[Remainder of page intentionally left blank]**

11802147.12

Case 17-03469-TOM7    Doc 95-3    Filed 09/05/17    Entered 09/05/17 15:32:05    Desc
Exhibit Exhibit C    Pt. 1    Page 28 of 38

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be signed, in triplicate, as of the date and year first above written.

WITNESSES AS TO LANDLORD:

_____
_____ (Print Name)

_____
_____ (Print Name)

LANDLORD:

DDRM LARGO TOWN CENTER LLC, a Delaware limited liability company

By: _____
Name: _____
Its: _____
**William J. Kern**
**Senior Vice President of Leasing**

WITNESSES AS TO TENANT:

_____
PERVEZ KAISANI (Print Name)

_____
_____ (Print Name)

TENANT:

MARYLAND LC VENTURES LLC, a Maryland limited liability company

By: _____
Name: WAZIR A4 KAISANI
Its: V.P. _____

STATE OF OHIO )
                        )SS:
COUNTY OF CUYAHOGA )

BEFORE ME, a Notary Public in and for said County and State, personally appeared William J. Kern, known to me to be the Senior Vice President of DDRM Largo Town Center LLC, a Delaware limited liability company which executed the foregoing instrument, who acknowledged that he/she did sign the foregoing instrument for and on behalf of said limited liability company, and that the same is his/her free act and deed as such officer and the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at Beachwood, Ohio this 28th day of January, 2015.

Notary Public
My commission expires:

**Nicole Mulloy**
**Notary Public, State of Ohio**
**My Commission Expires**
**March 12, 2019**
**Recorded in Geauga County**

STATE OF Texas )
                        )SS:
COUNTY OF Collin )

BEFORE ME, a Notary Public in and for said County and State, personally appeared Wazir Kaisani, known to me to be the Vice President of Maryland LC Ventures LLC, a Maryland limited liability company which executed the foregoing instrument, who acknowledged that he/she did sign the foregoing instrument for and on behalf of said limited liability company, and that the same is his/her free act and deed as such officer and the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at Allen, Tx this 15th day of December, 2014.

Notary Public
My commission expires: 1-29-17

**ROSA HILDA ESCAJEDA**
**My Commission Expires**
**January 29, 2017**

29

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be signed, in triplicate, as of the date and year first above written.

WITNESSES AS TO LANDLORD:

LANDLORD:

DDRM LARGO TOWN CENTER LLC, a Delaware limited liability company

_____
_____(Print Name)

_____
_____(Print Name)

By: _____
Name: _____
Its: _____

WITNESSES AS TO TENANT:

TENANT:

MARYLAND LC VENTURES LLC, a Maryland limited liability company

_____
_____(Print Name)

_____
*MARKWilliams* (Print Name)

By: _____
Name: _Richard Rugg__
Its: _VP operations__

STATE OF OHIO )
                              )SS:
COUNTY OF CUYAHOGA )

BEFORE ME, a Notary Public in and for said County and State, personally appeared _____, known to me to be the _____ of DDRM Largo Town Center LLC, a Delaware limited liability company, the limited liability company which executed the foregoing instrument, who acknowledged that he/she did sign the foregoing instrument for and on behalf of said limited liability company, and that the same is his/her free act and deed as such officer and the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at Beachwood, Ohio this _____ day of _____, 2014.

_____
Notary Public
My commission expires: _____

STATE OF *Maryland* )
                              )SS:
COUNTY OF *Anne Arundel* )

BEFORE ME, a Notary Public in and for said County and State, personally appeared *Richard Ruggiero*, known to me to be the _VP OPERATIONS_ of Maryland LC Ventures LLC, a Maryland limited liability company, the limited liability company which executed the foregoing instrument, who acknowledged that he/she did sign the foregoing instrument for and on behalf of said limited liability company, and that the same is his/her free act and deed as such officer and the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at *Gambrills*, *MD* this _15th_ day of _DECEMBER_, 2014.

_Marlon J. Woolley_
Notary Public
My commission expires: _07/31/2016_

MARLON J WOOLLERY
Notary Public-Maryland
Prince George's County
My Commission Expires
07/31/2016

11. Landlord shall not be bound by any modification or extension of any term or terms of the loan agreement between Lender and Tenant.

