13. Tenant shall keep the Premises and Shopping Center common areas free from accumulations of debris caused by Tenant's employees, vendors and contractors. Tenant shall arrange for services to be provided for the removal of debris during the period of Tenant's Work. Tenant may place one (1) construction dumpster (max size 40 cubic yards) and one (1) portable toilet on the outside the Premises in a location mutually agreed upon with Landlord. In Landlord's sole discretion, additional dumpsters and toilets may be placed adjacent to the Premises.

14. Tenant's contractor may not erect temporary signs or banners in or upon the Premises or the Shopping Center advertising its business without Landlord's prior consent and subject to the prepayment of a fee as set forth in Landlord's guidelines.

15. Tenant shall clean HVAC filters clogged by dust or other debris resulting from Tenant's construction in premises.

16. Tenant shall not cause or permit any Hazardous Materials (as defined in the Lease) to be released, spilled or otherwise permeated in, on or under the Premises or any portion of the Shopping Center while performing Tenant's Work.

17. Tenant shall provide to the Landlord a copy of the Certificate of Occupancy (or local equivalent) issued for the Premises within seven (7) days of opening for business in the Premises from Tenant's work.

B. **Exterior Work**

Tenant shall not perform any work, which would in any way alter or modify the appearance or structural integrity of the building without prior written approval from the Landlord.

C. **Interior Work**

Tenant shall provide all necessary work according to Tenant's business and local code requirements. This work shall include but not necessarily be limited to the following:

1. All interior partition walls, doors, etc.

2. Interior wall finishes including priming, painting, wall coverings, etc.

3. Floor coverings and wall base.

4. Plumbing

    a. All necessary plumbing work, other than that provided by the Landlord as previously referred to
    b. Tenant shall apply to the local utility company for water/sewer service and shall pay all tap, connection and impact fees attributable to Tenant's design and nature of Tenant's business.
    c. Tenant shall pay for meter set and all related fees if individual metering is required by the Developer-Landlord. Meter or remote read-out device shall be installed in a location easily accessible for reading.

5. Electrical

    a. All electrical work, other than that provided by the Landlord as previously referred to.
    b. At Tenant's option, Tenant may provide burglar alarm system, emergency generator, Musak system, etc. as approved by the Landlord.
    c. Tenant shall apply to the local utility company for metering and/or service and shall pay all related fees.

6. Heating, Ventilating and Air Conditioning

    a. Installation of additional, or relocation of Landlord provided, rooftop HVAC units, supply air diffusers and return air grilles as approved by the Landlord.
    b. If applicable, Tenant shall apply to the local utility company for gas service and/or metering and shall pay all related fees. Meter or remote read-out device shall be installed in a location easily accessible for reading.

11802147.12

c.  Restaurants, food service, pet shop, hair/nail salons, barber shops, laundromats and any other uses which, in the sole opinion of the Landlord, produce odors, shall provide and exhaust system which will prevent such odors from entering the other tenant's spaces, enclosed Common Areas or any other portions of the Shopping Center. In the event Tenant's use requires an exhaust system, Tenant shall, unless otherwise approved in writing by Landlord, provide tempered make-up outside air up to ninety percent (90%) of all such exhaust. Clothes dryers shall be vented using rigid metal duct routed to an approved container or otherwise as required by Landlord.

7. Fire Protection

   a.  Any deviation from, or modification to, the regular standard grid layout of sprinkler heads within the leased Premises due to Tenant's design or nature of Tenant's business. The location, type and number of sprinkler heads shall be based upon local codes and the Landlord's insurance underwriter requirements. Modifications to the standard grid layout must be performed by the project sprinkler contractor at Tenant's expense.
   b.  Any fire alarm system and monitoring thereof as may be required by governing codes and authorities. Tenant's system and system components shall match and be compatible with Landlord's systems and requirements.
   c.  Tenant shall coordinate sprinkler shut downs with Landlord. One shut off/turn on shall be provided by Landlord, additional shut downs may be subject to a fee as defined in Landlord's construction guidelines.
   d.  Any special sprinkler heads, extinguisher systems, flame retardants, smoke/heat detectors, etc. as required by all applicable building codes, laws, regulations and ordinances due to Tenant's design or nature of Tenant's business.
   e.  Two (2) 5 lb. ABC fire extinguishers properly maintained on a continued basis.

8. Miscellaneous

   a.  All trade fixtures, shelving, furnishings, signage, merchandise, etc.
   b.  Toilet room accessories such as paper holders, soap dispenser, mirrors, shelves, etc.
   c.  All curbs, lintels, flashings, pipes, ducts, vents, exhaust hoods, louvers, etc. necessary for Tenant's equipment requiring openings through roof and/or exterior walls. All cutting, patching and flashing of the roof system must be performed by the Landlord's roofing contractor at Tenant's expense.
   d.  All required safety, emergency and handicap aid equipment within the leased Premises as required by Local, State and Federal authorities.
   e.  Tenant shall insulate, to the extent required by the nature of Tenant's business, the demising walls and ceiling so as not to permit sound, odors, etc., to emanate outside the leased Premises.
   f.  Wet areas within Premises must be waterproofed by Tenant to prevent moisture from migrating under or through demising walls and exterior perimeter walls. Wet areas include, but are not limited to: rooms or areas with fixtures or appliances having a water supply line and/or drain line; rooms or areas with floor drains, mop sinks, hose spigots, water tanks, etc.; kitchens, bar areas, service areas, toilet rooms and rooms or areas that will undergo wet cleaning with mops, hoses, pressure washers, etc. Waterproofing at wet areas shall consist at a minimum of the installation of: a.) cement board or moisture-resistant gypsum board (in lieu of regular gypsum board); b.) sheet membrane waterproofing material extending at least 6" up the wall and 18" along the floor; with a hard surface finish material over it; c.) a hard surface wall covering extending a minimum of 4'-0" up the wall.

– END –

11802147.12

**EXHIBIT C**

[See attached]

11802147.12



EXHIBIT C

## SIGN CRITERIA FOR SHOPPING CENTER

### General

All permanent Tenant signs, both as to design and shop drawings, must receive written approval by Landlord before fabrication and any signs installed without such written approval may be removed by the Landlord at Tenant's expense.

