# Exhibit A

DEED OF L E A S E
A G R E E M E N T

SHOPPING CENTER:      SILVER HILL PLAZA

DATE:      MARCH 7 _____, 2011

LANDLORD:      SILVER HILL II LLC

TENANT:      PG COUNTY PARTNERS, LLC

## TABLE OF CONTENTS

| Section | | Page |
|---|---|---|

| | | |
|---|---|---|
| 1. | BASIC LEASE INFORMATION | 1 |
| 2. | PREMISES AND THE SHOPPING CENTER | 4 |
| 3. | TERM | 5 |
| 4. | SECURITY DEPOSIT | 5 |
| 5. | PAYMENT OF RENT | 6 |
| 6. | EXPENSE OF COMMON AREAS | 6 |
| 7. | REAL ESTATE TAXES | 7 |
| 8. | [INTENTIONALLY OMITTED] | 8 |
| 9. | INSURANCE | 8 |
| 10. | UTILITIES | 9 |
| 11. | TENANT'S SIGNS | 10 |
| 12. | LANDLORD'S WORK | 11 |
| 13. | TENANT'S WORK | 11 |
| 14. | USE OF COMMON AREAS | 13 |
| 15. | OCCUPANCY AND OPERATING HOURS | 14 |
| 16. | [INTENTIONALLY OMITTED] | 14 |
| 17. | REPAIRS | 14 |
| 18. | ALTERATIONS BY TENANT | 15 |
| 19. | HAZARDOUS MATERIALS | 15 |
| 20. | EXTRA HAZARDS | 17 |
| 21. | MECHANIC'S LIENS | 17 |
| 22. | ADDITIONS AND FIXTURES | 17 |
| 23. | INSPECTION BY LANDLORD | 18 |
| 24. | COVENANT TO HOLD HARMLESS, WAIVER OF SUBROGATION | 18 |
| 25. | LIMITATION OF LANDLORD'S LIABILITY | 19 |
| 26. | CASUALTY | 20 |
| 27. | CONDEMNATION | 21 |
| 28. | DEFAULT AND REMEDIES | 21 |
| 29. | SUBORDINATION | 23 |
| 30. | RECORDATION | 23 |
| 31. | [INTENTIONALLY OMITTED] | 24 |
| 32. | ASSIGNMENT AND SUBLEASE | 24 |
| 33. | HOLDING OVER | 25 |
| 34. | SHOWING OF PREMISES | 26 |
| 35. | QUIET ENJOYMENT | 26 |
| 36. | ADDRESSES AND NOTICES | 26 |
| 37. | ESTOPPEL CERTIFICATES | 26 |
| 38. | MISCELLANEOUS | 27 |
| 39. | GUARANTY AGREEMENT | 29 |

ADDENDUM TO DEED OF LEASE AGREEMENT

EXHIBIT "A"    –    SITE PLAN OF SHOPPING CENTER AND PREMISES
EXHIBIT "B"    –    LANDLORD'S SIGN SPECIFICATIONS AND REGULATIONS
EXHIBIT "B-1"  –    APPROVED EXTERIOR SIGN SPECIFICATIONS
EXHIBIT "C"    –    DESCRIPTION OF LANDLORD'S WORK
EXHIBIT "D"    –    TENANT'S APPROVED PLANS
EXHIBIT "D-1"  –    TENANT'S MINIMUM BUILDOUT REQUIREMENTS
EXHIBIT "D-2"  –    GREASE GUARD SPECIFICATIONS
EXHIBIT "E"    –    USE OF PREMISES RESTRICTIONS
EXHIBIT "F"    –    RULES AND REGULATIONS
EXHIBIT "G"    –    LIST OF ENVIRONMENTAL REPORTS

GUARANTY AGREEMENT

DEED OF LEASE AGREEMENT

DATE: _MARCH 7_____, 2011

LANDLORD: SILVER HILL II LLC
1255 22nd Street, N.W., 6th Floor
Washington, DC 20037

TENANT: PG COUNTY PARTNERS, LLC, a Maryland limited liability company
P.O. Box 3353, Crofton, MD 21114

PREMISES: Silver Hill Plaza
5850 Silver Hill Road
Forestville, MD 20747

In consideration of the covenants contained herein, this Deed of Lease Agreement is made and shall be effective as of the date above written by and between Landlord and Tenant under the following terms, conditions, and provisions:

1. BASIC LEASE INFORMATION

The following Basic Lease Information is hereby incorporated into and made a part of this Lease. Each reference in this Lease to any information and definitions contained in the Basic Lease Information shall mean and refer to the information and definitions hereinafter set forth.

(a) Tenant's Trade Name: Little Caesars

(b) Premises: Approximately 2,200 square feet, located within the area of the Shopping Center cross-hatched or outlined on Exhibit "A" commonly known as Store No. 11.

(c) Original Term: Five (5) Lease Years.

(d) Option Term: Two (2) terms of five (5) Lease Years.

(e) Rent Commencement Date: The date on which Tenant opens for business in the Premises or, if earlier, the ninetieth (90th) day after the last to occur of the following: (A) the issuance of Tenant's Permits as defined in Section 13(c) hereof, (B) Landlord's delivery of the Premises to Tenant in the condition required in clause (i) of the second paragraph of Exhibit "C" attached hereto, or the date on which Landlord would have delivered the Premises in such condition but for any omission, delay, or default caused by Tenant, or (C) Landlord's approval of Tenant's Plans.

(f) Expiration Date: The last day of the Term, or the earlier date on which this Lease was terminated in accordance with the provisions hereof.

(g) Rental Deposit: None.

(h) Security Deposit: Three Thousand Seven Hundred Forty and 00/100 Dollars ($3,740.00).

(i) Minimum Rent:

Original Term

| Lease Years | Annually | Monthly |
|---|---|---|
| 1-5 | $34,100.00 | $2,841.67 |

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 4 of 67

First Option Term

| Lease Years | Annually | Monthly |
|---|---|---|
| 6-10 | $ 38,192.00 | $3,182.67 |

Second Option Term

| Lease Years | Annually | Monthly |
|---|---|---|
| 11-15 | $ 42,775.04 | $3,564.59 |

(j)    <u>Initial Monthly Operating Cost Estimate</u>: Five Hundred Twenty-Nine and 83/100 Dollars ($529.83).

(k)    <u>Initial Monthly Tax Estimate</u>: Three Hundred Sixty-Eight and 50/100 Dollars ($368.50).

(l)    [Intentionally Omitted]

(m)    [Intentionally Omitted]

(n)    <u>Tenant's Permitted Use</u>: The retail sale of pizza, beverages, Italian specialties, pasta, bread products, salads, sandwiches, dessert items, chicken wings, and, while the Premises are operated as a Little Caesar's restaurant, promotional items related to Little Caesars restaurants and other items typically sold in Little Caesars restaurants, and for no other purpose or use.

(o)    [Intentionally omitted]

(p)    <u>Landlord's Address for Rent Payments</u>:
Silver Hill II LLC
P.O. Box 402947-028
Atlanta, GA 30384-2947

(q)    <u>Landlord's Address for Notices</u>:
Silver Hill II LLC
c/o Combined Properties Incorporated
1255 22nd Street, N.W., 6th Floor
Washington, DC 20037
Attention: Legal Department
202-293-4500

(r)    <u>Tenant's Address For Notices</u>:
PG County Partners, LLC
1809 Harewood Lane
Crofton, Maryland 21114
c/o Richard Ruggiero
301-367-5208

(s)    <u>Broker</u>:
Karen Elsbury
KLNB Retail
5225 Wisconsin Avenue, NW, Suite 404
Washington, D.C. 20015

(t)    <u>Store Hours</u>: Monday through Friday 10:00 a.m. to 9:00 p.m.; Saturday 10:00 a.m. to 6:00 p.m.; Sunday 12:00 p.m. to 5:00 p.m. Notwithstanding the foregoing, while the Premises are operated as a Little Caesar's, the Store Hours may be, as elected by Tenant, (i) the standard store hours for the plurality of Little Caesars in the Washington, D.C. metropolitan area while at least ten (10) Little Caesars are open and operating in the Washington, D.C. metropolitan area or (ii) the standard

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 5 of 67

store hours for the plurality of Little Caesars nationally while at least ten (10) Little Caesars are open and operating nationally.

DEFINITIONS:

(u)  **Additional Rent**:  Any and all sums payable to Landlord by Tenant under this Lease, other than Minimum Rent.

(v)  **Business Day**:  A day other than a Saturday, Sunday, or holiday.

(w)  **Calendar Year**:  A period of twelve (12) full calendar months beginning on January 1 and ending on the following December 31.  If the Rent Commencement Date or Expiration Date occur on dates other than January 1 or December 31, respectively, any charges in this Lease which are to be calculated on the basis of a Calendar Year shall be calculated on a proportionate basis.

(x)  **Common Area Contribution**: Tenant's Proportionate Share of the Common Area Operating Cost as defined in Section 6(a) hereof during each Calendar Year.

(y)  **Common Area(s)**:  Any existing or future improvements, equipment, areas and/or spaces for the non-exclusive, common and joint use or benefit of Landlord, Tenant and other tenants, occupants and users of the Shopping Center.  The Common Areas include sidewalks, roofs, exterior walls (excluding storefronts), gutters and downspouts, parking areas, parking lot lighting, access roads, driveways, landscaped areas, service drives and service roads, traffic islands, loading and service areas, stairs, ramps, elevators, escalators, comfort and first aid stations, public washrooms, and other similar areas and improvements.

(z)  **Date of Delivery**:  The date upon which Landlord delivers possession of the Premises to Tenant.  Landlord shall deliver possession of the Premises to Tenant upon the mutual execution and delivery of this Agreement and Tenant's payment of the Security Deposit and submission of evidence of the insurance coverage required by Section 9 hereof.

(aa)  **Date of Lease**: The date designated as such on page 1 of this Lease.  On such date, all rights and obligations of the parties under this Lease shall commence.

(bb)  **Floor Area**:  When used with respect to the Premises, the number of square feet set forth in Section 1(b).  When used with respect to any other space in the Shopping Center, the number of leasable square feet on the first floor of such space as determined by Landlord.

(cc)  **Interest**:  A rate per annum being the lesser of (i) twelve percent (12%) or (ii) the maximum interest rate permitted by law.

(dd)  **Lease Year**:  The first Lease Year shall be the period commencing with the Rent Commencement Date and ending upon the expiration of twelve (12) full calendar months thereafter.  Commencing upon the expiration of twelve (12) full calendar months following the Rent Commencement Date, each Lease Year shall consist of consecutive twelve (12) full calendar month periods.

(ee)  **Mortgage**: Any and all mortgages, deeds of trust and other security instruments now or hereafter placed upon or affecting the Shopping Center or any portion thereof and all ground leases and other underlying leases from which Landlord's interest is derived.

(ff)  **Mortgagee**: The holder of any note or obligation secured by a Mortgage, including without limitation, any beneficiary under a deed of trust and lessors under ground leases.

(gg)  [Intentionally Omitted]

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 6 of 67

(hh) <u>Person:</u>  An individual, firm, partnership, association, limited liability company, corporation, or any other entity.

(ii) <u>Plan Delivery Date:</u>  The thirtieth (30th) day after the Date of Lease.  Landlord acknowledges that it has received Tenant's Plans as of February 4, 2010.

(jj) <u>Real Estate Taxes:</u> All governmental or quasi-governmental real estate taxes, fees, charges and assessments (whether general or special) levied or assessed against the Shopping Center and the underlying land and improvements situated thereon including any sewer taxes, front-foot benefit charges, tax or license fees, school taxes, and rental occupancy and gross receipt taxes, together with the cost of appealing or otherwise challenging any tax assessment levied against the Shopping Center.  The term "Taxes" shall not include any income, inheritance, gift, franchise, corporate, gross receipts, capital levy, single business, or estate tax, or any interest and penalties as a result of Landlord's failure to timely pay said Taxes.  It shall also not include taxes on any adjacent or contiguous land owned by Landlord or its affiliates outside the boundaries of the Shopping Center.  Special assessments, if any, shall be spread across as long of a period as is allowed by the taxing authority.

(kk) <u>Rent:</u>  Minimum Rent plus Additional Rent.

(ll) <u>Shopping Center:</u>  The shopping center commonly known as Silver Hill Plaza, as shown on <u>Exhibit "A,"</u> as the same may be modified from time to time.

(mm) <u>Tax Rent:</u> Tenant's Proportionate Share of Real Estate Taxes during each Tax Year.

(nn) <u>Tax Year:</u>  A Twelve (12)-month period established by Landlord as the year for purposes of computing Tax Rent.  The Tax Year may or may not coincide with the period designated as the tax year by the taxing authorities having jurisdiction over the Shopping Center.

(oo) <u>Tenant's Proportionate Share:</u>  A fraction, the numerator of which is the Floor Area of the Premises and the denominator of which is the total Floor Area of the Shopping Center; <u>provided</u>, <u>however</u>, that if any tenant in the Shopping Center pays real estate taxes pursuant to a separate tax assessment of its premises, maintains its own  parcel, or insures its own building, then such tenant's premises shall not be included in the total Floor Area of the Shopping Center for purposes of computing Tenant's Proportionate Share.

(pp) <u>Term:</u>  The Original Term and, if the option(s) contained in <u>Section 3(b)</u>, if any, is (are) properly exercised by Tenant, the Option Term(s).

2.   <u>PREMISES AND THE SHOPPING CENTER</u>

(a)     Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises for the Term and upon the terms and conditions set forth herein.  The Premises shall include any loading dock designated exclusively for Tenant's use.  Landlord has the exclusive right to use the roof of the Shopping Center and the exterior faces of the exterior walls of the Premises (excluding Tenant's storefront), <u>provided</u> that such use does not interfere with or prohibit the placement of Tenant's exterior sign(s) permitted in accordance with <u>Section 11</u> and <u>Exhibit "B"</u> of this Lease.  Landlord reserves the right to place in, under, over or through the Premises, pipes, wires, conduits, lines, vents, ducts, and mechanical equipment serving other parts of the Shopping Center, <u>provided</u> that such right is exercised in a manner which does not unreasonably interfere with Tenant's conduct of its business at the Premises.

(b)     <u>Exhibit "A"</u> sets forth the general layout of the Shopping Center.  <u>Exhibit "A"</u> shall not be deemed Landlord's representation or agreement that all or any part of the Shopping Center is, will be, or will continue to be, configured as indicated therein.  Landlord reserves the right to determine all tenancies in the Shopping Center, and Tenant does not rely on, nor does Landlord represent, the tenancy of any specific tenant(s).  Landlord reserves the right to change, at any time and from time to time, the name of the Shopping Center.

(c)     Landlord shall have the right, at any time to (i) make alterations or additions to, or demolish all or any part of, the Shopping Center; (ii) build other buildings or improvements in or about the Shopping Center; and (iii) convey to others or withdraw portions of the Shopping Center, provided that any such changes do not materially adversely affect ingress to, egress from, or access to the Premises.

(d)     If Landlord renovates or remodels the front exterior of the Premises or the Shopping Center, Tenant agrees at its sole risk and expense: (i) upon request of Landlord, to remove its then existing signs to facilitate the remodeling work; (ii) upon direction of Landlord, to re-install signs as appropriate under the new criteria and consistent with such exterior remodeling; (iii) replace Tenant's storefront if such replacements are part of Landlord's renovation plans and (iv) otherwise to cooperate with Landlord to facilitate such renovation and remodeling. Tenant consents to the performance of all work deemed appropriate by Landlord to accomplish any of the foregoing, and to any inconvenience or disruption caused thereby, provided that such work does not materially adversely affect ingress to, egress from or access to the Premises.

(e)     Tenant shall not use or penetrate the roof for any purpose without first obtaining Landlord's written consent, and, upon obtaining such consent, Tenant agrees that any such work shall be performed by Landlord's roofing contractor at Tenant's sole expense. Landlord may at any time relocate any of the equipment serving the Premises which is located on the roof of the Shopping Center, provided that such relocation does not materially adversely interfere with Tenant's use and occupancy of the Premises.

3.     TERM

(a)     The Term shall commence on the Rent Commencement Date and end on the Expiration Date. Upon the Expiration Date, Tenant shall quit and surrender to Landlord the Premises including all keys, broom-clean, in good order and condition, ordinary wear and tear excepted. If requested by Landlord, Tenant shall execute an agreement confirming the Rent Commencement Date and Expiration Date of this Lease. If Tenant shall fail to execute such agreement within ten (10) days after receipt of such agreement from Landlord, the Rent Commencement Date and Expiration Date shall be conclusively deemed to be those dates as set forth by Landlord in such agreement.

(b)     If Tenant is not in Default hereunder beyond any applicable notice and cure period and Tenant is operating a business in the Premises in accordance with Tenant's Permitted Use, then Tenant shall have the option to renew this Lease for the Option Terms commencing at the expiration of the Original Term or the Option Term, whichever the case may be. Said option must be exercised by Tenant and received by Landlord at least nine (9) months and not more than twelve (12) months prior to the expiration of the Original Term or Option Term, whichever the case may be, by written notice sent by certified mail or reputable express courier service to Landlord at Landlord's Address for Notices. All of the terms and conditions of this Lease shall remain in full force and effect during the Option Terms, except that Minimum Rent shall be in the amount set forth in Section 1 of this Lease for the applicable Option Term. Should Tenant fail to exercise such option by timely notice, any such option shall lapse and be of no further force or effect.

4.     SECURITY DEPOSIT

Tenant shall deposit with Landlord in advance upon Tenant's execution of this Lease, for Landlord's general account, the Security Deposit as security for the performance of each and every term, covenant, agreement, and condition of this Lease to be performed by Tenant. Landlord may use, apply on Tenant's behalf or retain (without liability for interest) during the Term all or any part of the Security Deposit to the extent required for the payment of any Rent which may be owed hereunder, or for any sum which Landlord may expend to cure any Default of Tenant. After each application from the Security Deposit, Tenant shall, within five (5) days following notice from Landlord, restore the Security Deposit to the amount set forth in Section 1 of this Lease. The use, application or retention of the Security Deposit by Landlord shall not be deemed a limitation on Landlord's recovery in any case, or a waiver by Landlord of any Default, nor shall it prevent Landlord from exercising any other right or remedy for a Default by Tenant. If Tenant has complied with all of the terms, covenants, agreements, and conditions of this

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 8 of 67

Lease, the Security Deposit (less any amount applied as herein provided) shall be returned to Tenant without interest within forty-five (45) days after the Expiration Date and after surrender of possession of the Premises to Landlord in accordance with the terms of this Lease.

5.   PAYMENT OF RENT

   (a)   Tenant shall pay to Landlord the Minimum Rent in equal monthly installments, in advance, commencing on the Rent Commencement Date, and on the first day of each calendar month thereafter throughout the Term; provided, however, that Tenant shall pay to Landlord at the time of execution of this Lease the Rental Deposit, for Landlord's general account, which shall be credited by Landlord against Tenant's Rent obligations coming due immediately after the Rent Commencement Date.

   (b)   Tenant shall pay all Rent to Landlord, without prior notice or demand and, except as otherwise expressly permitted in this Lease, without setoff, offset, deduction or counterclaim whatsoever, in the amounts, at the rates and times set forth herein, and at such place as is provided in Section 1 of this Lease, or at such other place as Landlord may from time to time designate by notice to Tenant.

   (c)   If Tenant fails to make any payment of Rent within ten (10) days from the date that such Rent is due, Tenant shall pay a late charge equal to the greater of one hundred dollars ($100.00) or five percent (5%) of such delinquent Rent. Payment of such late charge shall not excuse or waive the late payment of Rent. Tenant acknowledges and agrees that such late charge is a reasonable estimate of the damages as a result of Tenant's violation of this Section 5 and that it would be impracticable or extremely difficult to determine Landlord's actual damages.

   (d)   If Landlord receives two (2) or more checks from Tenant that are dishonored by Tenant's bank, all checks for Rent thereafter shall be bank certified and Landlord shall not be required to accept checks except in such form. Tenant shall pay to Landlord any bank service charges resulting from dishonored checks, plus Fifty Dollars ($50.00) for each dishonored check as compensation Landlord for the additional cost of processing such check.

   (e)   Any payment by Tenant of less than the total Rent due shall be treated as a payment on account. Acceptance, negotiation and deposit of any check bearing an endorsement, or accompanied by a letter stating that such amount constitutes "payment in full" (or terms of similar import) shall not be, and Tenant hereby waives any claim or defense based on, an accord and satisfaction or a novation, and such statement shall be given no effect. Landlord may accept any check without prejudice to any rights or remedies which Landlord may have against Tenant.

   (f)   For any portion of a calendar month at the beginning of the Term, Tenant shall pay in advance the pro-rated amount of the Rent for each day included in such portion of the month.

6.   EXPENSE OF COMMON AREAS

   (a)   "Common Area Operating Cost" shall mean the total cost and expense incurred in equipping, maintaining, managing, operating, cleaning, lighting, repairing and replacing the Common Areas, specifically including but not limited to the cost of (i) removal of snow, ice, garbage, trash and debris from the driveways, alleyways, parking areas and sidewalks of the Shopping Center, (ii) maintaining, repairing, replacing, cleaning, repaving and re-striping the sidewalks and parking areas of the Shopping Center, (iii) lighting the Common Areas of the Shopping Center (including maintaining, repairing and replacing lighting standards), (iv) providing and maintaining landscaping, (v) periodic repainting and repairs of exterior walls, fascias and parapets of the buildings in the Shopping Center, (vi) maintaining, repairing and replacing roofs of the building in the Shopping Center, (vii) all utilities relating to the Common Areas, (viii) all premiums, fees and other charges for insurance applicable to the Shopping Center, (ix) providing security services (if any) with respect to the Common Areas, (x) providing and maintaining Shopping Center identification signs, (xi) all machinery and equipment used to maintain, repair and operate the Common Areas of the Shopping Center, (xii) operating, equipping, upgrading, maintaining, repairing and replacing utility lines and systems which do not exclusively serve one tenant, storm and sanitary drainage systems, sprinkler systems, directional signs, markers and other traffic regulation control signs and devices, (xiii) employing personnel to implement the operation, maintenance, repair and replacement of the Common Areas,

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 9 of 67

including the salaries, benefits and insurance costs of such personnel (provided, however, that where personnel is employed less than full-time for the Shopping Center, salaries will be appropriately apportioned), (xiv) seasonal decorations, (xv) management fees paid by Landlord to any management companies for the management of the Shopping Center (subject to the provisions of Section 6(c) below), and (xvi) an administrative charge equal to fifteen percent (15%) of the total of all costs and expenses included in Common Area Operating Cost.