12. If either party institutes any action or proceeding or asserts any counterclaim against the other relating to the provisions of this Agreement or any default hereunder, the unsuccessful party in such action or proceeding agrees to reimburse the successful party for the reasonable expense of attorney's fees and costs incurred by the successful party before, during and after trial and or appeal. Any sums which shall accrue hereunder, if not paid when due, shall accrue interest at the rate of twelve percent (12%) per annum until paid in full

13. This Agreement shall be governed by the laws of the State of Ohio.

IN WITNESS WHEREOF, the parties have executed this Landlord Lien Subordination as of the _____ day and year first above written.

WITNESSES AS TO LANDLORD:

LANDLORD:

DDRM LARGO TOWN CENTER LLC, a Delaware limited liability company

_____
_____(Print Name)

By: _____
_____(Print Name)

_____
_____(Print Name)

Its: _____

WITNESSES AS TO TENANT:

TENANT:

MARYLAND LC VENTURES LLC, a Maryland limited liability company

By: *Wazrah Kassam*
_____ *WAZIA Au*(Print Name)
*KAISAN.*

Its: *V.P.* _____

_____
_____(Print Name)

WITNESSES AS TO LENDER:

LENDER:

By: _____
_____(Print Name)

_____
_____(Print Name)

Its: _____
_____(Print Name)

11802147.12

11. Landlord shall not be bound by any modification or extension of any term or terms of the loan agreement between Lender and Tenant.

12.     If either party institutes any action or proceeding or asserts any counterclaim against the other relating to the provisions of this Agreement or any default hereunder, the unsuccessful party in such action or proceeding agrees to reimburse the successful party for the reasonable expense of attorney's fees and costs incurred by the successful party before, during and after trial and or appeal. Any sums which shall accrue hereunder, if not paid when due, shall accrue interest at the rate of twelve percent (12%) per annum until paid in full

13. This Agreement shall be governed by the laws of the State of Ohio.

IN WITNESS WHEREOF, the parties have executed this Landlord Lien Subordination as of the _____ day and year first above written.

WITNESSES AS TO LANDLORD:                    LANDLORD:

                                             DDRM LARGO TOWN CENTER LLC, a Delaware limited liability
                                             company

_____              By: _____
_____(Print Name)                  _____(Print Name)


_____              Its: _____
_____(Print Name)


WITNESSES AS TO TENANT:                      TENANT:

                                             MARYLAND LC VENTURES LLC, a Maryland limited liability
                                             company

_Marlon J. Woollery_____                 By: _Richard Regan_____
MARLON WOOLLERY (Print Name)                  _Richard Regan___(Print Name)

[Notary stamp:]
MARLON J WOOLLERY
Notary Public-Maryland
Prince George's County
My Commission Expires
July 31, 2016
(Print Name)                                 Its: Vp Operations


WITNESSES AS TO LENDER:                       LENDER:

_____               By: _____
_____(Print Name)                   _____(Print Name)


_____               Its: _____
                                              _____(Print Name)

11802147.12

**EXHIBIT G**

<u>Tenant's Proprietary Items</u>

*[Subject to Landlord's signage criteria in Exhibit C and the terms of this Lease relating to Tenant's signage]*

# Little Caesar's Sign Options

LANDLORD TO INITIAL EACH OPTION ALLOWED



Option A – Logo & Letters – Raceway Mounted Sign



Option B – Logo & Letters – Flush Mounted Sign



Option C – Letters Only – Raceway Mounted Sign

Option D – Letters Only – Flush Mounted Sign

11802147.12

**SCHEDULE A**

**Rent Schedule**

| Lease Years | $ PSF | $ Annum | $ Monthly |
|---|---|---|---|
| 1 - 3 | $25.00 | $42,500.00 | $3,541.67 |
| 4 - 5 | $26.00 | $44,200.00 | $3,683.33 |
| **Renewal Terms** | | | |
| 6 - 10 | $28.60 | $48,620.00 | $4,051.67 |
| 11 - 15 | $31.50 | $53,550.00 | $4,462.50 |