Landlord's approval shall be based on:

(a) conformity to this Sign Criteria; and
(b) harmony, both architecturally and aesthetically, of the proposed sign with the design of the Shopping Center.

However, Landlord has the specific right to refuse approval of any sign whether or not such sign conforms to the specific sign criteria set out below and Landlord reserves the right to modify said criteria for any Tenant or Tenants of the Shopping Center without affecting Tenant's obligations hereunder.

To secure Landlord's approval, a design sketch of all proposed signs is to be submitted. After approval of design sketch in writing by Landlord, three (3) white prints of each shop drawing of all signs must be submitted to the Landlord for approval. The shop drawings must be consistent with the design sketch approved by Landlord and must indicate the type and sizes of all lettering, and their location. A schematic section through the sign will be required where necessary to show the form, colors and finishes of all materials, and wattages and light intensity must be specified. All disapproved or conditionally approved drawings must be resubmitted until unconditionally approved by the Landlord. Incomplete drawings will be returned without approval.

### Illuminated Storefront Signs

Tenant shall employ the services of a qualified sign contractor, licensed to do work in Prince George's County and State of Maryland.

Only Tenant's tradename will be permitted on its storefront sign.

Sign letters shall be individual channelized neon, with white metal cans and red plexiglass faces, selected by Landlord.

Letter size not to exceed two feet (2') in height and limited in width to seventy-five percent (75%) of Tenant storefront width.

The entire cost of Tenant's storefront sign including, without limitation, design, fabrication and installation, shall be at Tenant's sole expense.

### Other Signs

Tenant is encouraged to consider imaginative signage for the storefront windows/doors of the Demised Premises, such as gold leaf lettering, brass plaques, glass etching or exposed neon tubing suspended from the inside of windows; although Landlord shall be under no obligation to approve any such signs and may prohibit same in its sole discretion.

No flashing, flickering, blinking, animated or moving lights or signs shall be permitted. Paper signs, window stickers and handmade signs, whether or not of a temporary nature, are expressly prohibited.

Doc:17968/17

### Under Canopy Signs

At Landlord's sole option and discretion, Landlord designed illuminated, hanging, store identification signs extending perpendicular from Tenant's storefront shall be installed by Landlord's sign contractor with Proportionately sized lettering to match storefront sign. If so installed (Landlord being under no obligation so to do), the cost of such sign including, without limitation, design, fabrication and installation shall be reimbursed to Landlord by Tenant, as additional rent, on or before the Rent Commencement Date or within ten (10) days after Landlord's invoice therefore, if later. The estimated cost per each Tenant sign is $750.00. Tenant's under-canopy identification sign shall be connected to Tenant's electric meter and the cost of electricity therefore shall be paid directly by Tenant.

11802147.12

**EXHIBIT C-1**

Coming Soon Sign



EXHIBIT D-1

General Contractor's Lien Waiver

**GENERAL CONTRACTOR'S WAIVER OF LIEN AND LETTER OF GUARANTEE**

STATE OF _____ )
                          ) SS:
COUNTY OF _____ )

TO: Maryland LC Ventures LLC
     Tenant

and DDRM Largo Town Center LLC
     Landlord

                                            Unit No.: 2
                                            Store Name: Little Caesar's Pizza
                                            Shopping Center: Largo Town Center
                                            Location: Upper Marlboro, Maryland

_____ ("Real Estate") _____, being duly sworn and authorized, deposes and says that this affidavit is made on behalf of _____ (the "Company") as its _____ and is the free act and deed of the undersigned and the Company.

Furthermore, for and in consideration of $_____ paid to the Company, the receipt and sufficiency of which are hereby acknowledged, the Company does hereby waive, release and relinquish any and all liens, lien rights, claims or demands of any kind whatsoever which the Company now has or may hereafter acquire against the Tenant, the Landlord, the Real Estate referenced above and/or the improvements thereon for any and all work, labor, materials, equipment, machinery or other goods and services rendered, performed or furnished at the above referenced location (the "Work").

The Undersigned further warrants and represents that:

    (i)    Any and all amounts owed by or on behalf of the Company to any other party for the Work, or any portion thereof, furnished by such other party on behalf of the Company, have been paid in full;
    (ii)   The Company agrees to indemnify, defend and hold harmless the Tenant and Landlord from and against any and all claims, causes of action, loss, damage, cost and expense (including reasonable attorney's fees) as a result of any breach of the warranties and representations herein;
    (iii)  The Work has been fully performed in accordance with the plans and specifications and in conformance with the requirements of any building code authority having jurisdiction over the performance of the work; and
    (iv)  The Company guarantees all materials and workmanship for a period of one (1) year from the date of execution of this instrument.

Subscribed and sworn to              Company: _____
before me this ____ day               By: _____
of _____, 20___.                    Its: _____

Address: _____
Phone No.: _____

_____             _____
Notary Seal (seal required)

State of _____
County of _____              Date: _____

11802147.12

EXHIBIT D-2

Subcontractor's Lien Waiver

**SUBCONTRACTOR'S WAIVER OF LIEN AND LETTER OF GUARANTEE**

STATE OF _____ )
                        ) SS:
COUNTY OF _____ )

TO: Maryland LC Ventures LLC
      Tenant

and DDRM Largo Town Center LLC
        Landlord

Unit No.: 2
Store Name: Little Caesar's Pizza
Shopping Center: Largo Town Center
Location: Upper Marlboro, Maryland

_____ ("Real Estate") _____, being duly sworn and authorized, deposes and says that this affidavit is made on behalf of _____ (the "Company") as its _____ and is the free act and deed of the undersigned and the Company.

Furthermore, for and in consideration of $_____ paid to the Company, the receipt and sufficiency of which are hereby acknowledged, the Company does hereby waive, release and relinquish any and all liens, lien rights, claims or demands of any kind whatsoever which the Company now has or may hereafter acquire against the Tenant, the Landlord, the Real Estate referenced above and/or the improvements thereon for any and all work, labor, materials, equipment, machinery or other goods and services rendered, performed or furnished at the above referenced location (the "Work").