(b)     Tenant shall pay to Landlord Tenant's Common Area Contribution in equal monthly installments ("Operating Cost Estimates") in such amounts as Landlord estimates from time to time, with the first installment being due on the Rent Commencement Date and each succeeding installment being due on the first day of each calendar month thereafter. The initial Operating Cost Estimate and all succeeding installments thereof shall be in the amount set forth in Section 1 of this Lease until Landlord issues a notice of change to Tenant. After the end of each Calendar Year, Landlord shall send to Tenant a statement (which may be sent by first class U.S. Mail, postage prepaid) setting forth the amount of Tenant's Common Area Contribution for the Calendar Year in question, Landlord's standard categorized line item breakdown of the Common Area Operating Cost, and the sum of the Operating Cost Estimates due and payable by Tenant during such Calendar Year. If Tenant does not notify Landlord in writing of any objection to such statement within sixty (60) days after receipt, then Tenant shall be deemed to have waived such objection. Nothing herein contained shall be deemed to relieve Tenant at any time of its obligation to pay Tenant's Common Area Contribution at the times and in the manner herein designated for such payment. If the amount of Tenant's Common Area Contribution exceeds the sum of the Operating Cost Estimates paid by Tenant for such period, Tenant shall pay Landlord the difference within fifteen (15) days after receiving such statement, provided, however, that if the difference exceeds Five Thousand and No/100 Dollars ($5,000.00), Tenant may, upon written notice, elect to pay the difference in equal monthly installments, together with its then-current Common Area Contribution, over a six (6)-month period commencing on the first day of the month following the month in which a lump-sum payment of the difference otherwise would be due. If the sum of the Operating Cost Estimates paid by Tenant for such period exceeds Tenant's Common Area Contribution for such period, Landlord shall credit the difference toward the Operating Cost Estimate payment(s) next due and, at the end of the Term, refund any excess amount of Operating Cost Estimates paid by Tenant, less the amount of any moneys owed to Landlord by Tenant.

(c)     Tenant agrees to pay to Landlord, for each Lease Year during the Term, for management fees incurred by Landlord in managing the Shopping Center a management fee ("Management Fee") calculated on the basis of three percent (3%) of the annual Minimum Rent that Tenant is obligated to pay to Landlord, notwithstanding any rent abatement or rent credit that might otherwise be due Tenant. The Management Fee shall be in lieu of, and not in addition to, Tenant's Proportionate Share of the management fees described in item (xv) of Section 6(a) hereof. The Management Fee for the first Lease Year shall be One Thousand Twenty-Three and 00/100 Dollars ($1,023.00) annually, payable in equal monthly installments of Eighty-Five and 25/100 Dollars ($85.25) on the first day of each month (commencing with the Rent Commencement Date), in advance, along with Tenant's payment of Minimum Rent. Subsequent increases in the amount of the Management Fee shall correspond with the scheduled increases in Minimum Rent as set forth in Section 1 hereof.

7.     REAL ESTATE TAXES

(a)     Tenant shall pay to Landlord Tax Rent in such equal monthly installments ("Tax Estimates") in such amounts as Landlord estimates from time to time, with the first installment being due on the Rent Commencement Date and each succeeding installment being due on the first day of each calendar month thereafter. The initial Tax Estimate and all succeeding installments shall be in the amount set forth in Section 1 of this Lease, until Landlord issues a notice of change to Tenant. After the end of each Tax Year, Landlord shall send Tenant a statement (which may be sent by first class U.S. Mail, postage prepaid) setting forth the amount of the Tax Rent and the sum of the Tax Estimates due and payable by Tenant for such Tax Year. If the amount of the Tax Rent for such period exceeds the total of the Tax Estimates paid by Tenant, Tenant shall pay the difference to Landlord within fifteen (15) days after receipt of such statement, provided, however, that if the difference exceeds Five Thousand and No/100 Dollars ($5,000.00), Tenant may, upon written notice, elect to pay the difference in equal monthly installments, together with its then-current Tax Estimates, over a six (6)-month period commencing on the first day of the month following the month in which a lump-sum payment of

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 10 of 67

the difference otherwise would be due. If the total of the Tax Estimates paid by Tenant for such period exceeds the Tax Rent for such period, Landlord shall credit the difference toward the Tax Estimates next due and, at the end of the Term, refund any excess amount of Tax Rent paid by Tenant, less the amount of any moneys owed to Landlord by Tenant.

(b)     Tenant shall pay all governmental taxes, charges, fees, and assessments applicable to Tenant's Property and Tenant's Rent obligation before they become delinquent. If there is presently in effect or hereafter adopted any nature of sales tax or use tax or other tax on rents or other sums received by Landlord under this Lease ("Rent Sales Tax"), then in addition to all Rent and other payments to be made by Tenant as provided above, Tenant will also pay Landlord a sum equal to the amount of such Rent Sales Tax. The term "Rent Sales Tax" shall not include any income taxes applicable to Landlord.

(c)     In the event that subsequent to Tenant's payment, the amount of Real Estate Taxes of which Tenant paid Tenant's Proportionate Share is reduced, Landlord agrees to refund to Tenant's Proportionate Share of any reduction, less any expenses incurred by Landlord in pursuing the reduction; provided, however, that nothing contained herein shall be deemed to relieve Tenant at any time of its obligation to pay Tax Rent at the times and in the manner set forth herein.

8.     [INTENTIONALLY OMITTED]

9.     INSURANCE

(a)     Landlord, at its cost and expense, but subject to reimbursement as part of Common Area Operating Cost, shall obtain and maintain throughout the Term the following policies of property damage insurance:

(i)     all risk or Special Form insurance for the Shopping Center with a replacement cost endorsement, in an amount equal to 100% of the full replacement cost of the buildings composing the Shopping Center exclusive of the cost of foundations, excavations, and footings below grade, and without any deduction being made for depreciation;

(ii)     at Landlord's option, rental income insurance against loss of rent caused by the perils insured against in the policy referred to in Section 9(a)(i); and

(iii)     such other policies of insurance and in such amounts as may from time to time be reasonably required by Landlord or Landlord's Mortgagee covering other insurable perils which at the time are customarily insured against in the case of comparable shopping centers in the jurisdiction in which the Shopping Center is located.

Landlord shall not be required to carry insurance of any kind on Tenant's Property and the plate glass and floor and wall coverings in the Premises, and shall not be obligated to repair or replace such property should damage occur.

(b)     Landlord, at Landlord's cost and expense, but subject to reimbursement as part of Common Area Operating Cost, shall obtain and maintain in effect throughout the Term a policy or policies of Commercial General Liability Insurance (ISO form or equivalent) for bodily injury, death and property damage occurring upon or in the Shopping Center, with such policy to afford protection to the limit of not less than $3,000,000 annual aggregate for bodily injury, death and property damage.

(c)     Tenant, at its sole cost and expense, shall obtain and maintain in effect throughout the Term a policy or policies of all risk or Special Form insurance (including earthquake sprinkler coverage, if applicable) on Tenant's Property and the floor and wall coverings in the Premises, in an amount equal to 100% of the full replacement cost of Tenant's Property and the floor and wall coverings in the Premises, without deduction being made for depreciation.

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 11 of 67

(d)     Tenant, at its sole cost and expense, shall obtain and maintain in effect throughout the Term, a policy or policies of Commercial General Liability Insurance, including products and completed operations coverage, with a combined single limit of $1,000,000 per occurrence and $2,000,000 in the aggregate, naming Landlord, Landlord's Managing Agent, and Landlord's Mortgagee as additional insureds thereunder. Tenant shall also obtain, pay for, and maintain with respect to the Premises an umbrella excess liability policy in an amount not less than $1,000,000 excess over said primary Commercial General Liability policy.

(e)     Tenant, at its sole cost and expense, shall obtain and maintain in effect throughout the Term, plate glass insurance covering all of the plate glass in the Premises. Tenant shall be liable for the repair and restoration of all such plate glass.

(f)     The insurance policies required by this section to be obtained by Landlord and Tenant shall be issued by insurance companies of recognized responsibility licensed to do business in the jurisdiction in which the Shopping Center is located which are rated "A" or better (and are in a Financial Size Category of Class VIII or higher) by *Best's Key Rating Guide* or which have an equivalent financial rating from a comparable insurance rating organization. All policies of liability insurance required by this section shall be issued on an "occurrence" basis and shall be written as primary policy coverage (or may be satisfied by maintaining a policy of primary insurance and a policy or policies of excess liability insurance). Neither the issuance of any insurance policy required under this Lease nor the minimum limits of liability specified in this Lease shall be deemed to limit or restrict in any way the insuring party's liability under this Lease.

(g)     Tenant shall deliver to Landlord a certificate of insurance for the liability insurance required to be obtained by Tenant pursuant to Section 9(d) on or before the Date of Delivery and prior to the expiration of any expiring certificate previously furnished. Each liability insurance policy required to be carried hereunder by Tenant shall provide (and any certificate evidencing the existence of each such liability insurance policy shall certify) that such insurance policy shall not be canceled or materially reduced in coverage unless Landlord shall have received at least thirty (30) days' prior written notice of such cancellation or reduction in coverage.

(h)     Landlord and Tenant each shall have the right to comply with and to satisfy its obligations under this Section by means of any so-called blanket policy or policies of insurance covering this and other liabilities and locations of Landlord or Tenant, provided that (i) Landlord's and Tenant's policy or policies of property damage insurance by the terms thereof shall allocate to the buildings comprising the Shopping Center and Tenant's Property, as the case may be, an amount not less than the amount of insurance required to be carried pursuant to Sections 9(a) or 9(c), so that the proceeds from such insurance shall not be less than the amount of proceeds that would be available if Landlord or Tenant were insured under a single policy, and (ii) the aggregate limits under any liability insurance policies shall equal or exceed those required elsewhere in this Section 9.

(i)     If Tenant sells, serves, or distributes alcoholic beverages in or on the Premises, then Tenant's Commercial General Liability Insurance shall include, at the same limits of liability designated above, Liquor Legal Liability coverage, if available.

10.     UTILITIES

(a)     Commencing on the Date of Delivery, Tenant shall pay, when due, all charges for water, sewer, electricity, gas, telephone service and other utilities supplied to the Premises. Tenant shall place all utility meters in its name for billing purposes with the appropriate utility companies within five (5) Business Days of the Date of Delivery, but in all events, prior to the commencement of any of Tenant's Work in the Premises. If Landlord is required or elects to supply water, gas, electricity, heat, sewer rentals or service charges, or any other utility service, for the Shopping Center and/or the Premises, then Tenant agrees to purchase same from Landlord at the then prevailing local rates and charges, and to pay promptly the charges therefor when bills are rendered to Tenant. Tenant shall use reasonable diligence in conservation of such utilities.

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 12 of 67

(b)     If any such utilities are not separately metered or assessed, then in addition to Tenant's payment of separately metered charges, Tenant shall pay to Landlord Tenant's Proportionate Share of the charges for non-separately metered utilities, which shall be calculated by multiplying the utility charges for such utilities by a fraction, the numerator of which is the Floor Area of the Premises and the denominator of which is the Floor Area of those tenants using such utilities. At any time Landlord may, at Landlord's option, install submeters. If Landlord does so, Tenant shall pay to Landlord the submetered utility charges (along with Tenant's Proportionate Share of any meter reading charges incurred by Landlord) on the first day of each calendar month, provided that such utility charges shall not exceed the rates Tenant would be charged if billed directly for the same services by the utility company.

(c)     Landlord shall not be liable to Tenant in damages or otherwise for the quality, quantity, failure, unavailability or disruption of any utility service and the same shall not constitute a termination of this Lease, or an actual or constructive eviction of Tenant, or entitle Tenant to any abatement of Rent. Notwithstanding the foregoing, if a utility service to the Premises is interrupted due to the negligence or intentionally wrongful actions of Landlord or its agents, employees, and/or contractors, the service is not restored within three (3) Business Days after Tenant notifies Landlord of the interruption, and Tenant is unable to operate its business in the Premises due to the interruption, then as Tenant's sole remedy therefor Minimum Rent shall abate during the period commencing on the expiration of said three (3)-Business-Day period and expiring on the date that the interruption no longer prevents Tenant from operating its business in the Premises.

(d)     Landlord may at any time alter any utility, and related equipment, serving the Shopping Center, provided that such alteration does not materially interrupt service to the Premises and does not unreasonably interfere with Tenant's business operations within the Premises.

11.     TENANT'S SIGNS

(a)     In order to obtain a harmonious appearance in the Shopping Center, Landlord has established specifications and regulations for exterior signs which are attached hereto as Exhibit "B." All of Tenant's exterior signs shall conform to and be in accordance with the terms and provisions of Exhibit "B."

(b)     Tenant shall install prior to opening for business in the Premises an exterior sign(s) above Tenant's storefront and within thirty (30) days after opening for business in the Premises an exterior under-canopy sign in front of Tenant's storefront in areas designated by Landlord. Tenant shall submit to Landlord reasonably detailed drawings of all proposed signs for review and approval by Landlord prior to installation or utilization of the signs, which approval shall not be unreasonably withheld, provided that Tenant's sign drawings conform to Exhibit "B" and are in compliance with governmental codes. In addition, while the Premises are operated as a Little Caesars, Landlord shall not withhold its approval of signs, in locations permitted by this Lease, that are consistent with Little Caesars' national trade dress or signage program, including without limitation trademarked colors, letters, and logos, so long as they conform to Exhibit "B" and comply with applicable law. The design and installation of Tenant's signs shall be a part of Tenant's Work and subject to the provisions of Section 13 and Exhibit "B" and "D" of this Lease. All sign permits which are required for any such signs shall be obtained and paid for by Tenant. Landlord hereby approves Tenant's proposed exterior signage design and specifications as set forth in Exhibit "B-1."

(c)     Tenant's storefront sign(s) shall be kept illuminated at a minimum during the hours from dusk until dawn, seven days per week, and in any case, at all other times Tenant is open for business. Tenant shall be responsible for all utility charges necessary to illuminate its sign(s).

(d)     Except as approved by Landlord in writing, Tenant shall not maintain or display any sign, lettering or lights on the exterior of the Premises or on the interior or exterior surfaces of windows of the Premises. Hand lettered signs and flashing signs visible from the Common

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 13 of 67

Areas are prohibited. Any signs within five (5) feet behind the storefront of the Premises, or within any display window space, must comply with the following criteria: (a) the signs are (i) professionally designed and manufactured; and (ii) used in substantially all of Tenant's (and its affiliates') stores operating under the Tenant's Trade Name; (b) the signs do not flash, blink or otherwise light in an alternate fashion; (c) the signs do not individually exceed two (2) feet by three (3) feet in size, or in the aggregate exceed more than one-third (1/3) of the glass portion of the storefront; and (d) the signs are not taped or affixed to the glass of the storefront windows or doors;  provided, however, that Tenant may install professionally prepared store hour signs and credit card decals on the inside of the windows and doors of the Premises, subject to Landlord's approval, which approval shall not be unreasonably withheld. In addition, while the Premises are operated as a Little Caesars, Tenant may display in the Premises' storefront windows, without Landlord's approval, professionally-prepared, unlit window signs approved by Franchisor, as defined in Section 32(e) hereof, for display in all Little Caesars restaurants in the region containing the Premises so long as they do not in the aggregate, together with all other window signs, exceed more than one-third (1/3) of the glass portion of the Premises' storefront.

(e)     All of Tenant's signs shall be maintained by Tenant at all times in first class condition, operating order and repair. Tenant shall repair any signs that have been damaged within five (5) days after such damage occurs. If Tenant fails to repair any of its signs as specified above, and such failure continues for a period of three (3) Business Days following receipt of notice from Landlord, Landlord shall have the right to make such repairs at Tenant's sole cost and expense, provided, however, that Landlord's right to repair Tenant's signs shall be a remedy in addition to those provided to Landlord upon Tenant's Default pursuant to Section 28 hereof, and Tenant shall not be deemed in Default within the meaning of Section 28 for a violation of this Section 11(e) until Landlord has complied with the provisions of said Section 28 and Tenant has had the benefit of any applicable cure period contained therein.

12.     LANDLORD'S WORK

Landlord shall, at Landlord's sole cost and expense, provide the work and installations set forth in Exhibit "C" hereof ("Landlord's Work"). Except for Landlord's Work, Tenant acknowledges: (i) it has inspected the Premises; (ii) it accepts the Premises, and all improvements, betterments and equipment "AS IS," with no representation or warranty by Landlord as to the condition or suitability of the Premises or of the Shopping Center for Tenant's purpose; and (iii) Landlord has no obligation to improve or repair the Premises, or the Shopping Center, except as specifically set forth in this Lease. Tenant shall cooperate with Landlord, and coordinate Tenant's activities with those of Landlord, in connection with the performance of Landlord's Work, including without limitation moving Tenant's property and equipment as reasonably requested by Landlord and rescheduling Tenant's Work to avoid conflicts.

13.     TENANT'S WORK

(a)     Tenant shall, at a minimum, at Tenant's sole cost and expense, make all interior improvements, installations, fixturing, and alterations to the Premises (over and above Landlord's Work, if any) as necessary to cause them to comply with applicable law, to place them in a first-class, modern, and attractive condition, consistent with the requirements of Franchisor for new Little Caesars restaurants, and to enable Tenant to properly use them for Tenant's Permitted Use, and shall include without limitation the work and installations set forth in Exhibit "D-1," all of such improvements being hereinafter referred to collectively as "Tenant's Work."

(b)     All of Tenant's Work shall be performed by Tenant in accordance with detailed plans and specifications, to be prepared by Tenant's architect and provided to Landlord in one (1) set of blue line plans and a cad disk, including Tenant's material sample board ("Tenant's Plans"), all of which shall be submitted to Landlord on or before the Plan Delivery Date, for Landlord's written approval (as to both to design and materials) which approval shall not be withheld unreasonably. Tenant shall diligently seek Landlord's approval of Tenant's Plans. If Landlord does not approve, reject, or otherwise respond in writing to Tenant's submission of Tenant's Plans within twenty (20) days following the date of Landlord's initial receipt thereof (or within twenty (20) days following Landlord's receipt of any subsequent revisions thereto, or within ten (10) days after the Date of Lease for submissions received before then), then Tenant's

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 14 of 67

Plans (including any revisions thereof as may have been submitted to Landlord) shall be deemed approved by Landlord. If Landlord disapproves Tenant's Plans, Tenant shall incorporate Landlord's comments into Tenant's Plans within ten (10) days from receipt thereof and resubmit the same to Landlord, who shall have ten (10) days to approve or disapprove Tenant's Plans as revised. If Landlord does not approve the same, the procedures set forth herein shall be followed until such time as Landlord has approved Tenant's Plans as revised. If Landlord does not approve Tenant's Plans within ninety (90) days after the Date of Lease, then until Landlord does so either party may terminate this Lease upon ten (10) days' written notice, provided that this Lease shall not terminate if Landlord approves Tenant's Plans within the ten (10)-day termination notice period. Landlord's approval, if any, of Tenant's Plans shall not in any way be construed or operate to bind Landlord or to constitute a representation or warranty of Landlord as to the adequacy or sufficiency of Tenant's Plans, or the improvements to which they relate, for any reason, purpose, or condition, but such approval shall merely be the consent of Landlord, as may be required hereunder, in connection with performance of Tenant's Work in accordance with Tenant's Plans. When Landlord has approved Tenant's Plans, Landlord shall initial and return one (1) set thereof to Tenant and the same shall be made a part hereof. TENANT SHALL NOT COMMENCE ANY OF TENANT'S WORK UNLESS AND UNTIL ANY REQUIRED BUILDING PERMITS HAVE BEEN ISSUED BY THE APPLICABLE LOCAL GOVERNMENTAL AUTHORITIES, PROVIDED, HOWEVER THAT TENANT MAY PERFORM GENERAL CLEANING AND OTHER PRE-CONSTRUCTION ACTIVITIES. No changes of materials or finishes shall be permitted after final approval by Landlord of Tenant's Plans unless approved in writing by Landlord.

(c)     Within ten (10) Business Days following Tenant's receipt of Landlord's approval of Tenant's Plans, Tenant shall apply for all governmental licenses, permits and approvals required to perform Tenant's Work (collectively "Tenant's Permits") and thereafter diligently and continuously pursue their issuance. For purposes hereof, "diligently pursue" shall include without limitation payment of all fees and charges, providing all requested information and data to the applicable governmental agencies in a timely manner, and otherwise cooperating with such agencies in an expeditious manner.

(d)     Tenant shall commence construction of Tenant's Work in the Premises not later than ten (10) Business Days after whichever of the following shall be the later to occur: (i) the date of receipt by Tenant of Landlord's approval of Tenant's Plans; (ii) the date of issuance of Tenant's Permits; and (iii) the Date of Delivery. In no event shall Tenant commence Tenant's Work without first obtaining all of Tenant's Permits. When Tenant's building permit is issued, Tenant shall promptly give a copy to Landlord. Tenant shall provide to Landlord evidence of all insurance coverage required hereby prior to the date of commencement of Tenant's Work and Tenant shall diligently pursue all of Tenant's Work to completion. Promptly following the completion of Tenant's Work, Tenant shall deliver to Landlord a copy of Tenant's certificate of occupancy or local equivalent.

(e)     If Tenant does not obtain Tenant's Permits within one hundred twenty (120) days after Landlord's approval of Tenant's Plans ("Tenant's Permit Period"), then so long as Tenant has diligently pursued Tenant's Permits at all times, Tenant may, upon written notice to Landlord given within the one (1)-week period before the expiration of Tenant's Permit Period, extend Tenant's Permit Period a single time by thirty (30) days. If Tenant does not obtain Tenant's Permits within Tenant's Permit Period, as it may be so extended, then until it does so Landlord may, in its sole discretion, seek, on behalf of Tenant, procurement of all of Tenant's Permits, at Tenant's sole cost and expense (including without limitation reasonable attorneys' fees). If Tenant or Landlord, as the case may be, does not obtain all of Tenant's Permits within one hundred twenty (120) days after the expiration of Tenant's Permit Period, plus the above-described extension if applicable, then until they are obtained either party, by written notice to the other, may terminate this Lease; provided, however, that notice of termination by a party who has not acted reasonably and in good faith in accordance with this Lease or is otherwise in default under this Lease shall be null and void.

(f)     Landlord and Tenant understand and agree that except as otherwise specifically provided herein, any work required in order for Tenant to open and operate its business from the Premises shall be performed and paid for entirely by Tenant. Landlord undertakes no responsibility for the performance and/or payment of any costs of Tenant's Work; provided, however, that if Tenant fails to timely perform Tenant's Work in accordance with the further

terms and provisions of this Lease, Landlord shall have the right, but not the obligation, upon not less than thirty (30) days prior written notice to Tenant, to perform such work (unless Tenant shall fully cure such Default within said thirty (30) day notice period); and in such event, in addition to any other remedies available to Landlord upon Tenant's Default hereunder, Landlord shall be entitled to reimbursement from Tenant within thirty (30) days following Landlord's written demand therefor (accompanied by reasonable supporting documentation) in an amount equal to one hundred fifteen percent (115%) of Landlord's reasonable costs and expenses incurred in performing or otherwise completing Tenant's Work.