11802147.12

# EXHIBIT A

## Site Plan of Shopping Center



**LARGO TOWNE CENTER**
950 Largo Center Dr
UPPER MARLBORO, MD 20774

Latitude: 38.9015, Longitude: -76.8354

REVISION: 3/13/2014, SFV

EXHIBIT A

11802147.12

## EXHIBIT A-1

### Depiction of Permissible Relocation Zone



| | TENANT INDEX | |
|---|---|---|
| 1 | SHOPPERS FOOD WAREHOUSE | 49,840 |
| 2 | AVAILABLE | 3,130 |
| 3 | LARGO CLEANERS | 2,600 |
| 4 | GENERAL NUTRITION CENTER | 2,230 |
| 5 | GOLDEN BOWL | 3,311 |
| 6 | LARGO LIQUORS | 3,044 |
| 7 | ANNA'S LINENS | 6,301 |
| 8 | DOLLAR TREE | 12,013 |
| 9 | AVAILABLE | 16,000 |
| 10 | HAIR CUTTERY | 10,005 |
| 11 | AVAILABLE | 2,670 |
| 13 | MARYLAND SPEEDY TAG & TITLE | 900 |
| 14 | BEAUTY MAX | 4,235 |
| 16 | DRESS BARN | 8,781 |
| 17 | AMERICA'S BEST CONTACTS & EYEGLASSES | 2,800 |
| 18 | RADIO SHACK | 2,250 |
| 19 | B & E HAIR STUDIO | 1,216 |
| 20 | CROCHET WIRELESS | 1,630 |
| 21 | LANDOVER DENTAL | 6,046 |
| 22 | MARSHALLS | 25,975 |
| 23 | ADVANCE AUTO PARTS | 6,972 |
| 24 | SALLY'S HAIR BRAIDING | 1,630 |
| 25 | AMERICA'S BEST WINGS | 2,480 |
| 26 | NEW IMAGE NAILS | 1,620 |
| 27 | TREND SETTERS | 2,473 |
| 28 | LARGO ONE BARBER SHOP | 1,630 |
| 29 | SUBWAY | 1,150 |
| 30 | AVAILABLE | 4,800 |
| 31 | REGENCY FURNITURE | 71,042 |
| 32 | BOJANGLES | 3,050 |
| 33 | CAPITAL ONE | 3,632 |
| 34 | MCDONALDS | 3,645 |
| 35 | MOBIL OIL | 910 |
| 36 | SUNTRUST BANK | 3,255 |
| 37 | TACO BELL | 2,142 |
| U-38 | APPLEBEE'S | 4,121 |



### LARGO TOWN CENTER
**950 Largo Center Dr**
**UPPER MARLBORO, MD 20774**

Latitude: 38.9015 , Longitude: -76.8354

11802147.12

*This Exhibit shall set forth the division of responsibility for work, materials and any other applicable costs and fees between the Landlord and the Tenant. Items designated under the heading "Work by Landlord" shall be performed by the Landlord, at Landlord's expense, according to all applicable codes, and the Landlord shall acquire all permits and inspections related to this work. These items shall constitute the entire scope of Landlord work, and any and all other work, whether included in this list or not, required to complete the Tenant's premises per Tenant's requirements, Landlord's criteria or code requirements shall be by the Tenant at the Tenant's sole expense.*

*In such cases where the Landlord is responsible for the construction documents necessary to perform the Landlord's work, Landlord shall provide a copy of the construction plans to the Tenant for review and approval. The Tenant shall be obligated to return review comments or approved plans to the Landlord within the timeframe defined in the lease or, if the lease does not define a timeframe, within ten (10) days of receipt of the plans. Tenant's failure to adhere to this obligation shall result in the construction plans being deemed approved and any changes requested by the Tenant thereafter shall be performed at the Tenant's expense.*

I.      **WORK BY LANDLORD**

The Premises is being delivered to the Tenant in an "as-is" condition. The Landlord shall not be required to perform any work on the Premises except for the following:

1. Install new demising wall composed of 6" metal studs insulated and 5/8th drywall on both sides. Tape and ready for tenants finishes.
2. Move existing electrical service away from newly constructed demising wall.
3. Split existing water line and a sub-meter.

II.     **WORK BY TENANT**

A.      **General Requirements**

1.      Tenant shall deliver to Landlord plans and specifications (including proposed storefront signage) for Tenant's work within the Premises. Such plans and specifications shall include proper safety measures which insure that Hazardous Materials (as defined in the Lease) are not released in, on or under the Premises or any part of the Shopping Center during the Initial Construction of the Premises and during the term of this Lease. Tenant shall submit Tenant's plans and specifications in hardcopy (three (3) sets) and electronically on a CD to Landlord within the timeframe defined in the Lease.