The Undersigned further warrants and represents that:

   (i)    Any and all amounts owed by or on behalf of the Company to any other party for the Work, or any portion thereof, furnished by such other party on behalf of the Company, have been paid in full;
   (ii)    The Company agrees to indemnify, defend and hold harmless the Tenant and Landlord from and against any and all claims, causes of action, loss, damage, cost and expense (including reasonable attorney's fees) as a result of any breach of the warranties and representations herein;
   (iii)    The Work has been fully performed in accordance with the plans and specifications and in conformance with the requirements of any building code authority having jurisdiction over the performance of the work; and
   (iv)    The Company guarantees all materials and workmanship for a period of one (1) year from the date of execution of this instrument.

Subscribed and sworn to
before me this ____ day
of _____, 20___.

Company: _____
By: _____
Its: _____

Address: _____

_____
Notary Seal (seal required)

Phone No.: _____

_____
State of _____
County of _____

Date: _____

11802147.12

## EXHIBIT E

### Schedule of Exclusive and Prohibited Uses

### Prohibited Use

Those certain covenants, conditions, and restrictions set forth in Declaration of Covenants, Conditions and Restrictions by Largo C.L. and DXD, Inc., dated January 1, 1990, and recorded among the Land Records of Prince George's County, Maryland in Liber 7530, folio 313; as supplemented by Supplement to Declaration of Covenants, Conditions and Restrictions of Largo Town Center recorded among the aforesaid land records in Liber 8535, folio 773; as further supplemented by Supplement to Declaration of Covenants, Conditions, and Restrictions of Largo Town Center recorded among the aforesaid land records in Liber 10038, folio 59.

### MARSHALLS

Landlord specifically agrees with Tenant that during the term of this lease it will not lease, sell or otherwise permit any structure within the Shopping Center to be used (hereinafter the "Obnoxious Uses") for any manufacturing operation; as a factory; for any industrial usage; as a warehouse, processing or rendering plant; for any establishment selling cars (new or used), trailers, mobile homes; for the operation of a billiard parlor, "disco", flea market, massage parlor or carnival; for a so-called "off-track betting" operation; for the sale or display of pornographic materials; or for any other purpose which, at the relevant time, would be incompatible with the use of the Shopping Center as a predominantly retail development.

### Exclusive Uses

### ADVANCE AUTO PARTS

Provided Lessee is operating in the Shopping Center as an automobile parts and accessories business, and subject to the rights already granted to the Major Tenants [Hechinger, Marshalls, Shoppers Food Warehouse, or F&M], [sic] not to permit any building or other improvements located within the Shopping Center to be principally to be used or occupied for the sale of automobile parts and accessories except for a gasoline or service station(s) and except for a service business(es) which perform automotive repairs and/or installation on site, such as "Jiffy Lube", Merchant's Tire" or "Midas Muffler" provided, however, that in no event shall this exclusive provision be construed to prohibit any existing tenant situated on Lessor's property from handling and selling any of the items which they customarily handle and sell, nor shall this provision be construed to prohibit any future tenant from utilizing up to 500 square feet of said tenant's premises for the sale of automobile parts and accessories, nor any tenant from using all or any portion of its premises for the sale of cellular or similar telephones or automobile sound systems…

### AMERICA'S BEST CONTACTS & EYEGLASSES

Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center by a tenant, subtenant, assignee, licensee or concessionaire (collectively "Occupant") whose Principal Business (as hereinafter defined) is either (i) the display and retail sale of optical goods, including corrective eyeglasses, corrective sunglasses, and contacts or (ii) providing optometric services (collectively, the "Exclusive Use"). As used herein, the term "Principal Business" shall mean any business devoting more than twenty-five percent (25%) of its sales floor area for the Exclusive Use. Notwithstanding anything to the contrary contained herein, the foregoing Exclusive Use shall not be applicable to the units occupied by tenants whose gross leasable area is 10,000 square feet or more, the occupant of any outparcel within and adjacent to the Shopping Center, any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors or assigns.

### ANNA'S LINENS

The retail sale of blankets, bedspreads, sheets, towels, pillows, window coverings, table top and kitchen accessories and all incidental products related thereto. Tenant shall have the exclusive right to sell the above referenced items throughout the term of the lease (hereinafter referred to as "Restricted Items"). The Restricted Items shall not include the items specified on Exhibit H [Exclusive Uses existing at the time of Tenant's lease] attached hereto (the Non-Restricted Items). A "Use Restriction Violation" occurs upon either or both of the following events: (1) any tenant or occupant in the Shopping Center uses more than ten percent (10%) of its sales area to sell Restricted Items; or (2) Landlord leases space to another tenant in the Shopping Center for the sale of primarily Restricted Items.

### APPLEBEES

So long as the improvements on the Apple Parcel [*unowned parcel in northeast corner*] are used as a full service (i.e., table service with waiters and/or waitresses and a full complement of alcoholic beverages for on-premises consumption, casual dining

11802147.12

restaurant, Developer shall not allow any portion of the Developer Parcel including any outparcel or other property now or hereafter connected with the Shopping Center to be used for any other full service casual dining restaurant similar to Applebee's Neighborhood Grill & Bar. As sued herein, a restaurant shall be deemed similar to an Applebee's Neighborhood Grill & Bar if it serves beer, wine and liquor for on-premises consumption and is similar in concept to other full service, casual dining restaurants such as and including but not limited to, "Bennigan's, TGI Fridays, Chili's, Ruby Tuesday's, O'Charley's, Houlihan's, and other such similar type restaurant concepts. The above restriction shall not apply to (and the same shall not be deemed a restaurant similar to Applebee's Neighborhood Grill & Bar) any full service, casual dining restaurant concept if at least fifty-one percent (51%) of that concept's food sales (excluding dessert items) is related to a single food item such as beef, chicken, or seafood, or a single cuisine such as Italian, Mexican, or Chinese, nor shall such restriction apply to any (a) stores on the Developer Parcel existing in the Shopping Center as of the date of this REEA containing more than 20,000 square feet or their assignees, sublessees, licensees, or concessionaires unless in either instance the tenant's or other occupant's present (as of the date of this REA) lease or other occupancy agreement either expressly prohibits any such full service, casual dining restaurant or expressly provides Developer with the right to approve any such change of the present use and Developer's right to disapprove a change in the use to a full service, casual dining restaurant is deemed reasonable.