(g)     Tenant shall not open the Premises for business to the public or sell any merchandise or services, as the case may be, from the Premises without having first (i) submitted and obtained Landlord's approval of its Tenant's Plans and (ii) substantially completed Tenant's Work pursuant to approved Tenant's Plans.  Landlord and Tenant further agree that Tenant shall on or before the date that the Premises is opened for business to the public (i) provide to Landlord written notice of the Premises opening date and (ii) schedule a final walk-through inspection of Premises with a representative of Landlord at a time and date mutually agreeable to the parties to be conducted within thirty (30) days following said Premises opening date.  Failure by Tenant to complete Tenant's Work or otherwise to comply with the terms of this <u>Section 13</u> shall not delay the Rent Commencement Date.

(h)     Tenant shall obtain, pay for and maintain with respect to the Premises, or shall cause its contractor(s) to obtain, pay for and maintain, during the continuance of construction and fixturing work on or about the Premises: (1) a Builder's Risk, Special Cause of Loss Form insurance policy; (2) a Commercial General Liability Insurance policy, including products and completed operations coverage, with a combined single limit of $1,000,000 per occurrence and $2,000,000 in the aggregate, naming Landlord, Landlord's Managing Agent and Landlord's Mortgagee as additional insureds thereunder; and (3) Workers' Compensation and Employer's Liability Insurance coverage as required pursuant to applicable law.  Tenant shall also obtain, pay for and maintain with respect to the Premises, or shall cause its contractor(s) to obtain, pay for and maintain during the continuance of construction and fixturing work on or about the Premises, an umbrella excess liability policy in an amount not less than $1,000,000 excess over said primary General Liability and Employer's Liability policies.

(g)     Tenant's Work, or any future work or construction performed by or on behalf of Tenant in the Premises, shall be performed at Tenant's sole cost and expense, in strict accordance with Tenant's Plans (or such other plans as may be approved by Landlord).  All construction or alterations performed in the Premises by Tenant shall be (i) performed in a good and workmanlike manner and in compliance with all applicable laws, rules and regulations and with all other provisions of this Lease, (ii) pursued diligently to completion, and (iii) performed in a manner so as not to interfere with the business or operations of Landlord or any other occupant of the Shopping Center.  Contractors must be licensed and carry such insurance in the amounts and with the coverages required by this Lease and provided by insurers satisfactory to Landlord.  In no event shall Tenant or its contractors or subcontractors be required to pay or post any "security deposit" or payment or performance bond in connection with the performance of Tenant's Work.

(i)     LANDLORD AND TENANT AGREE THAT THE PROVISIONS OF THIS <u>SECTION 13</u> CONSTITUTE A MATERIAL INDUCEMENT TO LANDLORD WITHOUT WHICH LANDLORD WOULD NOT HAVE ENTERED INTO THIS LEASE.

14.     <u>USE OF COMMON AREAS</u>

(a)     Tenant, its employees, customers and invitees shall have the non-exclusive use, along with others, of the Common Areas.  Tenant shall comply with such rules and regulations as Landlord prescribes regarding use of the Common Areas.  Attached hereto as <u>Exhibit "F"</u> and made a part hereof is a copy of the current Rules and Regulations.  Landlord shall provide Tenant with ten (10) days' written notice of any change in the Rules and Regulations, and in the case of a conflict between the terms of the Rules and Regulations and of this Lease, the terms of this Lease shall govern.  Except as specifically allowed in <u>Section 8</u> of the Addendum to Deed of Lease Agreement attached hereto, Tenant shall not use the Common Areas for any sales or

display purposes, or for any purpose which would impede or create hazardous conditions in regard to the flow of pedestrian or other traffic. Tenant shall use only such entrances, exits, and service lanes in the rear of the stores as designated by Landlord for the loading or unloading of trucks or other vehicles. Tenant and Tenant's employees shall use only the employee parking areas designated by Landlord, if any.

(b)     Landlord shall maintain the Common Areas in a manner consistent with other shopping centers in the Washington, D.C. metropolitan area that are similar in size and character. Without limiting the foregoing, Landlord may (i) change the arrangement, layout and/or size of the Common Areas; (ii) use the Common Areas for promotions, exhibits, displays, outdoor seating, food facilities and any other use which tends to attract customers to or benefits the Shopping Center; (iii) grant the right to conduct sales in the Common Areas; (iv) erect, remove and lease kiosks, planters, sculptures, buildings and other improvements within the Common Areas; (v) construct, maintain, operate, replace and remove lighting, equipment and signs on all or any part of the Common Areas; (vi) provide security personnel for the Shopping Center; and (vii) discourage non-customer parking. In exercising its rights under this section, Landlord shall not materially adversely affect ingress to, egress from or access to, the Premises.

15.     OCCUPANCY AND OPERATING HOURS

(a)     Tenant shall (i) use the Premises solely for Tenant's Permitted Use and for no other purpose; (ii) operate its business in the Premises continuously during the Store Hours (excluding closures for a reasonable time, not to exceed thirty [30] days, due to repair, remodeling, or permitted alterations or any closure for a reasonable time due to casualty or condemnation in accordance with the terms of Sections 26 and 27 hereof) and solely under Tenant's Trade Name; and (iii) comply with all statutes, laws, rules, ordinances, orders and regulations applicable to the Premises and the business conducted therein by Tenant and all orders of any insurance underwriters, safety engineers and loss prevention consultants as may from time to time be consulted by Landlord. Tenant shall not conduct any auction or bankruptcy or fire or "lost-our-lease" or "going-out-of-business" or similar sale or make any unlawful use of the Premises or permit any unlawful use thereof. Notwithstanding anything to the contrary contained elsewhere in this Lease, in no event shall Tenant use the Premises for any of the uses listed in Exhibit "E" of this Lease or for any purposes which are prohibited by zoning or similar laws or regulations, or covenants, conditions or restrictions of record.

(b)     Tenant shall (i) open the Premises for business on or before the Rent Commencement Date; (ii) carry at all times in the Premises a full stock of merchandise; (iii) employ reputable business standards and practices; and (iv) operate the entire Premises continuously and uninterruptedly during the Term. Tenant shall use for storage and office space only those areas indicated for such use on Tenant's Plans approved by Landlord.

(c)     If Tenant violates the terms and provisions of Section 15(b) hereof, Tenant acknowledges and agrees that Landlord shall be deprived of an important right under this Lease, and as a result thereof, will suffer damages in an amount which is not readily ascertainable; therefore in addition to, and not in lieu of, all other remedies which Landlord has under this Lease, at law or in equity, Tenant shall pay to Landlord, upon demand, in addition to other Rent, liquidated damages (and not as a penalty) in an amount equal to one hundred percent (100%) of the Minimum Rent per day for each and every day that such violation continues. Payment of such sum is intended to be only a partial and temporary remedy for Landlord during the continuance of such violation, and shall not relieve Tenant of any obligation under the Lease, be deemed an election of remedies, excuse any default or waive Landlord's other remedies therefor.

16.     [INTENTIONALLY OMITTED]

17.     REPAIRS

(a)     Landlord will, at Landlord's sole cost and expense (subject to reimbursement as part of Common Area Operating Cost, if applicable), repair and maintain the Common Areas and the following portions of the Premises in good order, condition and repair: roof (including

gutters and downspouts); exterior walls (excluding doors, windows, and glass); structural portions of the Premises (consisting only of the foundation and members supporting the roof); and any utility lines located outside the Premises that serve other premises in common with the Premises but only to the extent that such lines are not owned, operated or managed by any utility company or applicable governmental agency. If any such repairs are necessitated by Tenant's breach of this Lease, or by any act or negligence of Tenant, its agents, employees, contractors, customers, or invitees, Tenant shall reimburse Landlord for the reasonable cost incurred in completing such repairs.

(b)     Tenant shall maintain the non-structural portions of the Premises, any loading dock exclusively designated for Tenant's use, the Leasehold Improvements and Tenant's Property in good order, condition, and repair. Tenant shall not cause or permit any waste, damage, or injury to the Premises or the Shopping Center. Tenant's obligations shall include repairing, maintaining and making replacements to items such as the following: the heating, ventilating and air conditioning ("HVAC") system and equipment serving the Premises (whether roof mounted or otherwise affixed outside of the Premises); plumbing, electrical and other mechanical systems exclusively serving the Premises; floor coverings; interior walls (other than structural walls) and wall coverings; ceilings; utility meters; all pipes, conduits, wiring and plumbing lines exclusively serving the Premises; sprinkler and other fire protection equipment exclusively serving the Premises; the storefront(s); security grilles or similar enclosures; locks and closing devices; windows and window frames; glass; doors and door frames; and all trade fixtures and equipment. Tenant agrees to maintain with a reputable contractor reasonably acceptable to Landlord, a regular service and maintenance contract on the HVAC equipment and system servicing the Premises, with routine inspections and servicing as recommended by the HVAC manufacturer. Tenant shall also initiate and carry out a program of regular maintenance and repair of the Premises, including the painting or refinishing of all areas of the interior, and the maintaining or replacing of all trade fixtures and equipment, ceiling tile, flooring and other items of display used in the conduct of Tenant's business so as to keep the same in an attractive condition throughout the Term.

(c)     Tenant shall install and maintain such fire extinguishers and other fire protection devices in the Premises as may be required by any applicable governmental agency. If any governmental authority having jurisdiction over the Shopping Center requires the installation, modification or alteration of the sprinkler system by reason of (i) Tenant's specific business or (ii) the location of any partitions, trade fixtures or other contents of the Premises, then Tenant shall promptly install such sprinkler system or changes therein.

(d)     If the Premises are damaged by fire or other Casualty or a taking, the provisions of Section 26 and Section 27 and not this section shall govern the repair of the damage.

18.     ALTERATIONS BY TENANT

After the completion of Tenant's Work, Tenant shall not make or cause to be made any alterations, additions, renovations, improvements, or installations in or to the Premises without Landlord's prior written consent, which such consent shall not be withheld unreasonably for interior, non-structural, non-storefront alterations. Otherwise, Landlord may withhold its consent in its sole discretion. Notwithstanding the foregoing, Tenant may, without Landlord's consent, make interior, non-structural, non-storefront alterations, and improvements to the Premises made in accordance with the standard interior decor and fixtures of Franchisor, as defined in Section 32(f) hereof. With respect to any of Tenant's alterations pursuant to this Section 18 for which Landlord's consent is not required, Tenant may perform the same without Landlord's approval of any plans or specifications..

19.     HAZARDOUS MATERIALS

(a)     "Hazardous Material Laws" shall mean all federal, state and local laws, statutes, ordinances and regulations including the Federal Water Pollution Control Act (33 U.S.C. Section 1251, et seq.), the Resource Conservation & Recovery Act (42 U.S.C. Section 6901, et seq.), the Safe Drinking Water Act (42 U.S.C. Section 3000[f], et seq.), the Toxic Substances Control Act

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 18 of 67

(15 U.S.C. Section 2601, et seq.), the Clean Air Act (42 U.S.C. Section 7401, et seq.), the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601, et seq.), and comparable state laws relating to industrial hygiene, environmental protection or the use, analysis, generation, manufacture, storage, disposal or transportation of any oil, flammable materials, explosives, asbestos, urea formaldehyde, radioactive materials or waste, or other hazardous, toxic, contaminated or polluting materials, substances or wastes which are or become regulated as hazardous or toxic under any federal, state or local laws, statutes, ordinances or regulations (collectively, "Hazardous Materials").

(b)    Except for (i) ordinary and general office supplies typically used in the ordinary course of business, such as copier toner, liquid paper, glue and ink, and common household cleaning materials, and (ii) products which are necessary and customary in the conduct of Tenant's business in accordance with Tenant's Permitted Use, all of which shall be stored, used and disposed of in accordance with all Hazardous Material Laws, Tenant agrees not to cause or permit any Hazardous Materials to be brought upon, stored, used, handled, generated, released or disposed of, on, in, under or about the Premises, the Common Areas or any other portion of the Shopping Center by Tenant, its agents, employees, subtenants, assignees, contractors or invitees. Tenant shall not discharge Hazardous Materials or wastes into or through any sanitary sewer serving the Premises or the Shopping Center.

(c)    Tenant shall immediately notify Landlord in writing (and provide Landlord with copies) when (and if) Tenant first becomes aware or receives notice of any proceedings, actions, claims, notices, demands, reports or asserted violations arising out of or in connection with the presence of Hazardous Materials, or any actual or alleged violations of any Hazardous Material Laws, at, on, under or near the Premises or the Shopping Center.

(d)    In the event Hazardous Materials are discovered in, under or about the Premises or any part of the Shopping Center at any time due to any act or omission of Tenant (its agents, employees or contractors) which is (i) negligent, (ii) unlawful, or (iii) in violation of Tenant's obligations pursuant to this Lease, Tenant shall promptly, at its sole risk and expense, commence to perform, and diligently prosecute to completion, all work necessary or required to remove, treat, dispose of and clean up the Hazardous Materials and return the Premises, any portion of the Shopping Center and any adjacent property affected by such Hazardous Materials to the condition existing prior to the contamination by the Hazardous Materials. All such remediation shall be approved by Landlord and shall be performed to its satisfaction in accordance with all Hazardous Materials Laws.

(e)    Tenant shall defend, indemnify and hold harmless Landlord's Indemnitees (as defined in Section 24(a) hereof) and their successors and assigns from and against any and all liabilities, actions, demands, penalties, losses, costs and expenses (including reasonable attorneys' fees, consultants' fees and remedial costs), suits, costs of any settlement or judgment, and claims which may be paid, incurred, or suffered by, or asserted against, any of Landlord's Indemnitees or their successors and assigns as a result of the presence on or under the Premises or the Shopping Center of Hazardous Materials, which such presence is due to any act or omission of Tenant (or its agents, employees, contractors, or invitees) which is (i) negligent, (ii) unlawful, or (iii) in violation of Tenant's obligations under this Lease.

(f)    In the event that Hazardous Materials are discovered on the Premises that are required by the Hazardous Materials Laws to be removed or remediated and which were introduced by a party other than Tenant or its, agents, employees, contractors, or invitees, Landlord shall:  (i) pursue the party or parties responsible for such contamination in an effort to compel them to remediate the contamination in accordance with the Hazardous Materials Laws, or (ii) in the event that Landlord caused such contamination, Landlord shall proceed to remove or remediate it as and to the extent required by the Hazardous Materials Laws.

(g)    Landlord shall defend, indemnify and hold harmless Tenant's Indemnitees (as defined in Section 24(b) hereof) and their successors and assigns, from and against any and all liabilities, actions, demands, penalties, losses, costs and expenses (including reasonable counsel fees, consultants' fees and remedial costs), suits, costs of any settlement or judgment, and claims which may be paid, incurred, or suffered by, or asserted against, any of Tenant's Indemnitees or

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 19 of 67

their successors and assigns as a result of the presence on or under the Premises or Shopping Center of any Hazardous Materials existing prior to or subsequent to the Date of Lease, if such presence is the result of (i) any negligent or unlawful act or omission of Landlord's (its agents', employees' or contractors') or (ii) any act or omission which is in violation of Landlord's obligations under this Lease. Landlord shall not be liable under this section for any acts or omissions of third parties.

(h)    Landlord hereby represents and warrants that as of the Date of Lease, except as set forth in the environmental reports identified in <u>Exhibit "G"</u> attached hereto, to the best of the knowledge of Lucy Fraser, the Vice President of Property Management – East Coast for Landlord's Managing Agent, Combined Properties, Incorporated, neither the Shopping Center nor the Premises is in violation of any Hazardous Material Laws.

## 20.   EXTRA HAZARDS

Tenant shall not keep or do anything in the Premises that will (i) result in an increase in the rate of any insurance on the Shopping Center; (ii) violate the terms of any insurance coverage on the Shopping Center carried by Landlord; (iii) prevent Landlord from obtaining such policies of insurance acceptable to Landlord or any Mortgagee of the Shopping Center; or (iv) violate the rules, regulations or recommendations of Landlord's insurers, loss prevention consultants, safety engineers, the National Fire Protection Association, or any similar body having jurisdiction over the Premises. If Tenant does so, Tenant shall pay to Landlord upon demand the amount of any increase in any such insurance premium. In determining the cause of any increase in insurance premiums, the schedule or rate of the organization issuing the insurance or rating procedures shall be conclusive evidence of the items and charges which comprise the insurance rates and premiums on such property.

## 21.   MECHANIC'S LIENS

Tenant shall not suffer, permit, or give cause for the filing of a mechanic's or other lien against the Premises or the Shopping Center. Tenant shall promptly pay all persons furnishing labor, materials, or services with respect to any work performed by Tenant on the Premises or the Shopping Center. If any mechanic's or other lien shall be filed against the Premises or the Shopping Center by reason of any work, labor, services or materials performed or furnished, or alleged to have been performed or furnished, to or for the benefit of Tenant, Tenant shall immediately cause the same to be bonded or discharged of record. If Tenant shall fail to cause such lien to be bonded or discharged within fifteen (15) days after being notified of the filing thereof, then in addition to any other rights and remedies available to Landlord under the terms of this Lease, at law or in equity, Landlord may, but shall not be obligated to, discharge or bond off the same by paying the amount claimed to be due or posting a bond, and the amount so paid by Landlord and all costs and expenses, including reasonable attorneys' fees incurred by Landlord in paying, bonding off or procuring the discharge of such lien, shall be due and payable by Tenant to Landlord within five (5) Business Days following Landlord's demand therefor.

## 22.   ADDITIONS AND FIXTURES

(a)    All present and future alterations, additions, renovations, improvements and installations made to the Premises, including the HVAC system ("<u>Leasehold Improvements</u>"), shall be deemed to be the property of Landlord when made and, upon Tenant's vacation or abandonment of the Premises, unless Landlord directs otherwise, shall remain upon and be surrendered with the Premises in good order, condition and repair. All movable goods, inventory, office furniture, equipment, trade fixtures (including exterior signs) and other movable personal property belonging to Tenant in the Premises shall remain Tenant's property ("<u>Tenant's Property</u>") and shall be removable by Tenant at any time, <u>provided</u> that Tenant (i) is not in default under this Lease beyond any applicable cure period and (ii) shall repair any damage to the Premises and/or the Shopping Center caused by the removal of any of Tenant's Property. Notwithstanding the foregoing, Tenant shall have the right to remove from the Premises before the termination of this Lease, irrespective of any Default, any and all of Tenant's Property as necessary to protect its intellectual property rights, including (without limitation) trademarks, copyrights, and trade dress items.

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 20 of 67

(b)     Tenant shall, prior to the Expiration Date or the termination of Tenant's right to possession of the Premises, at Tenant's cost and expense, remove from the Premises (i) all of Tenant's Property (and any Leasehold Improvements as Landlord may direct) and (ii) all wiring in the Premises that is not terminated at both ends at a connector or designated for future use. Tenant shall repair any damage to the remaining Leasehold Improvements, the Premises or any other portion of the Shopping Center caused by such removal. If Tenant fails to timely remove said items, they shall be considered as abandoned and shall become the property of Landlord, or Landlord may have them removed and disposed of at Tenant's cost and expense.

(c)     Tenant may place liens on any furniture, trade fixture, equipment, or appliance installed by Tenant, and Landlord hereby agrees to subordinate any lien or right in and to these items to Tenant's lending institution. Any liens permitted to Tenant hereby shall attach only to Tenant's Property and shall not attach to the Shopping Center or to any property of Landlord's. If Tenant's lending institution requires a further writing from Landlord evidencing the foregoing subordination, Landlord shall upon written request provide a lien subordination agreement reasonably acceptable to Landlord.

23.     INSPECTION BY LANDLORD

Upon three (3) days' written notice to Tenant (except in the event of an emergency, when no notice shall be required) and without materially adversely affecting Tenant's business in the Premises, Landlord (and any persons designated by Landlord) shall have the right to enter upon the Premises during Tenant's Store Hours (except in the event of an emergency in which case Landlord shall have the right to enter the Premises at all hours) to inspect the condition thereof, to make necessary repairs or to repair or maintain pipes, wires, and other facilities serving other premises in the Shopping Center or in connection with making any additions or alterations to the Premises or other parts of the Shopping Center.

24.     COVENANT TO HOLD HARMLESS, WAIVER OF SUBROGATION

(a)     Except as otherwise provided in this section, Tenant agrees, to the fullest extent permitted by law, to indemnify, hold harmless, and defend Landlord, Landlord's Mortgagee, Landlord's managing agent, if any, and the officers, directors, agents and employees of, and the partners and members in, Landlord, Landlord's Mortgagee, and Landlord's managing agent (collectively, "Landlord's Indemnitees") from and against any and all claims, losses, actions, damages, liabilities and expenses (including reasonable attorneys' fees and disbursements) that (i) arise from or are incurred in connection with Tenant's possession, use, occupancy, management, repair, maintenance or control of all or any part of the Premises, the making or removal of alterations or improvements to the Premises, including Tenant's Work, and the performance of all related construction work, or that relate in any other manner to the business conducted by Tenant in the Premises, (ii) arise from or are in connection with any willful or negligent act or omission of Tenant or its agents, employees or contractors in the Premises or the Shopping Center, (iii) arise from injury or death to individuals or damage to property sustained within the Premises. Landlord may, at its option, require Tenant to assume Landlord's defense in any action covered by this section through counsel reasonably satisfactory to Landlord. Tenant shall not be obligated to indemnify Landlord's Indemnitees against any loss, liability, damage, cost or expense arising out of a claim for which Tenant is released from liability pursuant to Section 24(d) or a claim arising out of the willful or negligent acts or omissions of Landlord or its agents, employees or contractors.

(b)     Except as otherwise provided in this section, Landlord agrees, to the fullest extent permitted by law, to indemnify, hold harmless, and defend Tenant and the officers, directors, agents, and employees of, and the partners and members in, Tenant (collectively, "Tenant's Indemnitees") from and against any and all claims, losses, actions, damages, liabilities and expenses (including reasonable attorneys' fees and disbursements) that (i) arise from or are incurred in connection with Landlord's possession, use, occupancy, management, repair, maintenance or control of all or any part of the Common Areas, the making or removal of alterations or improvements to the Common Areas and the performance of all related construction work or that relate in any manner to Landlord's use of or control over the Common

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 21 of 67

Areas, (ii) arise from or are incurred in connection with any willful or negligent act or omission of Landlord or its agents, employees or contractors in the Premises or the Shopping Center, or (iii) arise from injury or death to individuals or damage to property sustained on or about the Common Areas. Tenant may, at its option, require Landlord to assume Tenant's defense in any action covered by this section through counsel reasonably satisfactory to Tenant. Landlord shall not be obligated to indemnify Tenant's Indemnitees against loss, liability, damage, cost or expense arising out of a claim for which Landlord is released from liability pursuant to Section 24(d) or a claim arising out of the willful or negligent acts or omissions of Tenant or its agents, employees or contractors.