2.      Tenant shall obtain written approval, from the Landlord, of all materials, equipment, fixtures, furnishings, etc., which become a permanent part of the structure. All work shall conform to all design criteria and construction guidelines established by the Landlord.

3.      Tenant shall be responsible for obtaining all required construction document reviews with all governmental authorities in order to obtain all required permits, inspections, occupancy permits, operating licenses, etc., pertaining to the Tenant's work and nature of Tenant's business.

4.      Insurance

a.      Tenant shall require its Contractor to provide and maintain the following insurance coverages:

1)      For all of its employees, Worker's Compensation insurance in the minimum amounts required by the State in which the Premises is located and to comply in all respects with the employment and payment of labor insurance required by any constituted authority having legal jurisdiction over the area in which the work is performed.

11802147.12

2)     Comprehensive General Liability insurance including Contractual and Contractor's Protective Liability coverage in the minimum amount of One Million Dollars ($1,000,000) single limit for bodily injury and/or wrongful death and a minimum of One Million Dollars ($1,000,000) single limit for property damage. This coverage shall include the hazards of explosion, collapse and underground damage, as well as contractual endorsements.

3)     Comprehensive Automobile Liability insurance, including hired and non-owned automobile coverage, with a minimum of One Million Dollars ($1,000,000) single limit for bodily injury and/or wrongful death and a minimum of One Million Dollars ($1,000,000) single limit for property damage.

4)     INTENTIONALLY DELETED

b.     The Landlord shall be named an <u>additional insured party</u> on all insurance policies required hereunder and certificates of insurance evidencing complying with this paragraph shall be provided to Landlord prior to commencement of any work in the Premises. Certificates of insurance must contain an endorsement to the effect that Landlord shall be given at least thirty (30) days prior written notice in the event of cancellation or material change in such insurance coverage represented by the Insurance Certificate.

c.     It shall be the sole and exclusive responsibility of the Tenant to require its Contractor to carry its own Builder's Risk insurance covering materials and/or work performed and/or stored on or about the Premises. Tenant shall be responsible for any deductible amount payable under Landlord's casualty insurance policy in the event a claim is paid under Landlord's policy, which is attributable to Tenant's Work.

d.     All policies of insurance maintained by Tenant's Contractor shall be written by insurance companies qualified to do business and write coverage in the state where the Shopping Center is located having a minimum Best rating of A-/X.

5.     Landlord shall have the right to disapprove all contractors employed by the Tenant including but not limited to the roofing and sprinkler subcontractors, which approval shall not be unreasonably withheld.

6.     Tenant shall not begin Tenant's work until all required approvals have been granted by the Landlord.

7.     All work undertaken by the Tenant shall be at Tenant's sole liability and expense.

8.     Tenant's work shall not damage or compromise the structural integrity of the building. All work shall be done in a first-class workmanlike manner in accordance with all applicable building codes, laws, regulations and ordinances. The Tenant shall be held liable for any damage caused by the Tenant and/or Tenant's employees, vendors, and contractors.

9.     All work undertaken by the Tenant shall be coordinated with and completed so as not to interfere with the Landlord's construction schedule or any other tenant's activities. All contractors employed by the Tenant shall allow other contractors to work on the Premises without interference.

10.     Tenant shall be responsible for the cost and receipt of all deliveries and unloading of all materials pertaining to Tenant's work. All deliveries shall be made through the service door (where provided). Storage of equipment and materials shall be confined to the leased Premises.

11.     Prior to commencing Tenant's Work in the Premises, Tenant shall have:

a.     Delivered to Landlord, Tenant's Contractor's insurance certificate(s) evidencing the insurance coverages as required hereunder.

b.     Delivered plans for Tenant's Work to Landlord and obtained Landlord's written approval of such plans.

c.     Transferred utility services for the Premises from the Landlord's account to the Tenant's account.

d.     INTENTIONALLY DELETED

e.     Filed with Landlord a copy of the building permit (if applicable) for Tenant's Work.

f.     INTENTIONALLY DELETED

12.     During the period of Tenant's work, Tenant shall provide and pay for connections, metering and consumption of all temporary utilities brought to such a point as determined by the Landlord.

11802147.12