**BOJANGLES**

For so long as Tenant shall be operating on the Property a typical Bojangles restaurant specializing in ready-to-eat chicken and chicken products, in the manner as required by this Lease, and shall not be in default of the terms of this Lease, after written notice and beyond expiration of any applicable grace period, Landlord agrees that, except as hereinafter otherwise provided, it shall not lease any space in the Shopping Center to, or permit any space therein to be occupied by, any person, firm or corporation for the purpose of operating what is commonly known as a "fast food restaurant" having as its primary use the sale of ready- to-eat chicken and/or chicken products. The foregoing restrictions, and the covenant herein granted, shall not apply to, bind or otherwise restrict (i) occupants of the Shopping Center leasing or owning more than 15,000 square feet of floor area (herein "Anchor Stores"), their successors, assigns or sublessees, or (ii) "McDonald's", "Taco Bell" or any other fast food restaurant except those which are operated primarily for the sale of chicken or chicken products such as, without limitation, "Popeye's", "Church's", "Chick-Fil-A", "KFC" or "Chicken Out", or (iii) any full service or table service restaurant with wait service, or (iv) the tenant or other occupant, their successors, assigns or sub lessees, under any lease or other occupancy agreement in effect as of the date hereof.

**CRICKET WIRELESS**

Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center by a tenant, subtenant, assignee, licensee or concessionaire (collectively "Occupant") whose Principal Business (as hereinafter defined) is the retail sale of wireless communications products (the "Exclusive Use"). As used herein, the term "Principal Business" shall mean any business devoting more than fifty percent (50%) of its sales floor area to the display and retail sale of wireless communications products. Notwithstanding anything to the contrary contained herein, the foregoing Exclusive Use shall not be applicable to the units occupied by tenants whose gross leasable area is 5,000 square feet or more, the occupant of any outparcel within and adjacent to the Shopping Center, any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors, assigns or replacements.

**DOLLAR TREE**

[I]n the event Landlord leases any other space in the Shopping Center to a tenant for the purpose of. or permits any other space in the Shopping Center to be used for, the operation of a retail store customarily known or referred to as a so-called "dollar store", which primarily sells general, consumable and variety merchandise generally under a single and uniform price point format the same or similar to that of Tenant (the "Competing Use ") then, from the dare such Competing Use commences operating in the Shopping Center until such Competing Use ceases operation in the Shopping Center, the Minimum Annual Rent payable by Tenant under this Lease shall be reduced...

Notwithstanding the provisions of Section 19.01 above to the contrary, the provisions of said Section 19.01, and the restrictions and limitations contained therein, shall not apply to nor restrict, and the term "Competing Use" shall not be deemed to include, (i) those spaces or buildings designated "Hechinger", "Marshalls" or "Shoppers Food Warehouse" on Exhibit" B" hereto [*Currently Marshalls, Shoppers Food, and Regency Furniture spaces*] or any other anchor stores (hereinafter defined) in the Shopping Center or to the occupants of such anchor stores, (ii) any tenants, subtenants, assignees or other occupants under leases or other occupancy agreements at the Shopping Center entered into prior to the date of this Lease (the "Existing Agreements") whose terms do not prohibit the tenants, subtenants, assignees or other occupants thereunder from operating as or for a Competing Use, provided Landlord agrees that it will not thereafter waive any provisions of, or modify or amend, any of the Existing Agreements to permit any tenants, subtenants, assignees or other occupants thereunder to operate as offer a Competing Use where such Competing Use is not otherwise permitted as of the date hereof; (iii) any property within the Shopping Center not owned by

11802147.12

Landlord; (iv) the sale of apparel or apparel accessories under a single and uniform price point format, such as "One Pricing Clothing ": or (v) any drug store, crafts store or health and beauty aids store.

For purposes of this Lease, an "anchor store" shall be deemed to mean and include any store building leased to or owned by a tenant or other occupant who initially occupies at least 20,000 square feet of space in a single store.

## DRESS BARN

Landlord covenants and agrees that it will not, at any time during the Lease Term, lease more than 7,500

square feet of additional Floor Area in the Shopping Center to a store or stores whose principal use is the sale at retail of off price, brand name, women's, medium to better priced, career-oriented apparel in missy sizes and accessories such, as those being operated, as of the date of this Lease, under the trade name "Hit or Miss"... Furthermore, as long as no default shall exist under the Lease and Tenant shall be in occupancy of the Demised Premises operating therein a women's retail apparel store with at least 2,500

square feet of Floor Area devoted to the sale and display of women's clothing in so-called half sizes and large sizes then, and in such event, Landlord covenants and agrees that it will not, at any time during the Lease Term, lease any other space in the Shopping Center to a store whose principal use is the sale at retail of women's clothing in half sizes and large sizes such as those being operated, as of the date of this Lease, under the trade names "Lane Bryant" and "Modern Woman".... Notwithstanding anything herein to the contrary, the so-called exclusive and the limitation of competing stores herein granted Tenant shall not be deemed to apply to or prohibit or restrict (i) another store from selling women's off-price, brand name, career-oriented apparel or accessories and/or half size and large size apparel on an incidental or ancillary basis, (ii) the tenants or other occupants of any so-called "anchor stores' in the Shopping Center (that is, stores of 15,000 square feet or greater) from subletting or otherwise using all or any portion of their stores for the sale of women's off-price, brand name, career-oriented apparel and/or accessories of any type and/or half size and large size apparel, (iii) other women's apparel stores such as, without limitation, "Fashion Bug" as long as the same are not selling women's, off-price, brand name, career-oriented apparel in missy sizes and/or half size and large size apparel as their principal business, or (iv) Big M, Inc., its successors, sublessees or assigns, from operating a women's apparel store in the Shopping Center under the trade names of 'Karin Morgan", "Mandee" or "Annie Sez" or similar or successor trade names, regardless of the type or manner of merchandise, provided the same shall not be primarily half-size or large size women's apparel.