(c)     To the maximum extent permitted by law and except as shall be caused by the negligence or willful acts of Landlord's Indemnitees, Landlord's Indemnitees shall not be liable for, and Tenant waives all claims for loss, injury or damage resulting from: (i) any equipment or appurtenances being or becoming out of repair; (ii) wind or weather; (iii) any defect in or failure to operate any sprinkler, HVAC equipment, electric wiring, gas, water or steam pipe, stair, railing or walk; (iv) broken glass; (v) the backing up of any sewer pipe or downspout; (vi) the escape of gas, steam or water; (vii) water, snow or ice being upon the Shopping Center or coming into the Premises; (viii) the falling of any fixture, plaster, tile, stucco or other material; or (ix) any act, omission or negligence of other tenants, licensees or any other Persons including occupants of the Shopping Center, occupants of adjoining or contiguous buildings, owners of adjacent or contiguous property, or the public.

(d)     (i)     Landlord and Tenant (each a "Waiving Party") each hereby waives and releases all rights of recovery against the other and the other's agents and employees (the "Released Parties") on account of loss or damage to the property of the Waiving Party to the extent that such loss or damage is required to be insured against under any property damage insurance policies required to be carried by this Lease. By this waiver it is the intent of the parties that the Released Parties shall not be liable to the Waiving Party or any insurance company (by way of subrogation or otherwise) insuring the Waiving Party for any loss or damage insured against (or that could have been insured against) under any property damage insurance required by this Lease, even though such loss or damage might be caused by the negligence of one (1) or more of the Released Parties; provided, however, that the mutual release contained herein shall not apply to damage to the Waiving Party's property caused by the gross negligence or willful misconduct of any of the Released Parties. If the Waiving Party does not carry, or is not required to carry, property damage insurance pursuant to this Lease, this release shall apply to damage to the Waiving Party's property that would have been covered by a policy of "all risk" or "special form" property damage insurance if the Waiving Party had maintained such insurance.

(ii)     Each of Landlord and Tenant shall include in each of its property damage insurance policies, including Landlord's policies of rental income insurance and Tenant's policies of business interruption insurance, if any, a waiver of the insurer's right of subrogation against the other party and the officers, directors, agents and employees of, and the partners and members in, the other party. If such waiver is not, or ceases to be, obtainable without additional charge (other than a nominal administrative charge) or at all, the insuring party shall so notify the other party promptly after notice thereof. If the other party agrees in writing to pay the insurer's additional charge therefor, such waiver shall (if obtainable) be included in the policy. Landlord and Tenant hereby acknowledge that such waiver is obtainable under normal commercial insurance practice on the date of this Lease at no additional charge (other than a nominal administrative charge).

(iii)     The waiver and release contained in this section shall not apply to loss or damage to property of the Waiving Party to the extent of the deductible contained in the Waiving Party's policies of property damage insurance.

25.     LIMITATION OF LANDLORD'S LIABILITY

In no event shall Landlord be liable to Tenant for loss of business or special or consequential damages. Notwithstanding the foregoing, Tenant may seek any and all damages, including but not limited to lost profits, arising from an intentional violation by Landlord of

Section 4(a) of the Addendum to Deed of Lease Agreement attached hereto. It is understood and agreed that the liability of Landlord hereunder shall be limited solely to the assets and property of the Shopping Center and the income generated therefrom; that no general partner of Landlord, nor any officer, director, agent or employee of Landlord shall be personally liable with respect to any claim arising out of or related to this Lease; and that a deficit capital account of a partner or member of Landlord shall not be deemed an asset or property of the Shopping Center.

26.    CASUALTY

(a)    Tenant shall give prompt notice to Landlord in case of fire or other casualty ("Casualty") to the Premises or the Shopping Center.

(b)    If (i) the buildings (taken in the aggregate) in the Shopping Center are damaged to the extent of more than fifty percent (50%) of the cost of replacement thereof; or (ii) during the last two (2) Lease Years or in any partial Lease Year at the end of the Term the Premises are damaged to the extent of more than twenty-five percent (25%) of the cost of replacement thereof; or (iii) the Premises are damaged to the extent of fifty percent (50%) or more of the cost of replacement thereof and such damage cannot be repaired within one hundred fifty (150) days from the date of such occurrence; or (iv) such damage is the result of any risk not covered by a policy of "all risk" or "special form" property damage insurance; or (v) by virtue of the terms of any Mortgage, sufficient insurance proceeds are not available for Landlord's use in the reconstruction or restoration of the Premises or the Shopping Center, as the case may be; then Landlord may terminate this Lease by notice to Tenant within one hundred fifty (150) days after the date of the Casualty. If Landlord so terminates this Lease, then the Expiration Date shall be the date set forth in the notice to Tenant, which date shall not be less than thirty (30) days nor more than ninety (90) days after the giving of said notice (unless the Premises are also directly affected whereupon the provisions in Section 26(d) below with respect to abatement of Rent would control). The "cost of replacement" shall be determined by the company or companies insuring Landlord against the Casualty, or, if there shall be no such determination, by a qualified Person reasonably selected by Landlord to determine such "cost of replacement."

(c)    If during the last two (2) Lease Years or in any partial Lease Year at the end of the Term either (i) the Premises are damaged to the extent of twenty-five percent (25%) or more of the cost of replacement thereof, or (ii) more than fifty percent (50%) of the Floor Area of the Shopping Center immediately before such Casualty is rendered untenantable, Tenant may terminate this Lease by giving Landlord sixty (60) days' prior notice given within sixty (60) days after the date of the Casualty. In the event of a Casualty to the Premises, if Landlord fails to commence and diligently pursue the repairs to the Premises in accordance with the provisions of Section 26(e) below within one hundred fifty (150) days from the date of the Casualty, Tenant shall have the right to terminate this Lease by giving Landlord thirty (30) days' prior notice given within thirty (30) days after the expiration of the aforesaid period.

(d)    If the Casualty shall render the Premises untenantable, in whole or in part, all Rent shall abate proportionately during the period of such untenantability, computed on the basis of the ratio which the amount of Floor Area of the Premises rendered untenantable bears to the total Floor Area of the Premises. Such abatement shall terminate on the earlier of (i) thirty (30) days after the date any such repair and restoration work is substantially completed by Landlord, or (ii) the date Tenant reopens for business in the portion of the Premises previously rendered untenantable. For purposes of this section, the Premises shall be deemed untenantable if damaged to such extent as to preclude Tenant's use of the Premises for the purposes originally intended.

(e)    To the extent of insurance proceeds made available to Landlord by any Mortgagee and subject to the termination provisions of this section and Landlord's ability to obtain the necessary permits, Landlord shall repair the Premises (excluding Tenant's Property and the floor and wall coverings and plate glass in the Premises, which shall be Tenant's obligation to repair, restore or replace) to a substantially similar condition as existed prior to the Casualty. All insurance proceeds payable with respect to the Shopping Center (excluding proceeds payable to Tenant for Tenant's Property) shall belong to and shall be payable to Landlord. If the Lease is not terminated pursuant to this section, Landlord shall, subject to the terms of any Mortgage,

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 23 of 67

disburse and apply any proceeds of Landlord's insurance to the restoration and rebuilding of the Premises and Shopping Center, as the case may be, in accordance with the terms of this section.

(f)     Subject to the termination provisions of this section, Tenant shall promptly commence and diligently pursue to completion the redecorating and refixturing of the Premises, including repairing, restoring or replacing Tenant's Property, the floor and wall coverings and the plate glass, to a substantially similar condition as existed prior to the Casualty.  Tenant shall reopen for business in the Premises as soon as practicable after the occurrence of the Casualty.

27.    CONDEMNATION

If the whole or any part of the Premises shall be taken under the power of eminent domain or under threat of condemnation, then this Lease shall terminate as to the part so taken as of the day Tenant is required to yield possession thereof; and the Minimum Rent and all other charges required under this Lease shall be reduced proportionately as to the portion of the Premises so taken.  If the amount of said Premises so taken is greater than thirty percent (30%) of Tenant's sales area or if the area of the Premises so taken would reasonably prohibit Tenant from using the Premises for Tenant's Permitted Use set forth in Sections 1(n) and 15 of this Lease, then either party, by giving sixty (60) days written notice to the other, shall have the option to terminate this Lease as of the date Tenant is required to yield possession.  All compensation awarded for such taking of the fee and the leasehold shall belong to and be the property of the Landlord; provided, however, that the Landlord shall not be entitled to any portion of any award made to the Tenant specifically for the cost of removal of stock and fixtures.

28.    DEFAULT AND REMEDIES

(a)     Each of the following events shall constitute a default ("Default") by Tenant under this Lease: (i) if Tenant fails to pay any Rent (or any installment thereof) within ten (10) days after the same shall be due and payable and such failure continues for a period of five (5) days after written notice from Landlord; (ii) if Tenant vacates, abandons, or ceases to continuously operate the Premises as required by Section 15 hereof; (iii) if Tenant fails to carry and maintain the insurance required by this Lease and fails to procure the same within ten (10) days of Landlord's written notice thereof; or (iv) if Tenant breaches or fails to observe or perform any other term, condition, or covenant of this Lease and such breach or failure is not cured within twenty (20) days after Tenant's receipt of written notice thereof, unless such condition cannot reasonably be cured within such twenty (20) days, in which case Tenant must commence such cure within said twenty (20) days and diligently pursue said cure to its completion (provided, however, that if such breach or failure creates a hazard, public nuisance, or dangerous situation, said twenty (20) day grace period shall be reduced to forty-eight (48) hours after Tenant's receipt of  notice).

(b)     Except as specifically provided in this Lease, if a Default described in this section occurs, Landlord shall have all the rights and remedies provided in this section, in addition to all other rights and remedies available under this Lease or provided at law or in equity.

(c)     Upon the occurrence of any event of Default described in this section (including the expiration of any applicable cure period), Landlord may, upon notice to Tenant, terminate this Lease, or terminate Tenant's right to possession of the Premises without terminating this Lease (as Landlord may elect).  If the Lease or Tenant's right to possession under this Lease are at any time terminated under this section, or otherwise, Tenant shall immediately surrender and deliver the Premises peaceably to Landlord.  If Tenant fails to do so, Landlord shall be entitled to re-enter the Premises in accordance with required legal process; and, alternatively, shall be entitled to the benefit of all provisions of law respecting the speedy recovery of possession of the Premises (whether by summary proceedings or otherwise).

(d)     Upon the occurrence of any event of Default described in this section (including the expiration of any applicable cure period), Landlord may also perform, on behalf and at the expense of Tenant, any obligation of Tenant under this Lease which Tenant fails to perform, the cost of which (together with an administrative fee equal to twenty percent (20%) of such cost to cover Landlord's overhead in connection therewith) shall be paid by Tenant to Landlord upon demand.  In performing any obligations of Tenant, Landlord shall incur no liability for any loss or damage that may accrue to Tenant, the Premises or Tenant's Property by reason thereof,

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 24 of 67

except if caused by Landlord's willful, wanton and malicious act. The performance by Landlord of any such obligation shall not constitute a release or waiver of any of Tenant's obligations under this Lease.

(e) Upon termination of this Lease or of Tenant's right to possession under this Lease, Landlord may at any time and from time to time relet all or any part of the Premises for the account of Tenant or otherwise, at such rentals and upon such terms and conditions as Landlord shall deem appropriate. In the event that Landlord shall relet the Premises, then rentals received by Landlord from such reletting shall be applied: first, to the payment of such expenses as Landlord may incur in recovering possession of the Premises, including legal expenses and attorneys' fees, in placing the Premises in good order and condition and in preparing or altering the same for re-rental; second, to the payment of such expenses, commissions and charges as may be incurred by or on behalf of Landlord in connection with the reletting of the Premises; and third, to the fulfillment of the covenants of Tenant under the Lease, including the various covenants to pay Rent. Any reletting by Landlord shall not be construed as an election by Landlord to terminate this Lease unless notice of such intention is given by Landlord to Tenant. Notwithstanding any reletting without termination of this Lease, Landlord may at any time thereafter elect to terminate this Lease. In any event, except as otherwise expressly provided in this Lease, Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet the Premises or any failure by Landlord to collect any sums due upon such reletting.

(f) If this Lease, or Tenant's right to possession of the Premises, is terminated by Landlord pursuant to the provisions of this section, Tenant nevertheless shall remain liable to Landlord for (a) any Rent, damages or other sums which may be due or sustained prior to such termination, (b) all reasonable costs, fees and expenses (including attorneys' fees, brokerage commissions, advertising costs, and expenses incurred in placing the Premises in first-class rentable condition) incurred by Landlord in pursuit of its remedies hereunder and in renting the Premises to others from time to time; and (c) additional damages which at Landlord's election shall be either:

(i) an amount equal to the Rent which would have become due from the date of such termination through the expiration of the Term (or what would have been the expiration of the Term but for any termination thereof), less the net avails of reletting, if any, which Landlord receives during such period from others to whom the Premises may be rented (other than any Additional Rent received as a result of any failure of such other Person to perform any of its obligation to Landlord), which amount shall be due and payable by Tenant to Landlord on the dates such Rent and other sums above specified are due under the Lease; any suit or action brought to collect any such damages for any month shall not in any manner prejudice the right of Landlord to collect any damages for any subsequent month by a similar proceeding; or

(ii) accelerated damages, payable to Landlord in one lump sum, in an amount equal to the present value (as of the date of such termination) of the Rent which would have become due through the expiration of the Term (or what would have been such expiration but for any termination thereof), plus any other amount necessary to compensate Landlord for its expenses (including without limitation attorneys' fees and costs and brokerage commissions) incurred in connection with reentering, repossessing, repairing and/or reletting the Premises, in excess of the loss that could reasonably be avoided by Landlord's mitigation of its damages. For purposes of this section, "present value" shall be computed by discounting such amount to present worth at a discount rate equal to one percentage point above the discount rate then in effect at the Federal Reserve Bank nearest to the location of the Shopping Center. Damages shall be due and payable immediately upon demand by Landlord following any termination of this Lease or Tenant's right to possession of the Premises pursuant to this section.

Tenant may, where appropriate, assert as a defense to any claim by Landlord for monetary damages under this section any failure by Landlord to use commercially reasonable efforts to mitigate its damages.

(g) If, as the result of Tenant's Default at any time prior to the Date of Delivery, this Lease shall be terminated, Landlord and Tenant agree that, at Landlord's sole option, Tenant shall pay to Landlord on account of such Default, as liquidated and agreed damages (and not as a

penalty), immediately upon demand by Landlord, a sum equal to such amount as would have constituted one year's Rent had the Rent Commencement Date occurred, the amount of any brokerage fees incurred by Landlord in connection with entering into this Lease with Tenant and any and all costs and expenses incurred by Landlord in performing any part of Landlord's Work as set forth in Exhibit "C."

(h)     No reference to any specific right or remedy in this Lease shall preclude Landlord from exercising any other right, from having any other remedy, or from maintaining any action to which it may otherwise be entitled under this Lease, at law or in equity.

(i)     Neither Landlord nor Tenant shall be deemed to have waived any provision of this Lease, or the breach of any such provision, unless specifically waived by said party in a writing executed by an authorized partner, member, or officer of said party (or its authorized management agent). No waiver of a breach shall be deemed to be a waiver of any subsequent breach of the same provision, or of the provision itself, or of any other provision.

(j)     Tenant hereby expressly waives any and all rights of redemption and any and all rights to relief from forfeiture which would otherwise be granted or available to Tenant under any present or future statutes, rules, or case law.

(k)     In the event that Landlord defaults in the performance of any of the terms or provisions of this Lease, Tenant shall so notify Landlord in writing. If Landlord fails to cure the default within thirty (30) days after receiving the notice, or, if the default cannot reasonably be cured within thirty (30), days then if Landlord fails to commence curing the default within such thirty (30)-day period and to diligently prosecute the cure to completion, then, subject to the further terms and conditions of this Lease, Landlord shall be liable to Tenant for any damages sustained by Tenant as a result of Landlord's breach; provided that, except as set forth in Section 25 hereof, in no event shall Landlord be liable for indirect, consequential, or punitive damages, nor shall Tenant have the right to terminate this Lease on account of Landlord's default. Notwithstanding any provision to the contrary in this Agreement, except as set forth in Section 9 of the Addendum to Deed of Lease Agreement attached hereto, Tenant shall not have the right to withhold, reduce, or offset any amount against any payments of Rent or any other charges due and payable under this Lease unless Tenant has obtained a final, non-appealable judgment against Landlord for the amount due.

29.    SUBORDINATION

(a)     This Lease shall be subordinate to any and all Mortgages currently existing or that may hereafter be placed upon the Shopping Center. This section shall be self-operative and no further instruments of subordination shall be required. Nevertheless, if requested by Landlord, Tenant shall promptly execute any certificate or other document specified by Landlord or any Mortgagee in confirmation of this subordination. In the event any Mortgagee elects to have the Lease be a prior lien to its Mortgage then and in such an event, upon such Mortgagee notifying Tenant to that effect, this Lease shall be deemed prior in lien to said Mortgage, whether or not this Lease is dated prior to or subsequent to the date of said Mortgage.

(b)     If any Person succeeds to all or part of Landlord's interest in the Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of any ground lease or otherwise (each a "Foreclosure"), this Lease shall not terminate or be terminable by Tenant (unless Tenant is specifically named and joined in such Foreclosure and a judgment is obtained therein against Tenant), and Tenant shall, without charge, attorn to such successor-in-interest upon request from Landlord or such successor-in-interest.

(c)     Tenant agrees that if any Mortgagee shall succeed to the interest of Landlord under this Lease, such Mortgagee shall not be (i) bound by any payment of Rent more than one (1) month in advance, (ii) bound by any amendment of this Lease made without the consent of such Mortgagee, (iii) liable for any act or omission of Landlord, (iv) subject to any offsets or defenses which Tenant might have against any prior landlord, or (v) liable for the return of the Security Deposit unless such Mortgagee actually receives the Security Deposit.

30.    RECORDATION

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 26 of 67

Tenant shall not record this Lease and/or its Exhibits. Any violation of this section shall without notice or grace period of any kind be deemed a Default by Tenant under this Lease, and Landlord, in addition to other remedies available for a Default, shall be entitled, at Tenant's cost, to take those steps necessary to remove the Lease and/or its Exhibits from record.

31.    [INTENTIONALLY OMITTED]

32.    <u>ASSIGNMENT AND SUBLEASE</u>

(a)    Tenant and any permitted "Transferee" (as hereinafter defined) shall not voluntarily or involuntarily, by operation of law or otherwise: (i) transfer, assign, mortgage, encumber, pledge, hypothecate, or assign all or any of its interest in this Lease, or (ii) sublet or permit the Premises, or any part thereof, to be used by others including, but not limited to concessionaires or licensees, or (iii) issue new stock (or partnership shares or membership interests), create additional classes of stock (or partnership shares or membership interests), or sell, assign, hypothecate or otherwise transfer the outstanding voting stock (or partnership shares or membership interests) so as to result in a change in the present control of Tenant or any permitted Transferee, <u>provided</u>, <u>however</u>, that this subparagraph (iii) shall not be applicable to Tenant if it is a publicly owned corporation whose outstanding voting stock is listed on a national securities exchange (as defined in the Securities Exchange Act of 1934, as amended) or is traded actively in the over-the-counter market, or (iv) sell, assign or otherwise transfer all or substantially all of Tenant's or any permitted Transferee's assets; without the prior consent of Landlord, in each instance, which consent shall not be unreasonably withheld or delayed. All of the foregoing transactions shall be referred to collectively or singularly as a "<u>Transfer</u>," and the Person to whom Tenant's interest is transferred shall be referred to as a "<u>Transferee.</u>"

(b)    Except as provided in <u>Subsection (f)</u> below, any Transfer without Landlord's consent shall not be binding upon Landlord, shall confer no rights upon any third Person, and shall, without notice or grace period of any kind, constitute a Default by Tenant under this Lease. Acceptance by Landlord of Rent following any Transfer shall not be deemed to be a consent by Landlord to any such Transfer, acceptance of the Transferee as a tenant, release of Tenant from the performance of any covenants herein, or waiver by Landlord of any remedy of Landlord under this Lease, although amounts received shall be credited by Landlord against Tenant's Rent obligations. Consent by Landlord to any one Transfer shall not be a waiver of the requirement for consent to any other Transfer. No reference in this Lease to assignees, concessionaires, subtenants or licensees shall be deemed to be a consent by Landlord to occupancy of the Premises by any such assignee, concessionaire, subtenant or licensee.

(c)    Subject to the provisions of <u>Subsection (g)</u> below, Tenant shall remain fully and primarily liable and obligated under this Lease for the entire Term in the event of any Transfer, whether or not Landlord's consent thereto is required or obtained, and in the event of a Default by the Transferee, Landlord shall be free to pursue Tenant, the Transferee, or both, without prior notice or demand to either.

(d)    Tenant shall pay to Landlord One Thousand and 00/100 Dollars ($1,000.00) to reimburse Landlord for attorney's fees and administrative expenses involved with the review, processing, or preparation of any documentation in connection with a Transfer, whether or not Landlord's consent to such Transfer is required or obtained.

(e)    Whether or not Landlord's consent is required or obtained, each assignee of Tenant's interest in this Lease shall expressly assume in an instrument delivered to and reasonably acceptable by Landlord all of the obligations of Tenant under this Lease. Each sublease shall incorporate the provisions of this Lease by reference.

(f)    Notwithstanding anything to the contrary contained herein, and <u>provided</u> that Tenant is not in monetary Default, Tenant shall have the right, without Landlord's consent, to assign this Lease, to sublet the entire Premises, or to transfer stock in Tenant to Little Caesar Enterprises, Inc. or any successor entity thereto ("<u>Franchisor</u>"), to the owners of Franchisor, family members of Franchisor's owners, and/or entities owned or controlled by any of the foregoing (collectively "<u>Franchisor Entities</u>"), or to a bona fide franchisee of Franchisor's who meets without waiver all of Franchisor's franchisee standards, qualifications, and conditions. At least thirty (30) days before the effective date of any assignment or sublease pursuant to this section, Tenant shall notify Landlord of the transaction and provide documentation verifying that

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 27 of 67

all of the requirements set forth herein have been fulfilled and that all of the foregoing the conditions have been met.