## LARGO CLEANERS

As long as no default by Tenant shall exist under the Lease and Tenant shall be in occupancy of the Demised Premises operating therein principally a dry cleaning establishment and laundry,

Landlord agrees that it will not, at any time during the Lease Term, lease any space in the Shopping Center to a store whose principal use is that of a dry cleaning establishment and/or laundry.

Notwithstanding anything herein to the contrary, the so-called exclusive herein granted Tenant shall not be deemed to apply to or prohibit or restrict the tenants or other occupants of any so called "anchor stores' in the Shopping Center (that is, stores of 20,000 square feet or greater) from subletting or otherwise using all or any portion of their stores as dry cleaning establishments and/or laundries.

## LARGO LIQUORS

Landlord agrees that it will not hereafter enter into a lease with any tenant for space in the Shopping Center which authorizes or permits (x) the operation of a liquor store for the sale of beer, wine and hard liquor for off premises consumption, (y) the sale of bottled wine for off-premises consumption, and (z) the sale of packaged beer for off-premises consumption, except as an incidental to the sale of food from the premises from which such beer is being sold. Notwithstanding the foregoing, the exclusive herein granted shall not prohibit nor apply to nor restrict those spaces and buildings designated "Anchor" on Exhibit "B" hereto and, as to (y) and (z) above, any outparcel or pad users. Provided and so long as this provision shall not conflict with or be in violation of any laws or legal restrictions and provided, further, that (i) this Lease is in full force and effect (ii) Tenant is an approved lottery agent and is selling Maryland lottery tickets at the Demised Premises, and (iii) no Event of Default shall exist under this Lease then, and in such event, Landlord agrees that it will not hereafter enter into a lease with any tenant for space in the Shopping Center which authorizes the sale of Maryland lottery tickets. Notwithstanding the foregoing, the exclusive granted in the preceding sentence shall not prohibit nor apply to nor restrict those spaces and buildings designated "Anchor" *[Regency Furniture, Marshalls, World Gym/Dollar Tree, and Shoppers Food]* on Exhibit "B" hereto nor any outparcel or pad users...

## LARGO ONE BARBER SHOP

11802147.12

Landlord agrees that Landlord will not lease space (other than with respect to Anchor sites shown on Exhibit B and presently executed leases) in the Shopping Center to a tenant for the primary purpose of operating a barber shop.

### MARSHALLS

If Landlord shall permit any one occupant of the Shopping Center (other than Tenant or any Major Tenant) to use more than 15,000 square feet of floor area in a store or if Landlord shall permit any Major Tenant (other than Tenant) to primarily use its store, for the sale or display at discount prices of (1) brand-name clothing or (ii) brand- name domestics (i.e., linens, towels and like items), then minimum rent payable pursuant hereto shall be reduced...

Notwithstanding the foregoing, the restriction of the preceding paragraph shall only be applicable to the premises identified on the site plan as "Anchor D" [*currently Regency Furniture*] to the extent that Tenant continues to operate the demised premises hereunder under the name "Marshalls" specializing in the sale of brand- name clothing, shoes, giftware and domestics, or any of them, at regularly discounted prices consistent with the operation of other stores operated under the "Marshalls" trade name. Further, if Tenant shall cease to carry either brand-name clothing or brand-name domestics for a period of one (1) year, then such category of merchandise shall not be included as a restriction against the occupant of the "Anchor D." ...

In addition, the restrictions of [this section] shall only be applicable to the premises identified on the site 'plan as "Anchor A" [*currently Shoppers Food Warehouse*] to the extent that Marshalls, Inc., its subsidiaries, affiliates, successors or assigns continue to lease the demised premises and to operate the same primarily for the sale of apparel or domestics (i.e., linens, towels and like items), and if Tenant shall cease to carry any one or more of the aforesaid restricted items (i.e., apparel or domestics) then the restrictions as to such item or items no longer being carried shall no longer be applicable to the premises identified as "Anchor A" on the site plan...

### MARYLAND SPEEDY TAG AND TITLE

Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center by a tenant, subtenant, assignee, licensee or concessionaire (collectively "Occupant") whose Principal Business (as hereinafter defined) is the operation of a motor vehicle license and title service agency (the "Exclusive Use"). As used herein, the term "Principal Business" shall mean any business deriving more than fifty percent (50%) of its gross sales from the operation of a motor vehicle license and title service agency. Notwithstanding anything to the contrary contained herein, the foregoing Exclusive Use shall not be applicable to the units occupied by tenants whose gross leasable area is 5,000 square feet or more, the occupant of any outparcel within and adjacent to the Shopping Center, any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors, assigns or replacements.

### MCDONALDS

As long as Tenant shall be operating at the Demised Premises a typical 'McDonald's' restaurant specializing in hamburgers, in the manner as required by this Lease, Landlord agrees that it shall not lease any space or land in the Shopping Center (exclusive of the stores designated "Hechinger" [*Regency Furniture*], "Marshalls", "F&M"[*World Gym/Dollar Tree*] and "Shoppers Food Warehouse" on Exhibit 'A' hereto) to, or permit any space therein or land thereof (exclusive of all or any portion of said stores designated "Hechinger", "Marshall", "F&M" and "Shoppers Food Warehouse") to be occupied by, any person, firm or corporation for the purpose of operating a restaurant specializing in hamburgers such as that being operated by Tenant under the 'McDonald's' trade name as of the date of this Lease. For purposes of this Lease, the term "specializing in hamburgers" shall mean that at least twenty-five percent (25%) of the gross dollar volume is derived from the sale of hamburgers or any other type of ground beef or ground beef substitute product in patty form served on a bun. In addition, and not by way of example, the following fast food restaurants operating under the listed trade names shall be herein prohibited: Burger King, Hardee's, and Wendy's. The foregoing restrictions, and the exclusive herein granted, shall not apply (i) to the stores designated Hechinger, Marshalls, F&M and Shoppers Food Warehouse on Exhibit 'A' hereto, or (ii) to any self-service restaurant specializing in hamburgers of the type the same or similar to that being operated as of the date hereof under the trade name "Fuddruckers's", or (iii) to any so-called "table service' restaurant specializing in hamburger such as, without limitation, "Hamburger Hamlet".