(g)     If Tenant assigns its entire right, title, and interest in and to this Lease, in compliance with its terms, to a Franchisor Entity or to a bona fide franchisee of Franchisor's who meets without waiver all of Franchisor's franchisee standards, qualifications, and  conditions, and:

(i)     at the time of the assignment, Tenant's business conforming to the requirements of Section 15(a) hereof is open and operating in the Premises,

(ii)     at the time of the assignment, the Transferee's net worth, excluding goodwill, tax credits, and other intangible assets, as evidenced by a recent financial statement certified to Landlord as true and accurate by a certified public accountant, exceeds Eight Hundred Thousand and No/100 Dollars ($800,000.00) multiplied by a fraction whose numerator is the Consumer Price Index - All Urban Consumers, all items, Washington-Baltimore region (November 1996 = 100), as published by the Bureau of Labor Statistics of the U.S. Department of Labor ("CPI") for the third month before the month in which the assignment occurs and whose denominator is the CPI for February, 2011,

(iii)     at the time of the assignment, the Transferee, or an employee of the Transferee's who will be responsible for the management of the business in the Premises, has at least three (3) years' experience operating a fast-food restaurant, as evidenced by a resume or other written statement identifying the person with the required experience and describing the experience in reasonable detail,

(iv)     before Landlord consents to the assignment, Tenant submits a written request to Landlord to confirm the satisfaction of the conditions set forth in the foregoing clauses (i) through (iii),

(v)     during the one (1)-year period after the effective date of the assignment the assignee and any successors thereto are never in Default under this Lease (beyond any applicable cure period), and

(vi)     during the three (3)-year period after the effective date of the assignment ('Release Qualification Period') the assignee and any successors thereto operate continuously and without interruption a restaurant in the Premises conforming to the requirements of Section 15(a) hereof,

then upon the expiration of the Release Qualification Period the assignor automatically shall be released from liability under this Lease except for (1) any default, act, occurrence, or omission relating to this Lease occurring before the expiration of the Release Qualification Period, (2) any amount owed by the assignor under this Lease for the period before the expiration of the Release Qualification Period, (3) any amount due and payable, or accrued but not yet due and payable, under the Lease before the expiration of the Release Qualification Period, and (4) any costs or expenses incurred by Landlord in collecting such sum or any part thereof or of otherwise enforcing this Lease against the assignor, including without limitation Landlord's reasonable attorneys' fees and court costs. This Subsection (g) shall apply only to assignments made by PG County Partners, LLC, a Maryland limited liability company.

33.     HOLDING OVER

If Tenant fails to vacate the Premises on the Expiration Date, Landlord shall have the benefit of all provisions of law respecting the speedy recovery of possession of the Premises (whether by summary proceedings or otherwise).  In addition to and not in limitation of the foregoing, occupancy subsequent to the Expiration Date ("Holdover Occupancy") shall be at will.  Holdover Occupancy shall be subject to all terms, covenants, and conditions of the Lease (including those requiring payment of Additional Rent), except that the Minimum Rent for each day that Tenant holds over ("Holdover Minimum Rent") shall be equal to two (2) times the per

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 28 of 67

diem Minimum Rent payable in the last Lease Year. Landlord also shall be entitled to recover all damages, including lost business opportunity regarding any prospective tenant(s) for the Premises, suffered by Landlord as a result of Tenant's Holdover Occupancy.

34. SHOWING OF PREMISES

Landlord may enter upon the Premises during the Store Hours for purposes of showing the Premises to Mortgagees or prospective Mortgagees at any time during the Term and to prospective tenants during the last six (6) months of the Term. Before the earlier of the termination of this Lease or Tenant's vacation of the Premises, Landlord may not display "for lease" signs (i) on the Premises' storefront or (ii) anywhere in the Shopping Center that specifically refer to the Premises.

35. QUIET ENJOYMENT

Landlord hereby warrants that Landlord and no other person or entity has the right to lease the Premises for the Term hereof. Tenant shall have the peaceful and quiet use and possession of said Premises without hindrance on the part of Landlord, provided that Tenant is not in Default of any provision of this Lease. This Lease is made by Landlord and accepted by Tenant subject to all matters of record affecting the Premises or the Shopping Center.

36. ADDRESSES AND NOTICES

(a)    Until notice by Landlord to Tenant, all Rent payments due herein shall be made payable to Landlord and delivered to Landlord's Address for Rental Payments listed in Section 1 above.

(b)    All notices required under this Lease shall be in writing and deemed to be properly served if sent by registered or certified mail or by reputable overnight courier service to the intended recipient at the relevant Address for Notices listed in Section 1 above, or to any subsequent address which Landlord, Tenant and/or Guarantor shall designate in writing by registered or certified mail. Either party may designate multiple addresses for its notices. The date of service of notice shall be (i) the next Business Day after notice is sent in the case of delivery by overnight courier, or (ii) three (3) Business Days after mailing the notice in the case of registered or certified mail. Neither party shall be required to notify the other party of any change in its designated telephone number.

(c)    If Landlord or any Mortgagee notifies Tenant in accordance with this Section 36 that a copy of each notice to Landlord shall be sent to such Mortgagee at a specified address, then Tenant shall give (in the manner specified in this section and at the same time such notice is given to Landlord) a copy of each such notice to such Mortgagee, and no such notice shall be considered duly given unless such copy is so given to such Mortgagee. If Tenant claims that Landlord has breached any obligation, then Tenant shall give such Mortgagee notice specifying the breach and permit such Mortgagee a reasonable opportunity (not less than sixty (60) days) to cure the breach. Such Mortgagee's curing of Landlord's default shall be deemed performance by Landlord.

37. ESTOPPEL CERTIFICATES

(a)    Each of Landlord and Tenant, within fourteen (14) days after receiving notice from, and without charge or cost to, the other, shall certify by written instrument to the other or any other Person designated by Landlord or Tenant: (i) that this Lease is in full force and effect and unmodified (or if modified, stating the modification); (ii) the dates, if any, to which each component of the Rent due under this Lease has been paid; (iii) whether Landlord or Tenant has failed to perform any covenant, term or condition under this Lease, and the nature of Landlord's or Tenant's failure, if any; and (iv) such other relevant information as Landlord or Tenant may reasonably request.

(b)    Tenant agrees that at any time, and from time to time as reasonably requested by Landlord, Tenant will execute such documents as are necessary in connection with any financing or sale of the Shopping Center or any part thereof, provided that such documents do not (i) increase Tenant's monetary obligations hereunder or (ii) reduce the Term hereof, or (iii)

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 29 of 67

otherwise materially adversely affect any material and substantive right of Tenant expressly granted hereunder.

(c)  Notwithstanding anything contained in Subsections (a) and (b) above to the contrary, Tenant shall not be required to provide Landlord with any financial information regarding Tenant, including, but not limited to, financial statements, sales reporting, or tax returns, so long as Tenant is operating as a Little Caesars and the same would be in violation of Franchisor's formal written policy for franchisees.

38.  MISCELLANEOUS

(a)  Successors and Assigns.  This Lease and the covenants and conditions herein contained, shall inure to the benefit of and be binding upon Landlord, its successors and assigns, and shall be binding upon Tenant, its successors and assigns, and shall inure to the benefit of Tenant and only such assigns of Tenant to whom the assignment by Tenant has been consented to by Landlord or to whom such assignment is otherwise permitted by the provisions of this Lease.

(b)  No Option.  The submission of this Lease for examination does not constitute a reservation of, or option for, the Premises, and this Lease shall become effective only upon execution by all parties hereto and delivery of a fully executed copy thereof by Landlord to Tenant.

(c)  Entire Agreement; No Representations.  This Lease sets forth the entire agreement between the parties.  There are no oral agreements between the parties hereto affecting this Lease, and this Lease supersedes and cancels any and all previous agreements, representations (other than Tenant's representations to Landlord as to Tenant's financial condition which are a material inducement to Landlord entering into this Lease), promises, warranties and understandings, written or oral, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease.  Tenant hereby expressly acknowledges that Landlord or Landlord's employees or agents have made no representations, warranties, inducements, or promises, written or oral, with respect to the Shopping Center or the Premises except as herein expressly set forth.

(d)  No Exclusive Rights.  Tenant acknowledges that, unless otherwise herein specifically provided, Tenant does not have any exclusive rights in the Shopping Center with respect to the sale of its merchandise or the provision of its services.

(e)  Severability.  Every agreement contained in this Lease is, and shall be construed as, a separate and independent agreement.  If any term of this Lease or the application thereof to any Person or circumstances shall be invalid and unenforceable, the remainder of this Lease, or the application of such term to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected.

(f)  Choice of Law/Forum.  The covenants, conditions, and provisions of this Lease shall be construed under the laws of the state in which the Shopping Center is located.  Any action involving a dispute relating in any manner to the Lease, the relationship of Landlord/Tenant, the use or occupancy of the Premises, and/or any claim of injury or damage shall be filed and adjudicated solely in the state or federal courts of the jurisdiction in which the Premises are located.  (For purposes of this section, the District of Columbia shall be deemed to be a state.)

(g)  Inability to Perform.  Except for the payment of monetary obligations, if Landlord or Tenant is delayed or prevented from performing any of its obligations under this Lease by reason of strike, labor troubles or any similar cause whatsoever beyond its control, the period of such delay or such prevention shall be deemed added to the time herein provided for the performance of any such obligation by Landlord or Tenant.  In the event that either party hereto should wish to rely on the provisions of this section, such party shall notify the other party in writing no later than ten (10) days after the date of any occurrence resulting in a delay or interruption referred to herein, which notice shall describe in reasonable detail the nature and cause of such delay and/or interruption and its expected duration.

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 30 of 67

(h)  Construction of Certain Terms.  The section headings contained in this Lease are for convenience only and shall not enlarge or limit the scope or meaning of the various and several sections hereof.  Words of any gender used in this Lease shall include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.  The term "including" and "include" shall mean in all cases "including, without limitation."  Wherever Tenant is required to perform any act hereunder, such party shall do so at its sole cost and expense, unless expressly provided otherwise.  All payments to Landlord, other than Minimum Rent, whether as reimbursement or otherwise, shall be deemed to be Additional Rent, regardless whether denominated as "Additional Rent."

(i)  Joint and Several Liability.  If two or more Persons shall sign this Lease as Tenant, the liability of each such Person to pay the Rent and perform all other obligations hereunder shall be deemed to be joint and several, and all notices, payments and agreements given or made by, with or to any one of such Persons shall be deemed to have been given or made by, with or to all of them.  In like manner, if Tenant shall be a partnership or other legal entity, the partners or members of which are, by virtue of any applicable law, rule, or regulation, subject to personal liability, the liability of each such partner or member under this Lease shall be joint and several and each such partner or member shall be fully obligated hereunder and bound hereby as if each such partner or member had personally signed this Lease.

(j)  Modifications.  No amendment or modification of this Lease shall be binding or valid unless expressed in a writing executed by both Landlord and Tenant.

(k)  Corporate Tenants.  If Tenant is not an individual, the individual(s) executing this Lease on behalf of Tenant hereby covenant(s) and warrant(s) that: Tenant is duly formed, qualified to do business and in good standing in the state in which the Shopping Center is located; and such Person(s) is(are) duly authorized by Tenant to execute and deliver this Lease on behalf of Tenant.  Tenant shall remain qualified to do business and in good standing in said state throughout the Term.

(l)  Broker's Commissions.  Except for the Broker designated in Section 1(s) hereof, to whom Landlord has agreed to pay a commission under the terms of a separate agreement, each of the parties hereto represents and warrants that there are no brokerage commissions or finder's fees of any kind due to anyone in connection with the execution of this Lease, and agrees to indemnify the other against, and hold it harmless from, all liabilities arising from any such claim (including the cost of counsel fees in connection therewith).  In no event shall Landlord be responsible to pay any brokerage commission or finder's fee in connection with any sublease, renewal, assignment, modification, or amendment of this Lease.

(m)  Relationship of Parties.  This Lease shall not create any relationship between the parties other than that of Landlord and Tenant.

(n)  Interest.  If (i) Tenant fails to make any payment under this Lease when due, (ii) Landlord performs any obligation of Tenant under this Lease, or (iii) Landlord incurs any costs or expenses as a result of Tenant's Default under this Lease, then Tenant shall pay, upon demand, Interest from the date such payment was due or from the date Landlord incurs such costs or expenses relating to the performance of any such obligation or Tenant's Default.

(o)  Legal Expenses.  If Landlord or Tenant institutes any suit against the other in connection with the enforcement of their respective rights under this Lease, the violation of any term of this Lease, the declaration of their rights hereunder, or the protection of Landlord's or Tenant's interests under this Lease, the non-prevailing party shall reimburse the prevailing party for its reasonable expenses incurred as a result thereof including court costs and attorneys' fees. Notwithstanding the foregoing, if Landlord files any legal action for collection of Rent or any eviction proceedings, whether summary or otherwise, for the non-payment of Rent, and Tenant pays such Rent prior to the rendering of any judgment, the Landlord shall be entitled to collect, and Tenant shall pay, all court filing fees and the reasonable fees of Landlord's attorneys.

(p)  Time is of the Essence.  Time is of the essence with respect to each and every obligation arising under this Lease.

(q)  WAIVER OF JURY TRIAL.  IN ANY LITIGATION (WHETHER OR NOT ARISING OUT OF OR RELATING TO THIS LEASE) IN WHICH LANDLORD AND

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 31 of 67

TENANT SHALL BE ADVERSE PARTIES, BOTH LANDLORD AND TENANT KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

(r)     Survival.  Occurrence of the Expiration Date shall not relieve Tenant from its obligations accruing prior to the expiration of the Term.  All such obligations including Sections 19 and 24 shall survive termination of the Lease.

(s)     Anti-Terrorism.  Each party hereto certifies to each other party hereto that (i) it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order of the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, or nation, pursuant to any law, order, rule, or regulation that is enforced or administered by the federal Office of Foreign Assets Control; and (ii) it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation.  Each party hereto agrees to defend, indemnify and hold harmless each other party hereto and its officers, directors, agents, employees, partners, members, successors and assigns, from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable counsel fees and costs) arising from or related to any breach of the foregoing certification.

39.     GUARANTY AGREEMENT

Attached hereto and made a part hereof is a Guaranty Agreement of even date herewith executed by Mark Williams, an individual, and Pervez Kaisani and Navin Kaisani, husband and wife.

IN WITNESS WHEREOF, the parties hereto have executed this Deed of Lease Agreement under their respective seals as of the day and year first above written.

WITNESS:

LANDLORD:
SILVER HILL II LLC, a Delaware limited liability company

By: _____ (SEAL)
Katherine D. Roberson
Vice President

Doug Raiden
Of Counsel

ATTEST:

TENANT:
PG COUNTY PARTNERS, LLC,
a Maryland limited liability company

Name: NAVIN KAISANI
Title: WITNESS

By: _____ (SEAL)
Name: PERVEZ KAISANI
Title: President

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 32 of 67

# ADDENDUM TO DEED OF LEASE AGREEMENT

The undersigned, SILVER HILL II LLC ("Landlord") and PG COUNTY PARTNERS, LLC, t/a Little Caesars ("Tenant"), do hereby agree that the following additional provisions contained in this Addendum to Deed of Lease Agreement ("Addendum") are hereby made a part of, and incorporated in, the foregoing and annexed Deed of Lease Agreement (hereinafter collectively referred to as "Lease"), both dated M̲A̲R̲C̲H̲ ̲7̲, 2011, demising certain premises located at 5850 Silver Hill Road, Forestville, MD 20747 ("Premises") in the Silver Hill Plaza ("Shopping Center"). The provisions of this Addendum shall govern and control in any instances where the same are inconsistent or conflict with the provisions of the Deed of Lease Agreement, and any provisions of the Deed of Lease Agreement which are inconsistent or conflict with the provisions of this Addendum, even though not herein expressly referred to, shall be deemed appropriately amended or modified.

1.   MORTGAGEE APPROVAL CONTINGENCY

Tenant understands and agrees that this Lease is contingent upon the approval of Landlord's Mortgagee under an existing mortgage or deed of trust encumbering the Shopping Center. Therefore, upon the full execution of this Lease, Landlord shall endeavor to obtain the approval of said Mortgagee. Landlord shall have no obligation to deliver possession of the Premises to Tenant unless and until Landlord has obtained the approval of said Mortgagee. Notwithstanding anything to the contrary contained herein, if Landlord is unable to obtain the approval of said Mortgagee within thirty (30) days following the date of full execution of this Lease, then until the approval is obtained or waived by Landlord either party may terminate this Lease, said termination to be effective fifteen (15) days after the other party's receipt of written notice of termination; provided, however, that the termination right set forth in this section shall not be available to Tenant if Landlord notifies Tenant within fifteen (15) days after receiving Tenant's notice of termination that Landlord has obtained or waived said Mortgagee's approval.

2.   RESTAURANT PROVISIONS

(a)   Tenant shall not cause or permit objectionable (in Landlord's reasonable determination) smells or odors to emanate or dissipate from the Premises. If Landlord provides written notice to Tenant regarding the existence of any such objectionable smells or odors, then Tenant shall, within thirty (30) days following the date of said notice, take all steps as may be necessary in order to remediate or eliminate, to Landlord's reasonable satisfaction, said objectionable smells or odors, and any failure to do so on the part of Tenant shall constitute a Default hereunder. If Tenant fails to cure any such Default (within any applicable cure period), then Landlord shall have the right to enter the Premises and to undertake, at Tenant's sole cost and expense (including the cost of any related administration or management fees incurred by Landlord in connection therewith), any necessary repairs, modifications or other actions in order to remediate or eliminate said smells or odors.

(b)   Notwithstanding any provision to the contrary contained herein, in order to eliminate problems relating to sewer back-ups and health hazards, Tenant shall install grease traps in the Premises. Tenant shall not permit fats, oils, grease or other greasy substances to be discharged into the waste lines of the building in which the Premises is located and shall take all steps necessary to prevent such discharges from occurring. The type and manner of installation of all such grease traps shall be subject to Landlord's prior written approval. Tenant shall establish a bi-monthly cleaning program in regard to the grease traps, and Tenant shall use "Cloroben PT" or a similar type of chemical in all drain lines from the Premises, in accordance with the manufacturer's recommendations to help to dissolve any grease build-up. Tenant shall institute a regular, periodic extermination program for the Premises. Upon execution of this Lease, Tenant shall provide to Landlord copies of its cleaning service contract for the grease traps and its extermination service contract for the Premises in accordance with this Subsection. Tenant shall keep a log of all cleaning and service of the grease traps and of all disposal and/or pumping by its authorized cleaning service contractor. Tenant shall also provide and install, at Tenant's cost and expense, an NFPA 96 Code Compliant Grease Containment System as further described in Exhibit "D-2" hereto.

(c)   If Tenant shall at any time during the Term hereof be engaged in the retail sale of alcoholic beverages in the Premises, Tenant shall obtain all required licenses, permits and

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 33 of 67

governmental approvals relating thereto, and shall comply with all applicable federal, state and local laws, ordinances and regulations regarding such sale. Any failure by Tenant to obtain such licenses, permits, and approvals shall constitute a Default hereunder and shall not relieve Tenant of any of its other obligations pursuant to this Lease.

3.     CAM AND TAX LIMITS

       Notwithstanding any provision to the contrary contained in Section 6 or 7 of the Lease, the portion of the Common Area Contribution attributable to Controllable CAM Charges and the Tax Rent charged to Tenant for 2011 shall not collectively exceed Eight Hundred Ninety-Eight and 33/100 Dollars ($898.33) per month from and after the Rent Commencement Date. Thereafter, the Controllable CAM Charges for any year shall not exceed the Controllable CAM Cap for the year. For the 2012 Calendar Year, the "Controllable CAM Cap" means five percent (5%) over the actual Controllable CAM Charges for the entire 2011 Calendar Year. Thereafter, the "Controllable CAM Cap" shall mean five percent (5%) over the Controllable CAM Cap for the preceding Calendar Year. Nothing herein shall limit Tax Rent after 2011. "Controllable CAM Charges" means all Common Area Operating Costs except the cost of insurance, snow removal, security services, and utilities.

4.     EXCLUSIVE USE RIGHTS

       (a)     Provided that (i) Tenant is not in default under the Lease beyond any applicable cure period and (ii) Tenant's business in the Premises is open to the public and continuously operating as a restaurant that primarily sells pizza (unless closed in compliance with Section 15 of the Lease), Landlord hereby agrees not to lease, or permit the use of, any portion of the Shopping Center then owned by Landlord as a Competing Business (as hereinafter defined); provided, however, that Landlord shall not be obligated to violate any antitrust, unlawful competition, or unlawful restraint of trade law. For purposes of this Section 4, a "Competing Business" means a restaurant whose gross sales of prepared pizza from the Shopping Center exceed, in any Calendar Year, twenty percent (20%) of its total gross sales from the Shopping Center during the Calendar Year. For purposes of this Section 4, the term "prepared pizza" shall include pizza that is completely prepared for cooking but is sold to be cooked outside the Premises.

       (b)     The restriction contained in Subsection (a) above shall not apply (i) to present tenants or other occupants of the Shopping Center or to their successors, assigns, or replacements, (ii) to any person or entity that now or in the future owns, leases, or occupies ten thousand (10,000) or more square feet of floor area in the Shopping Center, or during the last six (6) months of the Term.

       (c)     Notice of Violation. Tenant shall notify Landlord in writing within thirty (30) days after discovering a violation of Subsection (a) above. Tenant shall be deemed to have waived Subsection (a) violations with respect to which Tenant does not provide such notice within the time required hereby.

       (d)     Notwithstanding any provision herein to the contrary, Tenant shall have no remedy for a violation of Subsection (a) above if:

              (i)     The tenant or other occupant violates a provision of its lease or occupancy agreement regarding its premises which either does not permit or specifically prohibits a use ("Prohibited Use") that violates the Competing Business restriction contained in Subsection (a) above;

              (ii)     Landlord provides notice of the lease or license agreement violation to such other tenant or occupant; and

              (iii)     Landlord commences an action or arbitration against such other tenant or occupant, and thereafter uses good-faith efforts to enforce its rights under such lease or license agreement and to obtain Judicial Relief (as hereinafter defined). For purposes hereof, "Judicial Relief" means a temporary restraining order, preliminary injunction, order of eviction, other court order, or order resulting from an arbitration proceeding enjoining the Prohibited Use; provided, however, that Landlord shall not be required to appeal any adverse decision denying Judicial Relief.

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 34 of 67

(e)     If Landlord violates the terms of Subsection (a) above and fails to cure the violation within ninety (90) days after receiving notice of the violation from Tenant pursuant to Subsection (c) above ("Exclusive-Use Cure Period"), then upon the expiration of the Exclusive-Use Cure Period, except as set forth in Subsection (d) above:

(i)     If Landlord committed the violation intentionally, Tenant may exercise all remedies therefor available under applicable law.