### MOBIL

As long as Tenant shall be operating a retail drive-in facility for the sale of gasoline and other petroleum products as its principal business at the Demised Premises, and provided no default shall exist under this Lease after notice and beyond expiration of any permitted grace period, Landlord agrees that it shall not itself, directly or indirectly, operate a service station in the Project or lease any space in the Project to, or permit any space therein to be occupied by, any person, firm or corporation for the purpose of operating a service station. For purposes hereof, a service station shall mean a place that, as its principal business, sells and pumps gasoline and other fuels for automobiles and other vehicles and shall not, for example but not by way of limitation, be deemed to include (i) an oil or lubrication facility such as those operating, as of the date of this Lease, under the trade names

11802147.12

"Jiffy Lube" or "Quik Lube", (ii) a tire, battery or automobile accessories facility, such as those operating, as of the date of this Lease, under the trade names "Merchant's Tire" or "Market Tire", or (iii) an auto parts store.

**REGENCY FURNITURE**

Landlord agrees that Landlord will not hereafter enter into a lease with any other tenant for space in the Shopping Center which authorizes or permits such tenant, as its primary business, to sell furniture or mattresses....

Notwithstanding the provisions of [the Section] above to the contrary, the provisions of said Section and the exclusive therein granted Tenant, shall not apply to nor prohibit or restrict (i) the occupants of any other parcels in the Shopping Center not owned by Landlord; (ii) the incidental or ancillary sale of furniture or mattresses by a store whose primary business is not the operation of a furniture or mattress store such as, for example, "Pier 1 Imports" or "Cost Plus Word Market"; (iii) the sale of home furnishings or accessories such as, without limitation, lamps, artwork, floor coverings or wall coverings; (iv) the sale of kitchen or bathroom cabinets, fixtures or furnishings; (v) a store featuring specialty furniture items, such as, without limitation, futons, waterbeds, massagers or ergonomic or orthopedic furniture; (vi) the sale of outdoor or patio furniture and furnishings or office furniture or supplies; and (vii) the occupants of any store premises in the Shopping Center under lease as of the date hereof, their sublessees, licensees, concessionaires, successors or assigns.

**SHOPPERS FOOD WAREHOUSE**

Landlord hereby covenants for the term of this Lease and any or any extensions thereof not to lease space to a tenant operating within the Shopping Center as outlined in "green" on the attached Exhibit "A" whose primary business is: (1) that of a grocery store or supermarket, which terms shall include both a "conventional" and a "food warehouse" operation; or (2) (except for a convenience store operated in conjunction with a gasoline or other fuel station), a free standing convenience store offering for sale products normally found in grocery stores or supermarkets operating within the metropolitan Washington, D.C. area; or (3) a delicatessen with less than forty percent (40%) of its square footage sales area used for table space and seating purposes; or (4) (except for a convenience store operated in conjunction with a gasoline or other fuel station, which convenience store, in any case, will not exceed 2,500 square feet) any other store or shop using more than twenty-five percent (25%) of its square footage areas for the sale for off-premises consumption of one or more of the following: dry groceries, frozen food products, produce, dairy products, meats, poultry or fish or (5) regardless of size, the use of a computerized or electronic merchandising system for the sale of these items from offsite inventory; provided, however, that in the case of the drug store premises to be constructed within the Shopping center, the foregoing limitations shall not be applicable, and in lieu thereof, Landlord shall not permit the tenant of any such drugstore premises to operate a supermarket, grocery store or delicatessen of the type aforesaid or to sell for off premises consumption frozen food products (which term shall not include dairy or dairy-related products or frozen snacks) fresh delicatessen products cut on the premises or fresh meats, fresh seafood or fresh produce; and provided further, that in the case of the store designated "Hechinger" on Exhibit "A"[*currently Regency*] the foregoing limitations shall not be applicable and, in lieu thereof, Landlord shall not permit any tenant of all or part of such store designated Hechinger on Exhibit "A" [*Regency*] to operate or permit to be operated within such store (i) a supermarket or grocery store, which terms shall include both a "conventional" and a "food warehouse" operation, or (ii) a "warehouse club" type store similar in nature to those operated under the trade names of "Price Club", "BJ Wholesaler", "Costco", "Sam's Wholesale Club", "Makro", or "Pace", or (iii) more than twenty-five percent (25%) of the total square feet of the store designated "Hechinger" on Exhibit "A" for the sale for off premises consumption of one or more of the following: dry groceries, frozen food products, produce, dairy products, meats, poultry or fish, or (iv) any store or shop the primary business of which shall be the sale of the items enumerated in (iii) above. The foregoing restriction shall not be interpreted as restricting Landlord from leasing any portion of the Shopping Center to a bakery, an ice cream store, cookie store, yogurt store, fresh coffee store, cheese store, candy store, or beer, wine and cheese store or for a restaurant, cafe carry-out or coffee shop or to any other tenant specializing in the sale of prepared foods, or to any store which has a catalog or similar business which may sell specialty or gourmet food gift items such as, without limitation, fruit baskets and other items typically sold by Harry & David's", boxed steaks, smoked salmon or Russian caviar.

**SUBWAY**

Landlord agrees that it will not enter into a lease with any future tenant of Landlord or its affiliates for new space in the Shopping Center which authorizes or permits, as its primary use, the sale of sandwiches commonly referred to as "subs". Tenant covenants and agrees to indemnify, protect and defend Landlord and hold it harmless of and from all manner of loss or damage, including, without limitation, the costs of suit (whether in defending such suit or prosecuting and action for declaratory judgment), arising from, through or by virtue of the effect and/or existence of this provision, except for any suit brought by Tenant against Landlord for the purpose of enforcing this provision. Tenant further covenants and agrees that, in consideration for Landlord agreeing to the provisions of this Section, any action brought to enforce the provisions of this Section, any action brought to law and not in equity.

11802147.12

The foregoing does not prohibit, without limitation, a store which as its primary business sells pizza and Italian specialty items whether or not submarine sandwiches are included in their menu.