(ii)     Otherwise, until the violation is cured or as otherwise set forth herein, Minimum Rent shall be reduced to equal fifty percent (50%) of the amount otherwise payable under the Lease.  If the violation is not cured within one (1) year ("Reduced Rent Period") after the expiration of the Exclusive-Use Cure Period, except as set forth in Subsection (d) above, Tenant may terminate the Lease upon thirty (30) days' written notice given within thirty (30) days after the expiration of the Reduced Rent Period, but such notice may not be given after the violation is cured.  If the Lease is not terminated pursuant to this subsection, then upon the expiration of the Reduced Rent Period Minimum Rent shall revert to the full amount otherwise called for by the Lease.  Notwithstanding anything to the contrary in this Agreement, whenever Tenant is in default under the Lease beyond any applicable cure period, Minimum Rent shall not be reduced pursuant to this subsection, and Tenant may not give notice of the termination of the Lease under this subsection, while the default remains uncured, nor shall Tenant's deadline be extended for giving notice of termination.

This Subsection (e) contains Tenant's sole remedies against Landlord for a violation of the provisions of Subsection (a) above.

(f)     Tenant shall defend, indemnify, and hold harmless Landlord's Indemnitees, as defined in Section 24(a) of the Lease, from and against any claims, damages (including punitive or other exemplary damages), costs, and attorneys' fees which they may suffer or incur as a result of, or in any way arising out of, this Section 4, except for Landlord's violation of same.  The foregoing indemnification shall include, without limitation, the alleged violation of any federal or state antitrust law or similar statute.  Landlord shall promptly provide Tenant with a copy of any notice to Landlord given by any party threatening legal action regarding a violation of any antitrust law or similar statute and a copy of the complaint or similar document regarding legal proceedings alleging a violation of any such law or statute.

(g)     Subsection (a) above shall lapse and be of no further force and effect in the event that any action or proceeding is commenced against Landlord under a federal or state antitrust law or similar statute based on Subsection (a), or if Subsection (a) or a similar provision is held to be invalid or illegal by any court or agency of competent jurisdiction and all rights or appeals therefrom have been exhausted.

5.     USE PROHIBITIONS APPLICABLE TO LANDLORD

Landlord shall not lease any portion of the Shopping Center for use as a massage parlor or "adult" bookstore or for the sale or exhibition of pornographic material.

6.     INSPECTION OF LANDLORD'S BOOKS AND RECORDS

So long as Tenant is not in Default (beyond any applicable cure period), Tenant may inspect Landlord's books and records concerning the Common Area Contribution and Tax Rent, subject to the following terms and conditions: (i) Tenant shall give Landlord thirty (30) days' prior written notice of its intent to inspect;  (ii) the inspection shall be conducted during Landlord's normal business hours at Landlord's principal offices, wherever Landlord maintains the records, or at another reasonably convenient place in the county containing the Premises, as elected by Landlord; (iii) Tenant may inspect the books and records only once during each Calendar Year of the Term; (iv) if Tenant fails to commence an inspection of Landlord's books and records relating to the Common Area Contribution or to Tax Rent, as applicable, for a Calendar Year within ninety (90) days after receiving Landlord's annual reconciliation statement therefor, Tenant's right to inspect such books and records shall be deemed waived irrevocably; (v) Tenant must perform any inspection of Landlord's books and records diligently and continuously and complete or abandon the inspection within a reasonable time; (vi) Tenant shall produce a report summarizing its conclusions with respect to the inspection and shall provide a copy to Landlord, along with any

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 35 of 67

other reports prepared in connection with the inspection, within thirty (30) days following the completion of the inspection; and (vii) Tenant and its agents, employees, and contractors shall keep strictly confidential all information obtained from Landlord's books and records in connection with the inspection. If (i) the inspection is conducted in accordance with this section, (ii) the inspection accurately determines that Tenant overpaid the Common Area Contribution for the period covered by the inspection, and (iii) Tenant is not then in Default (beyond any applicable cure period), then Landlord shall refund the overpayment to Tenant (less any amounts then owed to Landlord) within thirty (30) days following Tenant's written request therefor. If the inspection accurately determines that Landlord overcharged Tenant for the Common Area Contribution for the period covered by the inspection by more than five percent (5%), then, provided that Tenant is not then in Default (beyond any applicable cure period), Landlord shall reimburse Tenant, within thirty (30) days following Tenant's written request therefor, for the reasonable and actual out-of-pocket cost paid to unaffiliated third parties for the inspection, not to exceed One Thousand and No/100 Dollars ($1,000.00), less any amounts then owed to Landlord.

7.     SHORT-TERM PARKING STALLS

While the Premises are operated as a Little Caesars, Landlord shall cause the two (2) parking stalls in the Shopping Center located the closest to the Premises' front entrance and available for such designation under applicable law to be designated for fifteen (15)-minute parking. Landlord shall not be obligated to enforce the foregoing time limit or to otherwise police the use of the parking stalls. Tenant may take reasonable steps to enforce its parking rights hereunder.

8.     SHAKERBOARDS

Notwithstanding the provisions of Section 14(a) of the Lease, while the Premises are operated as a Little Caesars and Tenant's business in the Premises is open to the public, Tenant may use the portion of the Common Areas shown on Exhibit "A" attached hereto as the "Shakerboard Area" and the sidewalks adjacent thereto during the times authorized below, for the display of standard Little Caesars shakerboard signs advertising Tenant's business in the Premises. Shakerboards may be displayed only by persons in Little Caesars uniforms. Tenant may not display more than two (2) shakerboards at a time. In the first thirty (30) days after Tenant's business in the Premises initially opens to the public following the Date of Delivery, Tenant may display shakerboards in the Shakerboard Area at any and all times during the Store Hours. Thereafter, Tenant shall be limited to a maximum of four (4) hours per day during the Store Hours. In no event may Tenant allow its shakerboard display personnel to verbally solicit, accost, threaten, provoke, engage in altercations with, or act aggressively towards Shopping Center invitees or to otherwise conduct themselves in a manner inconsistent with the operation of a family-oriented shopping center. Tenant shall cause its shakerboard display personnel to comply with rules and regulations reasonably adopted by Landlord from time to time upon written notice. Tenant may not use the sidewalks surrounding the Shopping Center for shakerboard signs except as set forth in this section. Landlord may revoke Tenant's rights under this section if Tenant violates this section repeatedly or if Tenant fails to cure any violation of this section within the cure period set forth in Section 28(a) of the Lease.

9.     REPAIR AND DEDUCT

If (i) Landlord fails to cure a default under the Lease within the time provided in Section 28(k) thereof, (ii) the basis of the default is Landlord's failure to perform maintenance inside the Premises or to maintain utility lines exclusively serving the Premises, and (iii) curing the default is necessary for the operation of Tenant's business, then Tenant may cure the default on five (5) days' notice and offset against the Rent due under the Lease its reasonable, out-of-pocket costs paid to unaffiliated third parties to effect the cure until recouped in full, provided that the offset in any month may not exceed one-half (1/2) of the Minimum Rent for the month.

**[SIGNATURES ON SUCCEEDING PAGE]**

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 36 of 67

IN WITNESS WHEREOF, the parties hereto have executed this Addendum to Deed of Lease Agreement under their respective seals as of the 7th day of MARCH _____, 2011.

WITNESS:

LANDLORD:
SILVER HILL II LLC, a Delaware limited liability company

Doug Raiden
Of Counsel

By: _____ (SEAL)
Katherine D. Roberson
Vice President

ATTEST:

TENANT:
PG COUNTY PARTNERS, LLC,
a Maryland limited liability company

Name: NAVIN KRISANI
Title: WITNESS

By: _____ (SEAL)
Name: PERVEZ KRISANI
Title: PRESIDENT

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 37 of 67



SILVER HILL PLAZA

DISTRICT HEIGHTS, MARYLAND

MARLBORO PIKE

CVS

Premises

FAMILY DOLLAR

ADVANCE AUTO

SHOPPERS FOOD WAREHOUSE

Shakerboard Area

SILVER HILL

LEASING PLAN

SITE PLAN OF SHOPPING CENTER AND PREMISES

EXHIBIT "A"

L:\LEASES\SILVERHILL\LITTLE CAESARS\Lease-A.doc
Rev. form 8/1/99
February 24, 2011

<u>**EXHIBIT "B"**</u>

**LANDLORD'S SIGN REGULATIONS AND SPECIFICATIONS**

Consisting of [five (5)] pages, attached to and made a part of Lease dated <u>MARCH 7</u>, 2011, between SILVER HILL II LLC ("<u>Landlord</u>") and PG COUNTY PARTNERS, LLC, t/a Little Caesars ("<u>Tenant</u>"), for Store No. 11 in the Silver Hill Plaza ("<u>Shopping Center</u>"), containing approximately 2,200 square feet.

I.    <u>Content</u>

The advertising or informative content of all signs shall be limited to letters designating the store name and/or type of store only (any such designation of the store type shall be by general descriptive terms and shall not include specific descriptions of the merchandise offered for sale, or the services rendered, therein) and shall contain no advertising devices, or slogans. Logos, symbols, crests, shields and marks other than the store name and/or type of store shall be permitted only upon Landlord's approval, which approval Landlord may withhold in its sole and absolute discretion.

II.    <u>Fascia Signs</u>

    A.    Tenant Signs: Anchor Tenant

        1.    Type – Internally illuminated channel letters.
        2.    Font/Letter Style – Tenant may use its corporate letter style as approved by Landlord.
        3.    Height – The height of the sign shall be determined by the Landlord.
        4.    Length - The sign shall be located no closer than eighteen inches (18") to the intersection of the lease line where it meets the sign band.
        5.    Depth - No sign or any part thereof shall project more than six inches (6") beyond the sign fascia provided by Landlord.
        6.    Mounting - All letters shall be flush mounted on the continuous sign band provided by Landlord.
        7.    Special Comment - The sign and any part thereof shall be centered left to right, top to bottom on the fascia canopy.

    B.    Tenant Signs: Small Shop

        1.    Type – Internally illuminated channel letters.
        2.    Font/Letter Style – Helvetica medium font, all capital letters.
        3.    Height – Maximum two feet, zero inches (2'-0").
        4.    Length - The sign shall be located no closer than eighteen inches (18") to the intersection of the lease line where it meets the sign band.
        5.    Depth – Five inches (5") maximum. No sign or any part thereof shall project more than five inches (5") beyond the sign fascia provided by Landlord.
        6.    Mounting - All letters shall be flush mounted on the continuous sign band provided by Landlord.
        7.    Special Comment - The sign and any part thereof shall be centered left to right, top to bottom on the fascia canopy. Signs may be on a two lines as approved by Landlord.

    C.    Materials

        1.    Letters - .040 aluminum returns with one-inch (1") silvatrim retainer.
        2.    Faces - Lexan SG400 Plexiglas.
        3.    Neon - Two (2) rows of thirteen (13) mm neon tubing for letters with a three inch (3") or larger stroke.
        4.    Special Materials – N/A
        5.    Special Comment – Each letter to have at least one (1) ¼" weep hole.

    D.    Colors

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 39 of 67

<ol>
<li>Letter Interiors – Sprayed white.</li>
<li>Returns & Trimcaps – Dark bronze.</li>
<li>Faces – Rohm & Haas #7328 white or Rohm & Haas #2283 red.</li>
<li>Raceway – N/A</li>
<li>Neon – White 6500 for signs with white faces. Red for signs with red faces.</li>
<li>Special Comment – N/A</li>
</ol>

E.     Electrical

<ol>
<li>Transformers - Sixty (60) m.a., housed within the fascia.</li>
<li>Power - 120 volts electric supply, to be supplied by Landlord to the back of each sign location. All secondary power connections must be made through P K Housings or equal to meet U.L. approved installation and material requirements. All secondary wiring jumps must be made through liquid tight greenfield conduit.</li>
<li>Special Comment – N/A</li>
</ol>

III.     <u>Undercanopy Signs</u>

A.     Type – Internally illuminated double-faced sign box.

B.     Materials – Aluminum cabinet provided by Landlord. Tenant shall install two (2) 3/16" Plexiglas faces.

C.     Colors – Letters shall be Rohm & Haas #7328 white. The background shall be dark bronze.

D.     Special Comment – Tenants may use their corporate letter styles with Landlord's prior approval. Prior to fabrication or installation of the sign faces, Tenant shall obtain Landlord's approval on such sign faces.

IV.     <u>Conditions</u>

The fabrication, installation, and operation of all signs shall be subject to the following restrictions:

A.     To secure Landlord's approval, three (3) color prints of each shop and elevation drawing of all proposed signs must be submitted to Landlord for final approval. The shop and elevation drawings must indicate the type and sizes of all lettering and background panels, their locations on the façade in relation to valance panels, floor levels, and soffits and store divider and building lines. Proposed location of license, union, and fabrication labels must be indicated. Landlord may require Tenant to provide a schematic of the sign detailing the form, colors, and finishes of all materials to be used therein. Wattages and light intensity must be specified. All "Approved As Noted" drawings must be resubmitted until marked "Approved" by Landlord. Incomplete drawings will be returned to Tenant without approval. Landlord agrees to give Tenant notice of Landlord's approval or the reason(s) for Landlord's disapproval of Tenant's design sketch for Tenant's signs within a reasonable period of time after the date on which Landlord shall receive all design sketches. Drawings shall be submitted to the following address:

Combined Properties, Incorporated
1255 22nd Street, NW, 6th Floor
Washington, DC 20037
Attn: Project Management Department

B.     All permanent Tenant signs, both as to design and shop and elevation drawings, must receive approval by Landlord prior to fabrication and installation. Any sign(s) installed without Landlord's prior written approval may be removed by Landlord at any time at Tenant's sole cost and expense.

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 40 of 67

C. Landlord has the specific right to refuse approval of any sign which, in its opinion, is not harmonious with the design standards of the Shopping Center whether or not such sign conforms to the specific sign criteria set out herein.

D. The letters on all signs shall be as specified herein or as otherwise approved by Landlord. The letters' illumination shall be contained wholly within the depth of the structure of the letters.

E. The character, design, color, and layout of all signs shall be subject to the approval of Landlord.

F. The signs and any part or parts thereof, except as otherwise expressly provided herein, shall be located within the physical limits of the storefront of the Premises, but in no case less than eighteen inches (18") from any leasehold line.

G. Signs shall not project beyond the exterior wall of the Premises by more than two inches (2"), if the sign is less than eight feet (8') above the finished floor line, or more than five inches (5"), if the sign is more than eight feet (8') above the finished floor line.

H. The maximum total area of each sign available to Tenant shall be determined by Landlord, provided same conforms to applicable codes and the requirements of governmental authorities.

I. Corner stores that have two (2) or more façades facing the Common Areas may have signs on each façade, subject to the requirements herein and the written approval of Landlord.

J. Except as otherwise expressly provided herein, no Tenant shall install more than one (1) sign.

K. No sign or any part thereof shall be located on the roof of the Premises.

L. No sign shall be placed in final position without the written approval of Landlord.

M. All signs shall be fabricated and installed in compliance with all applicable building and electrical codes and bear a U.L. label.

N. All necessary permits required for sign installation shall be obtained by Tenant or Tenant's contractor. Permit stamps shall be applied only as required by law. Tenant's sign contractor shall not begin fabrication of the sign(s) until it has received a permit.

O. No flashing, moving, flickering, and/or blinking illumination, animation, moving lights, and/or floodlight illumination shall be permitted.

P. No exposed neon, fluorescent and/or incandescent tubing or lamps, raceways, ballast boxes and/or electrical transformers, crossovers, conduit, and/or sign cabinets shall be permitted.

Q. The name and/or stamp of the sign contractor or sign company or both shall not be exposed to view, unless required by applicable law.

V. Prohibited Signs

The following type of signs is prohibited:

A. Paper signs and/or stickers utilized as signs inside or outside glass storefronts.

B. Temporary signs, except "For Rent" signs placed or approved by the Landlord and except signs required for emergency situations, irrespective of the composition of the sign material used therefore; provided that any sign permitted hereunder shall be lettered and designed to be in keeping with the character and quality of the Shopping Center, as determined by Landlord it its sole and absolute discretion.

C.     Painted or printed signs, except one (1) non-illuminated, small-scale "signature" sign or "store hours" sign, which is lettered on the glass portion of the store of a tenant and provided such sign does not exceed three inches (3") in height.  Also permitted are small credit card symbols.

D.     Moving signs, rooftop signs, parapet signs or pylon signs.

E.     Signs not lighted by electricity, which have luminous or reflecting letters.

VI.     <u>Interior Signs</u>

Notwithstanding the foregoing provisions, non-illuminated or non-luminous signs of metal and/or wood located within show windows or the interior of the stores shall be permitted, provided:

A.     Such signs are not affixed or attached to windows.

B.     Such signs contain only designations of merchandise or brand names and/or prices.

C.     Such signs are located next to merchandise on display within the show windows or the interior of stores.

D.     Such signs are reasonably sized, designed, and displayed.

E.     Such signs are approved in advance by Landlord.

# EXHIBIT "B-1"

## APPROVED EXTERIOR SIGN SPECIFICATIONS

---

### Sign Approval
Combined Properties, Incorporated

This review has been made only to confirm compliance with Landlord's minimum specifications for construction under the terms of the Lease Agreement. Neither Landlord nor Combined Properties, Incorporated as Managing Agent ("CPI") assumes any responsibility with regard to design, constructability, means, methods, or conformity with specific tenant requirements. Neither Landlord nor CPI is responsible for verification of dimensions, or compliance with applicable local, state, and/or federal codes, regulations and ordinances. Tenant's compliance with all comments noted on this document is mandatory. If any discrepancy exists between this document, Landlord's approval hereof, and the terms and conditions set forth in the Lease, the Lease shall govern, control and take precedence.

NO EXCEPTIONS: _____          APPROVED AS NOTED: __X__

EXCEPTIONS NOTED: (see attached mark-up)          REVISE AND RESUBMIT: _____

Project: SILVER HILL – space 11- Little Caesars

Combined Properties, Incorporated
As Managing Agent for: SILVER HILL II LLC

By: _____          Date: 2-22-2011
Thomas Williams, Tenant Coordinator

---

**Notes:**

- Color & Size of approved illuminated channel letters only - flush mounted no raceway.
- Center signs vertically & horizontally within lease line/sign band. Indicate all critical dimensions locating sign on building.
- Tenant to Patch/Repair/Paint building façade to match existing as required.
- Signage and all electrical work to comply with all codes. Certified Electrician to perform all electrical work.
- Tenant responsible for all permits and fees-and shall send Landlord copies of approved sign application/permit.
- Approved Certificate(s) of Insurance required for sign company and installation company (if sub-contractor performs work) prior to final approval.

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 43 of 67



35" Logo & 28" Face Lit Flush Mount Channel Letters
Centered 18" Horizontally & Vertically to L.L.

Wall 21.5' x 20' = 430 sq/ft
Sign 35" x 207.6255" = 41.26 sq/ft



# Face-illuminated Channels / w /LED

TAPCONS 1/4" X 2 1/4"
Minimum of 4 per letter

1/2" SEALTITE

PLEXI

TRANSFORMER

PRIMARY
HOOK UP

CBS Wall

Sign Lighted w/ LED Lights U.L. Approved  Sign Transformers
Connected to 110v / 20 amp Circuit w/ 24/7 Timer
Exterior Sign Electrical Meets U.L. Requirements
All Transformers, Connections, & Hardware Concealed

Sales Rep:  D.P.
Design:  D.P.

LEE DESIGNS

(941) 278-4245
Fax: 278-3912
3300 Palm Avenue
Ft. Myers, Fl. 33901

**This design is property of Lee Designs LLC and is not to be used in whole or part
by any other parties without written permission by Lee Designs LLC.**

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 45 of 67

## EXHIBIT "C"

## DESCRIPTION OF LANDLORD'S WORK

Tenant acknowledges that it has had an opportunity to inspect the Premises, and Tenant agrees to accept the Premises in "As Is" condition. Tenant understands and agrees that its acceptance of the Premises in "As Is" condition includes without limitation the condition of the structural elements and mechanical, plumbing, and utility systems of the Premises at the time of delivery of the Premises by Landlord to Tenant and shall not relieve Tenant of its obligations to perform all work to be performed by Tenant under this Lease including, but not limited to, the work described in Section 13 of this Lease and all work necessary to cause the Premises to be in compliance with all governmental codes and regulations nor shall the same eliminate the necessity of Landlord's approval of Tenant's Plans as required by Section 13 of this Lease or be deemed approval by Landlord under Section 13 of any existing features of the Premises. Landlord makes no representation or warranty with respect to the current condition of the Premises or the equipment/fixtures located therein. Tenant acknowledges and agrees that any and all repairs, improvements, etc., necessary for Tenant to conduct its business from the Premises shall be at the sole cost and expense of Tenant.

Notwithstanding the foregoing, Landlord shall:

(i)   Before delivering Premises to Tenant:
  - Place Premises' structural components in good condition and repair.

(ii)  Within sixty (60) days after the Date of Lease:
  - Replace Premises' HVAC units' belts and filters.
  - Install new water heater, 75-gallon minimum capacity.
  - Run electrical circuit to Premises' front wall, terminated at ceiling, with one (1) circuit breaker and a timer for Tenant's sign.

---

### EXHIBIT "C"

PROJECT:        Silver Hill Plaza
LANDLORD:       SILVER HILL II LLC
TENANT:         PG COUNTY PARTNERS, LLC
STORE NO:       11, Approx. 2,200 square feet
LEASE DATED:    MARCH 7 _____, 2011

---

## EXHIBIT "D"

## TENANT'S APPROVED PLANS TO BE
## PROVIDED IN ACCORDANCE WITH SECTION 13 OF THIS LEASE

| | |
|---|---|
| **_EXHIBIT "D"_** | |
| *PROJECT:* | *Silver Hill Plaza* |
| *LANDLORD:* | *SILVER HILL II LLC* |
| *TENANT:* | *PG COUNTY PARTNERS, LLC* |
| *STORE NO:* | *11, Approx. 2,200 square feet* |
| *LEASE DATED:* | *MARCH 7, 2011* |

## TENANT'S MINIMUM BUILDOUT REQUIREMENTS

Tenant shall, at a minimum, and at Tenant's sole cost and expense, perform and provide the following work, installations, finishes, fixtures and equipment with respect to the Premises, all of which shall be in accordance with Tenant's Plans and in compliance with all applicable laws, codes and regulations, including without limitation, the Americans With Disabilities Act, as amended ("ADA").

1.  Repair or replace as required for Tenant's use of the Premises (except to the extent included in Landlord's Work) the roof-mounted gas heating and electric cooling equipment with thermostat and controls located in the Premises, including all related electrical wiring and distribution system. Duct work shall be composed of sheet metal for normal distribution based on 350 square feet of Floor Area per ton of cooling and heating capacity. Supply air with flexible duct may be used if approved by Landlord in Landlord's sole discretion.

2.  Construct/install new toilet room(s), including new fixtures, accessories, and finishes, if necessary for Tenant's use of the Premises.

3.  Modify wet sprinkler fire protection system and smoke duct detectors to the extent required by applicable local codes and regulations and to accommodate Tenant's layout.