## TACO BELL

[I]n consideration of Tenant's covenants under Section 14 of this Lease and for so long as Tenant shall be operating at the Demised Premises a typical "Taco Bell" fast food restaurant, in the manner as required by this Lease, and shall not be in default of the terms of this Lease, Landlord agrees that it shall not lease

any space in the Shopping Center [exclusive of the four Anchor buildings] to, or permit any space therein (exclusive of all or any portion of said stores designated "Hechinger", "Marshalls", "F&M" and "Shoppers Food Warehouse") to be occupied by, any person, firm or corporation for the purpose of operating what is commonly known as a "fast food restaurant" having as its primary use the sale of Mexican food. The foregoing restrictions, and the covenant herein granted, shall not apply (i) to the buildings designated "Hechinger", "Marshalls", "F&M" and "Shoppers Food Warehouse" on Exhibit "A" hereto, or (ii) to any other kind of fast food restaurants such as, without limitation, "McDonald's", "Arby's", "Popeye's" or "Kentucky Fried Chicken", provided the same are not operated primarily as a restaurant for the sale of Mexican food, or (iii) to any other restaurant not operating as a "fast food restaurant" which has, as its primary use, the sale of Mexican food such as, without limitation, "Chi Chi's" or "El Torito" provided that it is located on any portion of the Shopping Center other than Parcel A8 [*currently Applebee's*] which is adjacent to the land.

## WORLD GYM FITNESS CENTER

Landlord agrees that it will not enter into a lease or consent to the use and occupancy of any other space within the Shopping Center by a tenant, subtenant, assignee, licensee or concessionaire (collectively "Occupant") who will operate a men's and women's health club or fitness facility at the Shopping Center (the "Exclusive Use"). Notwithstanding anything to the contrary contained herein, the Exclusive Use shall not be applicable to: (i) the units occupied by tenants whose gross leasable floor area is 60,000 square feet or more, (ii) the occupant of any outparcel within the Shopping Center, (iii) any existing Shopping Center tenant whose lease, as of the date of this Lease, does not prohibit the subject premises to be used in violation of the Exclusive Use, or any of their successors, assigns or replacements, (iv) yoga studios, (v) martial arts centers, (vi) weight loss clinics or (vi) women's only fitness studios.

11802147.12

**EXHIBIT F**

Form of Landlord Lien Subordination

THIS AGREEMENT is made this ____ day of _____, 20__, by and between DDRM Largo Town Center LLC ("Landlord"), Maryland LC Ventures LLC, a Maryland limited liability company ("Tenant"), and _____ ("Lender").

WHEREAS, Landlord and Tenant have entered into a certain lease dated _____ (the "Lease") for the premises known as Unit 2 at Largo Town Center in the Upper Marlboro, Maryland, outlined in red on Exhibit "A" attached hereto and more particularly described in the Lease;

WHEREAS, Lender has agreed to extend secured financing accommodations ("Loan") to Tenant covering certain inventory/goods/equipment ("Property"), which Property is described on Exhibit "B" attached hereto and incorporated by reference herein and which Property is now or shall be located on the Premises; and

WHEREAS, Lender has required the execution of this Subordination as a condition precedent to extending the Loan to Tenant.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration the undersigned parties hereby agree as follows:

1. Landlord hereby subordinates its interest in the Property to the interest of Lender to the extent that Landlord now has or shall acquire a superior interest in said Property by virtue of the above-mentioned Lease. Anything to the contrary notwithstanding, this Subordination shall have no effect upon Landlord's right to obtain or enforce any judgment lien or any other lien which may attach against the Property subsequent to the perfection of Lender's security or other interest in the Property, nor upon any lien which may attach at any time against any property of Tenant which is not listed as Property herein.

2. All sums extended to Tenant by Lender for which this Agreement is required shall be invested by Tenant in inventory, goods and/or equipment (and any replacements thereto) to be used, consumed and/or located on the Premises, and for no other purpose. Lender and Tenant hereby acknowledge that in the event said sums are used for a purpose other than specifically provided for in this Paragraph, this Agreement shall, at Landlord's sole option, become null and void and of no further force and effect.

3. The Property shall remain personal property notwithstanding the manner or mode of its attachment to, or installation on, the Premises, and the Property shall not become fixtures.

4. In the event of a default by Tenant in the payment or performance of any of its Loan obligations to Lender, or in the event of termination of Tenant's right to occupy the Premises for any reason, and subject to the conditions set forth herein, Lender may remove all or any portion of the Property from the Premises. Lender shall give Landlord ten (10) days written notice (from receipt) prior to any removal of the Property, and Lender shall accomplish such removal so as to cause Landlord and any of Landlord's tenants the least possible inconvenience or interference to its/their business. Lender further agrees that in the event the Property has not been removed from the Premises (upon a default by Tenant of its obligations to Lender or upon termination of Tenant's right to occupy the Premises) within ten (10) days of Lender's receipt of written notice from Landlord directing removal, then Landlord may remove the Property and charge Lender for storage, repair and other costs of removal as a condition precedent to Lender's right to possession of the Property. In the event Lender fails to reimburse Landlord for any such removal, repair and storage charges, Landlord shall have the right to sell the Property to pay for such costs. During such time as Lender is removing Property from the Premises, Lender shall be liable for and shall pay to Landlord a sum equal to the rental (on a per diem basis) provided for in the Lease or the rental (on a per diem basis) last payable by Tenant in the event said Lease has been terminated. Nothing contained herein shall be deemed to grant Lender any possessory rights to the Premises nor shall anything herein be deemed as an attornment by Lender to Landlord as to any Lease obligations of Tenant. In the event Lender fails to remove the Property from the Premises or refuses to claim the Property from Landlord within thirty (30) days from the date of Landlord's notice to Lender directing removal, Lender shall be deemed to have abandoned the property and Landlord shall be

11802147.12

free to dispose of the Property in Landlord's sole and absolute discretion, and Tenant hereby waives all claims or rights to the Property.

5. Lender shall repair any and all damage to the Premises caused by such removal of the Property, and Landlord shall also be entitled to such security as shall be deemed adequate by Landlord to evidence and insure that any damage to the Premises shall be repaired. In the event Lender fails or refuses to repair any damage to the Premises caused by the removal of the Property, Landlord shall have the right, but not the obligation, to repair such damage and Lender shall reimburse Landlord all such costs and expenses immediately upon demand plus an additional fifteen percent (15%) of such cost for Landlord's administrative costs and expenses.