4.  Provide/install interior plumbing serving the Premises as necessary for Tenant's use.

5.  Provide/install/upgrade separate water meter as necessary for Tenant's use.

6.  Provide/install 2' x 4' fluorescent lay-in light fixtures with acrylic lenses, beyond any in place on the Date of Delivery, based on one (1) fixture per 80 square feet of Floor Area.

7.  Provide/install exposed 2' x 4' ceiling grid system, beyond that in place on the Date of Delivery, with lay-in acoustic tile throughout the Premises. Ceiling height shall be at least ten (10) feet above finished floor elevation, except in toilet room(s) in which the ceiling height shall be at least eight (8) feet above finished floor elevation.

8.  Provide/install emergency and exit lighting including strobes, smoke duct detectors, and sound enunciators, beyond any in place on the Date of Delivery, to the extent required pursuant to applicable local codes and regulations.

9.  Except to the extent included in Landlord's Work, provide/install/upgrade, as needed for Tenant's use, electrical service, including separate meter and socket, CT cabinet, main disconnect, panels and wiring, outlets, including service with respect to sales and stockroom, heating and air conditioning, toilet room(s), store sign(s), and trade fixtures, including all required raceways.

10. Prepare (and demolish, to the extent necessary) level, and smooth the concrete slab per Tenant's Plans to the extent required in order to accept floor finishes.

11. Provide/install new floor finishes per Tenant's Plans.

12. Construct all interior walls and partitions (to the extent required pursuant to Tenant's Plans), including drywall, tape, spackle and sanding to the extent required in order to accept wall treatment and wall finishes.

13. Provide/install all new wall finishes, per Tenant's Plans.

14. Provide/install all interior doors, door frames, and related hardware.

15. Provide/install telephone system and telephone service wiring, including conduit raceway.

16. Provide/install all new trade fixtures and related equipment (as further set forth in Tenant's Plans).

17. Except as otherwise specifically provided herein, Tenant shall remove, dispose of, and/or demolish all trash, debris, and trade fixtures of former tenants or occupants, if any, existing in the Premises on the Date of Delivery.

Tenant hereby assigns to Landlord any assignable warranties with respect to any of the foregoing construction, installations, fixtures and equipment, to the extent any such warranties are provided to Tenant by any contractors, manufacturers, or suppliers thereof.

Notwithstanding the foregoing, to the extent that any requirement set forth on this Exhibit "D-1" is in existence and/or completed upon Tenants receipt of possession of the Premises, Tenant shall not be obligated by this Exhibit "D-1" to replace or reconstruct the same unless necessary for Tenant's use of the Premises or required for compliance with applicable law. Nothing herein shall detract from Tenant's obligations under the Lease outside of this exhibit to repair or replace components of the Premises.

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 49 of 67

## EXHIBIT "D-2"

### GREASE GUARD SPECIFICATIONS

# *Property Protection*

*Copy This Page for Use In Your Tenant's Lease or New Construction Specifications*

-------------------------------------------------------------------

## NFPA 96 Code Compliant
## Grease Containment System Specification



**G2³ Grease Guard³– Grease Containment System Filter**

"Tenant shall install at its sole cost and expense around all roof exhaust fans the UL Listed G2³ Grease Guard³ Rooftop Defense Systems³ manufactured, installed and maintained by Facilitec³ Corporation. No substitutions will be allowed. Contact Facilitec³ Corporation at 180 Corporate Drive, Elgin, Illinois 60123. 800-284-8273. Tenant shall be responsible for obtaining a maintenance agreement for the upkeep of the G2³ Grease Guard³ Rooftop Defense Systems³ and a copy of the agreement must be submitted to the mall office annually."



**facilitec.**

180 Corporate Drive, Elgin, IL 60123
Phone: 847.931.9500   Fax: 847.931.9629
E-mail: f9facilitec-corp.com
www.facilitec-corp.com

### For Information Call Toll Free: 800.284.8273

L:\LEASES\SSILVERHILL\LITTLE CAESARS\L.case.8.doc
Rev. form 8/1/99
February 24, 2011

**EXHIBIT "E"**

**USE OF PREMISES RESTRICTIONS**

Consisting of two (2) pages, attached to and made a part of the Lease Agreement by and between SILVER HILL II LLC ("Landlord") and PG COUNTY PARTNERS, LLC t/a Little Caesars, ("Tenant"), dated _MARCH 7_, 2011.

Tenant hereby covenants that throughout the term of the Lease, including any renewals or extensions thereof, the Premises, in whole or in part, will not be used or operated directly or indirectly for any of the following uses or purposes:

(a)    A store whose primary business is that of a supermarket, which term shall include both a "conventional" and a "food warehouse" operation, or a convenience store offering for sale products normally found in grocery stores or supermarkets, a delicatessen with less than 50% of its floor area used for table space purposes, or any other store or shop using more than 25% of its floor area for the sale for off-premises consumption of one or more of the following: groceries, dairy products, foods, food products, meats, poultry or fish.

(b)    Any business selling medicines or drugs requiring the presence of a registered pharmacist.

(c)    A business which primarily operates as a nail salon.

(d)    A business which primarily operates as a variety store, variety discount store, or dollar store.

(e)    A bowling alley, bingo parlor, flea market, gameroom, massage parlor or adult bookstore, or a sit-down, full service restaurant.

(f)    A theater, bowling alley, bingo parlor, game arcade or other entertainment facility, bar, lounge, night club or school.

(g)    Any temporary garden center selling individual potted gift plants, cut flowers or hanging baskets.

(h)    Barber shop.

(1)    Manufacturing, warehouse, industrial, or residential purposes; the selling of new or used cars, trailers, or mobile homes; a billiard parlor; game room, arcade, or amusement center; flea market; massage parlor; OTB operation; adult bookstore or the sale or exhibition of pornographic material.

(2)    Bar other than as incidental to a permitted restaurant use; "disco" or nightclub; theatre; bowling alley; skating rink; amusement park; carnival; meeting hall; dance hall; sporting facility or health club; auditorium or other place of public access.

(3)    Any use which is obnoxious or burdensome due to the emission or conduction of noise, smoke, dust, or odors.

(4)    Any use which requires a special permit, special exception or variance any of which would have an adverse impact or impose any requirement upon the Shopping Center or which would require a reclassification of the Shopping Center.

(5)    Any use which would cause Landlord's parking facilities to be in violation of code requirements or require Landlord to increase the parking area or the number of parking spaces to meet code requirements.

(6)    Car wash; auto body shop; lube and oil change shop; service station; bingo hall or other gambling establishment; consignment store; closeout, bankruptcy/fire sales, or damaged merchandise store; second hand or used goods store; or head shop.

(7)    Church or funeral parlor; medical clinic; offices (except incidental to a retail operation or customarily found in similar shopping centers which provide services to the general public).

(8)    Laundry, dry cleaning, or shoe repair.

(9)    Training or educational facility, including but not limited to, a beauty school, barber college, reading room, place of instruction, or any other operation catering primarily to students or trainees rather than to customers.

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 51 of 67

(10)  Store which regularly sells merchandise commonly known as "odd lot," "close out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "overstock," "distressed," "bankruptcy," "fire sale," or "damaged."

In the event such covenants shall be breached, Tenant agrees to take those steps necessary to correct any such violation of such covenants and Landlord shall be entitled to injunctive relief or other appropriate remedy at law or in equity, by status or otherwise, as Landlord may elect.

**(52) Silver Hill Plaza**
**updated March 23, 2010**

# EXHIBIT "F"

## RULES AND REGULATIONS

Tenant expressly covenants and agrees to comply with the following:

(a)     Tenant shall:  (i) keep the inside and outside of all glass in the doors and windows of the Premises clean; (ii) keep all exterior storefront surfaces of the Premises clean; (iii) keep the Premises clean at all times, including removal of debris and loose trash; (iv) replace promptly, any cracked or broken plate or window glass of the Premises with glass of like kind and quality; (v) maintain the Premises in a clean, orderly and sanitary condition and free of insects, rodents, vermin and other pests;  (vi) keep the Premises free of garbage and trash and remove the same from  the Premises to containers approved by Landlord; and (vii) keep the outside areas adjacent to the Premises clean, orderly and free of rubbish, obstructions and merchandise.

(b)     Tenant shall not (i) suffer, allow or permit any vibration, noise, odor or flashing or bright light to emanate from the Premises or from any machine or other installation located therein, or otherwise suffer, allow or permit the same to constitute a nuisance to or interfere with the safety, comfort or convenience of Landlord or of any other occupant or user of the Shopping Center; (ii) display, paint, or place any handbills, bumper stickers or other advertising devices on any vehicle(s) parked in the parking area(s) of the Shopping Center, whether belonging to Tenant, its employee(s), or any other Person(s); (iii) solicit business or distribute any handbills or other advertising materials in the Common Areas; (iv) conduct or permit any activities in the Shopping Center that might constitute a public or private nuisance; (v) permit the parking of any vehicles or the placement of any displays, trash receptacles or other items, so as to interfere with the use of any driveway, fire lane, corridor, walkway, parking area, Shopping Center or any other Common Area; (vi) use or occupy the Premises or permit anything to be done therein which in any manner might cause injury or damage in or about the Shopping Center; (vii) use or occupy the Premises in any manner which is unreasonably annoying to other tenants in the Shopping Center unless directly occasioned by the proper conduct of Tenant's business in the Premises; (viii) permit the accumulation of garbage, trash or other waste in or around the Premises or the Shopping Center; or (ix) use the Premises or any part of the Shopping Center for any prohibited use listed on Exhibit "E" of the Lease.

(c)     Tenant shall use the plumbing within the Premises and the Shopping Center only for the purpose for which it is designed.  Tenant shall be solely responsible for any breakage, stoppage or damage resulting from its violation of this provision, and shall pay any costs associated therewith to Landlord upon demand.

(d)     Tenant shall install and maintain at all times a display of merchandise in the display windows (if any) of the Premises and shall keep such display windows well lighted during all Shopping Center business hours and for at least one (1) hour thereafter.  All articles, and the arrangement, style, color and general appearance thereof, shall be in keeping with the character and standards of the Shopping Center as reasonably determined by Landlord.

(e)     Tenant shall promptly obtain all permits, including occupancy permits, for the Premises or its use thereof.  Upon request, Tenant shall provide to Landlord a copy of all permits, including the certificate of occupancy.

(f)     Tenant shall not store, display, sell, or distribute any alcoholic beverages, dangerous materials, flammable materials, explosives, or weapons in the Premises, or conduct any unsafe activities therein, unless permitted pursuant to Section 1(n).

(g)     Except to the extent permitted in Section 1(n), Tenant shall not sell, distribute, display or offer for sale (i) any paraphernalia commonly employed in the use or ingestion of illicit drugs, or (ii) any X-rated, pornographic, lewd, or so-called "adult" newspaper, book, magazine, film, picture, video tape or video disk.

(h)     Tenant shall not operate or permit to be operated in the Premises any automatic teller machines, or any coin or token operated vending machine or similar device including telephones, lockers, toilets, scales, amusement devices, and machines for the sale of beverages, foods, candy, cigarettes or other goods.

L:\LEASES\SILVERHILL\LITTLE CAESARS\l.case.8.doc
Rev. form 8/1/99
February 24, 2011

1

(i)      No radio or television aerial or other device may be erected by Tenant on the roof or on any exterior wall of the Premises, or the building in which the Premises is located, without Landlord's prior written consent. Any aerial or other device installed without such written consent shall be subject to removal by Landlord, at Tenant's sole risk and expense, without notice.

(j)      Tenant shall locate its trash receptacle adjacent to the rear wall of the Premises or in such other area designated or approved by Landlord. In the event Landlord should determine, at its option, to require Tenant to use a designated trash receptacle or trash removal service ("service") in common with other tenants of the Shopping Center, Tenant shall use such designated service. Tenant further agrees to pay for such service directly to the provider of such service, or to reimburse Landlord for Tenant's pro-rata share of the cost of such trash receptacle or service within ten (10) days of being billed by Landlord; or, in the alternative, as determined by Landlord, the cost of such receptacle and service shall be included in the Shopping Center's Common Area Operating Costs.

(k)      Tenant shall not install, operate or maintain in the Premises, or in any other part of the Shopping Center, electrical equipment which would overload the electrical system or any part thereof beyond its capacity for proper, efficient and safe operation.

(l)      Tenant shall maintain the temperature in the Premises to prevent freezing of plumbing lines and fixtures.

(m)      Neither Tenant nor any of Tenant's employees, subtenants, agents, contractors, customers or invitees shall be permitted to keep or bring into the Premises any dogs (except trained seeing-eye dogs), cats, birds or other domestic or feral animals.

# EXHIBIT "G"

## LIST OF ENVIRONMENTAL REPORTS

1.  Property Condition Report
    By: Eckland Consultants, Inc.
    Dated: September 23, 1994

2.  Environmental Site Assessment
    By: Environmental Science & Engineering, Inc.
    Dated: September 1994

3.  Environmental Assessment
    By: Penniman & Browne, Inc.
    Dated: January 15, 1993

4.  Remediation Assessment Report
    By: Apex Environmental
    Dated: January 7, 2003

5.  Phase II Environmental Audit
    By: Penniman & Browne, Inc.
    Dated: July 29, 1993

6.  Phase I Environmental Assessment
    By: IVI Environmental, Inc.
    Dated: April 30, 1998

7.  Monitoring Well Sampling
    By: Engineering Consulting Services, LTD
    Dated: February 24, 1998

8.  Determination of Ground Water Elevations
    By: Engineering Consulting Services, LTD
    Dated: October 7, 1998

9.  Site Characterization Report – Former Dry Cleaner Facility
    By: Apex Environmental, Inc.
    Dated: July 7, 2000

10. Voluntary Cleanup Program Application
    By: Apex Environmental, Inc.
    Dated: December 7, 2000

11. Addendum to Site Characterization Report
    By: Apex Environmental Site Characterization Report
    Dated: July 10, 2001

12. No Further Requirements Determination
    By: Maryland Department of the Environment
    Dated: April 3, 2003
    Recorded: August 13, 2003

# GUARANTY AGREEMENT

THIS GUARANTY is made as of <u>MARCH 7</u>, 2011, by MARK WILLIAMS, an individual, and PERVEZ KAISANI and NAVIN KAISANI, husband and wife (collectively, "<u>Guarantor</u>"), whose addresses are set forth in <u>Section 9</u> hereof, to SILVER HILL II LLC ("<u>Landlord</u>"), having an address at c/o Combined Properties, 1255 22nd Street, N.W., 6th Floor, Washington, DC 20037, Attention: Legal Department.

WHEREAS, Landlord has leased to PG COUNTY PARTNERS, LLC t/a Little Caesars ("<u>Tenant</u>"), certain space (the "<u>Premises</u>") located in the shopping center known as Silver Hill Plaza, located at 5850 Silver Hill Road, Forestville, MD 20747 pursuant to that certain Deed of Lease Agreement lease by and between Landlord and Tenant of even date herewith (the "<u>Lease</u>");

WHEREAS, Guarantor is materially benefited by the Lease, and Guarantor's executing this Guaranty is a material inducement to Landlord to enter into the Lease.

NOW THEREFORE, Guarantor agrees with Landlord as follows:

1.     Subject to the terms and conditions set forth in <u>Sections 12</u> and <u>13</u> of this Guaranty, Guarantor unconditionally and irrevocably guarantees that all sums stated in the Lease to be payable by Tenant shall be promptly paid in full when due in accordance with the Lease and that Tenant's covenants thereunder shall be performed and observed timely. If any such sum or covenant is not timely paid, performed or observed, then Guarantor shall, promptly after notice thereof and prior to the expiration of any applicable grace period specified in the Lease, pay and/or perform the same regardless of (a) whether Landlord shall have taken any steps to enforce any rights against Tenant or any other person, (b) termination of the Lease as a result of Tenant's default, or (c) any other condition or contingency. Guarantor shall also pay all expenses of collecting such sum or any part thereof or of otherwise enforcing this Guaranty, including reasonable attorneys' fees. This Guaranty is irrevocable, unconditional, and absolute.

2.     Guarantor's obligations and covenants under this Guaranty shall in no way be affected or impaired by reason of the happening from time to time of any of the following, whether or not Guarantor has been notified thereof or consented thereto: (a) Landlord's waiver of the performance or observance by Tenant, Guarantor or any other party of any covenant or condition contained in the Lease or this Guaranty; (b) any extension, in whole or in part, of the time for payment by Tenant or Guarantor of any sums owing or payable under the Lease or this Guaranty, or of any other sums or obligations under or arising out of or on account of the Lease or this Guaranty, or the renewal of the Lease or this Guaranty; (c) any assignment of the Lease or subletting of the Premises or any part thereof; (d) any modification or amendment (whether material or otherwise) of any of the obligations of Tenant or Guarantor under the Lease or this Guaranty; (e) the doing or the omission of any act referred to in the Lease or this Guaranty (including the giving of any consent referred to in the Lease or this Guaranty); (f) Landlord's failure or delay to exercise any right or remedy available to Landlord or any action on the part of Landlord granting indulgence or extension in any form whatsoever; (g) the voluntary or involuntary liquidation, dissolution, sale of any or all of the assets, marshaling of assets and liabilities, receivership, conservatorship, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar proceeding affecting, Tenant or Guarantor or any of Tenant's or Guarantor's assets; (h) the release of Tenant or Guarantor from the performance or observation of any covenant or condition contained in the Lease or this Guaranty by operation of law; or (i) the release or modification of any of the obligations of any other guarantor of any of Tenant's obligations under the Lease.

3.     To the extent not prohibited by law, Guarantor waives (a) any right Guarantor may now or hereafter have to any hearing prior to the attachment of any real or personal property to satisfy Guarantor's obligations, (b) the benefits of any present or future constitution, statute or rule of law which exempts property from liability for debt, and (c) any right Guarantor may now or hereafter have against Landlord (or any other guarantor of Tenant's obligations under this Lease) with respect to this Guaranty (including without limitation any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of Landlord against Tenant or any current or future security with respect to the Lease), whether such right arises under an express or implied contract or by operation of law.

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 56 of 67

Guarantor shall not be a creditor (as defined in Title 11 of the United States Code) of Tenant by reason of the existence of this Guaranty.

4.  If the Lease is rejected or disaffirmed by Tenant or Tenant's trustee in bankruptcy pursuant to bankruptcy law or any other law affecting creditors' rights, then Guarantor shall, and does hereby (without the necessity of any further agreement or act), assume all obligations and liabilities of Tenant under the Lease to the same extent as if (a) Guarantor were originally named Tenant under the Lease, and (b) there had been no such rejection or disaffirmance. Guarantor shall confirm in writing such assumption promptly upon Landlord's request.

5.  Notice of acceptance of this Guaranty and notice of any obligations or liabilities contracted or incurred by Tenant are hereby waived by Guarantor. Guarantor hereby waives presentment, notice of dishonor, protest, and notice of non-payment or non-performance.

6.  This Guaranty (a) shall be governed by the laws of the jurisdiction in which the Premises are located, (b) may not be modified or amended except by a written agreement duly executed by the parties, and (c) shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, personal representatives, successors and assigns. Guarantor waives trial by jury in connection with any action, proceeding, or counterclaim with respect to this Guaranty. Guarantor waives any objection to the venue of any action filed in any court in the jurisdiction in which the shopping center is located and waives any right under the doctrine of forum non conveniens or otherwise to transfer any such action to any other court.

7.  Guarantor's liability shall be primary and joint and several with that of Tenant. Landlord may proceed against Guarantor under this Guaranty without initiating or exhausting any remedy against Tenant, and may proceed against Tenant and Guarantor separately or concurrently. If more than one natural person and/or entity shall constitute Guarantor, then the liability of each such person and/or entity shall be joint and several.

8.  Within five (5) days after Landlord's written request, Guarantor shall execute and deliver to Landlord a written statement certifying any matter concerning this Guaranty or the Lease as Landlord may request.

9.  Any notice which Landlord may elect to send shall be binding upon Guarantor if mailed to Guarantor's address set forth below, by United States certified or registered mail, return receipt requested or sent by reputable express courier service:

> Mark Williams
> 226 Crowne Woods Drive
> Birmingham, Alabama 35244
> 904-672-7330
>
> Pervez and Navin Kaisani.
> 1516 Astoria Drive
> Allen, Texas 75013-5819
> 214-383-9944

10.  Any indebtedness or obligation of Tenant to Guarantor now or hereafter existing (including without limitation any right of subrogation Guarantor may have as a result of payment hereunder) shall be, and hereby is, subordinated to the prior performance in full of Tenant's obligations under the Lease.

11.  From time to time upon ten (10) business days' prior written notice, Tenant shall submit such information regarding Guarantor's financial condition as Landlord may request, provided, however, that in the event Landlord requests audited financial information and none is in existence for the period of time requested by Landlord, Guarantor may submit financial information certified by Tenant as true and accurate in lieu thereof. Notwithstanding the foregoing, Guarantor shall only be required to submit financial information in connection with a bona fide sale or refinancing of the Shopping Center. Guarantor warrants that all such information heretofore or hereafter submitted is and shall be correct and complete.

12.  Notwithstanding anything to the contrary contained herein, Guarantor's liability under this Guaranty shall be limited to the sum of (i) all Rent due and payable, or which has

Case 17-03469-TOM7   Doc 145-1   Filed 11/07/17   Entered 11/07/17 14:04:10   Desc
Exhibit A   Page 57 of 67

accrued but as yet has not been billed, under the Lease through the date upon which Tenant vacates or Landlord obtains possession of the Premises, (ii) if Tenant vacates the Premises during the Original Term, or Landlord obtains possession of the Premises based in whole or in part on defaults by Tenant under the Lease occurring during the Original Term, an amount equal to (24) full months of Rent due and payable or which accrues under the Lease from and after the date upon which Tenant vacates or Landlord obtains possession of the Premises; otherwise, an amount equal to twelve (12) full months of Rent due and payable or which accrues under the Lease from and after the date upon which Tenant vacates or Landlord obtains possession of the Premises; not to exceed, in either of the foregoing scenarios in this part (ii), the Rent due and payable, or which accrues under the Lease, from the date upon which Tenant vacates or Landlord obtains possession of the Premises through the scheduled expiration of the Term as then extended, and (iii) all reasonable costs and expenses incurred by Landlord in collecting such sum or any part thereof, including reasonable attorneys' fees and court costs.

13.     Guarantor automatically shall be released from liability under this Guaranty whenever Tenant is released from liability under the Lease pursuant to Section 32(g) thereof, except for (subject to the limitations set forth in Section 12 hereof) (i) any amount for which the assigning Tenant remains liable under Section 32(g) of the Lease, (ii) any amount owed by Guarantor under this Guaranty for the period before the expiration of the Release Qualification Period, as defined in Section 32(g) of the Lease, and (iii) all reasonable costs and expenses incurred by Landlord in collecting such sum or any part thereof or of otherwise enforcing this Guaranty, including reasonable attorneys' fees and court costs.