6. Lender shall indemnify and hold Landlord harmless from and against all actual loss, cost, expense and liability (including Landlord's cost of defending against the foregoing, such cost to include reasonable attorneys' fees) resulting or occurring by reason of Lender's removal of the Property from the Premises.

7. Landlord shall give Lender written notice of any default under or breach of the Lease which left uncured would cause a termination of the Lease by the Landlord. Any event of default by Tenant in the payment or performance of any of its Loan obligations to Lender for which Lender may be entitled to remove the Property from the Premises if left uncured shall be deemed to be an act of default under the terms and provisions of the Lease, and Lender agrees to provide Landlord with immediate written notice thereof. Should Lender fail to provide the within notice to Landlord, Lender shall not be entitled to proceed against Tenant or the Property until such time as Lender shall be in compliance with said notice requirements.

8. This Subordination shall continue in full force and effect until the earlier of (i) the date Tenant has fulfilled all of its obligations under the Loan or (ii) the date the term of the Lease shall expire or shall otherwise terminate.

9. Any notice or consent required to be given by or on behalf of either party to the other shall be given in writing and mailed by certified mail or by overnight courier service which provides a receipt, at the addresses below, or at such other address as may be specified, from time to time, by notice in the manner herein set forth. Notices shall be deemed given upon actual receipt or first rejection.

|  |  |
|---|---|
| Landlord: | DDRM Largo Town Center LLC<br>c/o Developers Diversified Realty Corporation<br>3300 Enterprise Parkway<br>Beachwood, Ohio 44122<br>Attn: Executive Vice President |
| With Copies To: | Developers Diversified Realty Corporation<br>3300 Enterprise Parkway<br>Beachwood, Ohio 44122<br>Attn: General Counsel |
| Tenant: | Maryland LC Ventures LLC<br>226 Crowne Woods Drive<br>Birmingham, Alabama 35224<br>Attention: Mark Williams |
| Lender: | _____<br>_____<br>_____ |

10. This Subordination shall inure to the benefit of and shall be binding upon the parties hereto, their heirs, administrators, successors and assigns.

11802147.12

# AFFIDAVIT

The undersigned has signed a lease dated ~~January 28~~ **2015**, ~~2014~~, with Maryland LC Ventures LLC, a Maryland limited liability company, for the occupancy of Unit No. 2, Largo Town Center in Upper Marlboro, Maryland. The Lease business terms were negotiated with Bennett Morrison as a representative of Landlord. Except as expressly provided in this Lease, (i) no representative, agent or employee of Landlord represented, suggested, promised or implied that the undersigned would be given an exclusive use in the Shopping Center for the operation of the business to be conducted in the Premises, or that Landlord would not lease space in the Shopping Center to a competing or other tenant, (ii) no representative, agent or employee of Landlord made any representations, inducements or promises about the Premises or the entry into the Lease, and (iii) no representative, agent or employee of Landlord made any representations, inducements or promises about the characteristics or conditions of or pertaining to the Premises or the Shopping Center. The undersigned has independently investigated the potential of the success of its operations in the Shopping Center and has not relied upon any representations, inducements or promises by Landlord's representatives, agents or employees, other than those contained in the Lease.

Dated this **15** day of **December**, 2014.

TENANT: Maryland LC Ventures LLC, a Maryland limited liability company

By: *Maryland LC Ventures LLC*
Name: *Richard Ruggiero*
Its: *VP Operations*

STATE OF **Maryland** )
                           )SS:
COUNTY OF **Anne Arundel** )

BEFORE ME, a Notary Public in and for said County and State, personally appeared **Richard Ruggiero**, known to me to be the **VP of Operations** of Maryland LC Ventures LLC, a Maryland limited liability company, the limited liability company which executed the foregoing instrument, who acknowledged that he/she did sign the foregoing instrument for and on behalf of said limited liability company, and that the same is his/her free act and deed as such officer and the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at **Gambrills**, **MD** this **15** day of **December**, 2014.

_____
Notary Public
My commission expires: **07/31/2016**

> MARLON J WOOLLERY
> Notary Public-Maryland
> Prince George's County
> My Commission Expires
> July 31, 2016

11802147.12

# AFFIDAVIT

The undersigned has signed a lease dated January 28, 2015, with Maryland LC Ventures LLC, a Maryland limited liability company, for the occupancy of Unit No. 2, Largo Town Center in Upper Marlboro, Maryland. The Lease business terms were negotiated with Bennett Morrison as a representative of Landlord. Except as expressly provided in this Lease, (i) no representative, agent or employee of Landlord represented, suggested, promised or implied that the undersigned would be given an exclusive use in the Shopping Center for the operation of the business to be conducted in the Premises, or that Landlord would not lease space in the Shopping Center to a competing or other tenant, (ii) no representative, agent or employee of Landlord made any representations, inducements or promises about the Premises or the entry into the Lease, and (iii) no representative, agent or employee of Landlord made any representations, inducements or promises about the characteristics or conditions of or pertaining to the Premises or the Shopping Center. The undersigned has independently investigated the potential of the success of its operations in the Shopping Center and has not relied upon any representations, inducements or promises by Landlord's representatives, agents or employees, other than those contained in the Lease.

Dated this 15th day of December, 2014.

TENANT: Maryland LC Ventures LLC, a Maryland limited liability company

By: *Wazir Kaisani*
Name: WAZIR ALI KAISANI
Its: V.P.

STATE OF Texas )
                )SS:
COUNTY OF Collin )

BEFORE ME, a Notary Public in and for said County and State, personally appeared Wazir Kaisani, known to me to be the Vice President of Maryland LC Ventures LLC, a Maryland limited liability company, the limited liability company which executed the foregoing instrument, who acknowledged that he/she did sign the foregoing instrument for and on behalf of said limited liability company, and that the same is his/her free act and deed as such officer and the free act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal at Allen, TX this 15th day of December, 2014.

*Rosa Hilda Escajeda*
Notary Public
My commission expires: 1-29-17

ROSA HILDA ESCAJEDA
My Commission Expires
January 29, 2017

11802147.12