IN WITNESS WHEREOF, Guarantor has caused this Guaranty to be executed as of the date first above written.

WITNESS:

Name:

Name: NAVIN KAISANI

Name: Pervez Kaisani

GUARANTOR:

MARK WILLIAMS

Social Security No.

Date: _3/2_____, 2011

PERVEZ KAISANI

Social Security No.

Date: _3/1_____, 2011

NAVIN KAISANI

Social Security No.

Date: _3/1_____, 2011

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 58 of 67

**LEASE MODIFICATION AGREEMENT**

THIS LEASE MODIFICATION AGREEMENT ("Agreement"), made this 28th day of July, 2011, is by and between SILVER HILL II LLC, a Delaware limited liability company ("Landlord"); PG COUNTY PARTNERS, LLC, a Maryland limited liability company t/a Little Caesars ("Tenant"); and MARK WILLIAMS, an individual, and PERVEZ KAISANI and NAVIN KAISANI, husband and wife (collectively, "Guarantor").

W I T N E S S E T H :

WHEREAS, Landlord and Tenant entered into that certain Deed of Lease Agreement dated March 7, 2011 which, together with all subsequent amendments and modifications thereto, is hereinafter collectively referred to as the "Lease," pursuant to which Tenant leases from Landlord approximately 2,200 square feet of floor area, commonly known as Store No. 11, located at 5850 Silver Hill Road, Forestville, MD 20747 ("Premises") in a shopping development known as Silver Hill Plaza;

WHEREAS, Guarantor guaranteed the obligations of Tenant under the Lease pursuant to that certain Guaranty Agreement dated March 7, 2011 ("Guaranty");

WHEREAS, the Original Term of the Lease ("Term") expires on March 31, 2016;

WHEREAS, Tenant has two (2) options to extend the Original Term for periods of five (5) years each; and

WHEREAS, the parties hereto desire to amend the Lease as hereinafter provided.

NOW, THEREFORE, in consideration of the foregoing and the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and the mutual promises contained herein, the parties hereto, intending to be legally bound, agree as follows:

1.     Recitals. Each of the foregoing recitals and representations forms a material part of this Agreement and is incorporated herein by this reference.

2.     Date of Delivery. Section 1(z) of the Lease is hereby deleted and the following is substituted in lieu thereof:

"(z)     Date of Delivery: February 28, 2011."

3.     Rent Commencement Date. Section 1(e) of the Lease is hereby deleted and the following is substituted in lieu thereof:

"(e)     Rent Commencement Date: March 29, 2011."

4.     Landlord's Work. "Install new water heater, 75-gallon minimum capacity" is hereby deleted from part (ii) of the final paragraph of Exhibit "C" to the Lease.

5.     Construction Allowance. Provided that Tenant (a) has completed Tenant's Work in accordance with the terms of the Lease; (b) has obtained a certificate of occupancy or non-residential use permit and has provided a true copy thereof to Landlord; (c) has provided to Landlord as-built drawings of the Premises and copies of all of Tenant's Permits, as defined in Section 13(c) of the Lease; (d) has opened the Premises for business in accordance with the terms of the Lease; (e) has performed all of its respective obligations under the Lease; and (f) is not then in Default and there exists no act, omission, or event which, with notice and the passage of time, would constitute a Default on the part of Tenant under the Lease; then Landlord shall pay to Tenant the sum of Three Thousand and No/100 Dollars ($3,000.00) ("Allowance") within thirty (30) days following the date that Landlord receives written notice from Tenant stating that Tenant has opened the Premises for business and confirming that Tenant has satisfied the requirements set forth in the foregoing clauses (a) through (f). At any time before paying the Allowance, Landlord may deduct therefrom amounts then owed by Tenant under the Lease.

6.     Guarantor. Guarantor hereby expressly agrees that it shall continue to be liable for the performance of all of Tenant's respective obligations under the Lease as amended hereby, including without limitation Tenant's obligation to pay Minimum Rent and all other charges and payments required to be made by Tenant under the Lease as amended hereby. Guarantor joins in the execution hereof to evidence its consent hereto and its continuing obligations with regard to the Lease as amended by this Agreement.

7.     Defined Terms. Except as otherwise defined herein, terms that are defined in the Lease shall have the same meanings when such terms are used in this Agreement.

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 59 of 67

8.    Time is of the Essence.  TIME IS OF THE ESSENCE WITH RESPECT TO EACH AND EVERY OBLIGATION ARISING UNDER THIS AGREEMENT AND THE LEASE.

9.    Binding Effect.  All of the covenants and agreements herein contained shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, representatives, successors, and assigns.

10.    Confirmation of Terms.  All of the terms, covenants, and conditions of the Lease, except as are herein specifically modified and amended, shall remain in full force and effect, and are hereby adopted and reaffirmed by the parties hereto.

IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and date set forth above.

WITNESS:

_____
Doug Raiden
Senior Real Estate Counsel

LANDLORD:
SILVER HILL II LLC, a Delaware limited liability company

By: _____
    Alexis S.C. Iszard
    Vice President

WITNESS:

_____
Name: WAZIR ALI KAISANI.
Title: V.P.

TENANT:
PG COUNTY PARTNERS, LLC, a Maryland limited liability company

By: _____
Name: PERVEZ KAISANI
Title: PRESIDENT

WITNESS:

_____
Name:

_____
Name:

_____
Name:

GUARANTOR:

_____
MARK WILLIAMS

_____
PERVEZ KAISANI

_____
NAVIN KAISANI

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 60 of 67

## <u>LEASE EXTENSION AND MODIFICATION AGREEMENT</u>

THIS LEASE EXTENSION AND MODIFICATION AGREEMENT ("<u>Agreement</u>"), made this *6th* day of *April*, 2016 ("<u>Effective Date</u>") is by and among SILVER HILL II LLC, a Delaware limited liability company ("<u>Landlord</u>"); PG COUNTY PARTNERS, LLC, a Maryland limited liability company, t/a Little Caesars ("<u>Tenant</u>"); and MARK WILLIAMS, an individual, and PERVEZ KAISANI and NAVIN KAISANI, husband and wife (collectively, "<u>Guarantor</u>").

### W I T N E S S E T H :

WHEREAS, Landlord and Tenant entered into that certain Deed of Lease Agreement dated March 7, 2011, which, together with all subsequent amendments and modifications thereto, is hereinafter collectively referred to as the "<u>Lease</u>," pursuant to which Tenant leases from Landlord approximately 2,200 square feet, commonly known as Store No. 11, located at 5850 Silver Hill Road, Forestville, Maryland 20747 as more particularly described in the Lease ("<u>Premises</u>") in a shopping development known as Silver Hill Plaza ("<u>Shopping Center</u>");

WHEREAS, Guarantor guaranteed the obligations of "Tenant" under the Lease pursuant to that certain Guaranty Agreement dated March 7, 2011 ("<u>Guaranty</u>");

WHEREAS, the current term of the Lease ("<u>Term</u>") expires on March 31, 2016;

WHEREAS, Tenant failed to exercise its option to extend the Term pursuant to <u>Section 3(b)</u> of the Lease and Tenant's option to extend the Term has expired; and

WHEREAS, the parties hereto desire to extend the Term and amend the Lease, all as hereinafter provided;

NOW, THEREFORE, in consideration of the foregoing and the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and the mutual promises contained herein, the parties hereto, intending to be legally bound, agree as follows:

1.     <u>Recitals</u>. Each of the foregoing recitals and representations forms a material part of this Agreement and is incorporated herein by this reference.

2.     <u>Lease Term</u>. The Term of the Lease is hereby extended for a period of five (5) Lease Years commencing on April 1, 2016 ("<u>First Extended Term</u>"). Accordingly, the Expiration Date (as defined in <u>Section 1(f)</u> of the Lease) shall be March 31, 2021, or the earlier date on which the Lease is terminated in accordance with the provisions of the Lease or pursuant to applicable law.

3.     <u>Minimum Rent</u>. Notwithstanding any provision contained to the contrary in the Lease, the Minimum Rent during the First Extended Term shall be as follows:

| Lease Years | Annually | Monthly |
|---|---|---|
| April 1, 2016 – March 31, 2021 | $52,800.00 | $4,400.00 |

4.     <u>Deletion of Renewal Option</u>. The parties acknowledge and agree that Tenant's options to renew the Lease for the Option Term, as set forth in <u>Sections 1(d)</u> and <u>3(b)</u> of the Lease, have expired without exercise and, therefore, Tenant's renewal options are hereby deemed null and void and <u>Sections 1(d) and 3(b)</u> of the Lease, together with all references to the "Option", "First Option Term", "Second Option Term", Option Terms, and/or "Option Term" are hereby deleted in their entirety.

5.     <u>Rent Payments</u>.  Rent payments due under the Lease shall continue to be paid in the intervals and manner required under the Lease and shall be made payable to Landlord at:

> Silver Hill II LLC
> P.O. Box 742685
> Atlanta, GA 30374-2685

6.     <u>Notice Address</u>.

<u>For Landlord</u>: All notices and correspondence (except for Rent payments) under the Lease addressed to Landlord shall be sent to Landlord at:

> Silver Hill II LLC
> c/o Combined Properties, Incorporated
> 1025 Thomas Jefferson Street NW
> Suite 700 East

1

Silver Hill Plaza/Little Caesars/Extension.2a

Case 17-03469-TOM7    Doc 145-1    Filed 11/07/17    Entered 11/07/17 14:04:10    Desc
Exhibit A    Page 61 of 67

Washington, D.C. 20007
Attention: Legal Department

For Tenant: All notices and correspondence under the Lease addressed to Tenant shall be sent to Tenant at:

PG County Partners, LLC
c/o Mark Williams
P.O. Box 551267
Jacksonville, FL 32255

7.    Condition of the Premises.   The parties acknowledge that Tenant is currently in occupancy of the Premises, has inspected the same and the Shopping Center and is fully familiar with the physical condition thereof and Tenant agrees to accept the Premises at the first day of the First Extended Term in its then "as is" condition.   Tenant acknowledges and agrees that Landlord shall have no obligation to do any work in or to the Premises in order to make it suitable and ready for continued occupancy and use by Tenant.

8.    Insurance. The first sentence of Section 9(d) of the Lease is hereby amended to add the words "and contractual liability" after the words "completed operations".

9.    Limitation of Landlord's Liability.  Section 25 of the Lease is hereby deleted in its entirety and replaced with the following:

"25.   LIMITATION OF LANDLORD'S LIABILITY

In no event shall Landlord be liable to Tenant for loss of business, special or consequential damages or lost profits.  It is understood and agreed that the liability of Landlord hereunder shall be limited solely to the assets and property of the Shopping Center; that no general partner of Landlord, nor any officer, director, agent or employee of Landlord shall be personally liable with respect to any claim arising out of or related to this Lease; and that a deficit capital account of a partner or member of Landlord shall not be deemed an asset or property of the Shopping Center.  Further, Landlord shall be liable under this Lease only for obligations accruing while it is the owner of a fee or leasehold estate in the Shopping Center.  If Landlord should sell or otherwise transfer Landlord's interest in the Shopping Center, then it shall be deemed without further documentation that the purchaser or transferee has assumed Landlord's obligations under this Lease from and after the date of transfer.  Tenant agrees that Landlord shall, after such sale or transfer of Landlord's interest, have no liability to Tenant under this Lease or any modification or amendment thereof, or extensions or renewals thereof, except for such liabilities which might have accrued prior to the date of such sale or transfer of Landlord's interest to such purchaser/transferee."

10.    Holdover. Section 33 of the Lease is hereby deleted in its entirety and replaced with the following:

"33.   HOLDING OVER

(a)    This Lease shall terminate on the Expiration Date pursuant to the terms of this Lease without the necessity of notice from either Landlord or Tenant.

(b)    If Tenant holds over after the Expiration Date without the express written consent of Landlord, such tenancy shall be a tenancy at sufferance, and shall not constitute a renewal hereof or an extension for any further term.  In such case Landlord shall be entitled to re-enter the Premises without notice (any notice to quit or of re-entry being expressly waived) and Tenant shall be subject to immediate eviction.  During such hold over, all the terms and conditions set forth in this Lease shall apply except that Tenant shall pay to Landlord a use and occupancy fee calculated at a daily rate equal to the greater of (i) two hundred percent (200%) of the Minimum Rent applicable during the last rental period of the Term under this Lease (calculated on a per diem basis) or (ii) the fair market rental rate for the Premises as of the commencement of such holdover period, plus all other Additional Rent and other charges under the Lease (the "Holdover Payment").  Landlord may simultaneously collect the Holdover Payment from Tenant and file suit to recover possession of the Premises, and Landlord's acceptance of such Holdover Payment shall not be deemed to extend the term of this Lease, to create a new month-to-month or year-to-year tenancy, or as a waiver of Landlord's rights to recover possession of the Premises immediately on the Expiration Date of this Lease.  Despite Landlord's acceptance of such Holdover Payment, Tenant hereby waives any requirement of a thirty (30) days' notice to quit the Premises and any and all other notice to quit.  Nothing contained in this Section 33 shall be construed as consent by Landlord to any holding over by Tenant, and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or sooner termination of this Lease.  The provisions of this Section 33 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law.

(c)    Tenant acknowledges that any holding over without Landlord's express written consent may compromise or otherwise affect Landlord's ability to enter into new leases with prospective tenants

2

regarding the Premises and/or otherwise cause Landlord to incur damages. Therefore, if Tenant fails to surrender the Premises upon the Expiration Date, in addition to any other liabilities to Landlord accruing therefrom, and in addition to the Holdover Payment, Tenant shall protect, defend, indemnify and hold Landlord harmless from and against all damages and claims resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded upon such failure to surrender, and any losses suffered by Landlord, including lost profits, resulting from such failure to surrender."

11.    Use Prohibitions. Paragraph 5 of the Addendum to the Lease is hereby deleted in its entirety and replaced with the following:

"5.    USE PROHIBITIONS APPLICABLE TO LANDLORD

Landlord shall not lease any portion of the Shopping Center for use as a massage parlor (except that upscale, legitimate retail operations such as, by way of example, but not limitation, Massage Envy or Massage Heights, day spas or similar therapeutic massage retailers whether as a primary use or ancillary to another operation or chiropractors shall not be prohibited in the Shopping Center) or "adult" bookstore or for the sale or exhibition of pornographic material."

12.    Miscellaneous Lease Revisions. Section 32(d) of the Lease is hereby modified by deleting the reference to "One Thousand and 00/100 Dollars ($1,000.00)" and replacing it with "Two Thousand Five Hundred and 00/100 Dollars ($2,500.00)".

13.    Landlord's Automatic Right to Terminate. Tenant acknowledges and agrees that if at any time during the First Extended Term, Tenant is late in the payment of Rent (regardless of cure) by an amount which is greater than two (2) months of the then Minimum Rent, then the foregoing shall be deemed an automatic Default under the Lease. Tenant shall have no right of redemption and Landlord, in addition to all other rights and remedies it has under the Lease, at law and/or in equity, shall have the right to terminate the Lease upon notice to Tenant.

14.    Guarantor. Guarantor hereby expressly agrees that it shall continue to be liable for the performance of all of Tenant's respective obligations under the Lease, as amended hereby and pursuant to any further amendments, modifications, extensions or renewals of the Lease, including without limitation, Tenant's obligation to pay Minimum Rent, Additional Rent and all other charges and payments required to be made by Tenant under the Lease, as amended hereby and pursuant to any further amendments, modifications, extensions or renewals of the Lease. Guarantor joins in the execution hereof to evidence its consent hereto and its continuing obligations with regard to the Lease.

15.    Brokers. Except for John Marigliano of Renaud Consulting, whose address is 8605 Westwood Center Drive, Suite 309, Vienna, VA 22182, to whom Landlord has agreed to pay a commission under the terms of a separate agreement, each of the parties hereto represents and warrants that there are no brokerage commissions or finder's fees of any kind due to anyone other than said broker in connection with the execution of this Agreement, and each party hereto agrees to indemnify the other parties against, and hold them harmless from, all liabilities arising from any and all claims of any other persons or entities for any brokerage commissions or finder's fees of any kind arising out of this Agreement (including any reasonable counsel fees incurred in connection therewith) by virtue of having dealt with the indemnifying party with regard to this Agreement. LANDLORD'S AGREEMENT TO PAY ANY BROKERAGE COMMISSION OR FINDER'S FEE IN CONNECTION WITH THIS AGREEMENT SHALL NOT BE DEEMED TO CREATE ANY OBLIGATION ON THE PART OF LANDLORD TO PAY ANY BROKERAGE COMMISSION OR FINDER'S FEE IN CONNECTION WITH ANY FUTURE SUBLEASE, RENEWAL, ASSIGNMENT, MODIFICATION OR AMENDMENT OF THE LEASE.

16.    Authority. Each party hereto represents and warrants to the other that it has full power and authority to enter into and perform its obligations under this Agreement and that the person executing this Agreement on behalf of such party is fully empowered and authorized to do so.

17.    Updated Exhibit "E." Exhibit "E" of the Lease is hereby deleted and Exhibit "E" attached to this Agreement is hereby substituted in lieu thereof.

18.    Defined Terms. Except as otherwise defined herein, terms that are defined in the Lease shall have the same meanings when such terms are used in this Agreement.

19.    Time is of the Essence. TIME IS OF THE ESSENCE WITH RESPECT TO EACH AND EVERY OBLIGATION ARISING UNDER THIS AGREEMENT AND THE LEASE.

20.    Binding Effect. All of the covenants and agreements herein contained shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, representatives, successors, and assigns.

21.    Confirmation of Terms; Conflict. All of the terms, covenants, and conditions of the Lease, and the Guaranty, except as are herein specifically modified and amended, shall remain in full force and

3

Silver Hill Plaza/Little Caesars/Extension.2a

effect, and are hereby adopted and reaffirmed by the parties hereto. In the event of any conflict between the provisions of this Agreement and the Lease, the provisions of this Agreement shall control.

      22.    <u>Merger</u>.  The Lease, as modified by this Agreement, represents the entire understanding between Landlord and Tenant with regard to the matters addressed herein and may only be modified by written agreement executed by Landlord and Tenant. Any prior understandings or representations between the parties hereto, oral or written, with regard to the matters addressed herein, other than the Lease, are hereby merged herein. Tenant acknowledges that neither Landlord nor any representative or agent of Landlord has made any representation or warranty, express or implied, as to the physical condition, state of repair, layout, footage or use of the Premises or any matter or thing affecting or relating to the Premises except as specifically set forth in this Agreement.

      23.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, which when taken together shall constitute one original of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGE FOLLOWS]

Silver Hill Plaza/Little Caesars/Extension.2a

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under their respective seals as of the date set forth above.

WITNESS:

_____
Lilia Komeva
Staff Attorney

LANDLORD:

SILVER HILL II LLC,
a Delaware limited liability company

By: _____
Katherine D. Bonnafe
Vice President

WITNESS/ATTEST:

_____
Name: Nicole O'Neil
Title:

TENANT:

PG COUNTY PARTNERS, LLC,
a Maryland limited liability company

By: _____
Name: MARK WILLIAMS
Title: COO

WITNESS:

_____
Name: Nicole O'Neil

_____
Name: Navin Kaisani

_____
Name: Pervez Kaisani

GUARANTOR:

_____
MARK WILLIAMS

_____
PERVEZ KAISANI

_____
NAVIN KAISANI

5

**EXHIBIT "E"**

**USE OF PREMISES RESTRICTIONS**

Tenant hereby covenants that throughout the term of the Lease, including any renewals or extensions thereof, the Premises, in whole or in part, will not be used or operated directly or indirectly for any of the following uses or purposes:

(a)     A store whose primary business is that of a supermarket, which term shall include both a "conventional" and a "food warehouse" operation, or a convenience store offering for sale products normally found in grocery stores or supermarkets, a delicatessen with less than 50% of its floor area used for table space purposes, or any other store or shop using more than 25% of its floor area for the sale for off-premises consumption of one or more of the following: groceries, dairy products, foods, food products, meats, poultry or fish.

(b)     Any business selling medicines or drugs requiring the presence of a registered pharmacist.

(c)     A business which primarily operates as a nail salon.

(d)     A business which primarily operates as a variety store, variety discount store, or dollar store.

(e)     A bowling alley, bingo parlor, flea market, gameroom, massage parlor or adult bookstore, or a sit-down, full service restaurant.

(f)     A theater, bowling alley, bingo parlor, game arcade or other entertainment facility, bar, lounge, night club or school.

(g)     Any temporary garden center selling individual potted gift plants, cut flowers or hanging baskets.

(h)     [Intentionally omitted]

(i)     A tenant whose primary business is the sale of submarine and deli style sandwiches.

(1)     Manufacturing, warehouse, industrial, or residential purposes; the selling of new or used cars, trailers, or mobile homes; a billiard parlor; game room, arcade, or amusement center; flea market; massage parlor; OTB operation; adult bookstore or the sale or exhibition of pornographic material.

(2)     Bar other than as incidental to a permitted restaurant use; "disco" or nightclub; theatre; bowling alley; skating rink; amusement park; carnival; meeting hall; dance hall; sporting facility or health club; auditorium or other place of public access.

(3)     Any use which is obnoxious or burdensome due to the emission or conduction of noise, smoke, dust, or odors.

(4)     Any use which requires a special permit, special exception or variance any of which would have an adverse impact or impose any requirement upon the Shopping Center or which would require a reclassification of the Shopping Center.

(5)     Any use which would cause Landlord's parking facilities to be in violation of code requirements or require Landlord to increase the parking area or the number of parking spaces to meet code requirements.

(6)     Car wash; auto body shop; lube and oil change shop; service station; bingo hall or other gambling establishment; consignment store; closeout, bankruptcy/fire sales, or damaged merchandise store; second hand or used goods store; or head shop.

(7)     Church or funeral parlor; medical clinic; offices (except incidental to a retail operation or customarily found in similar shopping centers which provide services to the general public).

(8)     Laundry, dry cleaning, or shoe repair.

(9)     Training or educational facility, including but not limited to, a beauty school, barber college, reading room, place of instruction, or any other operation catering primarily to students or trainees rather than to customers.

E-1

Silver Hill Plaza/Little Caesars/Extension.2a

(10)    Store which regularly sells merchandise commonly known as "odd lot," "close-out," "clearance," "discontinued," "cancellation," "second," "factory reject," "sample," "floor model," "demonstrator," "obsolescent," "overstock," "distressed," "bankruptcy," "fire sale," or "damaged."

In the event such covenants shall be breached, Tenant agrees to take those steps necessary to correct any such violation of such covenants and Landlord shall be entitled to injunctive relief or other appropriate remedy at law or in equity, by status or otherwise, as Landlord may elect.

**(52) Silver Hill Plaza**
**Updated June 3, 2015**